**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MELISSA MCFADDEN, | |
| | Case No. 2:18-cv-544 |
| Plaintiff, | |
| | Judge Edmund A. Sargus, Jr. |
| v. | |
| | Magistrate Judge Kimberly A. Jolson |
| CITY OF COLUMBUS, | |
| Defendant. | **DEFENDANT CITY OF COLUMBUS'** **MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Defendant City of Columbus respectfully moves this Court for summary judgment on all claims asserted against it by Plaintiff Melissa McFadden. A memorandum in support of this motion is attached. Supporting exhibits have been filed separately.

Respectfully submitted,

/s/ Susan E. Williams
Susan E. Williams (0073375)—LEAD
Westley M. Phillips (0077728)
Assistant City Attorneys
CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY
77 North Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
sewilliams@columbus.gov
wmphillips@columbus.gov

Attorneys for Defendant City of Columbus

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

I.      PRELIMINARY STATEMENT ............................................................................. 1

II.     SUMMARY OF THE ARGUMENT ...................................................................... 1

III.    STATEMENT OF FACTS ...................................................................................... 2

        A.      THE ALLEGATIONS OF RACIAL DISCRIMINATION .......................................2

        B.      THE INTERNAL AFFAIRS INVESTIGATION ................................................10

        C.      THE TEMPORARY REASSIGNMENT TO THE PROPERTY ROOM .................11

        D.      THE CHIEF'S RECOMMENDATION .............................................................15

        E.      THE SAFETY DIRECTOR'S DECISION ........................................................16

        F.      PLAINTIFF'S EXPERT WITNESS LOU REITER .........................................16

        G.      PLAINTIFF MELISSA MCFADDEN .............................................................18

IV.     LEGAL STANDARD ........................................................................................... 19

V.      LAW & ARGUMENT ........................................................................................... 20

        A.      PLAINTIFF'S TITLE VII CLAIMS .............................................................20

                1.      Title VII Race Discrimination .................................................. 20

                2.      Title VII Retaliation ................................................................. 35

        B.      42 U.S.C. § 1983 ......................................................................................37

                1.      First Amendment Retaliation ................................................. 39

                2.      Equal Protection ...................................................................... 39

                3.      Due Process ............................................................................. 40

        C.      PLAINTIFF'S WORK INJURY CLAIM IS PRECLUDED ..........................41

VI.     CONCLUSION ..................................................................................................... 42

CERTIFICATE OF SERVICE ......................................................................................43

## MEMORANDUM IN SUPPORT

## I.     PRELIMINARY STATEMENT

This is an employment discrimination and retaliation case brought by Plaintiff Melissa McFadden, a lieutenant with the Columbus Division of Police ("CPD"), and arising in large part out of an investigation that was conducted into allegations that Plaintiff discriminated against her subordinates on the basis of their race. Plaintiff now asserts that she was discriminated against on the basis of her race and retaliated against for helping another officer file a racial discrimination claim in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and Ohio Revised Code § 4112.02 (the Ohio Civil Rights Act, or "OCRA"). Plaintiff also asserts that Defendant City of Columbus ("the City") violated her due process and equal protection rights and the enjoyment of her employment contract because of her race. For the reasons that follow, the City respectfully asks the Court for summary judgment on all of Plaintiff's claims.

## II.    SUMMARY OF THE ARGUMENT

The City is entitled to summary judgment on Plaintiff's Title VII and OCRA discrimination claims. (pp. 20-42). Plaintiff cannot establish a *prima facie* case of race discrimination because she cannot show that she suffered an adverse employment action (pp. 21-24) *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1999). Plaintiff also cannot show that individuals outside of her protected class were treated more favorably (pp. 24-32) *Wright v. Murray Guard, Inc.,* 455 F.3d 702 (6th Cir. 2006). The City had legitimate, nondiscriminatory reasons for the investigation, the temporary reassignment, and the Chief's recommendation. (pp. 32-35) *Newman v. Fed. Express Corp.*, 266 F.3d 401 (6th Cir. 2001). Plaintiff also cannot produce sufficient evidence that the City's reasoning was pretextual. (p. 35) *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826 (6th Cir. 2012)

1

The City is entitled to summary judgment on Plaintiff's Title VII Retaliation claim. Plaintiff cannot present sufficient evidence of a causal connection between the Falacia Dragin claim and any alleged adverse employment action or any alleged "severe or pervasive retaliatory harassment." (pp. 35-37) *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784 (6th Cir. 2000).

Regarding Plaintiff's claims brought pursuant to 42 U.S.C. § 1983, the City is entitled to summary judgment on any First Amendment retaliation claim because Plaintiff cannot present sufficient evidence of a causal connection between the Dragin claim and the City's response to the allegations made by Tate, Morefield, and Johnson. (pp. 37-39) *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580 (6th Cir. 2008). The City is entitled to summary judgment on any Equal Protection claim because Plaintiff cannot show a discriminatory purpose. (pp. 39-40) *Bennett v. City of Eastpointe*, 410 F.3d 810 (6th Cir. 2005). The City is entitled to summary judgment on any Due Process claim because Plaintiff was not deprived of a property interest and she was provided notice and opportunity to be heard. (pp. 40-41) *Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000).

Finally, to the extent that Plaintiff is attempting to re-litigate her work injury claims she is precluded by Ohio law. (pp. 41-42) *Ritchie v. Dravo Corp.*, 585 F. Supp. 1455 (S.D. Ohio 1984).

## III.     STATEMENT OF FACTS

### A.     THE ALLEGATIONS OF RACIAL DISCRIMINATION

In early 2017, CPD Commander Rhonda Grizzell was assigned to CPD's Zone 2. GRIZZELL DEP. 10-11 (R.35-4 #1723-24). She began visiting precinct roll calls and learned of second shift's limited staffing concerns. *Id*. at 42, 59 (R.35-4 #1755, 1772). Plaintiff was Zone 2's second shift lieutenant. *Id*. at 44-45 (R.35-4 #1757-58). On March 1, 2017, while Commander Grizzell was at 13 Precinct Substation, CPD Officer Jeffrey Kasza suggested she talk to Officers Levon Morefield and Anthony Johnson on why they left Zone 2. *Id*. at 70 (R.35-4 #1783). Commander Grizzell provided Kasza her phone number and said if they wished, they could call her. *Id*. at 70 (R.35-4

2

#1783). That same evening, CPD Sergeant Andre Tate approached Commander Grizzell as she was eating in the substation and advised her that on January 25, 2017, while Plaintiff gave him his 2016 Performance Evaluation, she told him his rating would have been lower, but she did not want to put that in his file because she did not "believe in black on black crime." GRIZZELL DEP. 23-24, 70 (R.35-4 #1736-37, 1783); TATE DEP. 30-31, 39-41, 44, 49-50 (R.35-12 #2866-67, 2875-77, 2880, 2885-86). According to Tate, "…she gave me a performance evaluation that was higher than it would have been if I was white." TATE DEP. 28 (R.35-12 #2864). He testified at deposition:

> Q. So you believe that what she was talking about was discriminating in your favor because you were black; right? That's what you believe?
>
> A. Yes.
>
> Q. Now, and you believed that on January 25, of 2017; correct?
>
> A. Yes.
>
> Q. All right. So what she was doing was a violation of the Division's policies against discrimination; correct?
>
> A. I would guess that was. Yes.

*Id*. at 34-35 (R.35-12 #2870-71).

> Q. What was it that made you feel like you needed to tell Commander Grizzell that? Why did you want to tell her?
>
> A. Because it was wrong.

*Id*. at 44 (R.35-12 #2880).

In response to what she had been told by Sergeant Tate, Commander Grizzell contacted CPD's Human Resources Manager Miranda Vollmer. GRIZZELL DEP. 22-23 (R.35-4 #1735-36, 1783). Vollmer told Grizzell that the suspected EEO violation needed to be written up and reported. *Id*. at 24 (R.35-4 #1737). According to Grizzell, "And then Anthony Johnson and Levon

Morefield called me late on March 1 and into the morning of March 2 and detailed some very troubling things to me." *Id*. at 69-70 (R.35-4 #1782-83).

Officer Morefield called Commander Grizzell after being told that she wanted to know why Morefield "and four other officers who were pretty well respected in that area left the zone." MOREFIELD DEP. 63-65 (R.35-9 #2444-2446). Morefield left his Zone 2 assignment in approximately December, 2016. *Id*. at 62 (R.35-9 #2443). Prior to that time, his Zone 2 chain of command consisted of Sergeant Christopher Odom, Plaintiff, and Commander Mark Gardner. *Id*. at 81 (R.35-9 #2462). Morefield testified that he knew "pretty early on" that Plaintiff was racist. *Id*. at 87, 91 (R.35-9 #2468, 2472). According to Morefield, during an early conversation with Plaintiff, she said something along the lines of, "Nigga, if you don't call me Melissa." *Id*. at 48-49 (R.35-9 #2429-30). "[B]y September 2016, I was in definite belief that she was racist towards white people." *Id*. at 94 (R.35-9 #2475). Morefield, whose wife is white, testified:

> Q. So at what point could you say in your belief that Lieutenant McFadden was a racist?
>
> A. When she would say things to me about white officers not being my brothers, and they're not happy that I'm fucking one of theirs, and things along those lines.
>
> Q. And when about was that? Spring 2016, fall 2016?
>
> A. I'd say that was fall of 2016 following my marriage.
>
> Q. And we'll get into that in a little bit a little more. So it's safe to say by fall 2016, you had made the conclusion that Lieutenant McFadden was a racist?
>
> A. Absolutely.

*Id*. at 92-93, 130 (R.35-9 #2472-73, 2511).

> Q. So did you consider this at the time it was made to be a racist statement?
>
> A. Absolutely.

*Id*. at 130 (R.35-9 #2511). When Morefield left Zone 2, Plaintiff told him, "Don't forget you're nothing but a stupid nigga, and they're going to treat you like the stupid nigga you are!" *Id*. at 153-154 (R.35-9 #2534-35).

Officer Johnson was assigned to Zone 2 from roughly 2012 until 2017 and worked under Plaintiff on second shift. JOHNSON DEP. 10-11 (R.35-6 #2062-63). Johnson testified at deposition:

> A. [Meetings with Plaintiff] were extremely unusual. You know, she would make comments such as we have to stick together, which is unusual. She said—made comments that I shouldn't call my coworkers on 13 precinct family because they will hang me out to dry the first chance that they get, unusual.
>
> *******
>
> A. [I]t was followed by the statement we have to stick together. When you make a statement that we have to stick together, you are putting me and you in the same boat, meaning that we have something in common. We were not officers. She is a lieutenant, so we can throw that out the window. She is a female. I'm a male. So it is not that. We can throw that out the window. Only thing that we had in common is our race. So when you make a comment such as we have to stick together, and it is safe to assume that we in that statement is race and then you make another comment referring to Caucasian officers that they are not your brothers and they will hang you out to dry the first moment they get, I would say it is safe to say that that's a race related comment.
>
> Q. This may seem like an obvious question. You found that comment to be racist, correct?
>
> A. I found that comment to be race related.
>
> Q. Is that a discriminatory comment?
>
> A. Yeah, I would say it is discriminatory in nature, absolutely.

*Id*. at 57-60 (R.35-6 #2109-12).

> Q. [W]ere any of [the] orders, policies, whatever you want to call them, directives that Lieutenant McFadden issued, did you find any of those to be racist?
>
> A. Yeah, I mean, she—at one point she said that she didn't want officers being proactive. And she specifically told me that she didn't

5

want officers being proactive because it gives white officers more chances to oppress minorities.

\*\*\*\*\*\*\*

Q. And at the time she made that comment, were you—did you determine that was a racist comment?

A. Yes.

*Id*. at 75-77 (R.35-6 #2127-29).

Q. Do you believe that Lieutenant McFadden was a micro-manager?

A. Absolutely.

Q. And do you believe she was a micro-manager based on race?

A. I would say so.

Q. And why do you say that?

A. Because every conversation I ever had with her went back to race.

Q. And you believe that permeated her management decisions?

A. Yeah, if she is going to make a comment that I don't want proactive officers being proactive because it gives them a chance to oppress minorities and then puts a standing order in place, I would say absolutely.

*Id*. at 80 (R.35-6 #2132).

Q. And why did you wait until five years in to make that complaint?

A. I was no longer under her chain of command. I was no longer terrified that she was going to retaliate against me.

*Id*. at 81 (R.35-6 #2133).

After receiving this information, Grizzell met with Vollmer and CPD Chief Kimberly Jacobs and Ken Kuebler and briefed the Chief about the information she had been told. GRIZZELL DEP. 66, 149-150 (R.35-4 #1779, 1862-63). According to Grizzell, "I am required to consult my deputy chief and inform them if there is potential misconduct, so I told them the information that

came to me." *Id*. at 21-22 (R.35-4 #1734-35). Chief Jacobs told Grizzell "to obtain the information from Tate, Morefield, and Johnson in writing, and that if what they said in writing mirrored what they told me on the phone and what Tate told me in person, that I was to write this letter and send it through the chain, ask for an internal affairs investigation." *Id*. at 151-152 (R.35-4 #1864-1865). As instructed, Commander Grizzell reached out to Sergeant Tate and Officers Johnson and Morefield and asked if they would be willing to write detailed statements. *Id*. at 165, 197-198 (R.35-4 #1878, 1910-11).

On March 2, 2017, Sergeant Tate sent Commander Grizzell the e-mail that is marked as GRIZZELL DEP. EX. F (R.36-6 #3170). GRIZZELL DEP. 31 (R.35-4 #1744); TATE DEP. 30 (R.35-12 #2866). Notably, Tate wrote that during his January 25th performance evaluation:

> [Lieutenant McFadden] told me that some of my ratings would have been lower, but she didn't want to put that in my file because she does not "believe in black on black crime." While our conversation continued, that statement stuck with me. I felt that, while this is advantageous to me, it is unfair and discriminatory to all those being evaluated by her. My interpretation was that I was getting a better evaluation based on the color of my skin. I believe that one can easily imply that Lieutenant McFadden would have rated me differently if I were not black. I feel that her evaluation was inappropriately low based on my performance, but I would rather her have rated me even lower and explained what my deficiencies (perceived or otherwise) were in official documentation. There should not be a separate rating scale for people based on the color of their skin.

GRIZZELL DEP. EX. F (R.36-6 #3170).

On March 6, 2017, Officers Morefield and Johnson emailed Commander Grizzell their written statements as requested. GRIZZELL DEP. 196-197 (R.35-4 #1909-1910); GRIZZELL DEP. EXS. G, H (R.36-7 #3171; R.36-8 #3174-76); JOHNSON DEP. 94-95 (R.35-6 #2146-47); MOREFIELD DEP. 74 (R.35-9 #2455).

Morefield's email to Commander Grizzell included the following allegations:

Following The Dallas Police Department Ambush, I engaged in conversation with Lieutenant McFadden regarding body cameras. Lieutenant McFadden expressed her feelings about how body cameras are a good thing as they will decrease the number of black men killed by police in America. I respectfully disagreed. The Dallas Police Department Ambush Incident came about during the conversation and Lieutenant McFadden stated her thoughts on the Incident. Lieutenant McFadden stated, "There have been white men killing black people in this country for a long time. More recently, white Officers have been killing black men. If it takes a few officers having to die (referring to Dallas PD's Slain Officers) in order for this country to realize that we have an issue with white officers killing black men, then so be it." When this toxic militant verbiage spewed from her mouth, I was very disgusted by it, troubled by it, and most of all hurt by it. I wondered how someone who wears a badge on their chest could say something so foul, a person with rank nonetheless. That statement made me realize that I'm probably just a number and I'm expendable, as a Ranking Official in my Chain of Command stated that it was justifiable for Police Officers to be killed to prove a point that White Officers wrongly kill black men in America, which is a false narrative. I felt unsafe to continue working for a lieutenant that doesn't value my life or my Brothers' and Sisters' lives within our department and within our country.

Following my wedding in August 2016, Lieutenant McFadden stated to me that the people I consider to be my brothers and my friends, referring to white officers on 13B who attended my wedding, really aren't my friends and that I need to be careful as they (white officers on 13B) are not happy that I married one of theirs and that I am sleeping with one of theirs, referring to my white wife.

\*\*\*\*\*\*

Once Lieutenant McFadden became aware that I was leaving Zone 2, I was told by her, "Don't forget, you're nothing but a dumb nigga to them and they're going to treat you like the dumb nigga you are!" During the 90 days that I have been on Zone 5, I haven't been treated like anything except for an adult and a Police Officer, which is more than I can ever ask for.

Something I've witnessed since being on this department is that minority officers, mainly Black American Officers, are lured to some extent, some as early as the academy, to Zone 2, under Lieutenant McFadden. There is a very "us vs them" mentality regarding Black Officers and Supervisors vs White Officers and Supervisors. What I've noticed is that when dealing with Lieutenant

8

McFadden, she tries to reel you in to trust only her, and I believe the reason being is so that she can be in full control. I feel that Lieutenant McFadden attempts to alienate new younger Black Officers. From my experience, being a Black Officer, if you don't follow her, if you don't agree with her, if you have a differing opinion than her, if you oppose her, then you aren't considered Black or Black enough. This kind of behavior and militancy has and will cause issues as its intent is to create a divide within the department. Being the highest ranking Black Official on the entire Division of Police; Lieutenant McFadden has had the opportunity to impact all races and genders of Officers within our department, however, she has failed to do so and has earned one of the worst reputations because of her actions as a Lieutenant.

No Officer on our department should be led by someone with as much hatred for them as Lieutenant McFadden has for White Officers.

GRIZZELL DEP. EX. G (R.36-7 #3171-73).

Officer Johnson's email to Commander Grizzell included the following allegations:

I met with LT McFadden in and outside of her office multiple times per her request. During these meetings LT McFadden made comments such as "we have to stick together" and "those Officers on 13 aren't your brothers" insinuating that because of my race I should only trust other African American Officers. LT McFadden did not like that I worked under a "white" supervisor and attempted to recruit me to 9pct so she could "keep an eye on me". I informed LT McFadden that I appreciated her concerns but did not agree with her views. This upset her and started a chain of events that would ultimately result in my move to zone 5.

******

I left Zone 2 because I was ordered by a Lieutenant to not respond on Officer in trouble calls. I left Zone 2 because I felt I didn't deserve to be disrespected and cursed at anymore. I left because the target on my back became too heavy to bare and began to effect my health. I left because Zone 2 became a hostile environment to work. I left because I was tired of hearing Officers and Supervisors tell me how much my Lieutenant didn't like me. I left because I couldn't take hearing how my brothers and sisters in blue couldn't be trusted just because the color of their skin... And most of all I left because I couldn't stand to see the Community I've grown to love so much slowly be destroyed and infested with crime.

GRIZZELL DEP. EX. H (R.36-8 #3174-76).

**B.    THE INTERNAL AFFAIRS INVESTIGATION**

On March 9, 2017, Commander Grizzell wrote a letter to her chain of command requesting an Internal Affairs investigation. GRIZZELL DEP. 214-215 (R.35-4 #1927-28); GRIZZELL DEP. EX. HH (R.36-34 #3503-08).  On March 14, 2017, the matter was assigned to the Internal Affairs Bureau. WEAVER AFF. ¶ 3 (attached as Exhibit A). I.A.B. Database #201703-1015 ("the IAB Investigation") was assigned to IAB Sergeant and Investigator Daniel Weaver. *Id*. Sergeant Weaver interviewed a number of witnesses and prepared a number of documents as he investigated the following allegations:

> Allegation I—Lt. McFadden violated E.E.O. laws when she issued CPD Sergeant Andre Tate his 2016 performance ratings based upon her statement that she did not believe "in black on black crime;"
>
> Allegation II—Lt. McFadden did not rate Sergeant Tate according to his demonstrated performance for his 2016 Performance Evaluation; and
>
> Allegation III—Lt. McFadden violated E.E.O. laws by creating a Hostile Work Environment on Zone 2 B Company.

*Id*. The IAB Investigation has been submitted into evidence. WEAVER AFF. EXS. 1-18; AUDIO[1] 001-060, 062-071; WEAVER AFF. ¶¶ 9-84, 93-102. A review of the IAB Investigation shows the thoroughness of Sergeant Weaver's job.

Regarding Allegation I, Weaver determined that the alleged conduct was supported by a preponderance of the evidence and was in violation of the Rules of Conduct. WEAVER AFF. ¶ 6. Accordingly, he recommended a finding of Sustained. *Id*. Regarding Allegation II, Weaver determined that it was logical and reasonable to determine the alleged conduct was supported by

---

[1] The audio files cited in this memorandum are contained on a flash drive that was manually filed with the Clerk's Office on January 26, 2021 in accordance with leave granted by the Court. (R.32).

a preponderance of the evidence and was in violation of the Rules of Conduct. *Id*. Accordingly, he recommended a finding of Sustained. *Id*. Weaver determined that Allegation III was supported by a preponderance of evidence and was in violation of the Rules of Conduct. *Id*. ¶ 8. Accordingly, he recommended a finding of Sustained. *Id*.

## C.     THE TEMPORARY REASSIGNMENT TO THE PROPERTY ROOM

Plaintiff was temporarily reassigned to CPD's property room while the IAB Investigation took place. MCFADDEN DEP. 40-41 (R.33-1 #150-51). Chief Jacobs was responsible for reassigning Plaintiff to the property room and she doesn't recall ever hearing that Plaintiff participated in discrimination complaints prior to the reassignment taking place. JACOBS DEP. 63-69 (R.35-5 #1996-2002); MCFADDEN DEP. 72 (R.33-1 #182). Deputy Chief Kuebler recalls the discussions regarding Plaintiff's reassignment occurring as follows:

> A. I remember that it was a difficult situation to figure out where to put the Lieutenant because we're directed to—to move…[t]he focus of that complaint so as to not have contact with the complainers. And being a patrol lieutenant, that was a complicated decision because patrol personnel move around everywhere. So we wanted to ensure for the safety of those complaining that we would protect them by moving the Lieutenant in a manner that would reduce the likelihood of future contact while the investigation continued, as directed by City HR and City EEO direction.

KUEBLER DEP. 31 (R.35-8 #2317).

> Q. What were the options at that point in time?
>
> A. That was the sticky part, was there was a small number of options. There would be perhaps options to move her to different shifts, but there are contractual problems with that. We could reassign the complainers, which was counter to City direction and HR direction. Or there was to find a place where the Lieutenant could be successful and work somewhere else and provide additional benefit to the City while her complaint—while the complaint against her was being investigated.

*Id*. at 32-33 (R.35-8 #2318-19).

> Q. [A]nd it was the Chief's decision that Lieutenant McFadden should be assigned to the property room, correct?
>
> A. Yes, yes.

*Id*. at 37 (R.35-8 #2323).

The property room was chosen because CPD needed help in that location disassembling ballistic vests that needed to be destroyed pursuant to a contract. DUNLAP DEP. 44-45, 49-50 (R.35-2 #1605-06, 1610-11). According to Deputy Chief Gary Dunlap:

> A. It came up as a subject in a staff meeting with the Chief, and at that time, we needed some help down at the property room with some ballistic vests, and I said we could—if you're looking for a place to put somebody, I could use some extra help down at the property room.
>
> Q. Did you explain that you needed the help there with the ballistic vests during that meeting?
>
> A. I believe I did.
>
> Q. And you said, you know, Deputy Chief Kuebler was in that meeting and Chief Jacobs was in that meeting. Was Commander Grizzell in that meeting?
>
> A. I don't believe so. I think this came up in a staff meeting that the Chief held with her deputy chiefs.

*Id*. at 44-45 (R.35-2 #1605-06).

> A. [W]e had to take the ballistic panels out of the carrier, separate them from the vest carrier so that we could get them disposed of, because at that time, the vest manufacturer that we had did not take responsibility for disposing of the old vests. I guess now they do under the new contract. At that time, they didn't. They just piled up down there at the property room.
>
> Q. And you told Chief Jacobs that that was what you would need Lieutenant McFadden to do?
>
> A. Yeah. Whoever she sent down there, that's what they would be doing. They would be separating the ballistic inserts from the carrier, the vest carrier.

*Id.* at 49-50 (R.35-2 #1610-11). According to Commander Mark Gardner, "Chief Dunlap had said, 'Look, we've got those vests that need to be prepped for destruction. Could we have her do that?' 'Absolutely we could have her do that. It's something that needs to be done.' So it probably was something Chief Dunlap and I through our discussion made the determination that that's what she would be doing." GARDNER DEP. 47-48 (R.35-3 #1672-73).

Thus, Plaintiff was temporarily reassigned to the property because it was determined to be the best place to limit her contact with the multiple complainants and there was a need in the property room to complete a particular task. GARDNER DEP. 47 (R.35-3 #1672); JACOBS DEP. 99 (R.35-5 #2032). And despite Plaintiff's speculation on the matter, Deputy Chief Knight had no involvement in reassigning Plaintiff to the property room. KNIGHT DEP. 45 (R.35-7 #2234). ("Q. Have you ever been involved in a decision to involuntarily assign a member of the sworn personnel to the property room? A. I don't believe so.").

Both sworn and unsworn personnel are assigned to the property room on first, second and third shifts and it is seen as a coveted job within CPD. GARDNER DEP. 30-31 (R.35-3 #1655-56). During the time that Plaintiff was temporarily reassigned to the property room, she maintained her rank as lieutenant, her seniority level in CPD did not change, her salary did not change, and she maintained all health benefits. MCFADDEN DEP. 44 (R.33-1 #154). In addition, she received additional perks which included free on-site parking and the ability to wear casual clothing. *Id.* at 46 (R.33-1 #156). Plaintiff was also given the option to select her own duty hours. GARDNER DEP. 80 (R.35-3 #1705). She went from working a second shift assignment from 3 p.m. to 11 p.m., with Fridays and Saturdays off, to working a first shift assignment from 8 a.m. to 4 p.m. with Saturdays and Sundays off. MCFADDEN DEP. 45-46 (R.33-1 #155-56). She was also provided a private office, with the desk, located in the back of the property room, to work from during her duty hours.

GARDNER DEP. 83-84 (R.35-3 #1708-09). Plaintiff not only continued to attend law school classes during her temporary reassignment, the City also continued to reimburse her tuition for the classes she attended. MCFADDEN DEP. 75-76 (R.33-1 #185-86). Notably, Plaintiff applied for a permanent assignment in the property room under the supervision of Commander Gardner on January 14, 2019. *Id*. at 80 (R.33-1 #190).

To the extent that Plaintiff may take issue with not having supervisory authority over subordinates while temporarily reassigned to the property room, that was not because of where she was specifically reassigned, but was instead a direct result of being relieved of her assignment pending an investigation into her misconduct. DUNLAP DEP. 27-29 (R.35-2 #1588-90).

Plaintiff's witness Donna Alexander suggested that instead of the property room, Plaintiff should have been temporarily assigned to the patrol administrative unit. ALEXANDER DEP. 52 (R.37-1 #3921). Alexander testified as follows:

> Q. And you were talking earlier about when you saw sergeant level folks in the patrol administrative unit, they were provided offices, correct?
>
> A. Correct.
>
> Q. And I'm talking about, just for clarity sake, sergeant level folks who were involuntarily reassigned to the patrol administrative unit, correct?
>
> A. Correct.
>
> Q. And when they were reassigned involuntarily there, were they provided their own office, or did they 18 have to share an office with a civilian employee?
>
> A. They were provided their own office. There's two—at any given shift—there's three—there's three patrol administration offices, okay, that are by first shift, second shift, third shift. And if a person is there on third shift, they can go into the first shift and the second shift offices of the other sergeants. And not only that, it's private. You can close the door. You can watch TV. You could do whatever

14

> you wanted to do and not be seen or heard and then leave at your
> respectful time.

ALEXANDER DEP. 149-50 (R.37-1 #4018-19).

Plaintiff alleges that she injured her shoulder while performing work in the property room.

MCFADDEN DEP. 72 (R.33-1 #182). She currently has an open Ohio workers' compensation claim

for that alleged injury. *Id*.

## D.     THE CHIEF'S RECOMMENDATION

On May 15, 2018, Plaintiff presented herself at a disciplinary conference held in Chief

Jacobs' office to answer charges that she violated Division Rule of Conduct 1.48 and Division

Directives 8.08, and 7.02.[2] That hearing was recorded and has been submitted in the record.

JACOBS DEP. 49 (R.35-5 #1982); JACOBS DEP. EX. KK (R.36-37 #3537-61); WEAVER AFF. ¶ 90;

AUDIO 061. After reviewing the facts relevant to the disciplinary charges served upon Plaintiff

---

[2] As noted in Plaintiff's letter of departmental charges (WEAVER AFF. ¶ 89; WEAVER AFF. EX. 23):

Rule of Conduct 1.48-Compliance with EEO Laws, Rules, Orders, Policies, and Directives, states, "Division personnel shall obey federal, state, and local antidiscrimination statutes and Division rules, orders, directives, and policies pertaining to EEO."

Division Directive 8.08, "Equal Employment Opportunity, Nondiscrimination, and Americans with Disabilities Act," subsection (III)(A) states, "Discrimination in employment with regard to race, color, religion, sex (including sexual harassment), national origin, disability, ancestry, age, genetic information, sexual orientation, or military status is prohibited."

Division Directive 8.08, "Equal Employment Opportunity, Nondiscrimination, and Americans with Disabilities Act," subsection (III)(B) states, "Any conduct, whether verbal or physical, that is unwelcome and so severe or pervasive as to materially affect an individual's terrms or conditions of employment is prohibited."

Division Directive 8.08, "Equal Employment Opportunity, Nondiscrimination, and Americans with Disabilities Act," subsection (III)(C) states, "While the Division cannot dictate how a person must feel about another individual or group and may not be able to change negative attitudes, it does insist on proper behavior on the part of its employees toward both the public and other employees."

Division Directive 8.08, "Equal Employment Opportunity, Nondiscrimination, and Americans with Disabilities Act," subsection (III)(D) states, "The Division shall work toward and give full support to all efforts that lead to the achievement of harmony within the Division."

Division Directive 7.02, "Duties and Responsibilities of Personnel," subsection (III)(A)(l)states Division Personnel, "Enforce and uphold the Constitution and laws of the United States of America, the State of Ohio, and the City of Columbus; the rules and regulations of the Division of Police; and the Oath of Office."

and Plaintiff's statement relating to those charges, Chief Jacobs sustained the charges and made a recommendation to the City's Director of Public Safety that Plaintiff receive a 240 hour suspension, a demotion to police officer, and termination of her employment. MCFADDEN DEP. 72 (R.33-1 #182); MCFADDEN DEP. EX. 38 (R.33-14 #512-516). According to Chief Jacobs, "The basis for my recommendation of termination to the Director was that Lieutenant McFadden created a hostile work environment." JACOBS DEP. 49 (R.35-5 #1982).

## E. THE SAFETY DIRECTOR'S DECISION

Despite her recommendation, the Police Chief had no authority to terminate Plaintiff. Rather, the City's Director of Public Safety is the appointing authority and ultimately makes the decision for hiring and firing of individuals within the Division of Police. VAN PELT DEP. 44 (R.35-13 #2980). Plaintiff had a hearing before Ned Pettus, Jr., the City's Director of Public Safety, on July 26, 2018. MCFADDEN DEP. 160 (R.33-1 #160). On August 22, 2018 Director Pettus issued a decision in which he did not uphold the Chief's recommendation for termination. MCFADDEN DEP. 160 (R.33-1 #160); MCFADDEN DEP. EX. XXX (R.36-75 #3856-58). Plaintiff ultimately received no discipline whatsoever as she was not terminated, nor suspended, nor issued a written reprimand. MCFADDEN DEP. 160, 208 (R.33-1 #160, 318).

## F. PLAINTIFF'S EXPERT WITNESS LOU REITER

Lou Reiter is presented by Plaintiff as a police procedures expert. Reiter does not opine that CPD's policies, as written, were in any way deficient. REITER DEP. 21 (R.34-1 #1095). But Reiter is critical of what he describes as "(1) the unwilling transfer of Lieutenant McFadden from her patrol function to the assignment in the Property Room and (2) the EEO complaint investigation conducted regarding allegations against Lieutenant McFadden." *Id.* at 30 (R.34-1 #1104).

According to Reiter, a police agency's failure to crack down on internal racial discrimination or harassment creates a danger to the public. *Id.* at 27 (R.34-1 #1101). He notes, "Everyone is adversely affected if an agency allows any form of harassment, discrimination, or retaliation of its employees. If we don't treat our employees well, how can we expect our officers to treat citizens well?" *Id.* Reiter supports having a zero-tolerance policy for the use of racial slurs in a police department. *Id.* at 28 (R.34-1 #1102). Regarding Morefield's allegation that Lt. McFadden called him a "dumb nigga," Reiter notes, "If it was said, what it's basically doing is playing into a stereotype and it would be degrading, in my opinion, for anyone of color." *Id.* at 77 (R.34-1 #1151). "I don't care if it's between black persons, you're using a term that is not—should not be used within the police context." *Id.* at 69 (R.34-1 #1143).

Regarding Tate's performance review allegations, Reiter "think[s] it would be wrong for a police lieutenant to give a police sergeant a different evaluation based on the color of his skin[.]"*Id.* at 55 (R.34-1 #1129). According to Reiter, if there was corroborative evidence to support that the lieutenant is racist "you would not want that person supervising anybody…because…that would demonstrate a racial animus which is not something we can have in the police department." *Id.* at 78 (R.34-1 #1152). "We're the impartial protectors and the people who are going to serve the community, so you can't have management decisions based on race." *Id.* at 73 (R.34-1 #1147). Reiter also found the following allegations to be either troubling or disturbing:

1. McFadden's alleged comments regarding Morefield's interracial marriage [*Id.* at 78 (R.34-1 #1151)];

2. McFadden's alleged comments regarding police officers being ambushed in Dallas in 2016 [*Id.* at 75-76 (R.34-1 #1149-50)];

3. McFadden's alleged comment that she didn't want proactivity because proactivity gives white officers more of an opportunity to harass black suspects [*Id.* at 105-106 (R.34-1 #1179-80)];

4. Morefield's comment that McFadden is antiwhite [*Id.* at 69-70 (R.34-1 #1143-44)].

Reiter agrees that once Grizzell received the emails from Tate, Morefield, and Johnson, she should have forwarded them to HR, the chain of command, and Internal Affairs for an investigation. *Id.* at 35-36, 94-96, 116 (R.34-1 #1109-10, 1168-70, 1190).

> Q. So do you have any criticisms of the way Commander Grizzell handled any of this situation?
>
> A. From all the documentation and the depositions and the e-mails and the transmittal to HR and to IA, no. Like I say, we've already talked about the surreptitious recording, tape recording, but, no, handling these three allegations, no, I don't.

*Id.* at 107-108 (R.34-1 #1181-82). However, instead of temporarily reassigning Plaintiff to the property room, Reiter would have handled her situation as follows:

> A. The first thing you do is you would give [the lieutenant] a cease and desist order, preferably in writing, to say, I don't know if this is going on, but this is the allegation. If this, in fact, is true, you are hereby ordered to cease and desist any comments like this, any reference like this, any dealings with your officers when you're dealing with issues that are race-based. And, if necessary, you would make a reassignment, if the person still works for that supervisor, to ensure that they don't have any potential of exacerbating the allegations that are being made. So if the person is no longer in their zone of authority, then you don't have much to worry, other than putting them on formal notice of cease and desist.

*Id.* at 95-96 (R.34-1 #1169-70).

> Now, if they violate the cease and desist and do it again, now you have insubordination for which they can be terminated simply on that.

*Id.* at 97-98 (R.34-1 #1171-72).

## G. PLAINTIFF MELISSA MCFADDEN

Plaintiff denies any wrongdoing. However, she admits that she told Officer Morefield, "You should be mindful that some people don't like interracial relationships, so just make sure

you watch your back on that." MCFADDEN DEP. 40 (R.33-1 #150). She also admits to using the

phrase "black on black crime" during Sergeant Tate's 2017 performance evaluation. *Id*. at 29-30

(R.33-1 #139-40).

> Plaintiff agrees that the following allegations are concerning:
>
> 1.   If an officer is told, "You're nothing but a stupid nigga, and they're going to treat you like the dumb nigga you are"  [*Id*. at 149 (R.33-1 #259)];
>
> 2.   If an officer is told, "White officers are not your brothers, and they're not happy that you're fucking one of their own" [*Id*. at 149-150 (R.33-1 #259-60)];
>
> 3.   If an officer believes that he was treated more favorably during his performance evaluation because of his race [*Id*. at 150 (R.33-1 #260)];
>
> 4.   If an officer believes that his sergeant hated officers of another race [*Id*. at 150 (R.33-1 #260)].

If Plaintiff had received any of those complaints, she would have written a letter to her

chain of command reporting it, and she would make sure that the matter gets investigated "and a

fair, impartial investigation is done, and [the focus supervisor is] not being penalized prior to the

investigation being completed.  *Id*. at 150-153 (R.33-1 #260-63).

## IV.   LEGAL STANDARD

Summary judgment is appropriate "if [Defendant shows] that there is no genuine dispute

as to any material fact and [it is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Even though the Court must view all of the evidence and draw all reasonable inferences in

Plaintiff's favor, Plaintiff must still identify specific facts within the record showing there is a

genuine issue of material fact. *See Muncie Power Prods. v. United Techs. Auto.*, 328 F.3d 870, 873

(6th Cir. 2003). Not just any dispute of fact will do. The "dispute must present a *genuine* dispute

of *material* fact." *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013) (emphasis in original).

A fact is "material" only if its resolution "might affect the outcome of the suit under the governing law," and a dispute is "genuine" only if the "evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 251-52 (1986). The evidence with respect to a particular factual dispute cannot be "so one-sided that [Defendant] must prevail as a matter of law," and [Plaintiff] cannot rely upon a "mere existence of a scintilla of evidence in support of [her] position." *Id.* at 251-52.

## V.    LAW & ARGUMENT

### A.    PLAINTIFF'S TITLE VII CLAIMS

#### 1.    Title VII Race Discrimination

Under Title VII, an employer may not "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, with regard to individuals in protected classes, the OCRA makes it unlawful for an employer "to discharge without just cause, to refuse to hire, or otherwise to discriminate against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code Ann. § 4112.02(A). The same analysis generally applies to claims under Title VII and the OCRA. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (Ohio 1981).

"Title VII [also] forbids discrimination on the basis of association with or advocacy for a protected party." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Section 4112.02 of the OCRA similarly prohibits discrimination based on association. *Ohio Civil Rights Comm'n. v. Lysyj*, 38 Ohio St. 2d 217, 313 N.E.2d 3, 6 (Ohio 1974) (holding that discrimination based on association is forbidden in public accommodations) (superceded by statute on the availability of

punitive damages, as recognized in *Rice v. CertainTeed Corp.*, 84 Ohio St. 3d 417, 1999 Ohio 361, 704 N.E.2d 1217 (Ohio 1999)); *see Cole v. Seafare Enters. Ltd., Inc.*, No. C-950157, 1996 Ohio App. LEXIS 440, 1996 WL 60970, at *1-*2 (Ohio Ct. App. Feb. 14, 1996) (applying *Lysyj* to associational employment-discrimination case brought under OCRA § 4112.02).

### a. The *prima facie* case

At the summary-judgment stage, a plaintiff must adduce either direct or circumstantial evidence of race discrimination. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). No direct evidence of race discrimination exists in this case. It is well settled that absent direct evidence, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the familiar *McDonnell Douglas* burden shifting framework, a plaintiff must first establish that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) a similarly situated individual was treated more favorably. *Id.*

Once a *prima facie* case is established, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for its action. If the defendant satisfies this burden, plaintiff must demonstrate that the proferred reason was a pretext for discrimination. *McDonnell Douglas Corp.* at 804-805; *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). The burden of proof always remains with the plaintiff. *McDonnell Douglas Corp. v. Green*; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).

In this case, Plaintiff cannot establish a *prima facie* case of race discrimination because she cannot show that she suffered an adverse employment action or that individuals outside of her protected class were treated more favorably.

**(1)     Plaintiff did not suffer an adverse employment action**

To satisfy this element, a plaintiff must demonstrate that she suffered a materially adverse change in the terms and conditions of employment. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1999); *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) (citations omitted). As Plaintiff's criticisms pertain to the investigation into her alleged misconduct, her temporary reassignment to the property room, and her recommendation for termination, all three matters will be addressed below.

*(a)     The investigation into Plaintiff's alleged wrongdoing*

The Sixth Circuit has repeatedly held that neither an internal investigation into suspected wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action. *See Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (collecting cases*); Dendinger v. Ohio*, 207 Fed. Appx. 521, 527 (6th Cir. 2006). The Sixth Circuit has also held that an investigation alone is not sufficient to establish an adverse employment action. *Virostek v Liberty Twp. Police Dept./Trustees*, 14 F.Appx 493 (6th Cir. 2001); *Jackson v. City of Columbus, Lusaka, Rice*, 194 F.3d 737 (6th Cir. 1999).

Here, the investigation at issue occurred in direct response to the allegations of hostile work environment and racial discrimination made by Sergeant Tate and Officers Morefield and Johnson. Once the allegations of potential misconduct were made, the City had an affirmative obligation to conduct an investigation. *See Arnold v. City of Columbus,* S.D. No.2:08-cv-0031, 2011 U.S. Dist. LEXIS 35807, at *56 (Mar. 31, 2011), citing Ohio *Faragher v. City of Boca Raton*, 524 U.S. 775,

22

806, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (in which the U.S. Supreme court held that in line with the "primary objective" of Title VII "not to provide redress but to avoid harm," employers have an "affirmative obligation to prevent violations" of Title VII). **Plaintiff was neither suspended nor placed on administrative leave during her investigation. Consequently, the investigation into her alleged misconduct did not constitute an adverse employment action.**

*(b)      Plaintiff's temporary reassignment to the property room*

Plaintiff maintains her temporary reassignment to the property room resulted in a reduction in job responsibilities, reassignment to menial or degrading work, and to humiliation. COMPLAINT ☐☐ 62, 68 (R.1 #21-22). Simply because Plaintiff was unhappy by her temporary reassignment does not mean she has identified an adverse employment action. *Jiashin Wu v. Northeast OhioMed. Univ.*, 2019-Ohio-2530, 140 N.E.3d 100 (10th Dist.) quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Employment actions causing humiliation, hurt feelings, and bruised egos do not rise to the level of an adverse employment action. *Harrison v. P&G Distrib.*, LLC, 290 F. Supp. 3d 723, 734 (S.D. Ohio 2017). Generally, a temporary reassignment without a reduction in salary or benefits, changes to work hour, or significantly diminished material responsibilities, will not constitute an adverse employment decision. *See Kocsis v Multi-Care Mgmt., Inc.*, 97 F3d 876 (6th Cir. 1996); *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir. 1987). However, a reassignment with no change in salary or work hours, may be considered an adverse employment action, if it "constitutes a demotion evidenced by 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 797 (6th Cir. 2004) citing *Kocsis*, 97 F.3d 876, at 886.

As stated above, during the time that Plaintiff was temporarily reassigned to the property room, she maintained her rank as lieutenant, her seniority level in CPD did not change, her salary

did not change, and she maintained all health benefits. She received free on-site parking, a private office, the ability to wear casual clothing, and the option to select her own duty hours. She continued to receive tuition reimbursement from the City to attend law school classes. She later applied for a permanent assignment in the property room under the same supervisor. While she temporarily lost her supervisory authority over subordinates, that was not because of her temporary reassignment to the property room, but was instead a direct result of being relieved of her assignment pending an investigation into her misconduct. Based on all of the foregoing, Plaintiff's temporary reassignment did not constitute an adverse employment action.

(c)     The Chief's recommendation for termination

Chief Jacobs' recommendation for Plaintiff's termination also did not amount to an adverse employment action. As stated above, Chief Jacobs had no authority to terminate an employee as that decision can only be issued by the Public Safety Director. "[T]he threat of discipline, or even discharge, is not an adverse action for purposes of a discrimination claim." *Evergin v. City of Columbus*, S.D. Ohio No. 2:09-cv-1069, 2012 U.S. Dist. LEXIS 197375, at *18-19 (June 14, 2012) citing *Plautz v. Potter*, 156 Fed. Appx. 812, 817 (6th Cir. 2005).

**(2)     No similarly situated employees were treated differently**

Plaintiff's *prima facie* case of race discrimination also fails because she cannot demonstrate that she was treated differently than similarly situated individuals outside the protected class.  *See Wright v. Murray Guard, Inc.,* 455 F.3d 702, 710 (6th Cir. 2006). To establish that similarly situated employees were treated differently, Plaintiff must show that the comparables are similar in all respects. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992). Thus, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the

employer's treatment of them for it." *Id*. However, these factors are not exclusive. Rather, the Sixth Circuit has instructed district courts to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

To support an inference of unlawful discrimination, Plaintiff identifies Caucasian comparators she insists are similarly situated. Plaintiff's proposed comparators are Lieutenant Christine Nemchev, Lieutenant Duane Mabry, Lieutenant Lowell Rector, Commander Rhonda Grizzell, Sergeant Jason Grunkemeyer and Sergeant Eric Moore. MCFADDEN DEP. 214, 217 (R.33-1 #324, 327). Plaintiff contends that unlike herself, these individuals were afforded what she characterizes as "proper" internal investigations into their alleged misconduct, were not temporarily reassigned during their investigations to the property room and were not recommended for discipline. Defendant's motion follows with an analysis of each comparator.

### (a) Lieutenant Christine Nemchev

In August 2017, Sergeant Kim Edley, African-American female, alleged her supervisor, Lieutenant Nemchev, Caucasian female, created a hostile work environment and discriminated against her because of her race. BERNHARDT AFF. ¶ 2 (attached as Exhibit B). Sergeant Edley claimed that her lieutenant gave her orders that no other sergeants were given and caused her to miss out on training opportunities. *Id*. Upon becoming aware of the allegations, the Division initiated an investigation. *Id*. During the investigation, Lieutenant Nemchev was ordered to work a different shift, and change her work hours to avoid contact with Sergeant Edley. The Lieutenant was also not permitted to enter police headquarters during Sergeant Edley's work hours. VOLLMER DEP. 87 (R.35-14 #3081). Sergeant Edley was reassigned to a different lieutenant. *Id*. at 43 (R.35-14 #3037). The investigation determined that Sergeant Edley did not like how she was being supervised and she was unsatisfied with orders she receives from her Lieutenant. BERNHARDT AFF.

¶ 2. As a result of the investigation, the charges against Lieutenant Nemchev were unfounded and no further action was taken. *Id*. At the time of the incident, Lieutenant Nemchev's direct supervisor was Commander Suzanne Curmode. *Id*.

(b)     *Lieutenant Duane Mabry*

In November 2018, Officer Nicholas Reaper, Caucasian male, alleged his supervisor, Lieutenant Duane Mabry, a Caucasian male, created a hostile work environment when Lieutenant Mabry told the officer it was inappropriate for him to "talk black" after footage from the officer's body worn camera showed Officer Reaper purposely changing his dialect when communicating with African-American citizens. *Id*. ¶ 3. Officer Reaper also alleged that Lieutenant Mabry called his father a "piece of shit." *Id*. Upon becoming aware of the allegations, the Division initiated an investigation. *Id*. During the investigation, Lieutenant Mabry did not supervise Officer Reaper. *Id*. Additionally, weeks into the investigation, Lieutenant Mabry went out on personal leave followed by military leave for months. *Id*. At the conclusion of the investigation, it was determined the allegations did not amount to a hostile work environment or discriminatory conduct. However, Lieutenant Mabry was issued positive corrective action by his chain of command for telling his subordinate not to "talk black" and received discipline for the remaining allegations. *Id*. At the time of the incident, Lieutenant Mabry's direct supervisor was Commander Terry Moore. *Id*.

(c)     *Lieutenant Lowell Rector and Commander Rhonda Grizzell*

In November 2017, Sergeant Christopher Odom, African-American male, alleged his temporarily assigned lieutenant, Lowell Rector, a Caucasian male and Commander Rhonda Grizzell, a Caucasian female, created a hostile work environment, engaged in retaliatory conduct and discriminatory behavior. *Id*. ¶ 4. Sergeant Odom claimed that an email he received from Commander Grizzell addressing issues she had with his work performance, unapproved absences and incomplete assignments were sent because of his race. *Id*. Under Commander Grizzell's

26

direction, Lieutenant Rector investigated Sergeant Odom's performance issues. *Id.* After his completed investigation determined Sergeant Odom had several performance issues, Sergeant Odom accused Lieutenant Rector of creating a hostile work environment. *Id.* Upon becoming aware of Sergeant Odom's allegations, the Division initiated an investigation into the matter. *Id.* During the investigation, Sergeant Odom was permitted to report to a different chain of command. He was given a different lieutenant to supervise him, as well to whom to report. *Id.* Though Commander Grizzell was two ranks above him, Sergeant Odom was also afforded a different commander in his chain of command. *Id.* At the conclusion of the investigation, it was determined the allegations against Commander Grizzell and Lieutenant Rector were unfounded and no further action was taken. *Id.* At the time of the incident, Lieutenant Rector's supervisor was Commander Grizzell. Commander Grizzell's supervisor was Deputy Chief Richard Bash. *Id.*

### (d)  *Sergeant Jason Grunkemeyer*

In August 2016, civilian support clerk, Christine Hutton, a Caucasian female, alleged her direct supervisor Sergeant Grunkemeyer, a Caucasian male, created a hostile work environment when he gave her a written reprimand for insubordination and another written reprimand for being absent without leave. *Id.* ¶ 5. Ms. Hutton also alleged that Sergeant Grunkemeyer spoke to her in a rude manner and made inappropriate comments about her medical condition. *Id.* Upon becoming aware of the allegations, the Division initiated an investigation. *Id.* During the investigation, Ms. Hutton reported to a different sergeant until she eventually took a position in another City department. *Id.* The investigation determined the allegations against Sergeant Grunkemeyer were unfounded and did not amount to a hostile work environment. *Id.* However, Sergeant Grunkemeyer was ordered to attend additional management training. *Id.* Sergeant Grunkemeyer's supervisor was Lieutenant William Morrison. *Id.*

(e)  *Sergeant Eric Moore:*

In August 2014, Officer Wes Sorrell, a Caucasian male, told a superior in his chain of command that Sergeant Eric Moore, also a Caucasian male, had engaged in falsifying overtime. DECKER AFF. ¶ 2 (attached as Exhibit C). A month later in September 2014, Officer Sorrell made an additional allegation that during a one-on-one conversation he had with Sergeant Moore back in April 2014, Sergeant Moore called Officer Eric Cornett and Sergeant Doug Williams, both African-American males, "niggers" and told Officer Sorrell that he should kill them. *Id*. Neither Officer Cornett or Sergeant Williams were present when the comments were made.  Both learned of the comments five months later in September 2014. *Id*.  Officer Cornett was notified of the comments while he was out on scheduled military leave. *Id*.

When the Division became aware of the allegations, an investigation was immediately initiated in September 2014. *Id*. At the onset of the investigation, Officer Sorrell was not in Sergeant Moore's chain of command.  He did not report to nor was he supervised by Sergeant Moore. *Id*. Likewise, neither Officer Cornett nor Sergeant Williams were supervised by or reported to Sergeant Moore. *Id*.

The investigation outlined fifteen charges against Sergeant Moore. *Id*. ¶ 3. At the conclusion of the investigation, twelve of the fifteen charges were sustained. *Id*. The investigation determined Sergeant Moore had used a racist slur, however the investigation was unable to corroborate Officer Sorrell's claim that Sergeant Moore made a threat against Officer Cornett and Sergeant Williams.  *Id*. For seven of the charges, Sergeant Moore received documented constructive counseling. *Id*. For the racist slur he received a written reprimand. *Id*. Four charges related to falsifying overtime, interfering with Division property and for being deceptive during hos interviews with Internal Affairs were forwarded to Chief Jacobs for departmental charges. *Id*. Chief Jacobs recommended Sergeant Moore be terminated and suspended. *Id*. The Public Safety

Director upheld Chief Jacob's recommendation and terminated Sergeant Moore's employment. *Id.* However, after challenging his termination at arbitration, the arbitrator overturned his discharge. *Id.* Sergeant Moore direct supervisor was Lieutenant Ty Brust. *Id.* ¶ 2.

Plaintiff is not similarly situated to any of her proposed comparators. None of them dealt with or reported to the same supervisor as Plaintiff. In addition to not dealing with the same supervisor, Sergeant Grunkemeyer and Sergeant Moore were an entire rank below Plaintiff. And Commander Grizzell was classified in a rank above Plaintiff.

Regarding Moore, Plaintiff received no discipline whatsoever, including for her alleged racist slur. Moore was disciplined for his alleged racist slur and was fired by the City for his other transgressions.

Regarding the others, even if Plaintiff's proposed comparators shared the same rank and dealt with the same supervisor as Plaintiff, none can be deemed to have engaged in the same egregious misconduct in which Plaintiff engaged. None of her comparators were accused by multiple subordinates of creating a hostile work environment by telling them, "you're nothing but a dumb nigga, and they're going to treat you like the dumb nigga you are;" MOREFIELD DEP. 153-54 (R.35-9 #2534-35); or "white officers are not your brothers, and their not happy that you're fucking one of their own." *Id.* at 92 (R.35-9 #2473). None of her comparators were accused of telling subordinate officers that officers on other precincts should not be considered family because they (referring to Caucasian officers) "will hang you out to dry the first moment they get." JOHNSON DEP. 59 (R.35-6 #2111). Or, telling subordinate officers that they did not want officers to be proactive because being proactive gave "white officers more chances to oppress minorities." *Id.* at 75 (R.35-6 #2127). Furthermore, none of her comparators were alleged to have given a direct

report a more favorable performance evaluation based on the subordinate's race because she did not believe in "black on black crime." TATE DEP. 44 (R.35-12 #2880).

Since none of Plaintiff's comparators engaged in conduct that was similar to that of Plaintiff, Plaintiff cannot establish that she was treated differently from similarly situated non-protected individuals. *Macy v. Hopkins Cnty. School Bd. of Edu.*, 484 F.3d 357, 370 (6th Cir. 2007) (in which the 6th Circuit held that where incidents of misconduct giving rise to discipline form the crux of the similarities between employees, the degree of their misconduct is a factor to be given great weight).

Plaintiff's complaint that the investigations of those individuals she asserts to be similarly situated were done "properly" compared her own does not establish that she was differently than her comparators. Plaintiff does not dispute that the alleged misconduct of the comparators she identified in her deposition were investigated. MCFADDEN DEP. 217 (R.33-1 #327). In fact, although Plaintiff and her expert criticize the manner in which the investigation was performed, they both agree that the allegations needed to be written up and investigated. MCFADDEN DEP. 152-53 (R.33-1 #262-63); REITER DEP. 35-36, 94-96 (R.34-1 #1109-10, 1168-70).

Instead, Plaintiff argues the investigations of her comparators were done "correctly compared to [her own], which was done differently." MCFADDEN DEP. 217 (R.33-1 #327). In support of her claim, Plaintiff testified that her investigation lacked "interviewing witnesses, of following up or including any exculpatory evidence…" MCFADDEN DEP. 194 (R.33-1 #304). However, Plaintiff does not explain how the investigations of her proposed comparators specifically differed from her own. Plaintiff offers nothing more than her own self-serving deposition testimony which is speculative and has no basis in fact. Moreover, her unsubstantiated allegations are not objective evidence. See, *Bradley v. Rhema-Northwest Operating LLC*, No. 16-

2493, 2017 U.S. App. LEXIS 19522, at *13 (6th Cir. Oct. 3, 2017) (holding that conclusory testimony is not sufficient to raise such a genuine issue of material fact as to whether the plaintiff was treated less favorably than similarly situated employees outside the protected class.).

Plaintiff also asserts that her Caucasian counterparts were treated differently because they were not reassigned during the investigations into their misconduct. However, unlike Plaintiff, none of the comparators had several allegations from multiple complainants who were assigned to different patrol zones throughout the Division. Each of her proposed comparators had a single complainant assigned to a single zone or bureau section. As a result, the Division could easily take necessary steps to control complainants from having any contact with the comparators.

Plaintiff, on the other hand had multiple complainants assigned to different patrol zones. As an active Lieutenant, Plaintiff could potentially be called to respond to multiple runs on a number of different patrol zones or to oversee a different zone at any time. KUEBLER DEP. 58 (R.35-8 #2344). As such, there is a greater likelihood Plaintiff could come into contact with any of her complainants. Keeping Plaintiff on Zone 2 or reassigning her to a different patrol zone would make no sense.

Furthermore, merely because her comparators were not reassigned specifically to the property room does not satisfy a claim that she was treated differently than similarly situated individuals. Plaintiff's reassignment is not determined by her personal desires or preferences. It is determined by the needs of the Division. As a lieutenant, if the Division has a need in "HR, if it's the property room, if it's narcotics, if it's out at AIU as a receptionist" that is where she would be assigned. DUNLAP DEP. 35 (R.35-2 #1596). As noted earlier, Plaintiff's subjective desire to be reassigned to a certain assignment or bureau is insufficient as a matter of law to establish a claim that she was treated differently than similarly situated individuals.

Finally, Plaintiff's argument that her counterparts were treated differently because they were not recommended for termination also does not prove that she was treated differently than her similarly situated counterparts. The allegations brought against most of the individuals Plaintiff believed to be similarly situated were determined to be unsubstantiated or unfounded. As result, no further action was warranted. Sergeant Moore's investigation however did result in a number of sustained charges that went before the Chief for a hearing. At the conclusion of that hearing, the Chief recommended Sergeant Moore's termination and the Public Safety Director upheld the Chief's recommendation. Plaintiff admittedly was not suspended or terminated for her misconduct. MCFADDEN DEP. 208-09 (R.33-1 #318-19). Plaintiff's outcome was more favorable than Sergeant Moore, because unlike his case, the Chief's recommendation to terminate Plaintiff was overturned by the Public Safety Director.

Plaintiff cannot establish a *prima facie* case of race discrimination.  Plaintiff has presented no evidence that a similarly situated individual outside the protected class was treated more favorably than she.  Accordingly, Plaintiff has failed to create a genuine of material fact to support her prima facie case.

### b.      Legitimate, Nondiscriminatory Reason

Once a *prima facie* case has been established, "[t]he burden then shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for its actions." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001) (quoting *McDonnell Douglas*, 411 U.S. at 802). In this case, the City had legitimate, nondiscriminatory reasons for the investigation, the temporary reassignment, and the Chief's recommendation. The City's burden at this stage is one of production, not persuasion, and "it does not involve a credibility assessment." *Smith v. Interim Health Care of Cincinnati, Inc*., S.D. Ohio No. 1:10-cv-582, 2011 U. S. Dist., LEXIS 13885, at *31-32 (Dec. 2, 2011) citing, *Upshaw v. Ford Motor Co*., 576 F.3d 576, 585 (6th Cir. 2009).

The City had a legitimate, nondiscriminatory reason for investigating Plaintiff. The City had an obligation to act once it became aware of Plaintiff's alleged misconduct against Sergeant Tate, Officer Morefield, and Officer Johnson. The City would be remiss if it did not investigate their claims that Plaintiff committed multiple acts of racial discrimination and harassment while working as their police lieutenant. Plaintiff's own expert witness testified that it was appropriate for Commander Grizzell to forward the allegations to Internal Affairs for an investigation. REITER DEP. 35-36, 94-96, 116 (R.34-1 #1109-10, 1168-70, 1190). According to Mr. Reiter's testimony, "[e]veryone is adversely affected if an agency allows any form of harassment, discrimination or retaliation of its employees." REITER DEP. 27 (R.34-1 #1101). It would be entirely unacceptable for the Division to turn a blind eye and simply ignore the allegations of potential misconduct of one of its Division members.

The City also had a legitimate, nondiscriminatory reasons for temporarily reassigning Plaintiff to the property room. As noted earlier, Plaintiff was temporarily reassigned to the property room because the Division had to place her in an assignment that would limit her contact with the complainants. The Chief of Police testified that according to her training, "it is most appropriate to move the person being complained of if you needed to move that person." JACOBS DEP. 99 (R.35-5 #2032). She went on to testify that, "[i]f there is a potential for those persons to have contact with each other or to still be in a supervisory position of those or potentially generate more allegations, lots of different things can happen." JACOBS DEP. 99 (R.35-5 #2032). Moreover, the location of Plaintiff's temporary reassignment was driven by whatever bureau within the Division had work that could be done at that time. DUNLAP DEP. 30-32 (R.35-2 #1591-94). Essentially, Plaintiff could be reassigned wherever there was a need. In this case, Deputy Chief Dunlap expressed during an executive staff meeting with the Chief of Police that he needed some help

33

with ballistic vests in the property room. He told the Chief, "if you're looking for a place to put somebody, I could use some extra help down at the property room." DUNLAP DEP. 45 (R.35-2 #1606).

Lastly, Defendant has a legitimate, nondiscriminatory reason for the Chief's recommending Plaintiff's termination. After hearing the evidence presented at the Chief's Hearing and after reviewing the entire internal investigation, the Chief sustained the allegations against Plaintiff. The Chief's recommendation for Plaintiff's termination was based on her belief that Plaintiff had created a hostile work environment as related to Sergeant Tate, Officer Morefield, and Officer Johnson. JACOBS DEP. 49 (R.35-5 #1982). Notably, Reiter testified that he would have issued Plaintiff a cease and desist order and would have terminated her for insubordination if she violated that order. REITER DEP. 95-98 (R.34-1 #1169-72). Regardless, as stated above, the Chief's recommendation is not an adverse employment action and was overturned by the Public Safety Director. Plaintiff received no discipline whatsoever.

Plaintiff cannot create an issue of fact merely by challenging the judgment of her employer. An employer "may make employment decisions 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Brown v. Renter's Choice, Inc.,* 55 F. Supp.2d 788, 795 (N.D. Ohio 1999) quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). Furthermore, "it is inappropriate for the judiciary to substitute its judgment for that of management....Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 462 (6th Cir. 2004) (internal citations and quotations omitted); see also *Johnson v. Middle Metro. Gov. of Nashville and Davidson Cty., Tenn.*, 502 F. App'x 523, 539 (6th Cir. 2012) (federal courts do not act as a "'super personnel

department,' overseeing and second-guessing employers' business decisions." (citations omitted).

For all of the reasons stated above, the City has satisfied its burden of production in this case and has articulated a legitimate, nondiscriminatory reason for its actions. Therefore, the City is entitled to summary judgment.

### c. Pretext

Because the City has articulated legitimate, nondiscriminatory reasons for the investigation and the temporary reassignment, the burden shifts back to Plaintiff to "prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Plaintiff may show pretext by showing: (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the employer's action, or (3) that the reason was insufficient to motivate the employer's action. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). A reason cannot be shown to be pretext unless it is both, "false, and that discrimination was the real reason." *Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012).

Plaintiff cannot produce any evidence of pretext. Therefore, the City is entitled to summary judgment on her discrimination claims.

### 2. Title VII Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) her employer knew about her exercise of protected rights; (3) the employer thereafter took adverse employment action against her or a supervisor subjected her to severe or pervasive retaliatory harassment; and (4) there was a causal connection between her

protected activity and the adverse employment action or the retaliatory harassment. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

Plaintiff alleges that in retaliation for representing Officer Falacia Dragin in her capacity as a union representative, Commander Grizzell requested Plaintiff be investigated, Plaintiff was temporarily reassigned to the property room, and the Chief recommended Plaintiff's termination. For the same reasons Plaintiff cannot establish an adverse action in her race discrimination claim, Plaintiff also cannot show an adverse action in her retaliation claim. Moreover, Plaintiff's retaliation claim also fails because she cannot establish a causal connection between her representation of Officer Dragin and any alleged adverse action.

To support her allegation of retaliation, Plaintiff claims that in January 2017, Officer Larry Gauthney told her that Commander Grizzell was going to "come after" Plaintiff and run her off Zone 2. MCFADDEN DEP. 141-42 (R.33-1 #251-52); COMPLAINT ¶ 38 (R.1 #18). However, Plaintiff admits that Officer Gauthney never told her that Commander Grizzell was going to run her off the zone in retaliation for representing Officer Dragin or because Deputy Chief Knight was reassigned from the Internal Affairs Bureau. MCFADDEN DEP. 148 (R.33-1 #258). In fact, Commander Grizzell testified she did not learn that Officer Dragin filed a complaint of discrimination until after Plaintiff filed her charge of discrimination with the Ohio Civil Rights Commission on May 3, 2017. GRIZZELL DEP. 140 (R.35-4 #250). Indeed, since Commander Grizzell was not aware that Plaintiff engaged in any protected activity until May 2017, Plaintiff's temporary reassignment to the property room and Commander Grizzell's request to initiate an investigation, both of which occurred two months earlier, could not have been taken but for Plaintiff's engagement in her protected activity.

36

Plaintiff also alleges Sergeant Smith-Hughes told her Deputy Chief Knight was, "going to take[her] out." MCFADDEN DEP. 86 (R.33-1 #196). However, Sergeant Smith-Hughes testified he never personally heard Deputy Chief Knight say that. SMITH-HUGHES DEP. 30-31 (R.35-4 #2728-29). Likewise, both Sergeant Smith Hughes and Chief Jacobs testified that Sergeant Smith-Hughes never told Chief Jacobs that Deputy Chief Knight had threatened to take Plaintiff out. SMITH-HUGHES DEP. 35 (R.35-4 #2733); JACOBS DEP. 92 (R.35-5 #2025). Lastly, Plaintiff's claim that Deputy Chief Knight was reassigned from the Internal Affairs Bureau because of Plaintiff's work with Officer Dragin is purely speculative and based on conjecture, as Plaintiff admits no one told her the reason why Deputy Chief Knight was reassigned. MCFADDEN DEP. 95-96 (R.33-1 #205-06). Plaintiff's conclusory allegations for why she believes she was retaliated against are insufficient to support her claim.

Despite her allegations, Plaintiff cannot offer any admissible evidence to substantiate her claim that her investigation, temporary reassignment, or recommendation for termination was the result of her representation of Officer Dragin.  As there is insufficient evidence to establish a causal connection, Defendant is entitled to summary judgment on this claim.

**B.    42 U.S.C. § 1983**

Plaintiff next alleges that "[b]y reassigning, and recommending suspension, demotion, and termination for Plaintiff without due process, and depriving her of equal protection under the law because of her race and engagement in protected activity, Defendant violated 42 U.S.C. § 1983." COMPLAINT ¶ 92 (R.1 #25). Plaintiff also alleges that "[b]y denying Plaintiff the enjoyment of her employment contract because of her race, Defendant violated 42 U.S.C. § 1983." COMPLAINT ¶ 94 (R.1 #25). 42 U.S.C. § 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any

statute, ordinance, regulation, custom, or usage, of any State or Territory." The City is entitled to summary judgment on these claims as well.

Plaintiff names the City as the sole defendant. A municipality can be held liable under 42 U.S.C. § 1983 only when there is 1) a constitutional violation and then 2) only when the municipality itself caused the alleged constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) and *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978). The doctrine of *respondeat superior* does not apply; a governmental entity cannot be held liable under § 1983 based solely upon allegations that an employee or agent inflicted an injury. *Monell,* at 691. Municipalities can be held liable under § 1983 for the conduct of an employee only when the alleged constitutional violation is caused by the "execution of a government's policy or custom." *Id*. In order to satisfy the *Monell* requirements, a plaintiff must "identify the policy, connect the policy to the City itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987). The local governmental entity "must be the moving force of the constitutional violation in order to establish the liability of a governmental holding under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326 (1981) (*citing Monell*, 436 U.S. at 694). The Plaintiff does not allege the existence of such custom or policy, nor can she identify any evidence pointing to such custom or policy. For this reason alone, Plaintiff's 1983 claims against the City must be dismissed.

Furthermore, "[f]or a municipality to be liable under 42 U.S.C. § 1983, a plaintiff must show harm 'caused by a constitutional violation.'" *Thomas v. Columbus*, 854 F.3d 361, 367 (6th Cir. 2017) (quoting *Lee v. Metropolitan Government of Nashville & Davidson County*, 432 F. App'x 435, 449 (6th Cir. 2011)); *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Stevens-Rucker v. Columbus*, 739 Fed. App'x 834, 846 (6th Cir. 2018). "No constitutional violation means no

38

municipal liability." *Thomas*, 854 F.3d. at 367. In the absence of an underlying violation upon which to base municipal liability, this Court does not need to engage in the more vigorous inquiry as to whether the "alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *Stanfield v. Lima*, 727 Fed. App'x 841, 851 (6th Cir. 2018). In this case, Plaintiff cannot establish an underlying constitutional violation.

### 1. First Amendment Retaliation

To support a First Amendment retaliation claim, a plaintiff must offer proof of three elements: (1) the plaintiff was engaged in a constitutionally protected activity; (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585-86 (6th Cir. 2008) (internal quotation marks and citation omitted). As stated above, Plaintiff cannot present sufficient evidence of a causal connection between the Dragin claim and the City's response to the allegations made by Tate, Morefield, and Johnson. Thus, any First Amendment retaliation claim fails.

### 2. Equal Protection

As stated above, Plaintiff alleges that she was reassigned and recommended for suspension, demotion, and termination because of her race and engagement in protected activity. She also alleges that she was denied the enjoyment of her employment contract because of her race. A plaintiff seeking to establish an Equal Protection violation must show that "'the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1137 n.7 (6th Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)). "The showing

a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988).

"To show discriminatory purpose, a plaintiff can proffer 'evidence that an official chose to prosecute or engage in some other action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *King v. City of Eastpointe*, 86 F. App'x 790, 802 (6th Cir. 2003)). For the same reasons Plaintiff cannot demonstrate that the City's legitimate reasons for its allegedly adverse employment actions are pretext, she cannot show a discriminatory purpose. Accordingly, Plaintiff's Equal Protection claim fails.

### 3. Due Process

Finally, Plaintiff alleges that her Due Process rights were violated. The Court must answer two questions to analyze Plaintiff's proposed due process violations: (1) does she have a property interest sufficient for due process protection; and (2) if she indeed possesses such an interest, what is the proper amount process to which she is entitled? *Leary v. Daeschner*, 228 F.3d 729, 741-42 (6th Cir. 2000). If an individual does possess a property interest, deprivation of that right must be "preceded by notice and opportunity for a hearing appropriate to the nature of the case." *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1986). The query of "how much process is due" is one of "federal law and thus is not limited by the procedures that the state may have deemed to be adequate when it created the property right." *Id*. (citation omitted). However, the process does not have to be elaborate and is subject to change depending on the competing interests. *Higgins v. Jefferson Cnty., Ky.*, 344 F. Supp. 2d 1004, 1007 (W.D. Ky. 2004) (citations omitted). "The specific dictates of due process are determined by considering factors such as the employee's interest in retaining employment, the governmental interest in the

expeditious [discipline] of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous [discipline]." *Id.* (describing the process as it applies to termination) (citations omitted). In this case, Plaintiff was afforded two separate hearings, one in front of the Chief of Police, and one in front of the Safety Director. Plaintiff ultimately received no discipline whatsoever.

Any suggestion that Plaintiff's temporary reassignment constituted a due process violation is also unpersuasive. *See e.g., Eggers v. Moore*, 257 F. App'x 993, 995 (6th Cir. 2007) (putting teacher on paid forced administrative leave did not require due process hearing); *Joseph v. City of Columbus*, No. C2-04-754, 2006 U.S. Dist. LEXIS 69962, 2006 WL 2795195, *6-7 (S.D. Ohio Sept. 27, 2006) ("[E]mployers may avoid due process concerns in cases in which immediate suspension of an employee is necessary by placing that employee on paid, rather than unpaid, leave." (citing *Loudermill*, 470 U.S. at 538)); *Lynch v. McNamara*, 342 F. Supp. 2d 59, 65-66 (D. Conn. 2004) ("[R]eassignments and transfers generally do not implicate a protected property interest for the purposes of due process, unless accompanied by a loss in pay.") (citations omitted). As Plaintiff received full pay and benefits during her temporary reassignment, such action may not form the basis of a due process claim. Accordingly, Plaintiff's Due Process claim fails.

## C. PLAINTIFF'S WORK INJURY CLAIM IS PRECLUDED

As stated above, Plaintiff alleges that she injured her shoulder while performing work in the property room and she currently has an open Ohio workers' compensation claim for that alleged injury. MCFADDEN DEP. 72 (R.33-1 #182). To the extent that Plaintiff is attempting to re-litigate her work injury claims she is precluded by Ohio law. The Ohio Workers' Compensation statute provides that employers "shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of [her] employment[.]" Ohio Rev. Code § 4123.74. Ohio

courts accordingly recognize the general rule that workers' compensation is the exclusive remedy for an employee injured as a result of negligence. *Ritchie v. Dravo Corp.*, 585 F. Supp. 1455, 1456, 11 Ohio B. 181 (S.D. Ohio 1984); *Alessio v. United Airlines, Inc.*, 2018 U.S. Dist. LEXIS 25120, *15, 2018 WL 902334. Thus, to the extent that Plaintiff is seeking reimbursement of her prior medical bills, or money to pay for future medical expenses relating to her injury, her remedies are limited to those provided by Ohio's workers' compensation statute. *Williams v. GM*, S.D. Ohio No. 1:13-cv-336, 2014 U.S. Dist. LEXIS 117216, at *14-15 (July 28, 2014).

## VI. CONCLUSION

For the reasons stated above, Defendant City of Columbus respectfully moves this Court for summary judgment on all claims asserted against it by Plaintiff Melissa McFadden.

Respectfully submitted,

/s/ Susan E. Williams
Susan E. Williams (0073375)—LEAD
Westley M. Phillips (0077728)
Assistant City Attorney
CITY OF COLUMBUS, DEPARTMENT OF LAW
ZACH KLEIN, CITY ATTORNEY
77 North Front Street, Columbus, Ohio 43215
(614) 645-7385 / (614) 645-6949 (fax)
sewilliams@columbus.gov
wmphillips@columbus.gov

Attorneys for Defendant City of Columbus

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 29, 2021, I electronically filed the foregoing with the Clerk of the Court by using this Court's e-Filing System, which will send a notice of this electronic filing to all counsel of record in this matter:

/s/ Susan E. Williams
Susan E. Williams (0073375)