UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MELISSA MCFADDEN,

            **Plaintiff,**

     v.

CITY OF COLUMBUS,

           **Defendant.**

Case No. 2:18-cv-544
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

<u>**OPINION AND ORDER**</u>

The matter before the Court is Defendant City of Columbus's Motion for Summary Judgment. (ECF No. 38). Plaintiff Melissa McFadden responded in opposition, (ECF No. 40), to which Defendant replied (ECF No. 43). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendant's Motion. (ECF No. 38).

**I.**

This is an employment discrimination and retaliation case brought by Melissa McFadden, an African American lieutenant with the Columbus Division of Police ("CPD").  Lieutenant McFadden asserts that she was discriminated against on the basis of her race and retaliated against for engaging in protected activity, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and Ohio Revised Code § 4112.02. Plaintiff also asserts that Defendant City of Columbus ("the City") violated her due process and equal protection rights and the enjoyment of her employment contract because of her race.

A.    **Background**

Lieutenant McFadden began with the CPD on May 19, 1996. (McFadden Dep. at 12:22-24, McFadden Decl. at Ex 1). After completing the training academy and a probationary period, she was assigned to the Patrol Division in May 1997. She served in patrol and advanced training for thirteen years, earning strong performance reviews and praise from supervisors and community members. (*Id* at ¶6). While working as a patrol officer and advanced training officer, Lt. McFadden earned an Associate Degree in 2002, a Bachelor of Criminology Degree and Bachelor of Social Work Degree in 2004. She qualified for a license with the Ohio Marriage & Family Therapist Board. (*Id.* at Ex 1) Five years later, while still serving as an advanced training officer, Lt. McFadden earned a Master Degree in Criminal Justice in 2009. (*Id.*)

After earning her Master Degree, the patrol officer McFadden sought promotion to Sergeant at the CDP. Lieutenant McFadden was required to pass written examinations and a round of interviews and received the highest score on this promotional exam. (McFadden Decl. at ¶ 8) She was promoted to sergeant in March 2010. (McFadden Dep. at 13:1-3)

As a sergeant, Lt. McFadden was assigned to various posts including the Internal Affairs Bureau ("IAB"). While at the IAB, she was taught how to conduct a complete, independent, and impartial investigation. (*Id.* at 15: 1-14, and McFadden Decl. at ¶ 10). She was told that it was essential to not only interview inculpatory witnesses, but potential exculpatory witnesses too. (McFadden Decl. at ¶11).  She was trained that there is no set number of witnesses, but to interview all witnesses necessary to make a credible and fully informed recommendation up the chain of command. (*Id.* at ¶12).

Lieutenant McFadden was promoted to the rank of lieutenant in March 2014. (McFadden Dep. at 13:4-6) While serving in this role she earned a Juris Doctor in 2018. (McFadden Decl. at.

Ex. 1) As a lieutenant, in 2014 McFadden was one of the four highest ranking African Americans at the CPD, and the highest ranking African American female. (McFadden Decl. at ¶17)

**B.    Protected Activity**

In the Fall of 2016, in her capacity as a union representative, Lt. McFadden represented an African American female officer, in her defense against a complaint of insubordination and failure to follow the chain of command. (McFadden Decl. at ¶¶ 23–24, ECF No. 40-1). Lieutenant McFadden also assisted this officer in filing her own charge of discrimination against the sergeant, Kyle Fishburn, who had accused the officer of insubordination. (*Id.* at ¶¶ 22, 26). According to IAB Commander Jennifer Knight, Lt. McFadden's activity in support of this officer was known within the IAB. (Knight Dep., ECF No. 35-7, PageID 2243, 2245–46).

Thereafter, IAB Cmdr. Knight met with Sgt. Fishburn. (Smith-Hughes Dep., ECF No. 35-11, PageID 2725). Sergeant Christopher Smith-Hughes testified to having overheard their conversation, and that IAB Cmdr. Knight allegedly told Sgt. Fishburn "you don't have to worry about that. I'll handle that. It won't go anywhere." (Smith-Hughes Dep., ECF No. 35-11, PageID 2726). This characterization of the conversation is disputed by IAB Cmdr. Knight who stated that when asked about an investigation she typically replied, "I don't know who the investigator is. . . . Don't worry about it. Someone will call you." (Knight Dep., ECF No. 35-7, PageID 2248). When word of the alleged conversation reached Chief of Police Jacobs, the Chief asked Sgt. Smith-Hughes to repeat the story to her and stated her disappointment because IAB Cmdr. Knight "was her friend." (Smith-Hughes Dep., ECF No. 35-7, PageID 2733).

**C.     Investigation into Lt. McFadden**

Lieutenant McFadden presents evidence she contends shows that Cmdr. Rhonda Grizzell solicited false complaints about her. Specifically, shortly after Lt. McFadden assisted the officer in filing a discrimination claim, Chief Jacobs reassigned IAB Cmdr. Knight; at the same time, Chief Jacobs reassigned several others, including Cmdr. Grizzell. (Jacobs Dep., ECF No. 35-5, PageID at 2049–50). Chief Jacobs assigned Cmdr. Grizzell to Zone 2, where she directly supervised Lt. McFadden.

Early in her assignment, Cmdr. Grizzell attended the roll calls for Zone 2's four precincts and Community Response Team 2. (Grizzell Dep., ECF No. 35-4, PageID 1755). Lieutenant McFadden's assignment was as Zone 2 B Company Lieutenant. (*Id.* at PageID 1775). Commander Grizzell testified that she observed that B Company had staffing and moral issues and explained that was the reason she launched an investigation of Lt. McFadden. (*Id*. at 72:2-6).

Lieutenant McFadden offers evidence that there were numerous reasons Zone 2 had staffing issues and that they occurred before and after she was assigned there. For example, Zone 2 had the highest amount of calls requiring police assistance of any of the City's five patrol zones. (Smith-Hughes Dep. at 15:20-24, Grizzell Dep. at 39 :4-8). Previous Zone 2 Cmdr. Mark Gardner drafted a report describing the staffing concerns: "A second dynamic that further compounds the staffing challenge are extended absences that create additional unanticipated vacancies. Extended absences are created due to military deployments, injury leave, restricted duty officers relieved of duty[.]" (Grizzell Dep. at 97:12-20, Ex QQ)

On March 1, 2017, Sgt. Andre Tate spoke to Cmdr. Grizzell. (Tate Dep., ECF No. 35-12, 2880, 2894–95). According to Sgt. Tate, when Lt. McFadden gave the sergeant his performance review, Lt. McFadden told him that he would have scored lower but that she "did not believe in

4

black-on-black crime." (*Id.* at PageID 2867; Pl. Ex. F, ECF No. 36-6). Sergeant Tate further

indicated that Lt. McFadden ran "black only" study groups. (Tate Dep. at PageID 2907–08; Pl.

Ex. SSS, ECF No. 36-70, PageID 3707). This latter allegation is disputed by members of the

study groups who testify that there were also Hispanic individuals and white women in

attendance in at least some of the groups. (Odom Dep., ECF No. 36-10, PageID 2586, 2588;

Smith-Hughes Dep., ECF No. 35-7, PageID 2771–72).

        Commander Grizzell testified that on the same day she had lunch with Sgt. Tate, another

officer approached her and informed her that she should reach out to two particular officers who

had negative information about Lt. McFadden.  (Grizzell Dep., ECF No. 35-4, PageID 1783).

Lieutenant McFadden disputes that these officers independently decided to contact Cmdr.

Grizzell, providing evidence that the complaints were solicited by Cmdr. Grizzell. (Johnson Dep,

at 116:12-21, ECF No. 35-6) (*e.g.*, Cmdr. Grizzell sent each of the officers text messages asking

them to draft e-mails, saying: "would you be willing to write a detailed statement to accompany

my letter? I think having your own words makes sense" and to "make sure you include how this

made you feel").  Regardless of who initiated contact, both officers spoke with Cmdr. Grizzell.

        The City highlights the following testimony of one of the officers, Levon Morefield, who

avers that Lt. McFadden made racist comments related to his interracial marriage. (Morefield

Dep. at 92–93, 130, ECF No. 35-9, PageID 2472–73, 2511). When Officer Morefield left Zone

2, he avers that Lt. McFadden told him: "Don't forget you're nothing but a stupid [N-word], and

they're going to treat you like the stupid [N-word] you are!" (Morefield Dep. at 153–154, ECF

No. 35-9, PageID 2534–35). Lieutenant McFadden denies making these statements and notes

that it is undisputed that Officer Morefield never made a complaint about the statement.

Lieutenant McFadden testified she never used the "n" word, stating that "I don't use that word in

my private life. I don't use that word in my professional life. As much as I've helped African-Americans get promoted on this department and the things I've done to help them, for me to degrade someone like that, I wouldn't do that." (McFadden Dep. at 200:4-21). Lieutenant McFadden further testified that "black people know white people don't like that word. They don't tolerate that word at all. . . . . And so, [Officer Morefield] us[es] that word 'cause he knew that's a word that's very good that would definitely get people riled up." *Id.* Lieutenant McFadden provides testimony of other coworkers who have never heard her use that type of language. (Smith-Hughes Dep. at 67:1-3) (testifying that he has never heard Lt. McFadden use the "N word in any of its iterations"). Instead, Lt. McFadden testified that she told Officer Morefield : "You should be mindful that some people don't like interracial relationships, so just make sure you watch your back on that." (Mcfadden Dep. at 40, ECF No.33-1, PageID 150).

The other officer, Anthony Johnson, alleged that Lt. McFadden told him "we have to stick together" and "those Officers in 13 aren't your brothers[.]" (Pl. Ex. H, ECF No. 36-8, PageID 3174). Officer Johnson perceived Lt. McFadden to be insinuating that he should only trust African American officers, and he stated his disagreement. (*Id.*). Thereafter Lt. McFadden allegedly treated Officer Johnson harshly, to the point that he felt he needed to leave Zone 2. (*Id.* at PageID 3174–76). Lieutenant McFadden denies she treated him harshly, explaining her decisions regarding Officer Johnson were based on his being on restricted duty because of an injury.

Sergeant Tate, Officer Morefield, and Officer Johnson provided written statements to Cmdr. Grizzell, who in turn brought these statements to the Chief of Police. (Pl. Ex. HH, ECF No. 36-34; Pl. Ex. F, ECF No. 36-6; Pl. Ex. G, ECF No. 36-7; Pl. Ex. H, ECF No. 36-8). Chief Jacobs met with Deputy Chief Kuebler and Cmdr. Grizzell to discuss the situation. (Jacobs Dep.,

ECF No. 35-5, PageID 2013; Kuebler Dep., ECF No. 35-8, PageID 2316–17). According to

Deputy Chief Kuebler, based on City Human Resource Department and City Equal Employment

Opportunity ("EEO") direction, the group decided to reassign Lt. McFadden. (*See* Kuebler Dep.

at PageID 2317). Deputy Chief Kuebler testified that the group sought to assign Lt. McFadden to

an assignment where she would not have contact with the complainants. (*Id.*). At the time, Sgt.

Tate was assigned to Zone 2; Officers Morefield and Johnson had previously obtained

assignments elsewhere. (*See* Johnson Dep., ECF No. 35-6, PageID 2134; Morefield Dep., ECF

No. 35-9, PageID 2456, 2472).

**D.      Reassignment of Lt. McFadden**

The assignment decision made by Jacobs, Kuebler and Grizzell, came shortly thereafter,

based on a discussion during the Chief's bi-weekly executive staff meeting with the Deputy

Chiefs. (*See* Dunlap Dep., ECF No. 35-2, PageID 1606). At this staff meeting there was a

discussion about where to assign Lt. McFadden, and DC Dunlap suggested that he could use

some help in the Property Room. (*Id.*). Specifically, DC Dunlap suggested that he would have Lt.

McFadden help with old body armor, "tak[ing] the ballistic panels out of the carrier," and

"separat[ing] them from the vest carrier so that we could get them disposed of . . . ." (*Id.* at

PageID 1610–11). The Chief ultimately decided to adopt DC Dunlap's suggestion; DC Kuebler

agreed. (*See* Jacobs Dep., ECF No. 35-5, PageID 1996; Kuebler Dep., ECF No. 35-8, PageID

2323).

Deputy Chief Kuebler called Cmdr. Grizzell to inform the commander that Lt. McFadden

would be relieved from her Zone 2 assignment and assigned to the Property Room. (*See* Grizzell

Dep., ECF No. 35-4, PageID 1815). Commander Grizzell filled out the forms and gave them to

Lt. McFadden on March 12, 2017, and the following day Lt. McFadden began disassembling

body armor in the Property Room. (*Id.* at 102:10-19; Pl. Ex. M, ECF No. 36-13; Gardner Dep., ECF No. 35-3, PageID 1670; McFadden Dep., ECF No. 33-1, PageID 151). This was the first time Chief Jacobs involuntarily reassigned someone to the Property Room. (Jacobs Dep., ECF No. 35-5, PageID 2030–31). Similarly, DC Kuebler had never before been involved in a decision to reassign someone to the Property Room. (Kuebler Dep., ECF No. 35-8, PageID 2338). So too for DC Knight, DC Dunlap, and Cmdr. Grizzell. (Knight Dep., ECF No. 35-7, PageID 2234; Dunlap Dep., ECF No. 35-2, PageID 1591; Grizzell Dep. at PageID 1826).

While working at her task in the Property Room, Lt. McFadden lifted a stack of body armor and tore her rotator cuff. (McFadden Dep., ECF No. 33-1. PageID 177; McFadden Decl. at ¶ 38, ECF No. 40-1). In an email discussion, DC Kuebler expressed his opinion that "Lt. McFadden should remain on the Property Room roster for leave purposes unless and until she is no longer either the subject or complainant in an EEOC investigation involving Commander Grizzell." (*See* Pl. Ex. N, ECF No. 36-14, PageID 3191). The Chief decided to leave Lt. McFadden on the Property Room roster. (*Id.*).

**E.    The Results of the McFadden Investigation**

While Lt. McFadden was assigned to the Property Room, the IAB conducted an investigation of her. (*See* Weaver Aff. ¶ 3, ECF No. 38-1, PageID 4100). After the investigation ended, Chief Jacobs conducted a disciplinary hearing.  Chief Jacobs recommended that Lt. McFadden receive a 240-hour suspension, a demotion to police officer, and termination of her employment. (Mcfadden Dep. 72, ECF No. 33-1, PageID 182; Mcfadden Dep. Ex. 38, ECF No. 33-14, PageID 512-516). Human Resources Manager Amy VanPelt testified that the CPD rarely recommends termination for an EEO violation, and that to her knowledge prior to Lt. McFadden

the CPD had not before recommended termination for a first EEO violation. (VanPelt Dep., ECF No. 35-13, PageID 2978–79 at 42:20-22; 43:5-12).

Before a CPD employee can be terminated for an EEO violation, the City of Columbus Safety Director conducts a hearing on the matter. (McFadden Dep., ECF No. 33-1, PageID 269-11). After Lt. McFadden presented her case and the hearing ended on August 22, 2018, the Safety Director rejected the Chief's recommendation, finding that the charges were "not sustained." (*Id.* at PageID 270; Pl. Ex. XXX, ECF No. 36-75). Lieutenant McFadden was then permitted to return to her prior assignment. (Def. Resp., ECF No. 40, PageID 5193).

Before the Safety Director issued findings, Lt. McFadden filed suit against the City on June 6, 2018. (ECF No. 2). Defendant has filed a Motion for Summary Judgment on all claims (ECF No. 38), which is ripe for review (ECF Nos. 40, 43).

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)

(quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts.").  Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III.

The City moves for summary judgment on each claim brought by Lt. McFadden.

### A.    Title VII Discrimination and Retaliation[1]

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Title VII also prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII.  42 U.S.C. § 2000e–3(a). The opposition clause of Title VII makes it "unlawful . . . for an employer to discriminate against any . . . employe[e] ...

---

[1] As the City recognizes, the same analysis generally applies to Lt. McFadden's claims under Title VII and Ohio law. (Def. Mot., ECF No. 38, PageID 4076) (citing  *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (Ohio 1981). Accordingly, the analysis herein applies the same to the claims under Ohio law.

because he has opposed any practice made . . . unlawful . . . by this subchapter." § 2000e–3(a).
"The term 'oppose,' being left undefined by the statute, carries its ordinary meaning, 'to resist or
antagonize [...]; to contend against; to confront; resist; withstand.' " *Crawford v. Metro. Gov't of
Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (citing Webster's New
International Dictionary 1710 (2d ed.1958)). "The opposition clause protects not only the filing
of formal discrimination charges with the EEOC, but also complaints to management and less
formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d
714, 729–30 (6th Cir. 2014) (gathering cases of other examples of less formal protected activity).

A plaintiff may prove her discrimination or retaliation claim under Title VII using direct
or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648–49 (6th
Cir. 2012) (citation omitted).  Where, as here, the plaintiff seeks to establish her case using
circumstantial evidence, courts apply the three-party *McDonnell Douglas* analysis in both
discrimination and retaliation cases. *Id.* (discrimination); *Morris v. Oldham County Fiscal Court*,
201 F.3d 784, 792 (6th Cir. 2000) (retaliation). First, the plaintiff has the burden of proving a
prima facie case of discrimination. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53
(1981). The burden of proof then shifts to the defendant to articulate a "legitimate
nondiscriminatory reason for the adverse employment action." *Id.* If the defendant can articulate
a nondiscriminatory reason for the action, the burden shifts back to the plaintiff to prove that the
proffered reason is a "pretext for discrimination." *Id.*

### 1.    Prima Facie Case

As the first step in the three-part *McDonnell Douglas* analysis, Lt. McFadden must make
out a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S.
792, 802 (1973). To establish a prima facie case of racial discrimination under the *McDonnell*

*Douglas* framework McFadden must "present evidence that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012) (citation omitted).

"The prima facie elements of a retaliation claim are similar but distinct from those of a discrimination claim." *Michael v. Caterpillar Fin. Services Corp.*, 496 F.3d 584, 595 (6th Cir. 2007). To establish her prima facie retaliation case, Lt. McFadden must show that (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris,* 201 F.3d at 792.

As the Sixth Circuit has stated repeatedly, "[a plaintiff's] burden at the prima facie stage is 'not onerous' and 'poses a burden easily met.'" *See e.g.*, *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011). At bottom, to establish a prima facie case McFadden must demonstrate "circumstances giving rise to an inference of unlawful discrimination." *Jackson v. VHS Detroit Receiving Hospital, Inc.*, 814 F.3d 769 (6th Cir. 2016) (citation omitted).

Lieutenant McFadden alleges that she is an African American who was discriminated by white supervisors because of her race. The City does not contest that Lt. McFadden meets this element of her prima facie case. Additionally, Lt. McFadden contends that she is qualified for her position.  The City too, does not contest this prong of the prima facie case.  Defendant only contests whether Lt. McFadden can show (a) that she suffered an adverse employment action or

(b) that individuals outside of her protected class were treated more favorably." (Def. Mot., ECF No. 38, PageID 4077). The City also does not contest that Lt. McFadden can show that she engaged in a protected activity and that Defendant knew about the protected activity. Rather, the City asserts that Lt. McFadden cannot establish her prima facie case of retaliation because she cannot show (c) that there was a causal connection between the protected activity adverse employment action. Defendant's arguments are not well taken.

### a. Adverse Employment Action

In the context of a Title VII discrimination claim, an adverse employment action is defined as a "materially adverse change in the terms or conditions" of employment. *Laster*, 746 F.3d at 727 (citing *Kocsis v. Multi–Care Mgmt. Inc.,* 97 F.3d 876, 885 (6th Cir. 1996)). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)).

The Court finds that there is a genuine dispute of material fact as to whether Lt. McFadden suffered an adverse employment action. The City argues that reassignment to the Property Room was not an adverse employment action "[s]imply because Plaintiff was unhappy" with it. (Def. Mot., ECF No. 38, PageID 4079). Perhaps not, but that is not Lt. McFadden's argument.

Instead, Lt. McFadden argues that the investigation which triggered her loss of a field assignment and caused her reassignment to the Property Room culminated in significantly diminished material responsibilities. And indeed, reassignment that "significantly diminishes material responsibilities," may be considered an adverse employment action. *White v. Burlington*

*N. & Santa Fe Ry.*, 364 F.3d 789, 797 (6th Cir. 2004) (*en banc*), *aff'd*, 548 U.S. 53 (2006) (stating that a reassignment without material changes can be an adverse employment action when it "constitutes a demotion evidenced by 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'") (citation omitted)).

The evidence presented by Lt. McFadden shows that not only was she placed in the Property Room, she was not assigned and did not perform any of the traditional property lieutenant's assignments. (Grizzell Dep. at 112:11-17; Gardner Dep. at 29:5-7, 37:18-24). Usually, the lieutenant in the Property Room attends auctions for both the Property Room and for the impound lot. It "is more of an administrative role, paperwork." (Gardner Dep. at 35:6-11). Lieutenant McFadden was assigned the job of "tak[ing] the ballistic panels out of the carrier, [and] separat[ing] them from the vest carrier so that we could get them disposed of." (Dunlap Dep. at 49:6-16, 49:23-50:2; Morefield Dep. at 44:7-12)) The material covered Kevlar bullet proof vests are worn under an officer's uniform in all weather. Unsurprisingly, the pictures of the vests show them to be dirty and sweat stained.  Lieutenant McFadden helped process over 1,000 vests, weighing up to seven pounds each, injuring her rotator cuff during this physical labor. She was required to locate and record the serial number of each Kevlar panel once it was removed, tape the two panels together, and stack them on a pallet to be sent to special recycling. She injured her rotator cuff during this physical labor. For the related paperwork of tracking the serial numbers, Lt. McFadden shared a desk with a temporary worker. (McFadden Dep. at 48:18-24, 103:18-19)

Lieutenant McFadden presents testimony from a CPD retired sergeant, who served in CPD for 25 years, that "an involuntary assignment to the property room is considered to be

unwelcome, punitive, and humiliating." (Alexander Dec. at ¶1, 5-9,10, 15) This sergeant had experience as an IAB sergeant and FOP union grievance representative. She also testified that "the property room is among other things, is a dirty, grimy place" and "being assigned to do physical labor in the property room is more humiliating and punitive." (*Id*. at ¶11-12) This testimony is supported by other CPD employees who too assessed the reassignment of Lt. McFadden as a punitive measure. (*See* Odom Dep. at 64: 2-16; Smith-Hughes Dep. at 45:4-7, 112:9-12, 63:4-15)

A Zone 2 lieutenant with a law degree and Masters in criminal justice, who had been on the force for over twenty years was moved to the Property Room to disassemble body armor during an investigation where she, an African American, was accused of discriminating against other African Americans. A reasonable jury could view this reassignment as a significant diminishment in material responsibilities meeting Lt. McFadden's burden to show that she was subjected to an adverse employment action.

### b. Similarly Situated Coworkers

The Court also concludes that there are genuine disputes of material fact as to whether Lt. McFadden was treated differently from similarly situated coworkers who were not in her protected category. When determining whether a plaintiff and her proffered comparables are similarly situated, courts consider whether they are similarly situated in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). In *Mitchell*, the Sixth Circuit held that:

> to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citation omitted).

In clarifying *Mitchell*, the *Ercegovish* Court cautioned that courts should not "assume" that "the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F.3d at 352; *see also Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) ("the weight to be given to each [Mitchell ] factor can vary depending upon the particular case"). The Sixth Circuit "has asserted that in applying the standard [that plaintiff must show that he is treated differently than similarly situated employees from outside the class] courts should not demand exact correlation, but should instead seek relevant similarity." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (citation omitted). Even the "same supervisor' criterion" is not an "inflexible requirement." *Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479–80 (6th Cir. 2003).

Lieutenant McFadden presents evidence of seven police officers who she contends are similarly situated because they were accused of EEO violations, yet they were treated more favorably than she was treated. First, Sgt. Eric Moore was, among other things, accused of calling African American officers "apes" and "monkeys," using the N-word, and threatening to kill black officers. (Jacobs Dep., ECF No. 35-5, PageID 1953–54; McFadden Dep., ECF No. 33-1, PageID 316–18). Sergeant Moore was not reassigned pending investigation until he voluntarily sought reassignment. (*See* Jacobs Dep., ECF No. 35-5, PageID 2044–46). At the conclusion of the investigation, Sgt. Moore received a recommendation of termination for other charges, and a written reprimand based on the aforementioned allegations. (*Id.* at PageID 1952, 1955).

Second and third, Cmdr. Grizzell and Lt. Lowell Rector had EEO complaints filed against them by Srgt. Odom alleging their creation of a hostile work environment, and their engagement in racial discrimination and retaliation. (Odom Dep., ECF No. 36-10, PageID 2637–38; Pl. Ex. CCC, ECF No. 35-55; Pl. Ex. DDD, ECF No. 35-56; Pl. Ex. OOO, ECF No. 36-67). Pending completion of the investigation, these accused remained at their assignments, while only the complainant was reassigned. (Odom Dep., ECF No. 36-10, PageID 2643–44; Smith-Hughes Dep., ECF No. 35-11, PageID 2752; Grizzell Dep., ECF No. 35-4, PageID 1918–19; McFadden Dep., ECF No. 33-1, PageID 311–12, 324).

Fourth, Lt. Christine Nemchev, a Caucasian officer, was accused by a sergeant in an EEO complaint of committing racial discrimination and retaliation. (Jacobs Dep., ECF No. 35-5, PageID 2038; Pl. Ex. S, ECF No. 36-19). There too, the complainant and not the accused was reassigned pending investigation. (Knight Dep., ECF No. 35-7, PageID 2229, 2232; McFadden Dep., ECF No. 33-1, PageID 324).

Fifth, Officer Charles Meinhart.[2] Sergeant Smith-Hughes filed a complaint against Officer Meinhart accusing him of racial discrimination and retaliation. (Smith-Hughes Dep., ECF No. 35-7, PageID 2744–45, 2747). Sergeant Smith-Hughes alleges that Officer Meinhart "partially pulled his pistol" and told the sergeant to "speak American." (*Id.* at PageID 2744–45). Here too, the complainant was reassigned while the accused was not. (*Id.* at PageID 2746).

Sixth and seventh, Lt. Duane Mabry and Sgt. Jason Grunkemyer. Lieutenant Mabry took Lt. McFadden's position while Lt. McFadden was assigned to the Property Room. While under Cmdr. Grizzell, Lt. Mabry was accused of creating a hostile work environment, based on

---

[2] In its Reply Brief, the City takes issue with this comparator because he is a "last-minute addition." (ECF No. 43 at 7.) The City does not, however, ask for exclusion of this evidence based on untimeliness.

religion. (Pl. Ex. AA, ECF No. 36-27; ECF Nos. 36-27 and 36-28, McFadden Dep., ECF No. 33-1, PageID 254–55, 312, 324; Pl. Ex. Z, ECF No. 36-26). Sergeant Grunkemyer was also accused of creating a hostile work environment. Neither of these officers was reassigned. (Pl. Ex. BB, ECF No. 36-28; McFadden Dep. at PageID 254–55, 312, 324).

Lieutenant McFadden contends that the offered comparators were all the subject of EEO investigations, and it was the complainants who were reassigned. Further, these individuals were the subjects of complaints, while Lt. McFadden's was an elicited investigation. With Lt. McFadden, DC Kuebler directed that she "remain on the Property Room roster . . . until she is no longer the subject or complainant in an EEO investigation involving Commander Grizzell." (Kuebler Dep. at Ex N).

The City contends that these individuals are not similarly situated to Lt. McFadden based on differences in rank, supervisor, and the specifics of the complaints against them, and that "[n]one of her comparators engaged in the same alleged misconduct as Plaintiff." (Reply at 6, ECF No. 43.) The City specifies:

> Unlike her comparators, Plaintiff was accused by multiple subordinates of creating a hostile work environment when she stated directly to them, "you're nothing but a dumb nigga, and they're going to treat you like the dumb nigga you are;" Morefield Dep. 153- 54 (R.35-9 #2534-35); or "white officers are not your brothers, and their not happy that you're fucking one of their own." *Id*. at 92 (R.35-9 #2473). None of her comparators were accused of telling subordinate officers that officers on other precincts should not be considered family because they (referring to Caucasian officers) "will hang you out to dry the first moment they get." Johnson Dep. 59 (R.35-6 #2111). Or, telling subordinate officers that they did not want officers to be proactive because being proactive gave "white officers more chances to oppress minorities." *Id*. at 75 (R.35-6 #2127). Additionally, none of her comparators were alleged to have given a direct report a more favorable performance evaluation based on the subordinate's race because she did not believe in "black on black crime." Tate Dep. 44 (R.35-12 #2880).

*Id*.

18

However, the similarly situated consideration does not require the comparators to make the exact same offensive comments. And even if it did, it would be unlikely that Lt. McFadden could find another situation where an African American officer is accused of making racist comments to other African American officers and treating one African American officer more favorably because of his race—a situation that brings an entirely different dynamic to the table.

The evidence before the Court reflects investigations into situations where someone outside of the protected category is accused of discriminating or harassing someone who is in that protected category.  And this type of situation is the common one; that is a minority group (African Americans) historically discriminated against by the majority group (Caucasions).

The City frames Lt. McFadden's conduct as racist toward whites. Defendant offers disputed testimony that Lt. McFadden held black only study groups. However, no evidence has been offered from any white employee against whom Lt. McFadden allegedly discriminated. Instead, the alleged racist behavior was by one African American toward other African Americans.

The majority of discrimination claims under Title VII are for discrimination against African American employees by members outside of their protected group. There are also a minority of reverse discrimination claims brought by Caucasian employees. *Treadwell v. Am. Airlines, Inc.*, 447 Fed. Appx. 676, 679 (6th Cir. 2011) ("Our circuit's heightened standard for reverse-discrimination cases presumes that such discrimination is comparatively rare[.]") It is a rarer case indeed when the claims are brought by members of a protected category against another member of that protected category—the case *sub judice*.  In this situation, when the sample size of comparators is small, courts must not apply the "similarly-situated" requirement

so stringently that it "deprive[s a plaintiff] of any remedy to which [s]he may be entitled under the law." *Jackson v. FedEx Corp. Servs., Inc.,* 518 F.3d 388, 396–97 (6th Cir. 2008).

Based on the forgoing, the Court concludes that Lt. McFadden has presented sufficient evidence to raise a genuine issue of material fact as to whether any similarly situated coworkers outside of her protected group were treated more favorably.

### c.    Causal Connection

The City argues that summary judgment is appropriate because, in its view, Lt. McFadden failed to raise any genuine issue of material fact as to a causal connection between McFadden's protected activity and the adverse action. The Court does not share this view.

"To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003). Lt. McFadden relies on proximity of time to show a causal link, and also submits an email from DC Kuebler to show a dispute of material fact on the issue of causation.

As mentioned above, DC Kuebler wrote that, "Lt. McFadden should remain on the Property Room roster for leave purposes unless and until she is no longer the subject or complainant in an EEOC investigation involving Commander Grizzell." (Pl. Ex. N, ECF No. 36-14). Following that email the Chief responded with her decision that McFadden would remain on the Property Room roster. (*Id.*). McFadden views DC Kuebler's email as a statement from a deputy chief that, "on its face" connects her complaints against discrimination to the Property Room. (Pl. Resp., ECF No. 40, PageID 5195). According to the City, DC Kuebler's statement

20

had "nothing to do with" McFadden's protected activity. (Def. Reply, ECF No. 43, PageID 5271). This, however, is for the jury to decide.

Additionally, plaintiff relies on the temporal proximity between the reassignment of Cmdr. Knight and the investigation of Lt. McFadden, which was only a few weeks. "Causation may be inferred from such factors as temporal proximity and differential treatment of similarly situated comparators." *Mitchell v. Per-Se Techs., Inc.*, 64 Fed.Appx. 926, 927 (6th Cir. 2003) (internal citation omitted). "In analyzing the facts in temporal proximity cases, [the Sixth Circuit] ha[s] always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Johnson*, 642 Fed.Appx. at 607 (internal citation omitted). Here, Lt. McFadden offers additional evidence that the jury may, or may not, find is supportive of a finding of casual connection between her protected activity and her alleged adverse action.

The Court concludes that Lt. McFadden has produced sufficient evidence from which a reasonable juror could draw an inference that the City would not have taken the adverse actions against her had she not engaged in activity that Title VII protects.

### 2. Legitimate Reason for the City's Actions

Because Lt. McFadden has raised triable issues of fact as to her prima facie case of race discrimination and retaliation, the burden shifts to the City to articulate a legitimate nondiscriminatory reason for its adverse action against McFadden, which it has done. *McDonnell Douglas*, 411 U.S. at 802; *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) ("It is important to note that the defendant need not *prove* a nondiscriminatory reasons for not promoting Hartsel, but need merely *articulate* a valid rationale.")

The stated reason: the City was obliged to investigate upon learning of the racist comments McFadden allegedly made; during the investigation the Chief of Police reassigned McFadden to

avoid her contact with the complainants; and upon completion of the investigation the Chief was briefed on the situation, believed the allegations, and recommended termination based on that belief. (*See* Def. Mot., ECF No. 38, PageID 4089–90). This justification is not "so lacking in merit as to call into question its genuineness." *Hartsel*, 87 F.3d at 800.

### 3.     Pretext

"At the summary judgment stage, the Court's task is simply to determine whether a reasonable jury *could* find that the Defendant's reasons for the adverse employment action was a pretext to mask [discrimination or] retaliation, and that the real reason for the employer's action was intentional [discrimination or] retaliation." *Ferrell v. SunCrest Home Health of E. Tennessee, LLC*, 16-02270, 2018 WL 7964535, at *6 (M.D. Tenn. Sept. 25, 2018) (citing *Peck v. Elyria Foundry Co.*, 347 Fed. App'x 139, 145 (6th Cir. 2009)). In *Reeves v. Sanderson Plumbing Prods.*, the Supreme Court explained that proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination. 530 U.S. 133, 147 (2000). "Accordingly, if any of the evidence offered by [Lt. McFadden] could lead a jury to reasonably reject the Defendant's proffered reasons, summary judgment would not be appropriate." *Ferrell*, 2018 WL 7964535, at *6 (citing *Peck*, 347 Fed. App'x at 145).

Furthermore, the Sixth Circuit has held that a plaintiff's prima facie case combined with disbelief of the defendant's proffered reasons for the negative employment action permits a finding of retaliation or discrimination. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997). There are three ways in which a plaintiff may raise a general issue of fact as to pretext and defeat a motion for summary judgment. *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 589 (6th Cir. 2002). A plaintiff could show that: (1) the proffered reasons had no

factual basis,[3] (2) the proffered reasons did not actually motivate Defendants' action, or (3) the proffered reasons were insufficient to motivate the action. *Id.*

Applying the aforementioned principles to the case at hand, the Court finds that there is sufficient evidence to raise a genuine issue of fact as to whether the proffered reasons were a pretext for illegal discrimination or retaliation. Lieutenant McFadden offers evidence that Defendant's proffered reasons did not actually motivate its actions or were insufficient to motivate its actions.

For instance, the City states that the investigation began after employees approached Cmdr. Grizzell with their complaints. (Def. Mot., ECF No. 38, PageID 4078) (investigation occurred in "direct response" to allegations). McFadden presents evidence that one could view as showing Cmdr. Grizzell solicited the complaints. (*Compare* Grizzell Dep., ECF No. 35-4, PageID 1783 *with* Johnson Dep., ECF No. 35-6, PageID 2134). Similarly, the City explains that the Chief assigned Lt. McFadden to the Property Room to avoid the risk of her interacting with the complainants. (Def. Mot., ECF No. 38, PageID 4089) (citing Jacobs Dep., ECF No. 35-5, PageID 2032). Yet, Lt. McFadden has shown that two of the three complainants no longer worked with her, (*See* Johnson Dep., ECF No. 35-6, PageID 2134; Morefield Dep., ECF No. 35-

---

[3]Defendant relies, *inter alia*, upon the honest belief rule, which requires a plaintiff to show "more than a dispute over the facts upon which the [adverse action] was based." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) ("to demonstrate pretext by means of the first method—no basis in fact—which is essentially an attack on the credibility of the employer's proffered reason . . .[and] consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual. Where the employer can demonstrate an honest belief in its proffered reason, however, the inference of pretext is not warranted.") (citing *Braithwaite v. Timken Co.,* 258 F.3d 488, 493-94 (6th Cir. 2001)). Here, however, while Lt. McFadden does dispute some of the facts related to the investigation, she does not attempt to show pretext by the first method, and instead focuses more on the second and third ways in which pretext may be shown.

9, PageID 2456, 2472), the odds of their interacting appear low, (*e.g.*, Smith-Hughes Dep. at PageID 2758), and in other cases where the accused is white it has been the complainant that is reassigned pending investigation (*supra* § I.B.). Lieutenant McFadden contends therefore, that the City's offered reasons did not actually motivate its actions or were insufficient to motivate its actions, and instead, the Defendant was seeking a reason to discipline or terminate her based on illegal discrimination or retaliation.

Additionally, Lt. McFadden offers evidence that the City's treatment of her deviated from the standard operating procedures used during EEO investigations.  "[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) (emphasis noted). However, there are times that inferences can be drawn when a policy is not uniformly applied. *See, e.g., Lamer v. Metaldyne Co.*, 240 Fed.Appx. 22, 33 (6th Cir. 2007) ("Evidence that the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied is evidence of pretext."). The probative value depends on what inferences a reasonable juror might draw.  When an employer is not required to follow a procedure and deviates without harm to the plaintiff, no inference of pretext could be drawn. *See, e.g., Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 896–97 (6th Cir. 2020).

Thus, if Lt. McFadden's evidence is believed, a reasonable jury could find that the irregularities were not minor deviations and instead both prejudiced her in the disciplinary investigation process and reflect pretext for discriminatory or retaliatory intent on behalf of CPD. *Williams v. Columbus Metro. Hous. Auth.*, 90 Fed. Appx. 870, 876 (6th Cir. 2004). Of course, a reasonable jury could find that the irregularities were minor deviations and did not indicate the City's conduct was a pretext for illegal discrimination or retaliation.

24

Therefore, the Court finds simply that if Lt. McFadden's evidence is believed, and all justifiable inferences are to be drawn in her favor, a reasonable jury *could* find the City's proffered reasons for its actions were a pretext for race discrimination, or it *could not*. It is a decision for the jury.

**B.     Municipal Liability**

It is now well established that a city can be held liable under 43 U.S.C. § 1983, but only for its own acts. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). The acts of a city can include actions taken pursuant to custom or policy. *Id.* City policy can derive from an array of sources. Relevant here, it can arise as a one-shot policy from a person with decision making authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."). *Accord Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("official municipal policy includes . . . the acts of its policymaking officials.").

For a policymaker to have decision making authority with the force of policy, the policymaker must have "final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 482. When asked, "who made the decision to assign Lieutenant McFadden to the Property Room?" Chief Jacobs answered: "well, ultimately I would be responsible for that." (Jacobs Dep., ECF No. 35-5, PageID 1996, 2013). The deposition testimony of Chief Jacobs herself, along with the email chain creating a dispute of material fact, indicates that in the case of McFadden's relegation, the buck stops with the Chief.

The evidence indicates that the decision to transfer Lt. McFadden to the Property Room was made by a policymaker with significant decision-making authority as to that order—the Chief of Police. The discharge could not occur without the Chief's action, although ultimate

decision-making authority rested with the Public Safety Director. Thus, the evidence contradicts the City's argument that municipal liability under 42 U.S.C. § 1983 cannot be established.

## C.    First Amendment Retaliation

The City moves for summary judgment on Lt. McFadden's First Amendment[4] retaliation claim. To prove a claim of retaliation violative of the First Amendment in this context, McFadden must establish:

> (1) that she was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Strouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 345 (6th Cir. 2001).

As with McFadden's Title VII retaliation claim, the same genuine dispute of material fact exists to preclude summary judgment.

## D.    Equal Protection

The parties agree that for purposes of the present motion, as goes McFadden's Title VII discrimination claim, so goes her Equal Protection claim. (Def. Mot, ECF No. 38, PageID 4095–96; Pl. Resp., ECF No. 40, PageID 5230). Accordingly, and for the same reason as stated in that section, there is a genuine dispute of material fact and the City is not entitled to summary judgment on McFadden's Equal Protection claim.

## E.    Procedural Due Process

Last, the City moves for summary judgment on Lt. McFadden's procedural due process claim. The Due Process Clause of the Fourteenth Amendment enshrines the freedom from state deprivations of life, liberty, and property. U.S. Const., Amend. XIV, § 1, cl. 3 ("nor shall any

---

[4] Incorporated upon the states through the Fourteenth Amendment.

State deprive any person of life, liberty, or property, without due process of law"). By the plain language, to make out a claim of such a violative deprivation, the aggrieved must raise a legitimate life, liberty, or property interest. The aggrieved must also show that the State deprived him or her of that interest. And, the aggrieved must show that the process afforded, if any, fell below that process which was rightly due.

McFadden claims to possess a property interest in the privileges of her rank as Lieutenant, which she asserts was deprived from her when the Chief of Police assigned her to "menial and unpleasant" duties. (Pl. Resp., ECF No. 40, PageID 5228). The first question presented is whether indeed "rank has its privileges" so much so as to create a property interest therein. (*Id.*). That proposition is dubious at best, carrying with it serious and problematic implications. Purely for the sake of argument, this Court will nonetheless assume a property interest, because even if one existed, the process afforded did not fall below the level of process due.

"The fundamental requirement of due process is an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted). Due process does not require rigid rules but is flexible; it calls only for "'such procedural protections as the particular situation demands.'" *Id.* at 334 (quotation omitted). In *Mathews*, the Supreme Court set forth a balancing test for determining the minimum process due. Courts are to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

McFadden's opportunity to be heard came in the form of a hearing with the Safety Director. This hearing came pre-termination (or rather, before the possibility of termination), but post-relegation. At the hearing, McFadden presented her case, and the Safety Director concluded that the charges against her were "not sustained." (Pl. Ex. XXX, ECF No. 36-75, PageID 3858). McFadden concedes that following the Safety Director's decision McFadden returned to her full duty assignment. (Pl. Resp., ECF No. 40, PageID 5193).

McFadden's assignment to the Property Room pending investigation and subsequent hearing cannot be said to amount to a situation lacking process. To the contrary, this case involved plenty of process. While the hearing came post-deprivation, this case does not involve a personal interest of such strength or fleeting nature that the post-deprivation hearing could not suffice. Moreover, on the other side of the scale the City has strong administrative, fiscal, and efficacy related interests in moving police without delay.

Simply put, McFadden was afforded due process. Accordingly, as a matter of law the City is entitled to summary judgment on McFadden's Procedural Due Process Claim.

## IV.

In sum, the City's Motion for Summary Judgment, (ECF No. 38), is **GRANTED** with respect to McFadden's Procedural Due Process claim but **DENIED** in all other respects.

**IT IS SO ORDERED.**

**8/10/2021**                                              **s/Edmund A. Sargus, Jr.**
**DATED**                                                 **EDMUND A. SARGUS, JR.**
                                                          **UNITED STATES DISTRICT JUDGE**