**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA McFADDEN, | : | |
| | : | **Civil Action No. 2:18-cv-544** |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE: SARGUS |
| | : | MAGISTRATE JUDGE: JOLSON |
| CITY OF COLUMBUS, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S DESIGNATED PORTIONS OF MIRANDA VOLLMER'S OCTOBER 29, 2020 DEPOSITION TO BE READ AT TRIAL**

```
6 Q. Good morning, Ms. Vollmer.
7 We just met. Can you do me a favor and say your
8 name and spell your last name for the record?
9 A. Miranda Vollmer, V-o-l-l-m-e-r.
10 Q. And, Ms. Vollmer, you are not currently
11 employed by the City of Columbus; correct?
12 A. Correct. (5:6-12)
```

```
10. Who is your current
12 employer?
13 A. City of Gahanna.
14 Q. And how long have you been with Gahanna?
15 A. Almost two years.
16 Q. And what's your role at Gahanna?
17 A. I'm the Director of Human Resources. (7:10-17)
```

```
14 Q. What was your last role with the City of
15 Columbus?
16 A. I was the Human Resources Manager for
17 the Division of Police. (8:14-17)
```

1

```
21 Q. When did you start in
23 that role?
24 A

3 A. '15. Yeah. October of '15. (15:21-16:3)



12 Q. And were 2 Q. Lieutenant McFadden's -- was
3 placed on administrative reassignment roughly
4 March 12, 2017; correct?
5 A. I don't know.
6 Q. I'll represent to you that that's when
7 it was.
8 But we'll go with from March, 2017, until you left
9 in November of 2018, that time frame. Okay?
10 A. Okay.
11 Q. Did anybody complain to you that during
12 that time period, March '17, to November '18, that
13 Lieutenant McFadden did something improper during
14 those time periods?
15 A. Not that I recall. No.
16 Q. Did anybody complain to you that anybody
17 associated with Lieutenant McFadden did anything
18 improper during those time periods?
19 A. No. (13:12-17, 14:2-14:19)



15 Q. So in the -- you were -- in
16 the roughly three years you were with CDP as the
17 HR manager, did you perform any trainings for
18 personnel about the City's or the Division's --
19 excuse me -- EEO policies?
20 A. Yes.
21 Q. Tell me about those.
22 A. I did an in-service training for all --
23 that's the training that's conducted that all
24 sworn officers are required to go to, and I did

1 the EEO training on all three shifts for two
2 months while in-service was going on.
3 Q. So is that an annual in-service
4 training, or was that just one time?
5 A. They do annual in-service training. It
```

6 was in January and February, I would think, March.
10 Q. And how was that done? Is it classroom,
11 virtual? How do you do that?
12 A. It's classroom.
13 Q. And is it a full day? How long is your
14 presentation?
15 A. It was one hour.
16 Q. And what do you present in that? Is it
17 slides? Do you lecture? Do you have printed
18 material that you give to the officers?
19 A. There is a PowerPoint.
20 Q. And in that PowerPoint, do you go over
21 the Division directives on EEO policies?
22 A. Yes.
23 Q. And do you explain that the Division
24 takes those policies seriously?

1 A. Yes.
2 Q. And do you explain the anti-retaliation
3 provisions?
4 A. Yes.
5 Q. And do you avail yourself to questions
6 and answers after your presentation?
7 A. Yes. (18:15-20:7)


11 Q. And when you do those trainings, do you
12 explain to the personnel what would happen if they
13 made a complaint?
14 A. Yes. I believe so. I think there was a
15 slide on that. No. There was.
16 Q. What would you explain to them?
17 A. What the Division directive says. How
18 you make a complaint; what happens once you make a
19 complaint; where it goes.
20 Q. Can you run through that process for me,
21 please?
22 A. So you make a complaint to your
23 supervisor, HR, or different supervisor; that
24 supervisor forwards a letter through the chain or

1 calls me directly; and then I send a letter
2 through the chain requesting an investigation to

3

3 IA. IA's going to interview you and any
4 witnesses. They'll be an outcome, and you will be
5 notified. (21:11-22:5)


Q. So if somebody makes a complaint or
17 brings an issue to -- that gets to your desk, is
18 it automatic that the focus of that complaint is
19 reassigned?
20 A. No.
21 Q. What factors go in the decision-making
22 about whether a focus in one of those kind of
23 complaints gets reassigned?
24 A. It depends on the nature of the

1 allegation and the information that was given to
2 the Division by the person who complained. (22:16-23:2)


**Joint Exhibit 6 Depo Exhibit C**

18 A. I have it. The Division Directive,
19 8.08?
20 Q. Yeah. Do you know what this is?
21 A. Yes.
22 Q. And what is this?
23 A. It's the Division Directive 8.08.
24 Q. And if I'm reading that correctly,

1 that's the Division Directive on Equal Employment
2 Opportunity, Nondiscrimination, and Americans with
3 Disabilities Act?
4 A. Correct.
5 Q. And this says it was Revised
6 September 30, 2014. Do you know if that was in
7 effect in March of 2017?
10 Q. Sure. If I represent to you that this
11 was in effect in March of 2017, would you have any
12 reason to disagree with that?
13 A. No.
14 Q. And is this something that when you did
15 those annual in-service training with all the
16 sworn personnel, would you train them on this
17 information?

```
18 A. Correct.
19 Q. And in your experience with the Division
20 of Police, was it common knowledge about how to
21 get into contact with you or anyone else at HR?
22 A. Yes.
23 Q. And when you trained the folks annually
24 on this, did you provide contact information for

yourself and other contacts at HR?
2 A. Yes.
3 Q. Did you maintain an open door policy for
4 people to make EEO or HWE complaints to you as an
5 HR professional?
6 A. Yes.
7 Q. Did you tell the folks during the yearly
8 in-service trainings that you maintained an open
9 door policy to make EEO or HWE complaints?
10 A. I didn't use those specific words, but
11 yes.
12 Q. What words did you use?
13 A. That I'm available 24/7, and you can
14 call me at any time, and I'll come meet you
15 wherever or -- outside of headquarters. I've met
16 people at Starbucks, Panera.
17 Q. So you made it a point to make clear to
18 everyone during these trainings that you would
19 avail yourself to them for these kind of
20 complaints whenever and however they needed to?
21 A. Correct.
22 Q. Do you believe they understood that to
23 be true?
24 A. Yes. (25:18-27:24)



5 Q. So I want you to flip over a couple
6 pages to page 3 for me. And there is a section
7 III, Policy Statements; correct?
8 A. Correct.
9 Q. And can you read section III(G) for me?
10 A. "Any Division employee who believes that
11 he or she has been discriminated against in
12 violation of the City EEO policies, including
13 sexual harassment, should promptly report the
```

5

14 incident to: 1, the Division's HR Manager; 2, His
15 or her immediate supervisor or any supervisor, or;
16 3, the City's EEO Office."
17 Q. And starting in October of 2015 and
18 running to November of 2018, that number 1, the
19 Division's HR Manager was yourself; correct?
20 A. Correct.
21 Q. And you said in reading that, it said,
22 "...should promptly report the incident to...."
23 Do you train in those in-services that
24 sworn personnel should promptly report EEO or HWE

1 allegations?
2 A. Yes.
3 Q. What does that mean to you? What does
4 promptly report mean?
5 A. As -- whatever the individual finds to
6 be reasonably -- I mean, I don't want to use the
7 word prompt but whatever they find to be -- when
8 it comes to their attention that there is an
9 issue, and they are ready to report it, that's
10 what prompt means to me.
11 Q. And why is it important that they
12 promptly make a report of an EEO allegation?
13 A. So if the behavior is occurring, it can
14 be stopped. (28:5-29:14)


3 You've got an obligation whether a
4 complaint is one day old, one year old, or three
5 years old to investigate that if somebody makes an
6 EEO complaint to you; correct?
7 A. Correct.
8 Q. And that wouldn't change regardless of
9 your personal feelings about it? You've got an
10 obligation to investigate that and go through the
11 process that we talked about earlier; correct?
12 A. Correct. (30:3-12)


21 Q. Did you see in any time that you were
22 involved in an EEO, HWE complaint the focus

6

```
23 officer admonished not to retaliate against anyone
24 involved?

1 A. Do you want to give me a definition of
2 admonished?
3 Q. Instructed, told.
4 A. Yes. I personally sent -- had an e-mail
5 that I would send individuals who were the focus.
6 Q. And you would send that to every person
You sent e-mail with
11 anti-retaliation language to every focus of an
12 EEO, HWE complaint that you were involved with?
13 A. I believe so, but I -- there was a -- we
14 started doing it at a point certain, but I don't
15 know what that point certain is. We verbally told
16 people, but there was a follow-up e-mail that
17 started at some point.
18 Q. Sure. And in your experience of any of
19 the folks that you instructed not to retaliate
20 either verbally or via e-mail, were there
21 allegations of retaliations against those
22 officers?
23 A. I don't think so. (35:21-36:23)



3 Q. And are you ever made aware of when a
4 sworn personnel was reassigned or relieved from
5 duty when they're a focus of an EEO or HWE
6 complaint?
7 A. Yes.
8 Q. And how are you made aware of that?
9 A. Either verbally or via e-mail.
10 Q. Are you ever part of the decision-making
11 in that reassignment?
12 A. Sometimes.
13 Q. How often are you part of the
14 decision-making in that reassignment?
15 A. I would say less than half.
.  (48:3-15)
```

7

```
Q.. Where
2 were folks reassigned when you were consulted
3 about the reassignment?
4 A. Just depends on where they were working,
5 who the complainants were. I mean, there's many
6 assignments at the Division where you can separate
7 people, so --
8 Q. Can you give me a list of those
9 assignments where you can separate people?
10 A. Anywhere literally. There are, what,
11 2,300 people here, so there are 2,300 assignments.
12 Q. So if you had a zone lieutenant on
13 second shift -- there are five zones; correct?
14 A. Correct.
15 Q. So you could have reassigned a Zone 2
16 lieutenant to Zones 1, 3, 4 or 5?
17 A. Are we talking about this particular
18 case with Lieutenant McFadden?
19 Q. I'm talking in general.
20 A. Just depends on the nature of the
21 allegations.
22 Q. But you could have reassigned them to
23 any of the four other patrol zones?
24 A. Again, it depends on the situation. (50:1-24)


2 Q. And another possible reassignment would
3 be the patrol administrative unit or 580; correct?
4 A. Yes. Literally, they could go anywhere
5 in the Division.
6 Q. And another possibility would be the
7 training academy; correct?
8 A. Correct.
9 Q. And another possibility would be the
10 impound lot?
11 A. Yes. Anywhere in the Division.
12 Q. And sorry. I forgot to mention this (52:2-12)



16 Q. And what factors would go into your
17 recommendation of a reassignment happening?
18 A. Like the proximity to their -- like,
```

19 where they work, like, do they work in the same
20 building. If it's a supervisor, will that
21 supervisor have direct control or indirect control
22 as a supervisor over that employee. The --
23 because -- there are many factors, because you
24 take an issue at, like, let's say the training

1 academy where they're in one building compared to
2 somebody out on patrol, it's, like, very different
3 because of, you know, a building location and,
4 like, you know, you are kind of out on your own.
5 So it just really depends on where the person
6 worked. But it would be proximity that they could
7 connect with each other. If it was a supervisor
8 situation, how much, like, authority or control or
9 indirect control; how often -- what is the
10 likelihood that they would come across this
11 person; what shifts do the people work on.
12 Q. Is it possible in a reassignment to
13 change someone's shift? So, for example, if there
14 are two first shift -- if it's a first shift
15 officer making a complaint against a first shift
16 sergeant, EEO or HWE complaint -- all right -- are
17 you with me?
18 A. Yes.
19 Q. And you deem based on that that that
20 first shift focus officer sergeant needs to be
21 reassigned, is it possible or an option for that
22 first shift sergeant to be reassigned to second or
23 third shift to accomplish the goals?
24 A. It's possible but not likely due – we

1 attempted to keep people on the same days off and
2 shift that they were on unless they agreed to a
3 different one because of the FOP contract.
4 Q. Okay. So I'm -- just so I'm
5 understanding correctly, you could go to that
6 sergeant and say, Sergeant, you know, we need to
7 reassign you; would you accept going to second or
8 third or midwatch shift?
9 A. Yes. They often said no, but yes. (53:16-55:9)

|  |  |
|---|---|
| **OF COUNSEL:**<br>Louis A. Jacobs (002101)<br>(*LAJOhio@aol.com*)<br>177 19th St., Apt. 9C<br>Oakland, CA 94612<br>(614) 203-1255<br>Fax (510) 250-9007 | By: */s/ Samuel M. Schlein*<br>Samuel M. Schlein (0092194)<br>*(sschlein@marshallforman.com)*<br>John S. Marshall (0015160)<br>*(jmarshall@marshallforman.com)*<br>Edward R. Forman (0076651)<br>*(eforman@marshallforman.com)*<br>Helen M. Robinson (0097070)<br>*(hrobinson@marshallforman.com)*<br>Madeline J. Rettig (0098816)<br>*(mrettig@marshallforman.com)*<br>MARSHALL FORMAN AND SCHLEIN LLC<br>250 Civic Center Dr., Suite 480<br>Columbus, Ohio 43215-5296<br>(614) 463-9790<br>Fax (614) 463-9780 |

## **CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was filed with the Court on this 5th day of June, 2022 by hand delivery. Parties may access this filing through the court's filing system.

By: */s/ Samuel M. Schlein*

Samuel M. Schlein (0092194)

11