1

1                    ROUGH DRAFT DISCLAIMER

2

3        *Transcript of this proceeding, or portions thereof, are*

4    *being delivered in rough draft format, UNCERTIFIED, by the*

5    *Official Court Reporter.  The party receiving this product*

6    *agrees not to share, give, copy, scan, fax, or in any way*

7    *distribute this rough draft transcript in any form, written or*

8    *computerized, to any other party.  This rough draft transcript*

9    *has not been checked, proofread, or corrected into a finalized*

10   *format.  As such, it may contain computer-generated*

11   *mistranslations of stenotype code or electronic transmission*

12   *errors, resulting in inaccurate or nonsensical word*

13   *combinations, omissions, or untranslated stenotype symbols.*

14   *Rough draft transcripts contain no finalized page or line*

15   *numbers, appearance page, index, footers, or certificate page.*

16   *Due to the need to correct entries prior to certification, a*

17   *rough draft can be used only for the purpose of augmenting*

18   *notes and cannot be used or cited in any court proceedings or*

19   *distributed to other parties.*

20

21                        *  *  *  *  *

22

23

24

25

**UNCERTFIED ROUGH DRAFT**

2

```
 1                      Monday Morning Session,

 2                      June 6, 2022.

 3                         - - -

 4      (The following proceedings were had in the conference

 5  room.)

 6          THE COURT:  Got a couple of maybe not little things,

 7  but quick things to go over with you.  This is an easy one.

 8  Who is going to be the City representative at counsel table?

 9          MR. PHILLIPS:  Lashanna Potts, Assistant Chief of

10  Police.

11          THE COURT:  Assistant chief.  And can you spell her

12  name for me.

13          MR. PHILLIPS:  It's L-a-s-h-a-n-n-a, P-o-t-t-s.

14          THE COURT:  Potts.  Okay.

15          MR. PHILLIPS:  Correct.

16          THE COURT:  That's easy.

17          Bigger question for all of you.  I've been working on

18  preliminary jury instructions, and I never want them to vary

19  from the final jury instructions, of course.  So there's six

20  claims, but I think everybody's briefed this as if there are

21  two distinct claims under sort of three different legal

22  rubrics.  Is there any way to conflate that without injuring

23  anybody's substantive rights?

24          MR. MARSHALL:  I imagine there is.

25          THE COURT:  The reason I ask is you know what will
```

**UNCERTIFIED ROUGH DRAFT**

1    happen, in the final instructions, if we take these claim by

2    claim and there's six rather than two, we're going to add 10

3    pages to the jury instructions, which is not the end of the

4    world.  We want them to be precise, but I always have this

5    nagging fear -- by the way, we've been doing all these product

6    warnings cases, and the theory is the longer the warning, the

7    less likely it is for people to finish reading it and to absorb

8    it.  So I don't want to cut anybody's rights off.  For example,

9    the Title 7 in the 4112, there used to be some damages

10    difference.  Is that still the case?

11           MR. MARSHALL:  There is -- really the main difference

12    was it doesn't apply here because it had to do with punitive

13    damages.

14           THE COURT:  Yeah, and we don't have a punitive case,

15    as the City is the defendant.

16           MR. MARSHALL:  So, no, not really.

17           THE COURT:  So be thinking what -- I am going to

18    conflate them, but I also say in the preliminary jury

19    instructions, these are not instructions, they're just to give

20    you a roadmap, and here's what you're looking for.  So I don't

21    think that's going to cause anybody -- I'm going to mention all

22    three theories under both the race discrimination and the

23    retaliation.  So play with that.

24           The other thing is more of substance.  I did look to

25    your jury instructions to sort of prime mine, because I don't

**UNCERTIFIED ROUGH DRAFT**

4

1    want to have a dispute on my preliminary jury instructions, but

2    we know we're looking at, with regard to the race

3    discrimination claims, that there had to be an adverse

4    employment action as one of the controversies in this case.  I

5    was going to define that, which includes an employer's decision

6    to move to a position -- and this is the language I want to

7    discuss with you -- with significantly different and diminished

8    responsibilities.

9            Are you okay with that?

10           MR. BERNHART:  Can you read it once more?

11           THE COURT:  Yeah.  In other words, the adverse action

12   would be to move someone to a position with significantly

13   different and diminished.  So it has to be different.  I think

14   we all understand different alone isn't going to be a claim,

15   and diminished picks up the idea that it's got to be something

16   adverse.

17           Are you okay with that?

18           MR. MARSHALL:  Yeah, that's the law, I think.

19           MR. BERNHART:  Yeah.

20           THE COURT:  All right.  And last thing, you may have

21   noticed this, it hit me a few weeks ago, there is a Rhonda

22   Grizzell, who is the commander in this case.  She had a case in

23   front of me probably 10 years ago.  She was the plaintiff suing

24   the City over a promotion with regard to competing eligibility

25   lists, if that's ringing a bell.  It went to the Sixth Circuit.

**UNCERTIFIED ROUGH DRAFT**

5

1  I'm proud to say I know I was right because they said so.  I

2  was affirmed.  But it was an aggravated -- I mean, it was a

3  case that generated a fair amount of heat.  So I never met her,

4  but her name is certainly familiar.

5          MR. MARSHALL:  You granted summary judgment to the

6  City?

7          THE COURT:  The City, yes, and the Court of Appeals

8  affirmed.

9          MR. MARSHALL:  I don't think that matters.

10          THE COURT:  No, I know it doesn't recuse me, but I

11  don't want there to be any surprises.  And I do know the former

12  Chief just from being at dinners with her.  We're not great

13  close friends or anything but...

14          MR. MARSHALL:  So if Commander Grizzell scowls at you,

15  we will understand.

16          THE COURT:  Yes, and if the former chief smiles,

17  you'll understand.  It goes both way.

18          So we have 32 people who have shown up today.  I

19  always look at the list to see who didn't show.  One person

20  says they had a kidney stone.  And actually I had one about

21  three weeks ago, so I marked them off as excused because I

22  understand that.

23          But otherwise we have 32, so we should have plenty.

24  There will be a handful who won't be able to sit because of

25  scheduling.  Remember, we'll kind of leave them alone unless

**UNCERTIFIED ROUGH DRAFT**

6

1    you see some issue with any of them.  Okay?

2            That's all I have.  Anything on the plaintiff's side?

3            MR. MARSHALL:  Do we have a dispute about what we can

4    say in opening or otherwise about --

5            MR. PHILLIPS:  I think so.

6            MR. MARSHALL:  Well, then we need to get that resolved

7    before opening.

8            Here's the -- it was our understanding -- and I'm not

9    suggesting that they're going back on an agreement when I say

10   this, but we have this -- the motion in limine was essentially

11   agreed to with respect to the events of the investigation

12   after -- after she was reassigned to the property room.

13           THE COURT:  I mean, just so I'm clear, that's --

14   generally speaking, that's where the case ends, unless

15   something changes.

16           MR. MARSHALL:  Yes, yes, so the events and facts that

17   occurred prior to that.  However, we do need to -- we agreed to

18   that because we -- our understanding was that we would be able

19   to tell the jury three things that are not disputed.  These are

20   not disputed facts, they're facts.  One, that she -- the

21   investigation ended in August of 2018, that's when it ended.

22   She was returned to her very same position that she held before

23   she was taken out of that position and put in the property

24   room.  And third, she was not disciplined.  It's the "she was

25   not disciplined" that they have a problem with.  I don't know

**UNCERTFIED ROUGH DRAFT**

7

1  why.

2        You know, there was this whole long investigation, and

3  during the course of it, there's -- from the perspective of, I

4  think, both sides, there was a lot of politics on both sides,

5  because I'm sure the City thinks that the Safety Director's

6  decision to not sustain any of it and dismiss it all and not

7  discipline her was motivated by whatever was going on, and we

8  think --

9        THE COURT:  Well, you're sort of stuck with his

10  decision, right?

11        I mean, you're not going to try to argue with him.

12  He's the final decision-maker for the City, right?

13        MR. PHILLIPS:  And, Your Honor, this is our take.  The

14  answer to that is, yes, he's the final decision-maker.  Our

15  take on this -- and it's a respectful disagreement.  We talked

16  about it Friday on the phone.  But our take is we're fine,

17  whatever the scope of the case that the plaintiff presents, so

18  long as we can respond.  So the only way it gets to the Safety

19  Director is if the Chief recommended severe discipline, which

20  she did at this point in time.

21        THE COURT:  Well, how much does the Chief have to

22  recommend for her to get there?

23        MR. MARSHALL:  Termination.

24        MR. PHILLIPS:  Well, in this one it was termination.

25        MS. WILLIAMS:  Actually, no, it doesn't just have to

**UNCERTFIED ROUGH DRAFT**

8

1    be termination.  It can also be suspension.  But in this case

2    it was termination.

3            THE COURT:  A long suspension?

4            MR. MARSHALL:  We would argue that recommendation,

5    one, was retaliation, right?  That's why we're trying to avoid

6    all these mini trials.

7            THE COURT:  So, I mean, I see a couple of things that

8    plays out in the Rules of Evidence.  You know, one is her harm

9    is the reassignment, is your claim, right?

10           MR. MARSHALL:  Right.

11           THE COURT:  So this doesn't go to the harm.  On one

12   hand, it could be -- you would argue that this is additional

13   evidence of some sort of ill will towards her to have all this

14   happen and turn out to not be any discipline.

15           MR. MARSHALL:  Well, because, otherwise, the jury may

16   make assumptions about the whole thing, and that's the concern,

17   right.

18           THE COURT:  This -- I mean, I don't want try to make

19   anybody's case for them.  I'm not exactly sure how this hurts

20   your case.

21           MR. PHILLIPS:  Your Honor, this is our thought.  We

22   don't mind whatever the scope of the case is, so long as we can

23   give the full context to that scope.  For example, we think,

24   frankly, it could be that we just say that she's currently a

25   lieutenant in the Division of Police in the same assignment.  I

**UNCERTIFIED ROUGH DRAFT**

1   don't see why we have to say what happened at the end of the

2   disciplinary process; but if we are, we would want to say,

3   well, there was a recommendation for termination and then the

4   Safety Director said no discipline.

5           MR. MARSHALL:  That opens up the pandora's box of, you

6   know, because we have evidence we believe that that whole

7   process was motivated by, you know, retaliatory animus.

8           THE COURT:  So let me just first frame this.  So what

9   the City is saying is if you get to bring in the Safety

10  Director's decision, they want to bring in the Chief of

11  Police's decision.

12          MR. MARSHALL:   We weren't going to bring in the

13  Safety -- or we weren't going to mention the Safety Director.

14  We simply were going to say she wasn't disciplined so the jury

15  doesn't make some assumptions, because they're going to hear --

16  the jury's going to hear -- and they're going to call them --

17  ugly testimony from these officers who accused -- this is all

18  prior to the investigation -- accused Lieutenant McFadden of

19  saying horrible things.

20          THE COURT:  So I get it.  The real point you want to

21  make is not announcing Pettus' decision; you want to basically

22  say there was no discipline that followed?

23          MR. MARSHALL:  And that's all.

24          THE COURT:  Can we work -- that may not be perfect

25  from your end.  Can you make that workable?

**UNCERTFIED ROUGH DRAFT**

1       MR. PHILLIPS:  My first response is I don't think

2   that's relevant to what the claims are on this case or at this

3   point in time.

4       THE COURT:  Well, I mean, it's not legally relevant to

5   retaliation for sure, right?

6       I mean, it's the retaliation that's supposed to be at

7   issue, not the ultimate outcome of the charges that -- mixing

8   claim A and B together.  Would it be relevant with regard to a

9   claim of racial discrimination?

10       MR. PHILLIPS:  Would it be -- probably not.  We don't

11   think it would be relevant; but, once again, we don't mind

12   whatever the scope is, so long as we can just give our -- you

13   know, full -- because that's also not in dispute.  It's not in

14   dispute what the Chief did.

15       THE COURT:  We all understand post returning to her

16   normal position, this is tangentially relevant at best.  This

17   is not the direct case itself.  Do you agree with that?

18       MR. MARSHALL:  I agree.

19       THE COURT:  So then the question becomes if it's not

20   the core of the case, can you work out some sort of

21   understanding where you each get what you want.  You want to be

22   able to say simply she wasn't disciplined.  You know, to a

23   certain extent, that helps the City, doesn't it?  Because if

24   you're trying to rebut racial discrimination claims, in the end

25   you follow the truth and, you know, we decided not to

11

1   discipline her.

2          MR. PHILLIPS:  And I think we would be okay with that

3   if we could say the Chief recommended this and she received no

4   discipline.

5          THE COURT:  Yeah, that's where we get into --

6          MR. MARSHALL:  That opens up the whole box for us and

7   it's -- I mean, in our view we would have to call Ned Pettus,

8   right?  I think he would come and testify that he looked at the

9   whole thing, including the evidence about what these officers

10  did and didn't do, how they failed to report.

11         THE COURT:  We don't want to make this a trial between

12  the former chief and Ned Pettus basically, right?  That's the

13  problem?

14         MR. PHILLIPS:  Absolutely.

15         THE COURT:  So now you've got the help me.  How do we

16  bleed this out?

17         Go ahead.

18         MR. SCHLEIN:  The happy middle ground is, because if

19  we just say she was returned to assignment without discipline,

20  that doesn't bring in -- you know, the jury can think the Chief

21  said that, is the jury going to think that -- you know, there's

22  going to be no evidence.

23         THE COURT:  You're afraid there's going to be

24  implication that the investigation was permeated with racial

25  discrimination?

**UNCERTFIED ROUGH DRAFT**

12

1          MS. WILLIAMS:  Exactly.

2          MR. PHILLIPS:  And also I don't want there to be -- I

3 don't want the jury to improperly conclude that what the City

4 decided here is, well, these three officers, they're not

5 telling the truth.  Because, you know, based on our

6 understanding of the plaintiff's -- in her deposition, she

7 flatout says that.

8          THE COURT:  I can give you a legal answer to this.

9 This probably wouldn't satisfy you either.  We could say that

10 and I could tell them that they're not to draw any inference

11 from the way the final outcome of the investigation occurred.

12          MR. MARSHALL:  That's fine.

13          MR. PHILLIPS:  And, Your Honor, our thought would be

14 if it could be she's been -- she's returned to her position and

15 she is currently a lieutenant in the Division of Police and you

16 are not to make any -- you are not here to decide the

17 investigation or any potential discipline or lack of discipline

18 and just leave it quiet.  It's similar to our last case.

19          MR. MARSHALL:  That's an implication that she was

20 disciplined.

21          THE COURT:  Well, here, let me walk this through with

22 you.  So we'll start with -- this is what I would tell the

23 jury, the case ends with her return to her former position.

24          MR. MARSHALL:  Yeah.  And then just as a matter of

25 background, we're going to talk about what she's doing now.

**UNCERTIFIED ROUGH DRAFT**

13

1    You don't have a problem with that, right?

2          MR. PHILLIPS:  No.

3          THE COURT:  That's okay.  The case ends with her

4    return to her former position and that is where your task is

5    complete.  So we'll start with that.

6          MR. MARSHALL:  Except with respect to damages, because

7    she's suffered -- I don't want them to think that at that

8    point -- she returned in December of 2018.

9          THE COURT:  And other than damages.

10         MR. MARSHALL:  Other than damages, right.

11         THE COURT:  That's where your task is complete.  See

12   this, I'm using that first line, your case ends with her

13   returning to her former position, so they know she wasn't

14   fired.

15         MR. MARSHALL:  Right.

16         THE COURT:  And she's back at her old job.

17         MR. MARSHALL:  Right.

18         THE COURT:  You are not to draw inferences -- you are

19   not to consider other nondamage facts that occurred after her

20   return to work.

21         MR. MARSHALL:  I really think that raises the

22   implication that some action was taken against her.  I think

23   they're going to make those assumptions, given, among other

24   things, for example, that the assistant chief of police is

25   sitting in on their side, and I just -- you know, I understand

**UNCERTFIED ROUGH DRAFT**

14

 1    the concern, but it's just a fact that she wasn't disciplined.

 2            THE COURT:  You would want to say the case ends with

 3    her return to the former position and no discipline.

 4            MR. PHILLIPS:  And --

 5            THE COURT:  You don't like that.

 6            MR. PHILLIPS:  We would be fine with the first part

 7    without the "and no discipline" part.

 8            MR. MARSHALL:  But without the "no discipline," I

 9    think the jury is simply going to assume that she -- something

10    truly negative, you know, occurred.

11            MS. WILLIAMS:  But she was back at her position.  I

12    think we're running into a situation where without the

13    language -- with the language that the Judge has written up

14    initially, while understandably doesn't satisfy you, it

15    satisfies us because it just leaves it the Judge is giving the

16    instruction that you cannot infer anything else past what

17    this -- this is just all you're to consider.  But I think our

18    problem is when you just say, well, you know, she came back

19    with no discipline, then we are left with the factual part

20    where the jury is also left to assume many things into facts

21    that are not in the facts right now.

22            MR. MARSHALL:  For example, we're going to have a

23    wrestling match in the trial about the veracity of Morefield

24    and Johnson, right?

25            You're going to have them testify and say, hey, she

**UNCERTIFIED ROUGH DRAFT**

1   said these things.  We're going to cross-examine them about,

2   you know, why they never reported it, et cetera, et cetera,

3   right?

4           So that part is all things that happened before the

5   investigation.

6           THE COURT:  I'm looking for something flat-toned.  How

7   about -- I'm playing with words here.  This case ends with her

8   returning to her former position without loss of any pay.  How

9   would that sound?  It's factually true.

10          MS. WILLIAMS:  Yes, I like that.

11          THE COURT:  Most jurors would think, well, if you

12  didn't lose any pay, you couldn't have been disciplined more

13  than maybe a letter in a file, maybe not even that.

14          MR. MARSHALL:  That's helpful, except that it suggests

15  that she doesn't have economic damages, which she does.  So,

16  for example --

17          THE COURT:  Well, remind me again of the economic

18  damages stuff.

19          MR. MARSHALL:  Sure.  There's several aspects to it.

20  For example, she was off work -- assuming the jury finds in her

21  favor and the jury finds that the physical injury is part --

22          THE COURT:  Her shoulder, right.  I don't mean to --

23  we're going to have to talk about that later.

24          MR. MARSHALL:  Sure.

25          THE COURT:  But hold that.

16

1    MR. MARSHALL:  Sure, no, I understand.  There's a

2 wrestling match about that as well.

3    THE COURT:  Play with my words.  Let's make it more

4 accurate in your view.  Instead of without any loss of pay --

5    MR. MARSHALL:  Without any penalty.

6    MR. PHILLIPS:  Your Honor, from the defense's

7 perspective, I think if we say without any loss of pay, other

8 than potentially what the plaintiffs are alleging in this trial

9 itself, that way -- which defendants deny, something along

10 those lines.

11    THE COURT:  Just to back up.  On the shoulder injury,

12 she had some sick leave that -- did it run out?

13    MR. MARSHALL:  So her sick leave and holiday banks

14 were -- sick leave and vacation leave banks were exhausted,

15 which you're -- while you're on injury leave and not earning

16 full income.

17    THE COURT:  That's loss.

18    MR. MARSHALL:  Also there's direct loss of pay because

19 of being off and the difference between the other income she

20 was receiving.

21    THE COURT:  Workers' Comp. versus pay?

22    MR. MARSHALL:  Yeah.  And then --

23    THE COURT:  Well, let's play with that.  So the case

24 ends with her return to her former position without any loss of

25 pay other than the time she was receiving workers'

**UNCERTIFIED ROUGH DRAFT**

17

1  compensation.

2          MR. SCHLEIN:  What about -- I think we might have

3  gotten lost.  John said it and we started talking about it.

4  What about, she was returned to work without any penalty,

5  because I think if we go and she wasn't --

6          THE COURT:  I like that.

7          MR. SCHLEIN:  It's kind of confusing.  You know, she

8  wasn't returned to her work without loss of pay except for this

9  and maybe that but, you know --

10         THE COURT:  Let's say that.

11         MR. SCHLEIN:  -- without penalty is just nice, crisp,

12  and clean.

13         THE COURT:  Yeah, I like that, without any penalty.

14  Can you live with that?

15         MR. PHILLIPS:  Can we say without any financial

16  penalty?

17         MS. WILLIAMS:  I prefer that.

18         MR. SCHLEIN:  But that gets to the same issue that we

19  just had there, because if we get the shoulder injury, then

20  we're going to argue there was financial penalty.

21         MS. WILLIAMS:  Then if we -- it goes back to our

22  position that when you say without any penalty, then it goes

23  back to there's a suggestion that she received no discipline at

24  all.  So maybe we should continue playing with the words.

25         MR. MARSHALL:  That's just factually true, she

**UNCERTIFIED ROUGH DRAFT**

18

1 received no discipline.

2    MS. WILLIAMS:  It's also factually true that the Chief

3 did recommend termination.

4    MR. MARSHALL:  Yeah, but what does that prove, other

5 than the Chief was continuing acts of retaliation, from our

6 perspective; and from your perspective, she's trying to get rid

7 of a bad officer.

8    THE COURT:  Well, I mean, I don't want to tilt here,

9 but we would be talking about -- this reminds me of, you know,

10 we do a lot of administrative agency work and the decision of

11 the agency is the last decision and that would be your Safety

12 Director.

13    Let's go back.  I like that idea.  I think if we play

14 with these words a little bit, we can get to a win here.  The

15 case ends with her return to her former position without any

16 financial penalty.  That is true from your end?

17    MR. PHILLIPS:  It is.

18    THE COURT:  Your argument, and financial penalty would

19 still allow you to argue the workers' comp diminution of pay.

20 I wouldn't prohibit you from arguing that at least.

21    MR. MARSHALL:  Without any financial penalty imposed,

22 that's not right, because, in fact, we're arguing that she did

23 suffer financial loss.

24    THE COURT:  Other than time on workers' compensation.

25 How does that sound?

**UNCERTFIED ROUGH DRAFT**

19

1    MR. MARSHALL:  Well, for example, she was in law

2  school -- I don't know if you know this, she was in law school

3  at the time.

4    THE COURT:  She's a lawyer, isn't she?

5    MR. MARSHALL:  She is now.  She passed the bar

6  recently.  She hasn't been sworn yet.

7    MR. SCHLEIN:  She still has to do the MGR.

8    THE COURT:  I'm going to digress here.  When I was in

9  practice, for some reason I had many clients who were lawyers.

10  I'll leave it there.

11    MR. MARSHALL:  I'll tell you sometime about how I

12  represented the entire Southeast Ohio Legal Services in

13  arbitration.  I had 32 clients in a room once.

14    THE COURT:  Yeah, over your shoulder.

15    MR. MARSHALL:  Yes, yes.

16    So to give you another example.  So she was in law

17  school at the time, and because she was on injury leave, she --

18  the tuition reimbursement discontinued by City policy, so she

19  had to pay $20,000 for --

20    THE COURT:  Was out of work without any direct

21  financial penalty.  Indirect could be -- you know, we're going

22  to end up with an argument over the shoulder injury.  I already

23  teed you off to that.  Can you live with "without any direct

24  financial penalties"?

25    MR. PHILLIPS:  The defense can, and we would also be

**UNCERTIFIED ROUGH DRAFT**

```
 1    fine with, if you go a step further probably towards the
 2    plaintiff, is "without any direct financial penalty other than
 3    what you may hear in this trial, which defendant denies."  That
 4    way it keeps it open for all of the damages they want to argue
 5    in this case.
 6              MR. MARSHALL:  Other than what plaintiff will argue --
 7    what plaintiff will present on damages, which defendant denies.
 8              MR. PHILLIPS:  Right.  I think that gets us to
 9    where -- from the defense, that gets us to where we need to be.
10              THE COURT:  All right.  I think we're there.
11              MR. MARSHALL:  So it's, "Return to her same position
12    without any direct financial penalty, other than --"
13              THE COURT:  What the plaintiff will argue and the
14    defendant denies.
15              MR. MARSHALL:  Yep.
16              THE COURT:  That work?
17              MR. PHILLIPS:  That works for us.
18              THE COURT:  Very good.  Just like a contract
19    negotiation.
20              MR. SCHLEIN:  Each side seems slightly unhappy, so
21    we're good.
22              THE COURT:  Anything else?
23              MR. MARSHALL:  Are we going to do voir dire in the
24    larger courtroom?
25              THE COURT:  No, we're going to do it in here.  They're
```

1   going to be masked until we clear out the courtroom, and then

2   they will be unmasked.

3           MR. PHILLIPS:  We have one other thing.  It's much

4   smaller, and I apologize for not raising this in the motion in

5   limine.  But I was reading through Lou Reiter, the plaintiff's

6   expert witness' report yesterday, I'm fine with almost all of

7   it.  There are points at the very end where he says, you know,

8   the City didn't comply with generally accepted police practices

9   and procedures.  I have no problem with him saying that.  Then

10  and he says, Because of that, I have determined this must be --

11  the true reason for this must be discrimination and

12  retaliation.

13          THE COURT:  There's a lot of cases on that.

14          MR. MARSHALL:  Yeah, and we're not going to have him

15  testify as to the final conclusion of the case.

16          THE COURT:  Okay.  He can do all the tee up for your

17  closing argument, but he can't make the inference only the jury

18  can make.

19          MR. MARSHALL:  Clearly this was retaliation.  You

20  can't say that?

21          THE COURT:  You would like to.

22          MS. WILLIAMS:  We still have Exhibit 24, which is the

23  Director's decision.

24          MR. SCHLEIN:  We just won't use it.

25          THE COURT:  Yeah, okay.

**UNCERTFIED ROUGH DRAFT**

1    MS. WILLIAMS:  There was some additional exhibits that

2  came through, and I'm sure if we can just go through them

3  really quickly.

4    THE COURT:  So I would prefer we -- I told the jurors

5  9:00.  Why don't we -- they're not going to be used in opening,

6  are they?

7    MR. PHILLIPS:  Are they?

8    MR. MARSHALL:  No.

9    THE COURT:  Okay.  Very good.  Thank you.

10  (Recess taken from 9:02 a.m. to 9:11 a.m.)

11  (Jury in at 9:05 a.m.)

12  (The following proceedings were had in open court.)

13    THE DEPUTY CLERK:  Case No. 2:18-cv-544, Melissa

14  McFadden versus City of Columbus.

15    THE COURT:  Good morning, ladies and gentlemen, and

16  welcome to the United States District for the Southern District

17  of Ohio.  As you just heard, I'm Judge Edmund Sargus.  I'm one

18  of five district judges serving in Columbus.

19    This morning we're about to begin the trial in the

20  case of Melissa McFadden versus the City of Columbus.  As you

21  can see, this case will be tried to a jury and all of you have

22  been summoned as potential jurors.  So the very first part of

23  this case will involve the selection of a fair and impartial

24  jury.

25    Let me begin by indicating to all of you that I know

**UNCERTIFIED ROUGH DRAFT**

1    we've placed a real burden on your time and in many cases on

2    your families and co-workers. I also know that a number of you

3    have come from a great distance because the juror pool in this

4    case is drawn from 30 of Ohio's 88 counties.

5            But I know that all of you can appreciate how

6    important the right to a trial by jury is to our justice

7    system. It's actually guaranteed by the United States

8    Constitution. I want to begin by emphasizing that we'll make

9    every effort to limit the burden that we have placed upon your

10   time.

11           And a quick word on masks. If you're like most

12   people, we're pretty tired of masks. Our court rules only

13   require that when we have this large group of people that we

14   have to be masked. In a few hours, we'll have the jury

15   selected in this case and those of you who are on the jury can

16   decide whether you want to be masked or not. Only while we're

17   crowded like this are masks required.

18           Let me introduce some of the court personnel. Over to

19   my left is court reporter Crystal Hatchett. Over to my right

20   is Attorney Noah Spector. And directly in front of me is the

21   courtroom deputy, Ms. Christin Werner, who will now administer

22   an oath to all potential jurors.

23           THE DEPUTY CLERK: Will all the potential jurors

24   please stand and raise your right hand.

25       (Prospective jurors sworn.)

**UNCERTIFIED ROUGH DRAFT**

24

1      THE DEPUTY CLERK:  Thank you.  Please be seated.

2      THE COURT:  So, ladies and gentlemen, this is a simple

3  but very important process as this case begins.  I'm going to

4  begin by asking all of you some questions.  We have to

5  determine whether or not you can, in fact, serve as fair and

6  impartial jurors in this case.  When I've completed my

7  questions, then the attorneys for each side will have the same

8  opportunity.

9      There could be a legal reason why one or more of you

10  may not serve on this jury.  You could be related to one of the

11  witnesses or parties in this case.  You could be employed by

12  one of the parties in this case.  There are a lot of reasons

13  that could disqualify you.

14      In addition to that sort of analysis, each side has

15  the right to excuse up to three of you with no questions asked

16  for the simple purpose of making sure we pick a fair and

17  impartial jury.  What I mean by that is someone who can listen

18  to the facts in this case and decide the matter only on the

19  evidence presented and the law that applies.  Let me give you a

20  quick bit of advice.

21      We don't mean to embarrass anybody.  There are a lot

22  of people in this room.  If you raise your hand in answer to a

23  question and you would rather talk in a more private setting,

24  we will take you over to my left.  We call it sidebar where you

25  will be out of the presence of the other people in the room and

**UNCERTFIED ROUGH DRAFT**

25

1   we can talk to you privately but still on the record.

2          So, with that, let's begin.

3          It's estimated this case will take between five and

4   seven days.  To be clear, court will be in session on Monday

5   through Thursday on this case, not Friday.  So there's a good

6   chance this case will take four days this week and one or two

7   days next week, Monday or Tuesday.  Court will be in session

8   from 9:00 to 4:30.  Is there anyone here who has some major

9   burden or scheduling impediment that would prevent you from

10  serving on this jury?  If so, please raise your hand.

11         What I'm going to do is call on each of you separately

12  and please don't give me your name.  If you could give me your

13  juror number and then your answer.

14         Ma'am, we'll start with you in the front row.

15         PROSPECTIVE JUROR NO. 4:  No. 4.

16         THE COURT:  004, okay.  Your issue?

17         PROSPECTIVE JUROR NO. 4:  I'm a full-time stay-at-home

18  mom.  I live in a small community where I do not have

19  babysitter options.  My mom drove me up here today, took my

20  kids to her job.  And I currently have livestock penned up in

21  the barn ready to give birth at any time.  I'm not there with

22  them and if they have complications and I can't afford to lose

23  them.

24         THE COURT:  So you're a full-time mom basically and

25  you don't have anyone to fill in for you?

**UNCERTIFIED ROUGH DRAFT**

26

1    PROSPECTIVE JUROR NO. 4:  I'm embarrassed to say it,

2  but driving 140 miles round-trip would just about deplete my

3  bank account.

4    THE COURT:  Right.  Well, and I want to be clear, I'm

5  not going to rule as we go through each one, but that sounds

6  like a pretty good reason to me.  So thank you.

7    Anybody else in the jury box?  Yes, ma'am.

8    PROSPECTIVE JUROR NO. 1:  Juror No. 1.  I have a

9  family event I was hoping to attend this weekend, maybe

10  Thursday.  And also my son, who is one years old, has

11  immunology appointment that took us a couple months to get

12  scheduled.

13    THE COURT:  And, I'm sorry, your number again?

14    PROSPECTIVE JUROR NO. *:  Oh, sorry, No. 1.

15    THE COURT:  You're No. 1, okay.  And it's an

16  out-of-town event?

17    PROSPECTIVE JUROR NO. 1:  Yeah, out-of-town event and

18  my son has an immunology many appointment next Tuesday that

19  took a while to get scheduled, so hoping to not reschedule

20  that.

21    THE COURT:  Thank you.  Now, we'll go -- yes, ma'am.

22    PROSPECTIVE JUROR NO. 10:  No. 010.

23    THE COURT:  You're 010?

24    PROSPECTIVE JUROR NO. 10:  Yes.

25    THE COURT:  Okay.

**UNCERTIFIED ROUGH DRAFT**

27

```
 1          PROSPECTIVE JUROR NO. 10:  I work in the psychiatric
 2   crisis department --
 3          THE COURT:  With the mask on, I'm sorry, I can't --
 4          PROSPECTIVE JUROR NO. 10:  I work in a psychiatric
 5   crisis department and I'm the only nurse practitioner in my
 6   department during my scheduled days.  To provide coverage for
 7   multiple days is challenging.  They have to bring -- provide us
 8   from other departments to cover.
 9          THE COURT:  Do you mind if I ask the name of your
10   employer?
11          PROSPECTIVE JUROR NO. 10:  Nationwide Children's
12   Hospital.
13          THE COURT:  Oh, okay, all right.
14          PROSPECTIVE JUROR NO. 10:  And with multiple providers
15   out sick as early as last week, it may be challenging to
16   provide coverage every day for the next week to two weeks.
17          THE COURT:  Okay, thank you.
18          We've covered the jury box.  Now we'll go to my right,
19   second row.  Sir?
20          PROSPECTIVE JUROR NO. 48:  Hi.  No. 048.
21          THE COURT:  48?
22          PROSPECTIVE JUROR NO. 48:  Yes.
23          THE COURT:  Okay.  Your answer?
24          PROSPECTIVE JUROR NO. 48:  And one conflict I have is
25   that on my college campus there was no parking for the freshman
```

**UNCERTIFIED ROUGH DRAFT**

1    and so because of that I haven't had driving experience for

2    about a year so I was driven here.  So...

3          THE COURT:  It's a transportation issue basically.

4          PROSPECTIVE JUROR NO. 48:  Yes.

5          THE COURT:  Where do you live?

6          PROSPECTIVE JUROR NO. 48:  Lancaster.

7          THE COURT:  Okay.  Thank you.

8          Anybody else to my right?

9          Okay.  Ma'am?  We'll get to the second group in just a

10   moment on this side.

11         PROSPECTIVE JUROR NO. 62:  I'm 062.

12         THE COURT:  062?

13         PROSPECTIVE JUROR NO. 62:  And I'm also a nurse

14   practitioner and it is really hard for my company to cover me

15   for multiple days off.

16         THE COURT:  Okay, thank you.  You have scheduled

17   appointments, in other words?

18         PROSPECTIVE JUROR NO. 62:  I have patients to see,

19   yes.

20         THE COURT:  Okay, thank you.

21         And there was another hand.  Yes, ma'am?

22         PROSPECTIVE JUROR NO. 73:  073.  And my husband had a

23   stroke and needs full-time care.  He's immobile and we have

24   seven steps down to the front door.

25         THE COURT:  And you're basically his caretaker?

29

1    PROSPECTIVE JUROR NO. 73:  Yes.

2    THE COURT:  Okay.  I'm sorry about that, but thank

3  you.

4    And now we'll go over to the left.  Ma'am?

5    PROSPECTIVE JUROR NO. 23:  23.  I had scheduled next

6  week off as vacation and I had completely forgot about it for

7  my work.  I mean, if I desperately need to be here, that's

8  fine, but if I don't, I would prefer to take my vacation.

9    THE COURT:  You didn't imagine jury duty as your

10  vacation this year?

11    PROSPECTIVE JUROR NO. 23:  No, but, I mean, if I -- if

12  you need me, I'm fine.

13    THE COURT:  Well, let me ask you this, is it

14  adjustable?  Can you adjust your vacation time or is it too

15  late?

16    PROSPECTIVE JUROR NO. 23:  No, because they changed

17  the way our vacation is.  In the first six months of the year

18  we had to use two full weeks and I never take vacation this

19  early and that's why I forgot about it.  So I have to use it or

20  I lose it by July.

21    THE COURT:  Just so I'm clear, you want to be excused?

22  That's what you're telling me, right?

23    PROSPECTIVE JUROR NO. 23:  I mean, that would be nice,

24  but if you don't have enough jurors, I mean, I'm fine with it

25  if it goes over a couple days.

**UNCERTIFIED ROUGH DRAFT**

30

```
 1          THE COURT:  So, actually, it's funny, you're reading

 2    my mind.  We're going to put you in the maybe list.  How does

 3    that sound?  That's fine.  Thank you.  We should have enough

 4    jurors so that won't be necessary, but thank you for offering.

 5    That's very kind of you.

 6          All right.  There's some other hands.  We'll go all

 7    the way in the back, ma'am.

 8          PROSPECTIVE JUROR NO. 49:  Your Honor, I'm 049.

 9          THE COURT:  49.

10          PROSPECTIVE JUROR NO. 49:  My concern, sir, is I had

11    open heart surgery several years ago and I'm very vulnerable to

12    complications with COVID.  I take a lot of precautions.  I

13    don't go out basically.  I don't go to theaters, movies, et

14    cetera.

15          THE COURT:  So would you mind coming up here for just

16    a moment?

17          Counsel, how about one from each side, not all of you.

18       (The following proceeding was held at sidebar.)

19          THE COURT:  So you're at a special risk?

20          PROSPECTIVE JUROR NO. 49:  Yes, sir.

21          THE COURT:  Okay.  We're going to keep you far away

22    because I don't want to do anything to your health.

23          I propose we let this juror go right now.  Anybody

24    object?

25          MS. WILLIAMS:  No.
```

**UNCERTIFIED ROUGH DRAFT**

31

```
1            THE COURT:  So thank you for being here.  You know,
2   I'm sorry.  If I could have talked to you a day before, I would
3   have said please call us because I wouldn't have made you come
4   here.  You're going to be the one person we let just walk out.
5            In fact, Christy.
6            We're going to walk you this way.  Is your purse in
7   the back?
8            PROSPECTIVE JUROR NO. 49:  Yes, sir.
9            THE COURT:  She's going to leave.  Ma'am, just get
10  whatever you need and you can go out the door and you're
11  excused.
12     (The following proceedings were had in open court.)
13            THE COURT:  Were there any other hands that I missed?
14            Got two more in the back.
15            PROSPECTIVE JUROR NO. 50:  050.
16            THE COURT:  050.
17            PROSPECTIVE JUROR NO. 50:  My mom is coming to visit
18  from Puerto Rico for the first time in I don't know how many
19  years.  She's going to be meeting her grandkids for the first
20  time.  And I'll be here for the two weeks that she's basically
21  going to be here.  So I would like to be excused to spend time
22  with my mom.
23            THE COURT:  I didn't catch all that.  You have a trip
24  to Puerto Rico?
25            PROSPECTIVE JUROR NO. 50:  No, my mom is coming in
```

32

1  from Puerto Rico.

2          THE COURT:  She's coming to visit you?

3          PROSPECTIVE JUROR NO. 50:  Yeah, she's been trying to

4  come for a couple of years.

5          THE COURT:  She's coming this week?

6          PROSPECTIVE JUROR NO. 50:  She's coming tomorrow.

7          THE COURT:  And you would like to have her visit, not

8  do your jury service?

9          PROSPECTIVE JUROR NO. 50:  Yes.

10          THE COURT:  That's a good reason.  Thank you.  All

11  right.

12          PROSPECTIVE JUROR NO. 54:  54.

13          THE DEPUTY CLERK:  Judge, what was that juror's

14  number?

15          THE COURT:  Just one moment.  That was juror No. 55.

16          I'm sorry, sir.

17          PROSPECTIVE JUROR NO. 54:  54.

18          THE COURT:  54.

19          PROSPECTIVE JUROR NO. 50:  I'm sorry, I'm Juror 050.

20          THE COURT:  Oh, you're 050.  I've got the wrong

21  number.  Okay.

22          And Juror 55?

23          PROSPECTIVE JUROR NO. 54:  I'm 54, sir.

24          THE COURT:  Right.  But you have your hand up too.

25          PROSPECTIVE JUROR NO. 55:  I do not.

**UNCERTIFIED ROUGH DRAFT**

33

```
 1          THE COURT:  You do not.  Okay.  So you're still in.

 2          Now, sir, I'm sorry, go ahead.

 3          PROSPECTIVE JUROR NO. 54:  I work at the VA Hospital.

 4   I work in the boiler room.  It's 24 hours/7 day a week job.  We

 5   work 12-hour rotating shifts.  We're short a person right now.

 6   So if I have to work, we're already working overtime as it is.

 7   So if we work overtime, you're working a 12-hour shift.  Right

 8   now I'm supposed to be working, but my supervisor is working

 9   for me.  So if I have to do this, everybody's just going to

10   have to be working straight.

11          THE COURT:  I'm sorry.  I missed your number.  Your

12   number?

13          PROSPECTIVE JUROR NO. 54:  54.

14          THE COURT:  54.  And you work at the VA here in

15   Columbus?

16          PROSPECTIVE JUROR NO. 54:  Yes.

17          THE COURT:  Okay, thank you very much.

18          Yes, ma'am.

19          PROSPECTIVE JUROR NO. 57:  No. 057.

20          THE COURT:  57.

21          PROSPECTIVE JUROR NO. 57:  So I'm a mom of three

22   little ones, and childcare is a bit difficult right now,

23   finding a summer sitter for my oldest one.  The daycare does

24   not accept school-aged children.  And my other child is

25   beginning speech therapy this Thursday.  That's at 3:45 that
```

34

1  afternoon.

2         THE COURT:  Basically your childcare duties would

3  prevent you from serving is what you're saying?

4         PROSPECTIVE JUROR NO. 57:  Yes.

5         THE COURT:  Okay.  Thank you.

6         Have I missed anyone else?  All right.

7         I'm going to give you just a very brief overview of

8  what this case is about.  If you are a juror in this case, you

9  will hear several days of testimony and you will make your

10  decision based on the evidence presented.  So, again, this is

11  just a short summary of what the case is about.

12         Melissa McFadden is the plaintiff in this case, and

13  she brings a lawsuit against the City of Columbus.  She is a

14  Lieutenant in the Columbus Division of Police where she has

15  been employed as a police officer since 1996.  She claims that

16  she was the victim of racial discrimination in employment in

17  violation of the Federal Constitution and federal and state

18  statutes.  She also claims that she was unlawfully retaliated

19  against under the Federal Constitution as well as federal and

20  state statutes.  Again, if you serve on this jury, you will

21  receive legal instructions defining those statutes and

22  constitutional provisions for you.

23         Now, in turn, the defendant, the City of Columbus,

24  denies these claims and these are the issues that will be tried

25  in the case.

**UNCERTFIED ROUGH DRAFT**

35

1          I'm going to introduce the parties and the attorneys

2    involved in the case.

3          Lieutenant McFadden, would you please stand and face

4    the prospective jurors.

5          Thank you.  You may be seated.

6          Ladies and gentlemen, do any of you know, are you

7    related to or have you had acquaintance with Lieutenant

8    McFadden?  If so, please raise your hand.

9          I see no show of hands.

10         The representative of the defendant in this case is

11   Assistant Chief of Police Lashanna Potts.  If you would please

12   stand and face the jurors.

13         Ladies and gentlemen, do any of you know, are you

14   related to or acquainted with Assistant Chief of Police

15   Lashanna Potts?

16         I see no show of hands.

17         Ladies and gentlemen, have you or any members of your

18   immediate family members have been employed or are currently

19   employed by the City of Columbus?  If so, please raise your

20   hands.

21         All right.  I see one hand.  Sir -- actually, two

22   hands -- we'll start with you.

23         PROSPECTIVE JUROR NO. 46:  Yeah, my name is

24   [REDACTED], 46.

25         THE COURT:  Can you stand, sir, please, just so we can

36

1    hear you.

2              PROSPECTIVE JUROR NO. 46:  [REDACTED], 46.  I have an

3    in-law who is a member of the police, Columbus Police.

4              THE COURT:  So you have an in-law who is a police

5    officer?

6              PROSPECTIVE JUROR NO. 46:  Correct.

7              THE COURT:  What relationship?

8              PROSPECTIVE JUROR NO. 46:  An in-law, a cousin.

9              THE COURT:  So is the relationship close enough that

10   you would feel awkward being on a jury in this case?

11             PROSPECTIVE JUROR NO. 46:  Oh, yeah, we speak quite

12   often.

13             THE COURT:  Let me bring you over to sidebar for just

14   a moment.  Counsel, you can join me.

15        (The following proceeding was held at sidebar.)

16             THE COURT:  Good morning.  How are you?

17             PROSPECTIVE JUROR NO. 46:  How are you?

18             THE COURT:  Good.  Just some easy questions for you,

19   don't worry.

20             PROSPECTIVE JUROR NO. 46:  No problem.

21             THE COURT:  So the in-law, now like a brother-in-law?

22             PROSPECTIVE JUROR NO. 46:  No, he's like a

23   brother-in-law basically.

24             THE COURT:  Brother-in-law married to your sister

25   maybe?

**UNCERTFIED ROUGH DRAFT**

```
1              PROSPECTIVE JUROR NO. 46:  Yeah, my sister's sister.

2         THE COURT:  And you're close to this person?

3              PROSPECTIVE JUROR NO. 46:  Well, every family meeting

4    we're together.

5         THE COURT:  So like Thanksgiving he would be there?

6              PROSPECTIVE JUROR NO. 46:  Absolutely, yes.

7         THE COURT:  Christmas?

8              PROSPECTIVE JUROR NO. 46:  Birthdays.

9         THE COURT:  Birthdays?

10             PROSPECTIVE JUROR NO. 46:  Right.

11        THE COURT:  And they're going to get to ask you a

12   couple of questions.  This is an important matter.

13             PROSPECTIVE JUROR NO. 46:  Absolutely.

14        THE COURT:  So there's an officer making a claim

15   against the Police Department and let's take a hypothetical.

16   You're on the jury and you rule in favor of her.  Would that

17   cause you problems at the next Thanksgiving with your

18   brother-in-law?

19             PROSPECTIVE JUROR NO. 46:  No, but we would have some

20   words.

21        THE COURT:  Okay.  But you see what I'm getting at?

22             PROSPECTIVE JUROR NO. 46:  Yeah.

23        THE COURT:  If it would really make you think it will

24   make my brother-in-law mad as opposed to he will understand and

25   he would want me to do the right thing.  Which of those two is
```

38

1  it?

2          PROSPECTIVE JUROR NO. 46:  Oh, well, he would want me

3  to do the right thing.

4          THE COURT:  So you don't -- am I correct in assuming

5  that with what you know so far about this case, you don't have

6  any qualms about being a juror?

7          PROSPECTIVE JUROR NO. 46:  No.

8          THE COURT:  You can be fair and impartial?

9          PROSPECTIVE JUROR NO. 46:  Absolutely.

10          THE COURT:  Okay.  That's all I have.

11          Anything from the plaintiff's side?

12          MR. MARSHALL:  Do you know what your brother-in-law

13  does for the Division?

14          PROSPECTIVE JUROR NO. 46:  He's a police officer just

15  recently hired and with the new initiative.

16          MR. MARSHALL:  Is he on patrol?

17          PROSPECTIVE JUROR NO. 46:  Yes.

18          MR. SCHLEIN:  Have you and your brother discussed

19  issues involving racism in the Columbus Division of Police?

20          PROSPECTIVE JUROR NO. 46:  Absolutely.

21          MR. SCHLEIN:  Do you feel that based upon your

22  discussions it would be difficult for you to be impartial given

23  the parties in this case?

24          PROSPECTIVE JUROR NO. 46:  No, I know that's just how

25  things are.  I'm 46.  It's not new for me.  So it's not going

39

1   to surprise me anything that's said.

2   MR. SCHLEIN:  Do you have a problem with your brother

3   working for the Columbus Division of Police?

4   PROSPECTIVE JUROR NO. 46:  No, I congratulate him.  He

5   was one of the first in the family to do it.  So he got a lot

6   of honor for that.

7   MR. SCHLEIN:  Has he encountered racism in the

8   Department that he's shared with you?

9   PROSPECTIVE JUROR NO. 46:  Not that he's told me, not

10  that he's mentioned but...

11  MR. SCHLEIN:  Does your brother know Lieutenant

12  Melissa McFadden?

13  PROSPECTIVE JUROR NO. 46:  I don't think so.  I've

14  never heard the name.

15  MR. SCHLEIN:  Have you and your brother discussed --

16  or had discussions regarding the Assistant Chief of Police?

17  PROSPECTIVE JUROR NO. 46:  No, no.

18  THE COURT:  Anything else?

19  Thank you very much.  Appreciate it.

20  (The following proceedings were had in open court.)

21  THE COURT:  I believe there were some other hands in

22  response to that question.

23  Yes, ma'am.

24  PROSPECTIVE JUROR NO. *:  Can I verify that you said

25  previous employer?

**UNCERTFIED ROUGH DRAFT**

40

1          THE COURT:  Yes, that's right.

2          PROSPECTIVE JUROR NO. *:  My husband was an employee

3    for the City of Columbus.

4          THE COURT:  What department?

5          PROSPECTIVE JUROR NO. *:  Traffic and maintenance.

6          THE COURT:  All right.  Would that prevent you from

7    being fair or impartial in this case?

8          PROSPECTIVE JUROR NO. *:  No.

9          THE COURT:  Thank you.

10         Anyone else?

11         Ladies and gentlemen, do you know anything about this

12   case that I just described to you by either word of mouth or by

13   listening to media accounts involving this case?  If so, please

14   raise your hands.  I see no show of hands.

15         Each side is represented by attorneys in this case,

16   many whom I think you'll enjoy getting to know.  The plaintiff

17   is represented by attorneys John Marshall and Sam Schlein, with

18   the Columbus firm of Marshall, Foreman and Schlein.  Thank you.

19   You may have a seat.

20         And the defendants are represented by attorneys

21   Westley Phillips, Paul Bernhart, and Susan Williams, all

22   attorneys with the City Attorney's Office of Columbus.

23         Ladies and gentlemen, have you or any members of your

24   immediate families had cases with or against any of the

25   attorneys who have just been introduced?  If so, please raise

**UNCERTFIED ROUGH DRAFT**

41

1     your hand?

2            Have any of you been involved in any kind of lawsuits

3     involving the City of Columbus?  If so, please raise your hand.

4            There will be a number of witnesses testifying in the

5     case.  I want to make sure that, for example, you're not

6     related to or do business with any of them, so I'm going to

7     have each side list the witnesses for you and we'll start with

8     the plaintiff's side.

9            MR. MARSHALL:  Thank you, Your Honor.

10           Good morning.

11           May I?

12           THE COURT:  You may.

13           MR. MARSHALL:  Good morning, everyone.

14           Witnesses, roughly in this order, that we intend to

15    call in this case will begin with Deputy Chief Gary Dunlap who

16    is now retired from the Division.  Followed by a video

17    deposition because he can't be at trial, he's out of town, of

18    Deputy Chief Kenneth Kuebler.  After that we -- in some order

19    we will be calling an HR representative of the City of

20    Columbus, Maranda Vollmer.  We will call three -- two current

21    police officers, Le'von Morefield and Anthony Johnson.  We will

22    be calling two sergeants, Sergeant Christopher Odom and

23    Sergeant Smith-Hughes.

24           Anyone know any of those individuals?

25           We have an expert witness in this case who is coming

**UNCERTIFIED ROUGH DRAFT**

1   from out of town.  I doubt that any of you have met him.  He's

2   a trainer for police departments around the country.  His name

3   is Lou Reiter, R-E-I-T-E-R, Louis or Lou Reiter.

4        Lieutenant McFadden's husband.  Lieutenant McFadden

5   will obviously testify.  Lieutenant McFadden's husband, Charles

6   McFadden will testify.  Charles is a firefighter with the City

7   of Columbus and has been for many years.

8        We'll be calling some other officials with the City,

9   including former Chief Kim Jacobs, Deputy Chief Rhonda

10  Grizzell, and Deputy Chief Jennifer Knight.  If anyone knows

11  any of those names.

12       Maybe I should stop, Your Honor, and see if anyone

13  recognizes any of them or wants me to repeat them.

14       THE COURT:  Do any of you know any of the witnesses or

15  are related to any of the witnesses that were just listed by

16  Mr. Marshall?

17       MR. MARSHALL:  And, I didn't see any hands.  Two more,

18  Your Honor.

19       THE COURT:  Go ahead.

20       MR. MARSHALL:  Sergeant Tate with the Columbus

21  Division of Police and Deputy Chief Gardner with the Columbus

22  Division of Police.  I'm sorry, Commander.

23       Thank you, Lieutenant.

24       I got my ranks wrong.  I should know this.  It's

25  Commander Gardner with the Columbus Division of Police.

**UNCERTFIED ROUGH DRAFT**

43

1        THE COURT:  All right.  I see no show of hands.

2        MR. MARSHALL:  Thank you.

3        THE COURT:  Thank you, Mr. Marshall.

4        I'll now ask the City of Columbus to list their

5    witnesses.

6        MS. WILLIAMS:  Your Honor, the City intends to call

7    the same witnesses that have been identified, all except for

8    Lou Reiter and Charles McFadden, who we will obviously call on

9    cross.

10        THE COURT:  So, again, I see no show of hands.  No one

11    knows any of the witnesses who are going to be called.  Thank

12    you.

13        Ladies and gentlemen, have any of you served in the

14    past as jurors either in state or federal court in a trial jury

15    or also on a Grand Jury?  If so, please raise your hands.

16        Sometimes we get 20 hands to answer that question.

17    Today it's zero.  Thank you.

18        Have you or any members of your immediate families

19    ever participated in a lawsuit as a plaintiff, defendant, or

20    any other type of party?  If so, please raise your hand.

21        Again, I see no show of hands.  Oh, I'm sorry, there

22    is a hand.

23        PROSPECTIVE JUROR NO. *:  I was just going to say my

24    dad sued a contractor recently for somebody who charged him

25    money and never built the building.  That was it.

**UNCERTIFIED ROUGH DRAFT**

44

1    THE COURT:  Is the case pending now?

2    PROSPECTIVE JUROR NO. *:  Yes, in Chillicothe.

3    THE COURT:  Thank you.

4    Anybody else?  Ma'am, all the way in the back.

5    PROSPECTIVE JUROR NO. 77:  My husband has a small

6  claims court for hit and run.

7    THE COURT:  Can I get your juror number, please.

8    PROSPECTIVE JUROR NO. 77:  077.

9    THE COURT:  077.  So the case is also pending; it's

10  not resolved?

11    PROSPECTIVE JUROR NO. 77:  We're still waiting to be

12  heard.

13    THE COURT:  Has anything happened in that case?

14    PROSPECTIVE JUROR NO. 77:  They're not showing up for

15  court.

16    THE COURT:  Has anything happened in that case that

17  would prevent you from being fair or impartial in this case?

18    PROSPECTIVE JUROR NO. 77:  (Shakes head.)

19    THE COURT:  Thank you.  Anybody else?

20    All right.  Ladies and gentlemen, have you or any

21  members of your immediate families ever been the victim of what

22  you believe to be unlawful or an unfair employment

23  discrimination?  If so, please raise your hand.

24    I see no show of hands.

25    Have you or any member of your immediate families ever

**UNCERTFIED ROUGH DRAFT**

1  had a person make a complaint that you or your family member

2  committed an act of unlawful employment discrimination?  If so,

3  please raise your hand.

4            I see no show of hands.

5            Have any of you ever been discharged, laid off, or

6  otherwise disciplined from a job in a way that you believed was

7  unfair or illegal?  If so, please raise your hand.

8            I see no hands.

9            Have any of you ever filed a complaint with an agency

10  known as the Equal Employment Opportunity Commission or the

11  Ohio Civil Rights Commission?  If so, please raise your hand.

12            I see no show of hands.

13            Tell you the obvious, you've already heard that the

14  plaintiff in this case is a person and the defendant is the

15  City of Columbus.  Can we all agree that there's one standard

16  of justice that applies to both, whether they're individuals or

17  whether they're a municipal corporation.  Is there anyone here

18  who disagrees with that?

19            I see no show of hands.

20            So if you are selected to serve on this jury, your

21  very important task will be to listen to the facts and the

22  evidence presented and then you will decide this case solely on

23  the evidence, but also together with the law that applies in

24  this case.  One of my jobs is to explain to you the legal

25  standards.  Part of this comes from the Constitution.  Part of

1    this comes from the laws passed by Congress and part passed by

2    the Ohio General Assembly.  And we're all required to follow

3    the law.

4           Is there anyone here who would not be able to follow

5    the law in making your decision?

6           I see no show of hands.

7           Again, your job will be to listen to the evidence and

8    decide the case based on the legal standards.  It's possible in

9    every case that one of you may disagree with the legal

10   standards and that's all right.  That doesn't disqualify you

11   from jury duty.  This is a free country, after all.  What can

12   disqualify someone, though, is if they have such a strong

13   feeling about what the law should be that they're unable to

14   apply the law as it is when they decide this case.

15          From what I've told you so far about this case, is

16   there anyone here who feels they may have an opinion so strong

17   about what the law should be that they wouldn't be able to

18   follow the law as is in this case?  Is there anyone here who

19   feels that way?

20          All right.  I see no show of hands.

21          If it turns out that what Congress or the State of

22   Ohio has defined as unlawful discrimination is different than

23   what you think it should be in the law, is there anyone here

24   who wouldn't be able to follow the law?

25          Again, I see no show of hands.

**UNCERTFIED ROUGH DRAFT**

47

1        Have any of you ever had what you considered to be not

2   just an encounter with, but a bad experience with a law

3   enforcement official?  That could police officer, a deputy

4   sheriff, federal law enforcement agent or all the variety of

5   agencies that exist.  Is there anyone here who has had a bad

6   experience with any of those types of law enforcement people?

7        All right.  We've got three hands.  We'll start with

8   you, ma'am.

9        PROSPECTIVE JUROR NO. 12:  Juror No. 12.  My son was

10  wrongfully arrested.

11       THE COURT:  Can I see you over here at sidebar,

12  please.

13       Christy, we'll line up all three.

14     (The following proceeding was held at sidebar*.*)

15       THE COURT:  Good morning and thank you for being here.

16  You're No. 12?

17       PROSPECTIVE JUROR NO. 12:  Yes, No. 12.

18       THE COURT:  And your son you said you felt was

19  unlawfully arrested?

20       PROSPECTIVE JUROR NO. 12:  Well, he was wrongfully

21  arrested and that was in proved in the court in Newark.

22       THE COURT:  Newark?

23       PROSPECTIVE JUROR NO. 12:  Yeah.

24       THE COURT:  So was he charged?

25       PROSPECTIVE JUROR NO. 12:  He was charged with

**UNCERTIFIED ROUGH DRAFT**

48

1    attempted burglary.

2              THE COURT:  And how did the case end?

3              PROSPECTIVE JUROR NO. 12:  After a case was

4    presented -- I can't even remember it at this time.  I was so

5    upset.  We got about halfway through and the Judge said don't

6    go any further.  No, he did not do this.

7              THE COURT:  So he threw the case out?

8              PROSPECTIVE JUROR NO. 12:  Yeah.

9              THE COURT:  So the -- can I put it this way, you went

10   through a lot, he went through a lot.  The end was fine, but it

11   was the in-between part.

12             PROSPECTIVE JUROR NO. 12:  Oh, sure.

13             THE COURT:  So this was in Newark.  Was it Newark

14   Police Department?

15             PROSPECTIVE JUROR NO. 12:  No, it was in Johnstown.

16             THE COURT:  Johnstown.  So the Licking County

17   Sheriff's office?

18             PROSPECTIVE JUROR NO. 12:  Yeah.

19             THE COURT:  So you can see where I'm going.  So this

20   is all about police officers.  Most of the witnesses are police

21   officers.  Nobody in Johnstown, nobody from Licking County.

22   Right?

23             MR. BERNHART:  Right.

24             THE COURT:  So how do you feel in general?  This will

25   be an employment case, not about a burglar case.  Do you think

**UNCERTFIED ROUGH DRAFT**

1    this thing with your son would give you sort of a feeling that

2    you couldn't be fair, or do you think you could be?

3          PROSPECTIVE JUROR NO. 12:  I could be fair.  One bad

4    officer doesn't make them all bad or the system's bad.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR NO. 12:  And we came out of the

7    whole thing whole.  He felt much better about it, but it was a

8    lot at stake.

9          THE COURT:  Oh, yeah.

10         PROSPECTIVE JUROR NO. 12:  Obviously.

11         THE COURT:  Yeah.  Okay.  That's all I have.

12         MR. MARSHALL:  No questions, Your Honor.

13         MR. BERNHART:  When did this incident with your son

14   occur?

15         PROSPECTIVE JUROR NO. 12:  Okay.  Let's see.  He

16   graduated in 2004 from high school.  He was in college and was

17   home on Thanksgiving break in 2004.

18         MR. BERNHART:  2004, so 16 years ago.  Was it the

19   Licking County Sheriff's Office?

20         PROSPECTIVE JUROR NO. 12:  It was actually the Police

21   Department.

22         MR. BERNHART:  The Johnstown Police Department?

23         PROSPECTIVE JUROR NO. 12:  Uh-huh.

24         MR. BERNHART:  When this happened, and I understand

25   you're upset by it and you're still upset by it, did you

**UNCERTFIED ROUGH DRAFT**

50

1  believed that the officers, the individual officers who

2  arrested your son, were the ones at fault?

3          PROSPECTIVE JUROR NO. 12:  Absolutely.

4          MR. BERNHART:  Or did you hold the whole Police

5  Department responsible?

6          PROSPECTIVE JUROR NO. 12:  No, no, no, just the

7  individual.  And actually just one, because I saw his partner

8  and heard what she had said to him, that he shouldn't be doing

9  this.  They were just a group of boys home from college and

10  just walking around and making a little bit too much noise

11  basically.  It was all stupid.  If I might add, on

12  scholarships.

13          MR. BERNHART:  Was it a male officer or female

14  officer?

15          PROSPECTIVE JUROR NO. 12:  It was a male officer.  The

16  female tried to reason with him, with the male officer.

17          THE COURT:  Well, thank you very much.

18          There's two more.  Counsel, you might want to stay

19  here.

20          So you can go back to your seat.

21          PROSPECTIVE JUROR NO. 12:  Okay.

22    (Prospective Juror No. 12 returned to their seat.)

23          THE COURT:  Quickly, he's the only juror of color in

24  this case.

25          MR. MARSHALL:  There's another one --

**UNCERTIFIED ROUGH DRAFT**

51

```
 1              THE COURT:  Can't see that far.
 2              Hello again.  So you put your hand up.
 3              PROSPECTIVE JUROR NO. 46:  Are we worried about this
 4    particular state?
 5              THE COURT:  Anywhere?  So you had a bad experience?
 6              PROSPECTIVE JUROR NO. 46:  Yeah, of course.  Yes, one
 7    or two.
 8              THE COURT:  And why don't you tell us about that.
 9    You're 46, again, of course.
10              PROSPECTIVE JUROR NO. 46:  Yeah.  So it's nothing that
11    I've been arrested for, but I've been detained quite a few
12    times.
13              THE COURT:  How many times have you been detained?
14              PROSPECTIVE JUROR NO. 46:  Three times.
15              THE COURT:  Let me just ask, do you believe unfairly
16    or wrongfully?
17              PROSPECTIVE JUROR NO. 46:  Oh, absolutely.
18              THE COURT:  And you weren't charged?
19              PROSPECTIVE JUROR NO. 46:  No.
20              THE COURT:  Okay.  Where did that happen?
21              PROSPECTIVE JUROR NO. 46:  This was new York.
22              THE COURT:  I'm sorry.
23              PROSPECTIVE JUROR NO. 46:  New York.
24              MR. MARSHALL:  New York State or New York City?
25              PROSPECTIVE JUROR NO. 46:  City, yes.
```

**UNCERTFIED ROUGH DRAFT**

52

1      THE COURT:  So we've talked before at sidebar, and you

2  know what this case is a little bit about.  It's not about

3  arrests.  It's not about detaining.  Anything you're hearing so

4  far, in light of these three detentions, that make you think

5  you couldn't be fair?

6      PROSPECTIVE JUROR NO. 46:  No, I just wanted to bring

7  it to your attention.

8      THE COURT:  No, I appreciate that.  We want to be

9  accurate.

10      That's all I have.  Anybody else have any questions?

11      Thank you.

12      MR. MARSHALL:  No.

13      THE COURT:  Okay.  Thank you.

14   (Prospective Juror No. 46 returned to their seat.)

15      THE COURT:  We have two more people coming.  Both of

16  these two had their hands up.  Let's go light on these.  They

17  both want to be excused.

18      So, ma'am.  We're going to cut this quick.  You're

19  going to be excused because of your mother, so we don't -- in

20  other words, we don't need to ask anymore.  You can hang with

21  us a few more minutes.  We excuse everybody at the same time.

22  Thank you for being here.  I hope you have a great visit with

23  your mom.

24      PROSPECTIVE JUROR NO. 50:  Thank you.

25   (Prospective Juror No. 50 returned to their seat.)

**UNCERTFIED ROUGH DRAFT**

53

1      THE COURT:  He's also in that same category.  You're

2   not going to object to either, are you, excusing him?

3      MR. BERNHART:  No.

4      THE COURT:  Good morning.  I'm going to cut off your

5   answer for a reason you're going to like.  You're going to be

6   excused because of the reason you gave me.  Can you bear with

7   us for a few more moments, and we'll get everybody out of here

8   well in advance.

9      PROSPECTIVE JUROR NO. 54:  Thank you.

10   (Prospective Juror No. 54 returned to their seat.)

11      MR. BERNHART:  Before we sit down, there is an issue

12   with one of the jurors, the African-American juror.  You asked

13   a question, are there any other jurors or prospective juror

14   been sued or involved litigation with the City of Columbus.  He

15   did not raise his hand.  We, in fact, have information that he

16   was sued over a tax issue and it was my office, City Attorney's

17   Office, who pursued that case against him.

18      THE COURT:  How long ago?

19      MR. BERNHART:  Just a few years ago in Municipal

20   Court.

21      MR. MARSHALL:  Same person?

22      THE COURT:  That's number one.  Let's do this.  Let's

23   go through all this.  He'll probably put his hand up again.

24   Then you probably want to ask him about it.  I'm not -- there's

25   going to be a lot of things -- I'm not making any findings, but

**UNCERTFIED ROUGH DRAFT**

54

1     sometimes tax liens don't resonate with City Attorney's Office

2     and they'll just think it's something else.  But you certainly

3     have the right to explore it.

4         (The following proceedings were had in open court.)

5             THE COURT:  Is there anyone sitting in this potential

6     juror pool right now who has already formed an opinion about

7     this case?  If so, please raise your hand.

8             I see no hands.

9             Is there anything else we haven't talked about so far,

10    because the attorneys are going to follow up when I'm done,

11    that makes you feel you shouldn't be on this jury?  If so,

12    please raise your hand.

13            All right.  Well, thank you very much for all of the

14    answers that you've given to me.  I'm going to turn this over

15    to Mr. Marshall who is going to have a chance to ask you some

16    questions on behalf of Ms. McFadden.

17            MR. MARSHALL:  Thank you very much.

18            Hello, again everyone.  I just have a few questions,

19    but I really appreciate your cooperation because we do want --

20    both sides want to pick the best jury in this case.  So I'm

21    going to ask some questions about, first, workplace

22    retaliation.

23            Anyone here or a family member or a close friend or

24    co-worker experienced something at work where they did or said

25    something and the superiors, the powers that be, were upset and

**UNCERTFIED ROUGH DRAFT**

1    unhappy about it and did something to them?  What I'm calling

2    retaliation, is anyone familiar with that experience, had that

3    experience, had someone close to them have that experience?

4            Ma'am?  Could you stand and give your juror number.

5            PROSPECTIVE JUROR NO. 77:  I'm 077.  I'm not proud of

6    the fact, but definitely I made a few comments when I worked in

7    a mixed company and they took it offensively and fired me.

8    They said I was racist.

9            MR. MARSHALL:  Okay.  So you experienced kind of

10   racism or retaliation yourself at work.

11           PROSPECTIVE JUROR NO. 77:  Yes.

12           MR. MARSHALL:  How long was this?

13           PROSPECTIVE JUROR NO. 77:  About three-and-a-half

14   years ago.

15           MR. MARSHALL:  And you feel that you weren't

16   expressing that kind of belief, but that people took it the

17   wrong way?

18           PROSPECTIVE JUROR NO. 77:  Uh-huh.

19           MR. MARSHALL:  I'm guessing you didn't have -- you

20   weren't a member of the union, you didn't have the right to

21   fight about it; is that right?

22           PROSPECTIVE JUROR NO. 77:  They didn't even pull me

23   aside and talk to me about it or anything.  They just called me

24   and walked me to the door.

25           MR. MARSHALL:  How long had you worked there?

**UNCERTIFIED ROUGH DRAFT**

56

1    PROSPECTIVE JUROR NO. 77:  26 years.

2    MR. MARSHALL:  Did you bring any kind of legal action?

3    PROSPECTIVE JUROR NO. 77:  No.

4    MR. MARSHALL:  Did you think about it?

5    PROSPECTIVE JUROR NO. 77:  No.

6    MR. MARSHALL:  Have you been able to get employment

7    since?

8    PROSPECTIVE JUROR NO. 77:  Yes.

9    MR. MARSHALL:  That experience, has that experience in

10   your view, affected your ability to be a fair and impartial in

11   this case?

12   PROSPECTIVE JUROR NO. 77:  No, actually -- no, I don't

13   think so, I just think it opened my eyes to how to approach

14   things and see things in a different light.

15   MR. MARSHALL:  Thank you very much for that.

16   Anyone else?  Anyone else experience or have a close

17   friend or family member experience some kind of retaliation at

18   your job?  Anyone have that experience?

19   Judge Sargus asked about law enforcement and asked if

20   anyone had any negative experience with law enforcement.  Let

21   me ask the opposite question, which is have any of you had any

22   particularly positive experiences with law enforcement, the

23   kind of thing where you felt really great about a particular

24   officer or a particular police department because of what they

25   did or something they helped with?  Has anyone had that

**UNCERTFIED ROUGH DRAFT**

57

1 experience?

2 Ma'am? We're going to make you stand and give your

3 jury number.

4 PROSPECTIVE JUROR NO. 25: 25. My house was broken

5 into a couple summers ago and the Gahanna Police Department was

6 great about helping and charging the people who did break in

7 and making them pay a fine.

8 MR. MARSHALL: And the individual officers that you

9 worked with, was it detectives with the department that came

10 and worked with you?

11 PROSPECTIVE JUROR NO. 25: I'm not a hundred percent

12 sure, but I just know that it was some individual police

13 officers who did come over.

14 MR. MARSHALL: So you did a great experience -- well,

15 didn't begin with a great experience.

16 PROSPECTIVE JUROR NO. 25: Yes.

17 MR. MARSHALL: But you had a great experience with the

18 Gahanna Police Department.

19 Anything about that make you feel like you're going to

20 lean to one side or another in this case in some way?

21 PROSPECTIVE JUROR NO. 25: No.

22 MR. MARSHALL: Thank you.

23 Anyone else? Anyone else have any particularly

24 positive experiences? Sir?

25 PROSPECTIVE JUROR NO. 6: 006. Mine is not a person,

**UNCERTFIED ROUGH DRAFT**

58

1    it's more of community-related thing.  We were involved in

2    school PTA and the police community has always been a good part

3    of it and helped do emergency response at my job and they have

4    done helped with training and working hand-in-hand together.

5            MR. MARSHALL:  So you have a very positive sort of

6    working relationship, community relationship?

7            PROSPECTIVE JUROR NO. 6:  Yes.

8            MR. MARSHALL:  Which department?

9            PROSPECTIVE JUROR NO. 6:  This is actually in London.

10           MR. MARSHALL:  London, Ohio?

11           PROSPECTIVE JUROR NO. 6:  Yes.

12           MR. MARSHALL:  Is that where you work?

13           PROSPECTIVE JUROR NO. 6:  Yes.

14           MR. MARSHALL:  How long have you had this relationship

15    with London Police Department?

16           PROSPECTIVE JUROR NO. 6:  Over 23 years.

17           MR. MARSHALL:  Always been a very positive

18    relationship?

19           PROSPECTIVE JUROR NO. 6:  Yes.

20           MR. MARSHALL:  Anything about that -- have you had any

21    interaction in that same line of work with the Columbus

22    Division?

23           PROSPECTIVE JUROR NO. 6:  No.

24           MR. MARSHALL:  But obviously how big is London Police

25    Department?

1      PROSPECTIVE JUROR NO. 6:  They're not real big, no
2  like 20, maybe.
3      MR. MARSHALL:  Pretty small.
4      PROSPECTIVE JUROR NO. 6:  Pretty small.
5      MR. MARSHALL:  As opposed to a much, much larger
6  division.
7      PROSPECTIVE JUROR NO. 6:  Yes, sir.
8      MR. MARSHALL:  Anything about that experience make you
9  feel like I might lean in one direction or another in this
10  case?
11      PROSPECTIVE JUROR NO. 6:  No.
12      MR. MARSHALL:  You feel you can be fair and impartial?
13      PROSPECTIVE JUROR NO. 6:  Oh, yes.
14      MR. MARSHALL:  Thank you, sir.
15      Anyone else have particularly positive experiences?
16      I want to ask about -- Judge Sargus has asked many of
17  these questions.  He asked if anybody had experience with
18  discrimination at work, felt like they had been discriminated
19  against.  We heard one example back here of an unfortunate
20  experience where maybe she was misunderstood.  But anybody else
21  have a close friend, family member, someone close to you that
22  felt like they were discriminated against at work in some way
23  and that they talked to you about or they talked to you about?
24  Anyone?
25      I want to ask about military experience and rank.

**UNCERTIFIED ROUGH DRAFT**

60

1   We're not going to probably -- how many of you have served in

2   the military?  We have a couple.  Thank you.  Thank you for

3   your service.  You'll hear Lieutenant McFadden served in the

4   Air Force before she became a Columbus Police officer.

5           Have any of you worked -- either of you been promoted

6   in service?  Sir, tell us about that.

7           PROSPECTIVE JUROR NO. 6:  I was at the E4 promotable.

8   They didn't have the sergeant slot open.

9           MR. MARSHALL:  Meaning you should have been a sergeant

10  but didn't quite get there.

11          PROSPECTIVE JUROR NO. 6:  Yeah, slot wasn't opened.

12          MR. MARSHALL:  When did you serve and where did you

13  serve?

14          PROSPECTIVE JUROR NO. 6:  Early '90s in Germany.

15          MR. MARSHALL:  So full term of service?

16          PROSPECTIVE JUROR NO. 6:  Four years.

17          MR. MARSHALL:  Four years.  And came back and did

18  probably reserves after that?

19          PROSPECTIVE JUROR NO. 6:  No, I was out and done.  I

20  just moved on.

21          MR. MARSHALL:  So you moved up to E4?

22          PROSPECTIVE JUROR NO. 6:  Yes.

23          MR. MARSHALL:  In the military, have you heard the

24  phrase "rank has its privileges"?  Have you heard that phrase?

25  Something they talk about?

**UNCERTFIED ROUGH DRAFT**

61

1      PROSPECTIVE JUROR NO. 6:  Sounds little bit familiar,

2  yeah.

3      MR. MARSHALL:  That may be something that comes up in

4  this case.  What does that mean, that phrase, "rank has its

5  privileges"?

6      PROSPECTIVE JUROR NO. 6:  In our case it was --

7      MR. MARSHALL:  Thinking of the higher ranks maybe.

8      PROSPECTIVE JUROR NO. 6:  -- they had different

9  opportunities than we had, I guess.

10      MR. MARSHALL:  Had to do different kinds of tasks?

11      PROSPECTIVE JUROR NO. 6:  Tasks.

12      MR. MARSHALL:  All right.  Thank you.  Thank you for

13  that.

14      So have others heard that phrase, "rank has its

15  privileges"?  Have you heard that?  Did you hear that when you

16  served, sir?

17      PROSPECTIVE JUROR NO. 54:  (Nods head.)

18      MR. MARSHALL:  What did that mean?  If you don't mind

19  standing.

20      PROSPECTIVE JUROR NO. 54:  Well, if you're an officer

21  in the Navy, you're in a room with two people.  If you're

22  enlisted, you're in a room with about a hundred guys.  So,

23  yeah, rank has its privileges.

24      MR. MARSHALL:  You wouldn't expect the higher ranks to

25  do the same things as the lower?

**UNCERTIFIED ROUGH DRAFT**

1           PROSPECTIVE JUROR NO. 54:  No.

2           MR. MARSHALL:  All right.  Thanks.

3           I'm going to ask generally.  I asked about

4    retaliation. I've asked about discrimination.  I want to ask

5    about false accusations at work.  Have any of you at your jobs

6    or had a close friend or family member experience being wrongly

7    accused of something, accused of saying or doing something that

8    you just didn't do?

9           Ma'am?

10          PROSPECTIVE JUROR NO. 63:  No. 63.  I'm a retired

11   teacher and I had a student one time, a 4th grade student, that

12   accused me of throwing her against the wall in the bathroom.

13          MR. MARSHALL:  Goodness.

14          PROSPECTIVE JUROR NO. 63:  And I wasn't even in the

15   bathroom.

16          MR. MARSHALL:  How did you handle that?

17          PROSPECTIVE JUROR NO. 63:  I was a union member and my

18   union representative from OEA came in.  The little girl finally

19   said that she was not telling the truth and her parents had to

20   admit that she had some issues with lying and that was it.

21          MR. MARSHALL:  Was that scary moment, though?

22          PROSPECTIVE JUROR NO. 63:  It was, yeah, because I was

23   probably in my 18th year of teaching and had never had any kind

24   of encounter like that.

25          MR. MARSHALL:  Now, did your superiors immediately

**UNCERTIFIED ROUGH DRAFT**

63

1   back you up?

2           PROSPECTIVE JUROR NO. 63:  Yes.

3           MR. MARSHALL:  They did?

4           PROSPECTIVE JUROR NO. 63:  Yes.

5           MR. MARSHALL:  So they didn't immediately think you

6   did something wrong?

7           PROSPECTIVE JUROR NO. 63:  Oh, no.

8           MR. MARSHALL:  It got sorted out, sounds like,

9   relatively quickly.

10          PROSPECTIVE JUROR NO. 63:  Yeah, within three minutes.

11          MR. MARSHALL:  Sounds like the young girl has some

12  pretty significant challenges.

13          PROSPECTIVE JUROR NO. 63:  I had tried to address that

14  with the parents and, of course, the parents didn't think that

15  was an issue, which proved that was.

16          MR. MARSHALL:  Parents never do.

17          PROSPECTIVE JUROR NO. 63:  Right.

18          MR. MARSHALL:  They're perfect.

19          All right.  Thank you so much for that.

20          Anyone else experience a thing like that at work where

21  you were accused of something like that by a co-worker or

22  superior or someone else that it just didn't happen or was

23  exaggerated, anyone have that experience?

24          One second, let me check with my client, Lieutenant

25  McFadden, and we may be done.

**UNCERTIFIED ROUGH DRAFT**

64

1          (Attorney-client discussion off the record.)

2          MR. MARSHALL:  Well, Lieutenant McFadden has not

3     ordered me to do anything further.  So those are all the

4     questions I have.  Thank you very much.

5          THE COURT:  Thank you, Mr. Marshall.

6          Now the City of Columbus will have an opportunity and

7     Mr. Paul Bernhart may ask some additional questions.

8          MR. BERNHART:  Thank you, Your Honor.

9          Has anyone in this room ever taken any steps to

10    address issues with policing, such as being involved in

11    peaceful protests?

12         Has anyone put stuff on social media regarding

13    policing?

14         Has anyone put a yard sign in their yard regarding

15    police?

16         Have any of you dealt with racism in the workplace?

17         This case deals with allegations of racism and race

18    discrimination.  Is anyone in this room uncomfortable

19    discussing race in front of other people?

20         Does everyone understand the idea that white people

21    can be racist against black people?  I assume everyone

22    understands that.

23         Does everyone in this room also understand that black

24    people can be racist against white people.  By show of hands,

25    does anyone disagree with that statement?

**UNCERTFIED ROUGH DRAFT**

1    Does everyone agree that both forms of racism are bad?

2    Does everyone agree that both forms of racism

3 shouldn't be tolerated in the workplace?

4    Does anyone in this room think that because of events

5 that happened in American history, that makes it lesser of the

6 two evils for black people to be racist against white people?

7 Does anyone feel that way?

8    Has anyone in this room at their job ever been

9 reassigned to a task that they didn't like?

10    Does anyone in this room have any opinions, and I ask

11 you to raise your hand, any opinions positive or negative,

12 about people who claim discrimination in the workplace?

13    Does anyone in this room, by show of hands, have any

14 opinions on people that file lawsuits generally?

15    Has anyone in this room ever supervised any employees

16 that they have the ability to hire, fire, discipline other

17 employees?

18    Sir.

19    PROSPECTIVE JUROR NO. 5: No. 5.

20    MR. BERNHART: Okay. Have you supervised other

21 employees?

22    PROSPECTIVE JUROR NO. 5: I have.

23    MR. BERNHART: While supervising other -- first let me

24 ask, where do you work or where you did when you had the

25 opportunity to supervise others?

**UNCERTFIED ROUGH DRAFT**

1        PROSPECTIVE JUROR NO. 5:  This was at Nationwide

2   Insurance.  I'm an actuary and I was the supervisor for a small

3   team.  I was never involved with firing anyone, but I was

4   involved with hiring several people.

5        MR. BERNHART:  Were you ever involved in disciplining

6   anyone?

7        PROSPECTIVE JUROR NO. *:  No, it never came up.

8        MR. BERNHART:  Okay.  Thank you.

9        Go ahead, sir.

10       PROSPECTIVE JUROR NO. 6:  Sorry.  I was an electrician

11  most of my life, foreman, so hired, fired disciplined on job

12  sites.  Now I'm head electrician at manufacturing plant for 23

13  years.  I help with the hiring and do writeups and stuff for

14  other associates that are working underneath us and I'm

15  changing jobs now, a project manager, so definitely hiring and

16  firing there.

17       MR. BERNHART:  I want to focus on the discipline

18  employees.  Tell me, in your experience, approximately how many

19  employees have you had to discipline?

20       PROSPECTIVE JUROR NO. 6:  Not a whole lot, not really,

21  no.  Usually it's just a talk, something wrong, see what caused

22  it and resolve that issue by talking.

23       MR. BERNHART:  Did any of these matters involve

24  allegations of racism?

25       PROSPECTIVE JUROR NO. 6:  No.

**UNCERTFIED ROUGH DRAFT**

1        MR. BERNHART:  Or sexism or any form of

2   discrimination?

3        PROSPECTIVE JUROR NO. 6:  No.

4        MR. BERNHART:  So when you've had to discipline an

5   employee, walk through the steps that you've taken to

6   investigate the matter.

7        PROSPECTIVE JUROR NO. 6:  Sure.  Usually we find out

8   something is wrong, a scenario or scene that we're dealing with

9   could be job, hats, anything like that.  Find out, get an

10  understanding that we relay the information professionally to

11  allow the traffic to be done the way we ask.  If it's not, we

12  walk through why we want it this way, why it's safe to do it

13  this way, whatever is involved in that situation at the time

14  and then we try to work it out that way.  It's usually just

15  more communication.

16        There has been times where I had to let people go

17  because they just -- kind of I don't want to say refused but

18  didn't quite grasp the concept of tasks at hand, maybe they

19  weren't qualified enough to do the tasks and they said they

20  were.  So we've had to --

21        MR. BERNHART:  Have all of these issues been

22  performance related?

23        PROSPECTIVE JUROR NO. 6:  Yes.

24        MR. BERNHART:  Have you ever had a situation where

25  problems have arisen between two different employees?

**UNCERTIFIED ROUGH DRAFT**

1        PROSPECTIVE JUROR NO. 6:  Yeah, argumentative.  In the

2   electrical field, in the world of early days, I guess,

3   sometimes there would be some pushing and shoving and luckily

4   that's not there anymore.

5        MR. BERNHART:  So tell me about that.  Tell me what

6   happened.  What did you do with the employees?

7        PROSPECTIVE JUROR NO. 6:  Actually, those I called the

8   supervisor, the owner of the company, and he -- I was just

9   there on the sideline and described the scene, the incident,

10  what happened and he pretty much dealt with it.  I was young.

11       MR. BERNHART:  But you were involved with it?

12       PROSPECTIVE JUROR NO. 6:  Yes, I was involved it in

13  it.

14       MR. BERNHART:  Did the supervisor separate the

15  employees for any period of time?

16       PROSPECTIVE JUROR NO. 6:  Actually, I did.  I

17  separated them and I called him out.  I had an associate that

18  was my right-hand person, I guess.  He took one and I took the

19  other one, we got the stories, wrote down what happened, why

20  they thought they were right, and then that's what I gave to

21  the supervisor.

22       MR. BERNHART:  You felt it was important to separate

23  it and investigate the incident?

24       PROSPECTIVE JUROR NO. 6:  Yes, yes.

25       MR. BERNHART:  Appreciate that.

**UNCERTFIED ROUGH DRAFT**

69

1          Anyone else?  Yes, sir.

2          PROSPECTIVE JUROR NO. 37:  37.  When I was with

3    Sedgwick I supervised a team of probably 10 people and, I mean,

4    I've hired them.  I didn't have to fire anyone.

5          MR. BERNHART:  Did you ever have to discipline anyone?

6          PROSPECTIVE JUROR NO. 37:  My first supervising job 30

7    years ago I did, but it was for performance issues, nothing

8    related to this kind.

9          MR. BERNHART:  Was that the only time you had to

10   discipline anybody?

11         PROSPECTIVE JUROR NO. 37:  Yeah.

12         PROSPECTIVE JUROR NO. 1:  I just wanted to say about

13   the social media regarding the police.  This has been a year

14   so, I forgot, but I posted something about the George Floyd

15   shooting a while back as well as signing a petition charging

16   the officers.

17         MR. BERNHART:  Were you involved in the protests in

18   Columbus?

19         PROSPECTIVE JUROR NO. 1:  I was not.

20         MR. BERNHART:  Did you ever think about joining the

21   protests?

22         PROSPECTIVE JUROR NO. 1:  I thought about it, but I

23   was pregnant at the time and it would be a bad decision.

24         MR. BERNHART:  In thinking about joining the protests,

25   obviously you were supportive of the Black Lives Movement.

70

1        PROSPECTIVE JUROR NO. 1:  Yes.

2        MR. BERNHART:  Did that situation with George Floyd,

3  his murder, did that taint your view of police officers in any

4  way?

5        PROSPECTIVE JUROR NO. 1:  Not necessarily.  I tend to

6  believe that there is good and bad in every profession, so I

7  wouldn't say necessarily as a whole, but definitely -- maybe

8  changed the perspective a little bit from growing up thinking

9  that everyone on the police force is a positive.

10        MR. BERNHART:  Did you follow the protests on the

11  news?

12        PROSPECTIVE JUROR NO. 1:  Not on the news, but I would

13  see it through my social media feeds.

14        MR. BERNHART:  What did you see come through?

15        PROSPECTIVE JUROR NO. 1:  I mean, most of the those

16  things I saw were supportive of the protests, things like that.

17  I had friends who went to it and said they with send series

18  from it.

19        MR. BERNHART:  Did any have a negative experiences

20  with law enforcement during the protests?

21        PROSPECTIVE JUROR NO. 1:  I don't think so.

22        MR. BERNHART:  No injuries?

23        PROSPECTIVE JUROR NO. 1:  No, I don't think so.

24        MR. BERNHART:  Anything else you want to share about

25  that?

```
 1              PROSPECTIVE JUROR NO. 1:  No.

 2              MR. BERNHART:  Your Honor, that's all I have.

 3              THE COURT:  Thank you.

 4              Counsel, let me see you at sidebar.

 5              We're almost done with this, ladies and gentlemen, so

 6    bear with us just a moment.

 7          (The following proceeding was held at sidebar.)

 8              MR. MARSHALL:  I don't know if you want to talk about

 9    preemptories now.  I probably need little bit of time.

10              THE COURT:  No, you'll have plenty of time.  Couple

11    things.  I've -- somehow I can't follow their -- there are

12    actually a few people of color on this venire.

13              MR. BERNHART:  There's one African American.

14              THE COURT:  My numbering is off here for some reason.

15    On the right side in the back of the courtroom, there are two;

16    and there was one on the left, maybe not.

17              MR. MARSHALL:  They're our law clerks.

18              THE COURT:  I count No. 46.  Who else?

19              MR. MARSHALL:  That's the only one.

20              THE COURT:  He's the only juror of color, and he's the

21    one that you had some concern with?

22              MR. BERNHART:  Correct.

23              THE COURT:  I think we ought to clear that up now.

24    Don't you think?

25              MR. BERNHART:  Yeah.
```

**UNCERTFIED ROUGH DRAFT**

72

```
 1          THE COURT:  Let's bring him up.
 2          MS. WILLIAMS:  The question you asked is a juror of
 3   color, there's only one?
 4          MR. BERNHART:  There's one who identified as Asian and
 5   one who identified as other.
 6          THE COURT:  But this guy is important, so let's bring
 7   him up.
 8          MR. MARSHALL:  Maybe we shouldn't have all the lawyers
 9   around him, maybe just Paul and I?
10          THE COURT:  Yeah.
11          Christy, bring up Juror No. 46.
12          THE DEPUTY CLERK:  Juror 46.
13          THE COURT:  If you don't mind, I'll do the quick intro
14   with him and you'll do the loads of questioning.
15          MR. BERNHART:  All right.  Thank you.
16          THE COURT:  Hello again.  How are you?
17          PROSPECTIVE JUROR NO. 46:  All right.
18          THE COURT:  So let me just explain why we're asking
19   this question.  The attorneys on both sides, this is a
20   hard-fought case.  It's got to be fought fairly.  We give them
21   randomly drawn names of jurors, and yours is one of them.  And
22   there are certain things they're not allowed to do, and they
23   don't; and there are certain things they are allowed to do, and
24   they do.
25          So I'm only bringing this up because it could impact
```

**UNCERTIFIED ROUGH DRAFT**

73

1   whether you serve on this jury or not.  That's the only reason.

2          Do you remember a tax issue with the City of Columbus?

3          PROSPECTIVE JUROR NO. 46:  Do I remember a tax issue?

4          THE COURT:  Yeah.

5          PROSPECTIVE JUROR NO. 46:  Yeah.  That's probably a

6   while ago, yes.

7          THE COURT:  Yeah, yeah.  And I've had tax issues, so

8   this is nothing personal, so don't take it that way.  It's not

9   meant to be.

10          So any ill will towards the City over that?

11          PROSPECTIVE JUROR NO. 46:  No.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR NO. 46:  No, this --

14          THE COURT:  Okay.  I didn't think so.

15          PROSPECTIVE JUROR NO. 46:  I had ill will towards that

16   contractor.

17          THE COURT:  Okay.  So what happened exactly?

18          PROSPECTIVE JUROR NO. 46:  I believe they weren't

19   the -- the Columbus amounts or something wasn't coming out my

20   deduction.

21          THE COURT:  Oh, you were paid and they didn't

22   withhold?

23          PROSPECTIVE JUROR NO. 46:  Exactly.

24          THE COURT:  Suddenly you wind up at the end you owed

25   taxes?

**UNCERTFIED ROUGH DRAFT**

74

```
 1              PROSPECTIVE JUROR NO. 46:  Exactly.

 2              THE COURT:  That's exactly what happened to me.  I was

 3    commuting to Columbus from far away from here, and somewhere

 4    along the way I got this giant bill.

 5              Okay.  So anything else you want to ask?

 6              MR. BERNHART:  So that issue involved the City of

 7    Columbus suing you over a tax lien?

 8              PROSPECTIVE JUROR NO. 46:  Yeah, which was basically

 9    answered and dealt with.

10              MR. MARSHALL:  You resolved it and paid the taxes?

11              PROSPECTIVE JUROR NO. 46:  Right, so it's not --

12              THE COURT:  All paid up, all done?

13              PROSPECTIVE JUROR NO. 46:  Yeah.

14              THE COURT:  Again, I'm sorry to bring this up, but now

15    we've cleared that off the table.

16              MR. BERNHART:  No other questions.

17              THE COURT:  Thank you.

18          (The following proceedings were had in open court.)

19              THE COURT:  That completes all the questioning.  Let

20    me explain the next process.  We're going to excuse all of you

21    from the courtroom, and I will be discussing with the attorneys

22    if they have any challenges.  There's a couple things I need to

23    instruct here.

24              Sorry, there's a hand up.

25              PROSPECTIVE JUROR NO. 28:  It didn't come up --
```

**UNCERTFIED ROUGH DRAFT**

75

1    THE COURT:  I'm sorry, I can't hear you.

2    THE COURT SECURITY OFFICER.  What juror number are

3  you?

4    PROSPECTIVE JUROR NO. 28:  028.  It didn't come up,

5  but my stepdad was convicted in Florida some time ago.  It was

6  neither negative or positive for me.  I was out of the house,

7  and they wouldn't share any information with me.

8    THE COURT:  Do you think that would have any influence

9  on how you can decide the case or be fair?

10    PROSPECTIVE JUROR NO. 28:  No.

11    THE COURT:  All right.  Thank you.

12    So while we're on break, because you won't know yet

13  who is going to be on the jury and who isn't, there's a couple

14  of instructions I need to give you.  I never used to have to

15  give this one.  First, don't do any social media posting.  No

16  comments on Facebook, Twitter, anything like that.  Second,

17  don't do any research on this case.  And, third, don't even

18  talk amongst yourselves about this case.

19    So after about 15 minutes, we're going to bring you

20  back in here, eight of you will be selected, and the rest of

21  you will be excused.

22    So with that, we'll be in recess for 15 minutes.

23    (Jury out at 10:15 a.m.)

24    THE DEPUTY CLERK:  Judge, can she tell you something?

25    THE COURT:  Yes.  Can we get juror number too?

**UNCERTFIED ROUGH DRAFT**

1     PROSPECTIVE JUROR NO. 55:  55.

2         A couple of summers ago when all the unrest was going

3    on down here, I made one small post on probably Facebook saying

4    "Police Lives Matter."

5         THE COURT:  Okay.

6         PROSPECTIVE JUROR NO. 5:  One of my kids said, mom,

7    stop, so I did.  And I just wanted to tell you that because I

8    remembered that sitting back there.

9         THE COURT:  I appreciate that.  So just a general

10   question for me, and we'll see if anybody wants to follow up.

11        PROSPECTIVE JUROR NO. 55:  Sure.  This is an

12   employment matter case.  So do you think what you expressed has

13   anything to do with what this case is about?

14        PROSPECTIVE JUROR NO. 55:  I do not.

15        THE COURT:  Do you harbor any sort of feelings that

16   you think would be pro or against either side in this case?

17        PROSPECTIVE JUROR NO. 55:  No.

18        THE COURT:  Counsel, anything further?

19        MR. MARSHALL:  No, Your Honor.  Thank you.

20        MR. BERNHART:  Thank you.

21        THE COURT:  Thank you for your candor.  Appreciate it.

22      (Juror No. 55 left the courtroom.)

23        THE COURT:  I can tell you, Counsel, I'm a little

24   confused when we get to Batson here, because I think there are

25   at least two people of color in this venire, but I can't find

**UNCERTFIED ROUGH DRAFT**

77

1    this other person in the back on my numbering system.  Can

2    anybody help me?

3            MR. MARSHALL:  Are you certain it wasn't one of the

4    law clerks from the --

5            THE COURT:  It was an older person.  Not to say they

6    couldn't be a law clerk and be older, but he walked out with

7    the jurors.

8            THE DEPUTY CLERK:  Do you want me to go --

9            MS. WILLIAMS:  I do think my husband showed up at some

10   point.

11           THE COURT:  Would he be over on the left?

12           MS. WILLIAMS:  I didn't even see.  I purposely don't

13   look because I told him not to.

14           THE COURT:  There's nothing to apologize for.  I just

15   want to make sure we have everyone lined up.

16           MS. WILLIAMS:  When I saw him, he had the checkered

17   shirt, I think.

18           THE COURT:  He was over on -- well, on this side?

19           MS. WILLIAMS:  I couldn't tell you where he was

20   seated, Your Honor.

21           THE COURT:  Maybe three rows back.

22           MR. PHILLIPS:  I think that's who it is, Your Honor.

23           THE COURT:  All right.  As long as we're sure,

24   because, you know, look, we're not doing this on a race basis.

25   But you understand under Batson versus Kentucky, when we're

**UNCERTFIED ROUGH DRAFT**

78

1  using preemptories, they cannot be used to racially cleanse a

2  jury, and to be able to apply that rule.  We have to know who

3  is who.

4       So we all agree that there's one person in this case

5  who is of color and that's Juror No. 46, right?  I think there

6  was an Asian American also.

7       MR. MARSHALL:  Your Honor, I think the Asian American,

8  the Batson rule might apply to the Asian -- person of Asian

9  decent.  I think the Batson rubric might apply in that

10 situation.

11      MR. PHILLIPS:  Your Honor, we did see a black woman

12 too, and we thought -- we think she was part of the --

13      THE COURT:  What number?

14      MR. PHILLIPS:  I don't know.

15      THE COURT:  She was sitting on the left side.  That's

16 the trouble without looking at the juror forms, I can't tell by

17 sight sometimes.

18      All right.  What I want to do is just give you the

19 names of people I think should be excluded just for reasons of

20 schedule.  I think you know who they are, but let's see if we

21 can agree on excusing all of them right off the bat.

22      By my count, that is Juror No. 1, 4, 10.  We have

23 No. 23 who said she would do it if she had to.  Let's keep her

24 in that that category.  If we don't need her, I propose we

25 don't use her.  I don't think we will need her, but we'll see.

**UNCERTIFIED ROUGH DRAFT**

79

```
1    And then No. 48.  I've already excused No. 49.  She's the one

2    with the serious health issue.  50, 54, 57, 62, and 73.

3            Any problem if we excuse all of them?

4            MR. MARSHALL:  No, Your Honor.

5            MS. WILLIAMS:  Your Honor, I believe it was Juror No.

6    65 who was also African-American female.

7            THE COURT:  65?  She asked for an excuse?

8            MS. WILLIAMS:  No, when you were asking about the --

9            THE COURT:  Oh, 65 --

10           MS. WILLIAMS:  Yes.

11           THE COURT:  -- you believe is of color?

12           MS. WILLIAMS:  Yes, she has identified on the jury

13   form as African-American.

14           THE COURT:  Thank you.  That helps quite a bit.

15           I did say 73 is excused, right?

16           MR. MARSHALL:  Yes.

17           THE COURT:  So why don't I give you five minutes to

18   collect your thoughts.  We'll come back and we'll start with

19   challenges for cause, and then we'll do -- each of you will

20   have your three preemptories.

21           We'll be in recess.

22      (Recess taken from 10:22 a.m. to 10:33 a.m.)

23           THE COURT:  All right.  Let's begin with any

24   challenges for cause, starting with the plaintiff.

25           MR. MARSHALL:  We do not have any challenges for
```

**UNCERTIFIED ROUGH DRAFT**

80

1    cause, Your Honor.

2              THE COURT:  Thank you.

3              And the defendant?

4              MR. PHILLIPS:  We have no challenges for cause, Your

5    Honor.

6              THE COURT:  All right.  So I think, again -- I just

7    know all of you have done trials in front of me before, but as

8    it stands now, for example, Juror No. 3 would become our first

9    juror, unless anybody uses a preemptory.

10             So you can go anywhere you want on this list with your

11   preemptories, but obviously the first 10 to 16 are the ones

12   where it counts.

13             So we'll start with the plaintiff's side.  The

14   plaintiff may exercise her first preemptory challenge.

15             MR. MARSHALL:  Your Honor, I apologize.  I missed what

16   you were saying.  You want us to go number by number or just

17   exercise --

18             THE COURT:  Anywhere you like.  But, again, you go too

19   deep, they won't make any amount of sense.  So you can anybody

20   in the pool now.

21             MR. MARSHALL:  I learned that in my first trial when I

22   peremptorily challenged Juror No. 30-something on the back.

23             THE COURT:  Don't do that.  Not going to work.

24             MR. MARSHALL:  We would excuse Juror No. 6,

25   [REDACTED].

**UNCERTFIED ROUGH DRAFT**

81

1          THE COURT:  All right.  Juror No. 6, by way of the

2     plaintiff's first preemptory challenge, will be excused.

3          And the City may exercise its first preemptory.

4          MR. BERNHART:  Thank you, Your Honor.  We would strike

5     Juror No. 12.

6          THE COURT:  Juror No. 12 will be struck by way of the

7     defendant's first preemptory.

8          And the plaintiff may exercise her second preemptory.

9          MR. MARSHALL:  Juror No. 13, [REDACTED].

10          THE COURT:  Juror No. 13 will be struck by way of the

11     plaintiff's second preemptory.

12          And the defendant may exercise its second preemptory.

13          MR. BERNHART:  Juror No. 40.

14          THE COURT:  Juror No. 40 will be struck by way of the

15     defendant's second preemptory.

16          And the plaintiff may exercise her last preemptory.

17          MR. MARSHALL:  Juror No. 3, [REDACTED].

18          THE COURT:  Juror No. 3?  003.

19          MR. MARSHALL:  I'm sorry, five.  That was my third.

20          THE COURT:  Juror No. 5 will be struck by way of the

21     plaintiff's third.

22          And the defendant may exercise its last.

23          MR. BERNHART:  We have no other preemptories, Your

24     Honor.

25          THE COURT:  So let's go through -- by the way, unless

**UNCERTIFIED ROUGH DRAFT**

82

1    anybody objects, I'm not going to include Juror No. 23.  She

2    was the one who had the vacation but said if we're stuck.  I

3    propose we don't use her.  Everybody's okay with that?

4              MR. BERNHART:  Yes, Your Honor.

5              THE COURT:  Okay.  So we're going to count eight

6    jurors here.  Juror No. 3 will become our first juror; and

7    Juror No. 19 will become our second; Juror No. 21 will become

8    our third; Juror No. 24 will become our fourth; 25 is our

9    fifth; 28 is our sixth; 31 is our seventh; and 38 is our

10   eighth.

11             Is that how everyone sees it?

12             THE DEPUTY CLERK:  37.

13             THE COURT:  That's what I said.  Did I say 38?  I

14   meant 37.

15             Okay.  I'm repeating it the wrong way.

16             So, again, that's 3, 19, 21, 24, 25, 28, 31, and 37.

17             MR. PHILLIPS:  That's correct from the defendant.

18             THE COURT:  Okay.  Everybody's good with that?

19             MR. MARSHALL:  Your Honor, that's what I see too.

20             Was it your intention to add alternates or just seat

21   eight because you only need six?

22             THE COURT:  That's my preference, would be to have all

23   eight vote, no alternates.  If something happened, COVID for

24   example, as long as we have at least six, the rule permits a

25   verdict of six to twelve.

**UNCERTFIED ROUGH DRAFT**

83

```
1              MR. MARSHALL:  Thank you.

2              THE COURT:  Okay.  All right.  Quick scheduling issue.

3      I have about a 10-minute preliminary instruction to give and

4      then we will move into opening.  How long do each of you expect

5      your opening to take?

6              MR. MARSHALL:  My estimate is around 20 to 25 minutes,

7      Your Honor.  If the Court will permit, I'd like a brief break

8      between preliminary instruction and opening, or I can run and

9      use the restroom now if you like.

10             THE COURT:  Either way.  I mean, what I'd like to do

11     is get this in by noon.  You're giving me plenty of time.

12             On the defense side?

13             MS. WILLIAMS:  Same, Your Honor.

14             THE COURT:  I'm not going to clock you.  Let's make

15     sure we get it all done by noontime.

16             MS. WILLIAMS:  Yes.  Thank you.

17             THE COURT:  You want to break now or later?

18             MR. MARSHALL:  How about -- they're standing in the

19     hall.  So maybe we should bring them in, seat the jury, give

20     them the initial instruction, and take a break.

21             THE COURT:  All right.  That will be fine.  We'll

22     bring them in and we'll seat the eight.  We'll seat them every

23     other seat so there's nobody on top of each other.

24             Very good.  With that, we'll be in brief recess.

25         (Recess taken from 10:39 a.m. to 10:48 a.m.)
```

**UNCERTIFIED ROUGH DRAFT**

84

1      (Jury in at 10:48 a.m.)

2          THE COURT:  Ladies and gentlemen, eight of you have

3   been selected to serve as jurors in the case.  The eight so

4   selected are in the jury box and we welcome you.  Those of you

5   in the back are now completed with your jury duty.  Let me give

6   you a final warm thanks for your service in this case.  You

7   played a very important role in our justice system.  But with

8   that, you are excused.  And, again, many thanks for being here.

9      (Prospective jurors not selected left the courtroom.)

10         THE COURT:  Again, welcome to jury service.  I hope

11  you find this enjoyable.  Our first order of business is to

12  have you take an oath as a juror.  I'll ask Ms. Werner to

13  please swear in our eight jurors.

14         THE DEPUTY CLERK:  Could you please stand and raise

15  your right hand.

16     (Jurors sworn in.)

17         THE DEPUTY CLERK:  Thank you.  Please be seated.

18         THE COURT:  First is going to be a health matter.  You

19  notice the courtroom is not packed now, so it's entirely up to

20  you.  If you wish to wear masks, please do.  If you don't wish

21  to wear them, you're not required to.  That will be true for

22  the rest of the trial.

23         Now that you've been sworn in as jurors, it's my job

24  to give you some preliminary instructions to guide you during

25  the course of this trial.  Let me start with why you're here.

**UNCERTIFIED ROUGH DRAFT**

1       It is your single most important duty to decide what

2  the facts are in this case.  If you think of a trial as a set

3  of disputes, people have disputed certain facts and in our

4  system juries decide disputed facts.  You and you alone are the

5  judges of the facts in this case and that's what you'll do.  I

6  will explain the law to you as we go through this case.  I will

7  also rule on what matters are admissible as far as evidence.

8  You've seen enough TV to know that.  I apply the Rules of

9  Evidence.  I tell you the law that applies in this case, but

10  you and you alone will decide the facts in this case.

11       I want to make this very, very clear as we start.

12  Nothing that I say or do during the course of this case is

13  meant to give you any indication of how I think you should

14  decide the facts in this case.  That is your mission and yours

15  alone.

16       Now, when I mention evidence, what I mean by that is

17  what you'll find from the facts will be from testimony mainly.

18  There will be some exhibits, some documents the witnesses will

19  testify to.  And there will be some facts that are agreed upon.

20  One thing we want to emphasize, the lawyers are encouraged to

21  not fight over matters that are not disputed.  It would waste

22  your time.  And there are a lot of stipulations in this case

23  that I will read to you somewhere in the course of this trial

24  and you'll take those as given.  That's a way to make sure

25  you're focused on the disputed facts and that's what the trial

1    will be about.

2         Certain things are not evidence and you must not

3    consider them as you decide the facts of this case.  The

4    lawyers play a very important role in this case and every other

5    case, but we want to be clear, lawyers are not presenting

6    evidence.  They are not witnesses.  And the ethics rules are

7    simple.  If any of the lawyers in this case were significant

8    witnesses in the matter, they couldn't be a lawyer in the case.

9    They could only be a witness.  They can't be both.  So just

10   remember they have important roles to play in this case.  They

11   will guide you through the trial.  They will make arguments to

12   you, but they are not witnesses.

13        You've seen enough television to know what an

14   objection is.  When a lawyer asks a question, the other lawyer

15   may think that the answer solicited is objectionable.  Lawyers

16   are obligated under our rules to make an objection and I'll

17   rule on it.  If I say the objection is sustained, that means

18   the question cannot be answered and you will ignore the

19   question.  If I say the objection is overruled, that means

20   under the Rules of Evidence and the law of evidence, you'll

21   hear the answer and then you will treat the answer as you would

22   whether there had been an objection or not.

23        It's possible during the trial that you will hear some

24   evidence that I'll later realize was improperly admitted.  I'll

25   ask you to ignore that evidence and, of course, you will do

87

1    that.

2          And then most importantly, anything you see or hear

3    outside the courtroom is not evidence in this case and should

4    not be used by you as you reach a verdict in this case.

5          There are, generally speaking, two types of evidence.

6    The first is direct evidence.  That would be a witness with

7    personal knowledge who can come in, for example, and say I saw

8    it raining outside.  If you believe that witness, then that's

9    evidence it's raining outside.

10          There's also circumstantial, or indirect evidence.

11    Person could walk in this courtroom soaked with an umbrella

12    that's wet.  From that, you have circumstantial evidence that

13    it's raining outside.  As a general matter, the law doesn't

14    distinguish between direct evidence and circumstantial

15    evidence, but instead directs you to consider all the evidence

16    as you decide the facts in this case.

17          It will be up to you to decide what witnesses to

18    believe, how much of their testimony to believe, or how much of

19    their testimony you're going to reject.  Later in the case I'll

20    give you some additional instructions regarding how you may

21    weigh different testimony that's conflicting, certain things

22    that may or may not impress you that makes one witness

23    believable or maybe one witness not so believable.

24          Now, as we start, this is a Civil case.  The

25    plaintiff, Ms. McFadden, has the burden of proving her case by

1    a preponderance of the evidence.  That means for her to prevail

2    on the claims she brings, the evidence she presents must be

3    more likely than not true.

4            To put it differently, if we took the scales of

5    justice -- you've all seen those -- we put the evidence

6    presented by the plaintiff on one scale and the evidence

7    presented by the defendants on the other scale, Ms. McFadden

8    has the burden of tilting the scale, even slightly, but has to

9    tilt in her favor for to you bring a verdict on her behalf.

10           You've probably seen more television cases that are

11   about criminal trials.  There's a different version of proof.

12   You've heard the phrase proof beyond a reasonable doubt.

13   That's only in a criminal case.  That's not the standard that

14   applies in a criminal case.

15           You remember I gave you just a short summary of what

16   the case is going to be about.  What I want to do now is give

17   you an idea of the factual issues you'll be deciding and what

18   the legal standard is that applies in this case.

19           Later in the trial you'll get a lengthy written

20   description of all the laws that apply in this matter, and you

21   will have that as you deliberate in this case.  What I'm going

22   to give you now is a shorter version so you can have a bit of a

23   road map as we start this trial.

24           So Lieutenant McFadden brings six claims under three

25   different legal sources.  In a summary form, she first brings

**UNCERTFIED ROUGH DRAFT**

1    three claims for racial discrimination in employment.  She

2    first brings these claims under a federal antidiscrimination

3    law known as Title 7, which prohibits employment discrimination

4    based on a number of categories, including race.

5            There's a similar Ohio law found in Ohio Revised Code

6    Section 4112.01, which also prohibits race-based discrimination

7    in employment.

8            Finally, she brings a racial discrimination claim

9    under the United States Constitution through the equal

10   protection clause found in the 14th Amendment.

11           Then she also brings three claims in which she alleges

12   that her employer retaliated against her because she opposed

13   employment practices that she reasonably and sincerely believed

14   were racially discriminatory.  She makes these three claims on

15   the same legal grounds I just mentioned, Title 7 of Federal

16   law, Ohio Revised Code Section 4112.01, and the Equal

17   Protection clause of the United States Constitution.

18           I emphasize that the City of Columbus denies all these

19   charges, and this will be the issue you will decide in the

20   course of this case.

21           Now, again, I'm going to give you a general idea of

22   what you'll be considering.  As for the three claims she makes

23   regarding racial discrimination, Ms. McFadden must prove the

24   following by a preponderance of the evidence:

25           With regard to her claim for racial discrimination she

1   must prove first that the City discriminated against her

2   because of her race, and she must prove that her race was a

3   motivating factor in the City of Columbus' decision.

4        Lieutenant McFadden must also prove that she suffered

5   an adverse action in her work, which can include an employer's

6   decision to move a person to a position with significantly

7   different and diminished responsibilities.  If she meets her

8   burden, you will find in her favor.  If she fails to meet her

9   burden of proof, you will find for the City of Columbus.

10        As to her three claims for retaliation, she must prove

11   the following by a preponderance of the evidence:

12        First, that she engaged in some type of protected

13   activity, which may include opposing what she sincerely and

14   reasonably believed was an illegal employment practice of her

15   employer.

16        Second, that her employer, the City of Columbus, knew

17   of her activity.

18        Third, that thereafter the City took a materially

19   adverse employment action against her, which could include her

20   employer's decision to move her to a position with

21   significantly different and diminished responsibilities.

22        And, fourth, she must prove that there was a causal

23   connection between her protected activity and the adverse

24   action taken by her employer.

25        Again, if you find she has met her burden of proof,

1   you will return a verdict in her favor.  If you find she has

2   not met her burden of proof, you will return a verdict for the

3   City of Columbus.

4           Again, that's just a brief summary of the legal

5   standards you'll apply.  You will get a much more thorough

6   description in the written instructions at the end of this

7   case.

8           There are a few other matters I want to discuss with

9   you, starting with your conduct as jurors.  And these are going

10  to strike you as odd, so I want to explain each one of them to

11  you.

12          First, I instruct you that during the trial you are

13  not to discuss this case with anyone, even among yourselves as

14  jurors.  You need to hear all the evidence first before you do

15  that.  And until you retire to the jury room at the end of this

16  case, you are simply not to talk about this case.

17          In particular, and this can be awkward, you've been in

18  the courtroom now for several hours with a lot of people,

19  you'll be with us for several weeks, you may see them in the

20  hallway.  But you are now judges, the judges of the facts.  And

21  to be a fair judge, you have to be fair but, you also have to

22  appear to be fair.

23          So you can be walking down the hall talking to one of

24  the attorneys about the weather outside.  From a distance, it

25  will look like you're talking about the case.  So I know you're

**UNCERTIFIED ROUGH DRAFT**

1     not a rude group of people, and the lawyers aren't either, but

2     don't talk to them or the witnesses or parties in this case.

3           Second, do not listen to or read anything touching on

4     this case in any way.  Again, this is going to sound odd.  In

5     the event there are newspaper, television, radio, or internet

6     stories about this case, you are instructed not to read or

7     listen to any of those.  I don't mean to imply that they are

8     inaccurate, but what I am certain of, the Rules of Evidence

9     that apply in this courtroom don't apply to the news media, and

10    you could be reading things you shouldn't be reading.

11          Again, that's an odd one.  You would think a

12    responsible juror would go home and do some research, learn as

13    much as you can about this case.  I have to tell you, you

14    cannot do that.  And, again, I owe you an explanation.

15          This case has been going, through COVID, a little bit

16    longer than necessary because of COVID.  We had difficulty

17    doing jury trials for two years.  But the way the system is set

18    up, after a lawsuit's filed, each side gets to question the

19    other about:  What evidence are you going to use?  What

20    documents?  Who are your witnesses?  And then each side gets to

21    question the witness under oath.  You will hear all of this in

22    the trial.  It's a very formalized process that's been

23    completely gone through in this case, so there shouldn't be any

24    surprises.  Trials are never without any surprises, but no

25    surprise witnesses.  They had to be identified a long time ago.

1    The documents as well.

2           Which brings us back to if you go research on the

3    internet, the lawyers would have no idea what you found, and we

4    all know you can find great stuff on the internet, you can find

5    false things on the internet.  But you would prevent this

6    system we have designed called discovery from being effective

7    because the lawyers would have no way to rebut what you may

8    have found that they would disagree with.

9           And then the last we've talked about just briefly,

10   social media.  When this case is over, this is still America,

11   you can speak your peace, but not while you're jurors.  So

12   between now and your verdicts, you can't post anything on

13   Facebook commenting on each witness as they go by, for example,

14   or on Twitter.  Stay off all of that.

15          Once the case is over, you can use your own judgment

16   and do whatever you want, but, again, you have to be impartial

17   between now and the verdict in this case.  You can have an

18   opinion when the case is over, but keep an open mind while the

19   case is being tried, and do not express any sort of opinions on

20   social media while the case is still alive and open.

21          You've been given notepads.  You're free to take

22   notes.  You're definitely not required to.  I'll just give you

23   a cautionary word.  You should assume that you'll hear the

24   testimony only once in this case, so don't let note-taking

25   interfere with ongoing testimony.  I'll tell you this at the

**UNCERTIFIED ROUGH DRAFT**

94

1  end of the trial again.  You're all going to be tasked with

2  using your own recollection of the testimony and the facts.

3  That's an individual obligation all of you have.  So your notes

4  can be used to help you with that, but they cannot be used to

5  influence other jurors, because it's their memory that has to

6  be tasked, not yours.

7       So as we are about to begin, let me give you a brief

8  idea of the segments.  Each side, through counsel, will be

9  giving an opening statement.  That's intended mended to give

10  you an overview of the case, who the witnesses are going to be,

11  what they're going to say, and what this -- each side thinks

12  the facts are going to be, and then you should find in their

13  favor.  That won't be evidence, but it will be helpful.  It

14  will put into context the witnesses who are about to begin

15  testimony sometime today.

16       And then after opening statements from each side, then

17  the plaintiff will call her witnesses and the defense will have

18  an opportunity to cross-examine.  Each witness will go through

19  four cycles.  Direct examination by the party that called,

20  cross-examination by the other side, redirect by the party that

21  called, and then recross by the opposing party.  So everybody

22  will most likely have four rounds of testimony.  When the

23  plaintiff's witnesses are concluded, then the City of Columbus

24  may call any additional witnesses it wishes to call.  Both

25  sides have an opportunity at rebuttal if there's still some

**UNCERTIFIED ROUGH DRAFT**

95

1    things that either side wants to contest.

2           After that, we'll have closing arguments where the

3    lawyers will argue to you what your verdict should be.  I will

4    then read to you the final jury instructions that you will have

5    in written form when you deliberate, and then your

6    deliberations will begin.

7           So the last point I will make, and then I'll be done.

8    So to talk to all of you about schedule.  I made you a promise

9    in the beginning, and I take this very seriously, you're all

10   here, not entirely voluntarily, but you are our visitors.  We

11   like to spoil you, but I also like to have your time highly,

12   highly valued.

13          So just a thought.  If I'm late, I delay everybody.

14   If you're late, you delay everybody.  So my experience has been

15   if we start at five minutes late here, ten minutes late there,

16   instead of a five- to seven-day trial we're going to have a

17   seven- to nine- day trial, and that would be a big waste of

18   your time, which I have no intention of doing.

19          So this is for everybody in the courtroom.  We all

20   want to be punctual.  We're going to start each morning at

21   9:00 sharp, 15-minute recess in the morning, hour for lunch.

22   We'll go from 1:00 to 4:30 in the afternoon, and there will be

23   a 15-minute break in between 1:00 and 4:30.  Again, there won't

24   be court on Friday.  It will go Monday through Thursday, and

25   then the following week however many days we need to go.

**UNCERTIFIED ROUGH DRAFT**

1          So with that, we are ready to begin this trial with

2    opening statements.  The plaintiff may go and proceed.

3          MR. MARSHALL:  Your Honor, as we discussed.

4          THE COURT:  Oh, yes.  We're going to take a brief

5    recess.  My expectation is we'll finish opening statements by

6    noon and you'll break for the lunch hour.

7          With that, we'll be in recess for 10 minutes.

8       (Jury out at 11:06 a.m.)

9       (Recess taken from 10:06 a.m. to 11:17 a.m.)

10      (Jury in at 11:17 a.m.)

11         THE COURT:  Before Mr. Marshall begins, we have a lot

12   of visitors.  We have lots of law students here for the summer

13   in different Judges' chambers, so we have many of them who are

14   going to get to watch all of you in action.

15         With that, Mr. Marshall, you may proceed with opening

16   statement.

17         MR. MARSHALL:  Thank you, Your Honor.

18         Good morning everyone.

19         In a moment, I'm going to take you back to 2016 and

20   2017.  As Judge Sargus indicated, COVID has delayed this case

21   coming to trial, but here we are.

22         Before I do that, I want to tell you a little bit

23   about Melissa McFadden, Lieutenant Melissa McFadden.

24         Lieutenant McFadden was born in a small city in

25   West Virginia, Beckley, West Virginia.  Some of you may have

**UNCERTIFIED ROUGH DRAFT**

1  driven by there south of Charleston.  Her father left the

2  family when she was 4 years old, and for a time the family was

3  homeless, but they persevered.

4         Melissa finished high school in Beckley and signed up

5  to serve in the United States Air Force, where she served a

6  full term.  As a teen-ager, she had decided she wanted to be a

7  police officer and she will tell you why.  So she became an MP,

8  a military police officer, a job that she served in honorably,

9  including a stint overseas where she was awarded, among other

10 commendations and medals, a bronze star.

11        She served, after being honorably discharged, a year

12 in the reserves, and during that time she found work as a

13 security guard as a preliminary to trying to get on the police

14 force.  Her mother had moved to Columbus, Ohio, and so she did

15 too, after serving.

16        In 1996, she became a Columbus police officer.  As an

17 officer, she served in several different roles, including as a

18 trainer for other officers at the academy.  In part because of

19 her work as a military police officer.  It gave her special

20 skills.

21        In 2010, out of over 100 people taking the exam, she

22 scored number one on the sergeant's exam and was promoted to

23 sergeant.

24        In 2014, she also scored highly on the lieutenants'

25 exam and she was promoted to lieutenant.  As you will hear, she

**UNCERTFIED ROUGH DRAFT**

1  was recently passed and is up for promotion to the next level

2  called commander.  She hopes that happens soon.

3      As impressive as these achievements are, while she was

4  working more than full-time as a police officer -- and you will

5  hear, the job of a police officer or a sergeant or a lieutenant

6  is certainly more than full time -- and by the way, raising her

7  stepson Isaiah from age 2, and by the way, fostering and

8  raising two other children for three years, Lieutenant McFadden

9  earned two bachelor's degrees, one in criminology and one in

10  social work from Capital University.  Then she got her social

11  work license and a masters' degree in criminal justice from

12  Tiffin University.

13      She also, in the past few years, has attended the

14  part-time program at Capital University Law School, and in

15  September of 2018 she earned her law agree, and recently she's

16  passed the Bar exam.

17      Melissa's path in life has not been easy and sometimes

18  she had to fight for her rights.  This earned her, among some

19  higher ups at the division, a reputation for being litigious,

20  for filing lots of lawsuits and lots of complaints, lots of

21  discrimination complaints.  Not exactly true, as you will hear.

22  There was one lawsuit.  There was one issue that she fought

23  about, and you will hear about that, before March of 2017, when

24  these events came to the fore.

25      But that perception about her is one of the reasons

**UNCERTFIED ROUGH DRAFT**

99

1    we're here today.

2            And, yes, this is a discrimination retaliation case,

3    as you've heard, because -- not because she's lost her job or

4    is in danger of losing her job. She's not. As I said, she's

5    going to be promoted to commander. She's coming up on the list

6    because of her score, and she plans to be with the Columbus

7    Division until she retires.

8            But we are here because she was discriminated and

9    retaliated against by the former now retired Police Chief Kim

10   Jacobs and Deputy Chief Kenneth Kuebler, with the help of a

11   commander named Rhonda Grizzell, when she was punished,

12   punished, based upon mere accusations, accusations that she

13   said discriminatory things to two black officers and did

14   discriminatory things to those two black officers and gave a

15   better evaluation than he deserved -- by the way, it was a good

16   evaluation, but not a great evaluation -- a better evaluation

17   than he deserved to a sergeant because he was black. That's

18   what she was accused of.

19           What was the punishment? The punishment she endured

20   occurred before the investigation of those allegations even got

21   started. You will hear that when the investigation was

22   finished, after this punishment occurred, she was returned to

23   the very same job that she had had before as a lieutenant on

24   patrol. She was returned to the very same job as the

25   lieutenant on patrol. That was it. But she was hurt, badly

**UNCERTFIED ROUGH DRAFT**

1    hurt, both physically and emotionally, by what she endured.

2          Now, the Columbus Division has sensible policies about

3    discrimination complaints.  One of them requires prompt

4    reporting if there's a problem so it can be dealt with before

5    relationships between officers or their superiors is affected,

6    or the superior, if they are the type to discriminate, might

7    somehow retaliate.  That practice makes sense.

8          Another practice is to separate them.  There's prompt

9    reporting, and then there's a requirement that they do some

10   separation of the officers from the supervisor from the

11   subordinate while the complaint is being investigated.  Again,

12   that makes sense.

13         There are many ways to do that, including changing

14   reporting relationships or perhaps even moving a supervisor or

15   the officers to a different shift or a different zone or

16   administrative job.  They have administrative jobs you'll hear

17   about where they do paperwork, where they deal with citizen

18   complaints.

19         What the Division had never done, you'll hear, never,

20   was to involuntarily reassign a sworn officer, and officer,

21   sergeant, lieutenant, commander, anyone to the property room,

22   except Melissa McFadden.

23         You will hear from witnesses, including police expert

24   Lou Reiter, that involuntary reassignment to the property room,

25   in the world of policing, is a kind of punishment.

**UNCERTFIED ROUGH DRAFT**

1          But what did they reassign this lieutenant to do?

2   What did they reassign Melissa McFadden to do?  To do

3   paperwork?  There is a lieutenant's job in the property room.

4   You'll see the job description for it.  That lieutenant is in

5   charge of two sergeants, 18 to 20 civilians.  They manage all

6   the -- it's an enormous warehouse that's been described as

7   bigger than a Super Wal-Mart; and they manage all of that

8   property, all of that important -- all those important things.

9          So that administrative job exists in the property

10  room.  It's an administrative job with a nice office.  In fact,

11  you'll hear that Melissa, after all of this, in part because

12  she didn't want them to get away with what they did, she

13  actually applied for the job after all of this, the

14  lieutenant's job.  She didn't get it because of seniority, but

15  she actually applied for it.

16          You'll see that job description.  That job was filled,

17  of course, at this time.  No, what did they send her to do?

18  What did they send this lieutenant to do after 21 years on the

19  force?  What she was to do was to spend her days, eight hours a

20  day, disassembling, tearing apart a room full of nearly 3,000

21  sweaty, sweat-stained moldy bullet proof vests that had been

22  gathering in wooden crates in the property room since the late

23  1990s.  That's what she was told to do.  That's what she was

24  required to do.

25          She did it for several weeks before she was badly

1  injured, tore her rotator cuff, and herniated disks in her neck

2  lifting these piles of heavily Kevlar lumbar panels that she

3  had to pull out of these vests after tearing them apart.

4       Chief Jacobs and others did that to the Melissa before

5  the accusations against her were even investigated.  These

6  accusations, well, you will hear from the very officers who

7  made them.  In fact, we're going to call them in our case to

8  testify, and they will have to admit to you that despite the

9  Division policy requiring prompt reporting, the things they

10  told Commander Grizzell, that Melissa said some pretty awful

11  things about -- I'll give you an example.

12       She was -- she claimed -- they claimed that when

13  those -- that terrible tragedy occurred in Dallas and Dallas

14  police officers were murdered, one of them claimed that Melissa

15  said, well, maybe that just has to happen to prove that white

16  officers kill black men in this country.  A horrible thing to

17  say.

18       She didn't say it.  She will tell you she didn't say

19  it.  That officer is going to have to admit that he thought

20  that it was a vial, toxic, horrible thing to say.  Oh, and he

21  didn't report it.  He knew it was a violation.  He didn't

22  report it.

23       They will have to admit to you that the things that

24  she supposedly said were between nine months and over two and a

25  half years old when they were finally brought up.  Hardly

1    prompt, under the policies.

2          These two officers, not even under -- not even under

3    Lieutenant McFadden's supervision at the time, by the way.

4    They had left her zone three months earlier.  But how these

5    complaints come up?  Because they were sought out by Rhonda

6    Grizzell, Commander Rhonda Grizzell, who was out soliciting

7    complaints against Lieutenant McFadden, as you will hear.

8          These officers will also admit to you that they put

9    this stuff in writing at Commander Grizzell's insistence, but

10   they didn't even consider it an official complaint.  They're

11   going to have to admit that on that witness stand.

12         And another telling piece of evidence about those

13   accusations.  Internal affairs is the place where these kinds

14   of complaints should be investigated, but they're -- the

15   standard operating procedure, as you will see, says that a

16   victim -- a complaint must address the psychological well-being

17   of a victim.  Every complaint must do that.

18         So what did Commander Grizzell do when she was digging

19   up dirt on Melissa McFadden?  You will see in a text, she said,

20   Be sure to talk about how it made you feel, to these two

21   officers when they were writing up the complaints.  Be sure to

22   talk about how it made you feel.

23         And later, later -- and this will happen in this

24   courtroom -- she will have to admit it.  She lied about it,

25   because she said they were really upset when I talked to them.

**UNCERTFIED ROUGH DRAFT**

1  They were so upset about this. The officers are going to say,

2  Well, no, I wasn't crying. It was a normal conversation.

3  That's what the officers are going to say.

4  The other accusation -- so those are the two officers.

5  The other accusation comes from a Sergeant Tate, and it's an

6  odd one. What he said was he got a better written performance

7  review for the year 2016 than he deserved from Lieutenant

8  McFadden because he's black, and he thinks that because she

9  said to him, you know, I'm basically, you know, I'm giving you

10  a better written evaluation, but it might not be quite so good,

11  but I don't believe in black on black crime. That's what he

12  says she said in regard to the evaluation.

13  That's an expression that Melissa or others can

14  explain to you that's sometimes used in the black community

15  with -- among some people. You know, she said those words to

16  him, but it wasn't about the evaluation. She's going to

17  explain to you what she was talking about. She was talking

18  about an incident at a community event where he was supposed to

19  have sent some officers on a bike ride for this community

20  event. He didn't show up, and the chief or the commander was

21  upset about it.

22  And she said to him, you know, she said, hey, I've

23  gotten over that because I don't believe in black on black

24  crime. But it had nothing to do with his evaluation. How do

25  we know that for the sure? Perhaps Tate was confused, but how

1  do we know that?  Because his 2016 evaluation done by

2  Lieutenant McFadden is actually worse than his 2015 evaluation

3  done by Lieutenant McFadden.  And he's claiming it's better.  I

4  got it better because I'm black.

5        He didn't bring it up, by the way.  There's a

6  procedure for appealing an evaluation or challenging an

7  evaluation, which he didn't follow; but it only came up when,

8  guess what, Commander Rhonda Grizzell became the commander of

9  his zone.  That's when it came up, and it sure suggests she

10  seized on this comment to go after Lieutenant McFadden.

11        Commander Grizzell, why was she digging up dirt?  The

12  evidence will show that she was one of the higher ups that

13  thought -- and she'll admit it on the stand -- Melissa's

14  litigious.  She files -- again, not entirely true.  She files

15  lots of lawsuits, lots of complaints.

16        In fact, she secretly recorded Lieutenant McFadden

17  because of that perception.  She had a meeting with her and

18  secretly recorded her, and was even told to do that by former

19  Chief Jacobs, who also felt the same way.  But the evidence

20  will show that there was another trigger for Commander Grizzell

21  doing what she did in digging up this dirt on Lieutenant

22  McFadden.

23        Now, there will be plenty of evidence of this, and

24  I'll try to make it -- it's a pretty simple timeline when I've

25  been living this case, but let me tell you what happened.

1      Commander Grizzell was good friends with another

2  Commander, Commander Jennifer Knight.  Now, at the time that

3  she went out digging up dirt on Lieutenant McFadden, Jennifer

4  Knight had just been removed by Chief Jacobs from the

5  prestigious job as head of internal affairs at the Division.

6  In part because of Lieutenant McFadden.

7      You will hear how McFadden, in her role as a grievance

8  rep for the union, for the Fraternal Order of Police union,

9  assisted an officer named Felicia Dragon [phonetic] with a

10  discrimination case against a Sergeant Fishburn.  She was

11  supporting another Officer bringing a description complaint.

12      In fact, in a meeting with Fishburn, she told Fishburn

13  she had thought Fishburn was retaliating against

14  Officer Dragon.

15      When that issue finally got to internal affairs, when

16  Felicia Dragon's complaint got to internal affairs, where

17  Jennifer Knight was the head, the commander, before the

18  investigation of Dragon's complaint got under way, Knight was

19  overheard by witnesses talking to Fishburn, the subject of the

20  complaint, telling him, her, Dragon, her complaint is stupid.

21  It's not going anywhere.

22      She's the head of internal affairs.  Before the

23  investigation is under way she's saying it's stupid, it's not

24  going anywhere, to the person who was accused of

25  discrimination.

**UNCERTIFIED ROUGH DRAFT**

1       That witness, Sergeant Smith-Hughes, calls Melissa

2   McFadden and tells her about it.  Eventually, you'll hear the

3   story, it gets back to the union, the chief of the union, who

4   is responsible for dealing with these issues.  He goes to the

5   Chief about it.  Smith-Hughes gets called in and talks to the

6   Chief about it.

7       The chief is under fire for all of this.  She's got to

8   do something.  She removes Jennifer Knight from IA.  And then

9   she puts Jennifer Knight's good friend, Rhonda Grizzell, over

10  Lieutenant McFadden's zone.  She puts her in charge of the

11  zone.  And that's when the dirt gets dug up.

12      All right.  In summary, what is the evidence that you

13  will hear that this assignment to the property room was

14  discrimination, retaliation.  We'll talk about it in a minute.

15      Ah, here's where it gets easy, because there are

16  stipulations of fact in this case that Judge Sargus will read

17  to you at some point in the trial.  You will have an

18  opportunity to take them back -- they're about three pages

19  long -- to the jury room and look at them during your

20  deliberations.

21      What do those stipulations say?  These are facts which

22  are established.  There's no dispute.

23      Now, those established facts show that in the few year

24  time frame before and after Lieutenant McFadden's being sent to

25  the property room to do that job, to tear apart all those old

1   bullet proof vests, there were eight white members of the

2   division sworn personnel, three lieutenants, three sergeants,

3   one commander, and one officer, who were accused by other

4   officers of discrimination; and none of them, none of them,

5   none of the three lieutenants, the three sergeants, the

6   commander, the officer, none of them were reassigned at all,

7   much less sent to the property room to tear apart old bullet

8   proof vests.

9           I'll give you three examples.  Lieutenant Christine

10  Nemchev, white, was accused of creating a hostile work

11  environment and discrimination by Sergeant Kim Medley

12  [phonetic], who is black.  Lieutenant Nemchev was not sent to

13  the property room.  She was not reassigned at all.  She was

14  simply asked to work a different shift.  Melissa would have

15  been happy to work a different shift.

16          Black sergeant Christopher Odom made a complaint to

17  internal affairs that his commander, Rhonda Grizzell, and his

18  lieutenant, Lowell Rector, both white, created a hostile work

19  environment and discriminated against him because of his race

20  and retaliated against him.  Lieutenant Rector was

21  Sergeant Odom's direct supervisor on Zone 2.  Commander

22  Grizzell was a Zone 2 commander.  This happened after she took

23  over Zone 2.

24          Neither Grizzell or Rector were reassigned at all.

25  Both kept their supervisory authority, unlike McFadden.  And

**UNCERTIFIED ROUGH DRAFT**

1  when Odom was given a different -- Odom was given a different

2  commander and lieutenant to report to during the investigation,

3  and surely neither Rector for Grizzell were sent to the

4  property room.  They weren't reassigned at all.

5     In September 2014, Officer Eric Cornett, a black officer, and

6  Sergeant Doug Williams, also black, made a complaint to internal

7  affairs that a Sergeant Eric Moore, a white officer, made racist

8  slurs, including use of the N word multiple times, called black

9  officers apes and monkeys and threatened to kill black officers.

10        For the first several months of that investigation,

11  Sergeant Moore was not reassigned, nor was his supervisory

12  authority removed, and he surely was never sent to the property

13  room to disassemble moldy, sweat-stained bullet proof vests.

14        Lieutenant McFadden was also accused of

15  discrimination.  Those officers are going to say they did.

16  You'll hear about the staleness of those complaints and how

17  they were ginned up and solicited by Rhonda Grizzell.

18        But unlike the eight whites accused, within days, just

19  days of the accusations coming to Chief Jacobs and Deputy Chief

20  Kuebler's attention from Grizzell, she was pulled from a job as

21  a lieutenant and shipped off to the property room.  This was

22  March of 2017.

23        She was told her job was to tear a part 100 of these

24  vests a day, 100.  An impossible task, as you will learn.  She

25  did quite a few, and she was able, during her short time in the

**UNCERTIFIED ROUGH DRAFT**

1    property room, before she was injured, which was March 14th was

2    the first day of actual work, and June 5th -- although, you

3    will hear, she took quite a few days off during that time

4    because not only was the job awful and humiliating and she

5    didn't want to be there, she had lots of time built up, so she

6    took off quite a few days.  I think it was more than 22 during

7    that time.

8            But even during that time, even with all those days

9    off working a normal -- she didn't get to work overtime, she

10   processed over 1,100 of those vests.  You will see there's

11   lists where she recorded the serial numbers.  You'll see those,

12   where she had to tear apart the covers.

13           And during one of those days, June 5th, she was

14   lifting these heavy -- you'll learn these vests way, depending

15   on the size, they're sized according to the officers -- weigh

16   between maybe 5 to 10 pounds each.  She was lifting a stack of

17   these Kevlar vests and moving them from one place to another,

18   as she had been doing for days trying to meet this quota, tore

19   the rotator cuff in her right shoulder and herniated discs in

20   her neck.  As a result, she was off work for 18 months and has

21   gone through years of therapy.

22           Why?  Why did they send her to do this job?  A job in

23   which other officers would walk by and smirk at her, a

24   humiliating job for a lieutenant, a humiliating job for anyone.

25   These vests had been gathering there since the late 1990s in

**UNCERTFIED ROUGH DRAFT**

1  these crates.  Why was she the only officer, lieutenant,

2  sergeant, or commander, any member of the sworn personnel ever

3  reassigned to the property room during a discrimination

4  investigation?

5         Well, as I've said, we think it's straight up

6  discrimination.  She was the only black officer accused of an

7  EEO violation, and by the way, the only one who was accused, at

8  least by Tate, of discriminating in favor of black officers.

9  None of the whites were treated that way.

10        As I said, Melissa McFadden was judged by one of the

11  higher ups, some of the higher-ups, as litigious, filing lots

12  of lawsuits and complaints, and that surely played a role.

13  That kind of retaliatory motive played a role here.

14        The evidence will also show retaliation, as I've said,

15  because they were upset with her involvement with

16  Officer Dragon's EEO complaint, her support of it, which got

17  Commander Knight in a bind, when she was overheard saying that

18  Dragon's complaint was stupid.  Witnesses heard it, and of

19  course Chief Jacobs had the union on her back and had to take

20  action to against Commander Grizzell's good friend

21  Commander Knight, but then Grizzell became McFadden's superior.

22        Finally, what is the best evidence?  It's this:  Chief

23  Jacobs and Deputy Chief Kuebler sadly will be forced, because

24  they have done it before, to lie to you about what they knew,

25  what they knew Melissa McFadden --

**UNCERTIFIED ROUGH DRAFT**

112

1          MS. WILLIAMS:  Objection.

2          THE COURT:  There's an objection?

3          MS. WILLIAMS:  Yes.

4          THE COURT:  Let me see you at sidebar.

5          You may stand if you wish, ladies and gentlemen.

6      (The following proceeding was held at sidebar.)

7          THE COURT:  Ms. Williams?

8          MS. WILLIAMS:  To the characterization of Ms. Jacobs

9  lying.

10          MR. MARSHALL:  This is opening statements.  The

11  evidence will prove that she's lying.

12          THE COURT:  So there's sixth Circuit cases on this

13  word, reasonably.  A witness can't say that.  Because a witness

14  can't say that, you can't say that.  First of all, it's treated

15  as an opinion.  You're not -- you can say someone was

16  untruthful, you can compare and contrast testimony, but the

17  word "liar" is out.  So change that if you would, please.

18          MR. MARSHALL:  Sure.

19      (The following proceedings were had in open court.)

20          THE COURT:  Let me jump in.  This might be a good

21  learning moment for the jurors as well.

22          So at the end of this case, you're going to be

23  deciding facts, and you can do what we call drawing inferences.

24  In other words, you use your common sense of Point A has been

25  proven.  Does that also prove Point B?  That will be up to you.

**UNCERTFIED ROUGH DRAFT**

113

1  That can be true about somebody you didn't believe was
2  truthful.
3       There's some recent cases that we just discussed at
4  sidebar where our Court of Appeals has said witnesses and
5  lawyers can't use the word "lying."  That's for you to decide.
6  They can point out if something conflicts with other testimony,
7  if they think you shouldn't believe it, but that's a conclusion
8  only you can draw.
9       So that word is stricken, you may continue.
10       MR. MARSHALL:  All right.  As I understand the case
11  law, Your Honor, untruthful is the word, right?
12       THE COURT:  Actually, it's the four letter word too.
13       MR. MARSHALL:  Okay.  Let me just describe it to you
14  this way:  Chief Jacobs and Deputy Chief Kuebler will have to
15  testify in this courtroom, and will testify in this
16  courtroom -- I only know this in part because Deputy Chief, who
17  can't be at trial because he's away, his testimony is already
18  on video, and we're going to play it for you.
19       They're going to say that they had no idea what
20  Lieutenant McFadden would be doing or was doing in the property
21  room.  No idea.  They're going to say that -- Deputy Chief
22  Kuebler has testified that he thought she was going to go do
23  managerial work, this lieutenant, and they had no idea she
24  would be doing this job with the ballistic vests.
25       Likewise, Chief Jacobs will have to say on that

**UNCERTFIED ROUGH DRAFT**

1 witness stand, I just didn't knee know.  I didn't know what she

2 would be doing in the property room, either when I sent her

3 there or later.  Didn't know.

4      And that is why our very first witness will be retired

5 Deputy Chief Gary Dunlap.  He was not a decision-maker about

6 any of this.  He played no role in deciding where Lieutenant

7 McFadden would be sent, but he was at the very meeting in which

8 it was decided -- by the way, Deputy Chief Kuebler said, Well,

9 I don't remember him being there.

10      No, Dunlap was at the very meeting where it was

11 decided what to do about Lieutenant McFadden during the

12 investigation of these accusations against her, and he will

13 tell you there was no discussion about anything other than the

14 property room, and -- and -- he told Former Chief Jacobs and

15 Deputy Chief Kuebler exactly what the work was in the property

16 room; that the property room project was to disassemble

17 ballistic vests.  And he told them, we had to take ballistic

18 panels out of the carrier, separate them from the vest carrier,

19 so that we could get them disposed of.  That's exactly what he

20 told them.  So they knew.  They knew.

21      Deputy Chief Dunlap will be the first witness, and

22 it's likely that Columbus firefighter Charles McFadden,

23 Melissa's husband, will be the last.  Of course, in between you

24 will hear from several people, including Lieutenant McFadden.

25 I know you will give all the witnesses in this case your

**UNCERTIFIED ROUGH DRAFT**

1  careful attention, and we thank you now for being on our jury.

2  Thank you.

3          THE COURT:  Thank you, Mr. Marshall.

4          And we'll hear from Ms. Williams on behalf of the City

5  of Columbus.

6          MS. WILLIAMS:  Good morning.

7          Lieutenant McFadden was not reassigned to the property

8  room because of her race.  She was not reassigned to the

9  property room because she helped another officer file a claim

10  of discrimination.  She was reassigned to the property room

11  because three African-American officers, Sergeant Tate,

12  Officer Morefield, Officer Morefield, and Officer Johnson, all

13  told then Commander Grizzell that Lieutenant McFadden had made

14  inappropriate statements to them about race.

15          She was not reassigned to the property room because of

16  her race or because of retaliation for helping someone.  She

17  was placed in the property room because once the City received

18  notification of these allegations, it had to do something to

19  protect its officers.  She was reassigned to the property room

20  because there was a project in the property room.  There was a

21  project, as counsel has eluded to, to taking apart these vests,

22  and that project was in the property room.

23          So let me put all of this into context for you.  Back

24  in January of 2017, then Commander Jacobs shuffled around

25  commanders and moved them into different assignments.

**UNCERTFIED ROUGH DRAFT**

1    Commander Grizzell was one of those commanders that got moved

2    to a different assignment.  She was moved to Zone 2.

3    Lieutenant McFadden was the Zone 2, B Company lieutenant.  B

4    company meaning she worked second shift.

5         When Commander Grizzell came on, early on she started

6    to realize that there was staffing issues going on with Zone 2,

7    specifically Zone 2, B Company.  This was her zone.  She wanted

8    to find out why are these staffing issues.  What's going on?

9         So she started to attend roll calls, and she attended

10   these roll calls and started talking to people and started

11   listening to what was going on.

12        Now, Zone 2, Zone 2 was admittedly the most busiest

13   zone in the city.  But compared to the other shifts, B Company,

14   B Company had the most vacancies.

15        In March of 2017, Officer Jeff Kaza approached

16   Commander Grizzell and said, You know what?  You should talk to

17   Officer Johnson, talk to Officer Morefield, find out why they

18   left the zone.

19        She said, Okay.  Here's my cell phone number.  Tell

20   them if they want to talk, to give me a call.  I'm available

21   from this time to this time.  They can call me.

22        Few minutes later that same evening, Sergeant Tate

23   approached Commander Grizzell and said to her, I want to talk

24   to you about a performance evaluation I received from

25   Lieutenant McFadden.  And he wanted to talk to her about a

1    performance evaluation that he believed was based on his race,

2    was related to his race.

3          Hours later, Commander Grizzell received telephone

4    calls from Officer Morefield and Officer Johnson.  Both of them

5    spoke to her and described inappropriate statements that

6    Lieutenant McFadden had made to them, again related to race.

7          After talking to all three officers,

8    Commander Grizzell said, You know what?  If you're willing, put

9    these in writing.

10         These officers put down what Commander Grizzell --

11   what they discussed with Commander Grizzell in writing.  So

12   let's take a look at what they sent to her.

13         This first e-mail, this is an e-mail from

14   Sergeant Andre Tate.  This e-mail was sent on March 2nd, 2017.

15   This is approximately 10 days before Lieutenant McFadden was

16   reassigned to the property room.  Subject line, Evaluation.

17         Tate writes in his e-mail, I had my performance

18   evaluation on January 25th with Lieutenant McFadden.  I was

19   handed my performance evaluation form and she told me that this

20   was my official evaluation and she was going to give me an

21   unofficial evaluation in a minute.

22         Further down he writes, She told me that some of my

23   ratings would have been lower, but she didn't want to put that

24   in my file because she does not believe in black on black

25   crime.  While our conversation continued, that statement stuck

**UNCERTFIED ROUGH DRAFT**

1   with me.  I felt that while this is advantageous to me, it is

2   unfair and discriminatory to all those being evaluated by her.

3   My interpretation was that I was getting a better evaluation

4   based on the color of my skin.  I believed that one can easily

5   imply that Lieutenant McFadden would have rated me differently

6   if I were not black.

7          He continues to write, There should not be a separate

8   rating scale for people based on color of their skin.

9          He further writes, While I believe most, if not all,

10  Division personnel have biases, the nature of our job requires

11  us to set those biases aside and treat everyone fairly and

12  impartially.

13         He continues, There should be no special treatment or

14  special mistreatment.

15         The next e-mail was sent by Officer Anthony Johnson.

16  This e-mail was sent to Commander Grizzell on March 6th, 2017,

17  six days before Lieutenant McFadden was reassigned to the

18  property room.  Subject:  Zone 2.

19         Officer Johnson begins by writing, I was recently

20  contacted and asked why I left 13B.

21         Officer Johnson later writes, I met with Lieutenant

22  McFadden in and outside of her office multiple times, per her

23  request.  During these meetings, Lieutenant McFadden made

24  comments such as "we have to stick together" and "those

25  officers on 13 aren't your brothers," insinuating that because

**UNCERTFIED ROUGH DRAFT**

1　of my race I should not -- I should only trust other

2　African-American officers.  Lieutenant McFadden did not like

3　that I worked under a white supervisor and attempted to recruit

4　me to 9 Precinct so she could keep an eye on me.

5　　　　　He continues, I informed Lieutenant McFadden that I

6　appreciated her concerns but did not agree with her views.

7　This upset her and started a chain of events that would

8　ultimately result to my move to Zone 5.

9　　　　　As the letter goes on, he writes, To answer the

10　question why I left Zone 2, the answer is because of Lieutenant

11　McFadden.

12　　　　　He goes on, Lieutenant McFadden consistently attempted

13　to recruit certain officers, mainly minorities, to report

14　directly to her.

15　　　　　The letter continues, I left Zone 2 because I was

16　ordered by Lieutenant McFadden -- by a lieutenant to not

17　respond on officer in trouble calls.  I left Zone 2 because I

18　felt I didn't deserve to be disrespected and cursed at anymore.

19　I left because the target on my back became too heavy to bear

20　and began to affect my health.  I left because Zone 2 became a

21　hostile environment to work.  I left because I was tired of

22　hearing officers and supervisors tell me how much my lieutenant

23　didn't like me.  I left because I couldn't take hearing how

24　much my brothers and sisters in blue couldn't be trusted just

25　because of the color of their skin.

1          Continues, And most of all, I left because I couldn't

2     stand to see the community I've grown to love so much slowly

3     destroyed and infested with crime.

4          The next letter came from Officer Morefield.  His

5     e-mail was sent to Commander Grizzell on March 6th, 2017.

6     Again, six days before Lieutenant McFadden was reassigned to

7     the property room.  Subject line, Departing from Zone 2.

8          Officer Morefield writes in his e-mail, When it comes

9     to the situation at hand regarding the issues with officers

10    departing Zone 2, I believe the same consistent responses from

11    officers regarding why they left would be achieved, Zone 2's

12    chain of command.

13         Later on, Morefield writes, Since departing Zone 2, I

14    personally found myself to be in better health, both physically

15    and mentally.

16         He continues on, I believe this was a direct result of

17    dealing with less stress.

18         He then writes, I again became proud to be part of the

19    Columbus Division of Police, not ashamed that I had possibly

20    made a mistake in choosing this career, which was starting to

21    cause strain in my personal life.

22         Further on in the e-mail he notes, The Dallas Police

23    Department ambush incident came about during the conversation,

24    and Lieutenant McFadden stated her thoughts on the incident.

25    Lieutenant McFadden stated there have been white men killing

**UNCERTFIED ROUGH DRAFT**

1   black people in this country for a long time.  More recently,

2   white officers have been killing black men.  If it takes a few

3   officers having to die, referring to the Dallas PD slain

4   officers, in order for this country to realize that we have an

5   issue with white officers killing black men, then so be it.

6          Officer Morefield then writes, I felt unsafe to

7   continue working for a lieutenant that doesn't value my life or

8   my brothers' and sisters' lives within our department and

9   within our country.

10          The e-mail continues on, Following my wedding in

11   August 2016, Lieutenant McFadden stated to me that people I

12   considered to be my brothers and my friends, referring to white

13   officers on 13B who attended my wedding, really aren't my

14   friends and that I need to be careful, as they, white officers

15   on 13B, are not happy that I married one of their own, one of

16   theirs, and that I'm sleeping with one of theirs, referring to

17   my white wife.

18          In another section of the e-mail he writes, Once

19   Lieutenant McFadden became aware that I was leaving Zone 2, I

20   was told, Don't forget, you're nothing but a dumb nigga, and to

21   them you're going to be -- you're going to be -- they're going

22   to treat you like a dumb nigga that you are.

23          Later on in the e-mail, What I've noticed is that when

24   dealing with Lieutenant McFadden, she tries to reel you into

25   trust only her, and I believe that reason being so she can be

**UNCERTFIED ROUGH DRAFT**

1    in full control.  I feel that Lieutenant McFadden attempted to

2    alienate new, younger officers.

3         He continues on, If you don't follow her, if you don't

4    agree with her, if you have a different opinion than her, if

5    you oppose her, then you aren't considered black or black

6    enough.

7         Near the end of the e-mail Officer Morefield writes,

8    No officer on our department should be led by someone with as

9    much hatred for them as Lieutenant McFadden has for white

10   officers.  It is owed to every officer who is risking their

11   lives, giving everything day in and day out, doing the

12   unthinkable for the ungrateful, a chain of command that

13   supports them.

14        He ends off by saying, I appreciate being reached out

15   regarding the catastrophe that has taken place on Zone 2.

16        These statements, these statements were extremely

17   concerning.  Given the seriousness of these allegations, the

18   City had to do something to protect its officers.  It had to do

19   something.  They couldn't leave her in a position where she was

20   going to continue to supervise other patrol officers.  So she

21   was reassigned someplace where the City could limit her contact

22   with other officers on patrol but still have her do work and be

23   a benefit to the Division.

24        You're going to hear that at some point in time there

25   was a project in the property room.  The Deputy Chief over the

**UNCERTFIED ROUGH DRAFT**

1  property room needed help decommissioning, taking apart bullet

2  proof vests.  As you can imagine, this was an important

3  project.  Because the last thing the City wanted was one of

4  their old bullet proof vests getting in the hands of the wrong

5  person.

6       Now, you heard opposing counsel talk about other

7  officers who were not reassigned to the property room during

8  their EEO allegations or allegations of discrimination during

9  their investigation.  That's true.  It is true.

10      You see, at the time those officers were being

11  investigated for their actions, there was no vest project in

12  the property room.  There was no project in the property room

13  at all.  But during the investigation into the allegations made

14  against Lieutenant McFadden, there was a project, and that

15  project was in the property room.

16      So, now, while she's reassigned to the property room,

17  Lieutenant McFadden, she kept her rank as lieutenant, she kept

18  her badge, and she kept her gun.  Her seniority level did not

19  change.  She kept the same salary.  She kept the same health

20  benefits.  She had the option to wear casual clothing, didn't

21  have to wear her uniform.  She had the option to select her own

22  working hours.  She was given a private office, on-site

23  parking -- free on-site parking.  She continued to attend law

24  school classes, and she was even receiving tuition

25  reimbursement while she attended those law school classes.

**UNCERTIFIED ROUGH DRAFT**

124

1          Lieutenant McFadden's reassignment had absolutely

2    nothing to do with her race.  It also had nothing to do with

3    her helping out another officer.  Lieutenant McFadden was

4    reassigned to the property room because three African-American

5    officers brought concerning allegations to the City's

6    attention.  And once the City received those allegations, it

7    was on notice.  It had to do something.  It had to protect its

8    officers.  And rather than have her sit someplace and do

9    nothing, the City put her someplace where there was work to be

10   done.

11          Ladies and gentlemen, those, those are the facts of

12   this case.  Thank you.

13          THE COURT:  Thank you.

14          Perfect timing.  12:01, right up to the lunch hour

15   we're going to take a one hour recess at this point.  We'll see

16   you back here at 1:01.

17      (Recess was taken at 12:01 p.m. to 12:59 p.m.)

18                       - - -

19                       Monday Afternoon Session,

20                       June 6, 2022.

21                       - - -

22          THE COURT:  Counsel, I want to put something on the

23   record and bring it to your attention.  I'm not sure it's of

24   any import, but I'm not sure it's not.

25          So I have two summer law clerks who were close to the

**UNCERTIFIED ROUGH DRAFT**

 1  front row when the jurors were coming back after the break just

 2  before your opening, and they indicate one of the jurors -- and

 3  perhaps we can start -- nobody's being accused here, so nobody

 4  take it this way, but I think I have the duty to find out some

 5  more.

 6          And we have with us the deputy police chief.  Let me

 7  tell you what the two externs observed; that one of the jurors

 8  was trying to say something like a hello to the representative

 9  of the City.  Typically what I would do is explore this with

10  all of you.  I'm not crazy about bringing the juror in and

11  putting them on the stand.  That can be a bit intimidating.  I

12  wanted to put that on the record first, and then I'll invite

13  your comments.

14          So I'll start with you, Mr. Marshall.

15          MR. MARSHALL:  What you're saying is one of our

16  current jurors was attempting to say hello to Assistant Chief

17  Potts?

18          THE COURT:  That was the distinct impression that was

19  formed.  It could be an error.  It's an impression only.

20          One suggestion, I invite your comment, is perhaps we

21  hear from Assistant Chief Potts.  She might be the easiest way

22  to clear this up.

23          MR. MARSHALL:  Sure.

24          THE COURT:  Welcome.  Again, I start this without any

25  hint of accusation here.  You understand that?

**UNCERTFIED ROUGH DRAFT**

1          ASSISTANT POLICE CHIEF POTTS:  Absolutely.

2          THE COURT:  There's some gestures back and forth.

3    Simple question:  Do you know any of the jurors?

4          ASSISTANT POLICE CHIEF POTTS:  I do not.

5          THE COURT:  Okay.

6          ASSISTANT POLICE CHIEF POTTS:  And no one had a

7    conversation with me.

8          THE COURT:  And there was no -- that was not -- no

9    conversation was observed.  It was a hand gesture from the

10   juror and not from you.  So you're not the one whose conduct is

11   being questioned.

12         ASSISTANT POLICE CHIEF POTTS:  No, sir.

13         THE COURT:  I'm satisfied with that, unless anyone

14   wishes further inquiry.

15         MR. MARSHALL:  I don't see any need, Your Honor.

16         THE COURT:  Anything from the City?

17         MR. PHILLIPS:  Nothing.

18         THE COURT:  Thank you for clearing that up.

19         All right.  With that, we'll be in brief recess and

20   bring the jurors in.

21      (Recess taken from 1:01 p.m. to 1:04 p.m.)

22      (Jury in at 1:04 p.m.)

23         THE COURT:  We are about to begin with the first

24   witness.

25         And on behalf of the plaintiff, you may call your

**UNCERTFIED ROUGH DRAFT**

127

1    first witness.

2              MR. MARSHALL:  Thank you, Your Honor.  The plaintiff

3    calls retired Deputy Chief Gary Dunlap.

4              THE COURT:  If your vision is blocked, anyone on the

5    jury, let me know so we can move the podium, if necessary.

6              THE DEPUTY CLERK:  Good afternoon, please raise your

7    right hand.

8         (Witness is sworn.)

9              THE DEPUTY CLERK:  Please be seated.

10             THE COURT:  Mr. Marshall, when you're ready, you may

11   proceed.

12             MR. MARSHALL:  Thank you.

13                          - - -

14                RETIRED CHIEF DEPUTY GARY DUNLAP

15     Called as a witness on behalf of the Plaintiff, being first

16   duly sworn, testified as follows:

17                     DIRECT EXAMINATION

18   BY MR. MARSHALL:

19     Q    Good afternoon, Chief Dunlap.  I think we just met for

20   the first time in the hallway.

21     A    Yes, sir, we did.

22     Q    Would you please state your name for the record.

23     A    Gary Dunlap.

24     Q    And are you currently employed?

25     A    No, sir.

128

1    Q    All right.  I believe you retired from the Columbus --

2              MR. MARSHALL:  Your Honor, for the record, we do call

3    Chief Dunlap as upon cross-examination.

4              THE COURT:  All right.

5              MR. MARSHALL:  Thank you.

6    BY MR. MARSHALL:

7    Q    I believe you retired from the Columbus Division of

8    Police in 2019?

9    A    Yes, sir.

10   Q    How long were you with the Columbus Division of Police?

11   A    Forty-five years.

12   Q    And what was your last job with the Division?

13   A    I was the deputy chief over the support services

14   subdivision.

15   Q    What is the support services subdivision?

16   A    Well, at the time I had it, it consisted of the property

17   room, the impound lots, records bureau, records management,

18   technical services bureau, the Division fleet.  I think that's

19   it.

20   Q    How long did you do that job, sir, before you retired?

21   A    Four years.

22   Q    I want to ask you about reassignments within the

23   Division.  When there's a discrimination complaint by one

24   officer against another or one officer against a sergeant or

25   lieutenant -- are you with me?

**UNCERTFIED ROUGH DRAFT**

129

1    A    Yes, sir.

2    Q    Now, is it true that internal affairs does not dictate

3    reassignments; that's a chain of command decision for a

4    particular officer?

5    A    Yes, sir.

6    Q    All right.  The officer who has been accused of some act

7    of discrimination is sometimes called "the focus" of the

8    investigation, right?

9    A    Yes, sir.

10   Q    And so it's the chain of command that decides what

11   should happen to the focus, the officer whose been accused?

12   A    Yes, sir.

13   Q    And you've been in the chain of command with making the

14   decision to -- how to deal with an officer who has been accused

15   of a violation of equal employment laws or discrimination?

16   That's happened in your career?

17   A    I believe so, sir.  I don't recall any specifics, but I

18   believe so, yes.

19   Q    And you've certainly been involved in reassigning

20   someone or placing them on restricted duty status, right?

21   A    Yes, sir.

22   Q    And one place that these focus officers are placed is

23   something known as the fish bowl or 580; is that right?

24   A    Yes, it's been called that.  Yes.

25   Q    Now, what's the fish bowl?  Tell us what that is.

**UNCERTIFIED ROUGH DRAFT**

1    A    Well, it's the patrol administrative office.  If a

2  restricted duty officer is assigned there, then the patrol

3  administrative sergeant would assign them certain duties to do.

4  It could be answering the phones, it could be filing, any type

5  of clerical work, whatever they had that needed to be done.

6    Q    And that is where you would put someone that you need to

7  be in a nonsupervisory capacity for a while, right?

8    A    Yes, it could be there or it could be any other bureau

9  that needed a restricted duty officer.

10    Q    So, for example, HR, they could do office work in HR?

11    A    Yes, if they needed a restricted duty officer.

12    Q    There was a place where officers would handle civilian

13  complaints?

14    A    They could take a civilian complaint, yes.

15    Q    So you could have a lieutenant who needs to be a

16  nonsupervisory capacity put in the fish bowl or HR or doing some

17  other work, like taking civilian complaints.  You could do that?

18    A    Yes.

19    Q    And that's been done, hasn't it?

20    A    Well, as far as I know.  I don't know about a lieutenant

21  doing it, but I know restricted duty officers have done it in

22  the past.

23    Q    Well, if you've got to take a lieutenant out of

24  supervisory capacity for a period of time because there's an

25  ongoing investigation of something, you don't want them to have

131

1   supervisory authority.  Are you with me?

2       A     Yes, they wouldn't have supervisory authority.

3       Q     They would not have it in the fish bowl, correct?

4       A     No.

5       Q     Am I correct about that?

6       A     Yes.

7       Q     Thank you.

8       And they would not have it if they were working in human

9   resources, right?

10      A     That's right.

11      Q     They would not have it if they were taking civilian

12  complaints?

13      A     That's true.

14      Q     Chief, I want to take you back to March of 2017.  Your

15  job was, again, deputy chief over support services?

16      A     Yes.

17      Q     And let's take a look at the document -- an e-mail that

18  you got back at that time.  This is Joint Exhibit 8.

19      Is that on your screen, as well as on the big screen?

20      A     It's not on this one, but I can look at it up there.

21      Q     Maybe we can help it out there.

22          THE COURT:  Can everybody read that?  As part of your

23   jury duty we give you one free eye exam, and this is it.

24          MR. MARSHALL:  We can blow it up a little bit if you

25   can't read it.  It's -- there we go.  Little better.

**UNCERTFIED ROUGH DRAFT**

132

```
 1            THE COURT:  Not working.  Well, let's call IT.

 2            Mr. Marshall, you may have to work with this without

 3   the screen in front of the witness.

 4            MR. MARSHALL:  Do you have an extra copy we could

 5   provide -- may we provide the witness and give a paper copy

 6   rather than have him crane his neck there and look at the

 7   screen?

 8   BY MR. MARSHALL:

 9   Q    Chief Dunlap, Mr. Schlein has given you a book of

10   exhibits.  If you will turn to the tab -- to No. 8, please.

11   A    Okay.

12   Q    All right.  Do you recognize this as an e-mail that was

13   sent by Deputy Chief Kuebler to you and to Commander Rhonda

14   Grizzell and Maranda Vollmer in HR on March 10th of 2017?

15   A    Yes, sir.

16   Q    All right.  And this tells you that Lieutenant McFadden

17   was going to be relieved of an assignment effective Sunday

18   March 12th and assigned to work in the property room, correct?

19   A    Yes, sir.

20   Q    All right.  Now, as I understand it, at that time, then

21   Chief Jacobs had conducted staff meetings with her deputy chiefs

22   normally on Mondays and Wednesday; is that right?

23   A    Yes.

24   Q    So if March 12th was a Sunday and my math is right,

25   Wednesday was the 8th of March, the previous Wednesday?
```

**UNCERTIFIED ROUGH DRAFT**

133

1    A    That sounds right.

2    Q    Okay.  We'll go with that.

3    If you would normally have had a staff meeting with the Chief

4    on that Wednesday, March 8th, in the normal course?

5    A    Yes, sir.

6    Q    And I don't know if you specifically recall having it on

7    that exact date or not, but you do recall having a staff meeting

8    close in time to this e-mail in which Lieutenant McFadden was

9    discussed; is that right?

10   A    Yes.

11   Q    And it was at this staff meeting that it was discussed

12   and decided where Lieutenant McFadden would go when she was

13   relieved of duty -- I'm sorry, relieved of her assignment, as

14   the e-mail says?

15   A    Well, the Chief was looking for input on where to put

16   the Lieutenant, so I told the Chief, I said, If you don't have

17   anybody else that you're going to assign the Lieutenant, I could

18   use some help down at the property room.

19   Q    Right.  If you said to her, if you don't have anyplace

20   else to send her, is that what you told her?

21   A    Yeah, something like that.  I didn't know what her --

22   what the Chief's plan was on where she was going to assign the

23   lieutenant.  I told her, if you don't have anyplace else you're

24   going to put her, I could use help at the property room.

25   Q    As you recall, we've talked to you in this case.  You

**UNCERTIFIED ROUGH DRAFT**

134

1   gave testimony in this case in a deposition?

2       A    Yes, sir.

3       Q    All right.  I believe that in that meeting -- first of

4   all, in that meeting you didn't play any role in deciding where

5   Lieutenant McFadden would go?

6       A    No, sir.

7       Q    You had no role in the investigation of the accusations

8   against her; is that correct?

9       A    That's true, sir, I had no role in that.

10      Q    In fact, you didn't really know much about why they were

11  talking about her in that meeting?

12      A    That's true.

13      Q    It's just that you were asked for input -- the Chief was

14  asking for input --

15      A    Yes.

16      Q    You said, well, if there's no other place to put her,

17  right?

18      A    Yeah.  If the Chief didn't have anyplace else to assign

19  the lieutenant, I could use some help down in the property room

20  taking apart ballistic vests.

21      Q    Now, you didn't know -- well, let me ask this, sir:  I

22  believe you -- that no other deputy chief in that meeting,

23  Kuebler didn't say anything else about where she might go, no

24  other deputy chief suggested anything else about what she might

25  do; isn't that right?

**UNCERTFIED ROUGH DRAFT**

1    A    That's true.  I don't remember anybody else saying

2  anything about where --

3    Q    In fact, in terms of the discussion of Lieutenant

4  McFadden in that meeting, it began and ended when you said, I

5  got this project down in the property room, right?

6    A    Well, at the time, I didn't know that.  When I got this

7  I found out, but, yeah, when I left the Chief's meeting I didn't

8  know I was getting Lieutenant McFadden to be down at the

9  property room.

10    Q    Yeah, because she didn't -- if I'm correct, she did not

11  announce in that meeting, did she, well, that sounds like a

12  great idea.  Let's send her to the property room.  She didn't

13  say anything like that, right?

14    A    True.

15    Q    You didn't know until you got the e-mail on March 10th?

16    A    Yes.

17    Q    Now, not only did you mention the property room in that

18  meeting, you specifically told Chief Jacobs and Deputy Chief

19  Kuebler that this job was to deal with the ballistic vests that

20  had been piling up in the property room, right?

21    A    Yes.

22    Q    In fact, they had been piling up for years, hadn't they?

23    A    Well, they have been there a while.

24    Q    Okay.

25    A    I don't have -- I don't know how long they were down

**UNCERTIFIED ROUGH DRAFT**

136

1   there, but they had been there a while.

2       Q    Not only did you tell Deputy Chief Kuebler and Chief

3   Jacobs that it was to deal with the ballistic vests, you told

4   them specifically we had to take ballistic panels out of the

5   carrier, separate them from the vest carrier, so that we could

6   get them disposed of.  You told them that, didn't you?

7       A    Yes.

8           MR. MARSHALL:  Thank you very much, Chief.  That's all

9    the questions I have.

10          THE COURT:  Thank you.

11          Cross-examination?

12          MR. BERNHART:  We reserve.

13          THE COURT:  Thank you very much.  You may step down.

14          And the plaintiff may call her next witness.

15          MR. MARSHALL:  Call Deputy Chief Kenneth Kuebler, it's

16   the video deposition, Your Honor.

17          THE COURT:  And he's the witness who is out of the

18   state at this time?

19          MR. MARSHALL:  He's out of the state and could not

20   attend the trial.

21          THE COURT:  So, ladies and gentlemen, this is going to

22   be the same as if the witness showed up.  He's unavailable in a

23   legal sense.  The attorneys have taken his deposition under

24   oath in front of a court reporter.  So it's all very similar to

25   what we have here if he had been here in court.  Treat his

**UNCERTFIED ROUGH DRAFT**

137

```
1    testimony as you would any other witness.

2            And with that, the plaintiff may go ahead and play the

3    video.

4        (The following witness, Deputy Chief Kenneth Kuebler,

5    appeared by videotaped deposition.)

6            MR. MARSHALL:  That's it for his testimony, Your

7    Honor.

8            THE COURT:  Thank you.

9            And the plaintiffs may call their next witness.

10           MR. PHILLIPS:  For the record, we'll reserve.

11           THE COURT:  We'll be hearing your cross-examination in

12   your case in chief -- actually, it will be your direct

13   examination, to be precise.

14           MR. PHILLIPS:  Yes.

15           THE COURT:  Okay.  Very good.  Thank you.

16           MR. MARSHALL:  Sergeant Smith-Hughes.

17           THE COURT:  Sergeant will come forward.

18           THE DEPUTY CLERK:  Good afternoon.  I'm going to swear

19   you in.  Will you please raise your right hand.

20       (Witness is sworn.)

21           THE DEPUTY CLERK:  Thank you.  Pleads be seated.

22           THE COURT:  Mr. Schlein, whenever you're ready, you

23   may proceed.

24

25
```

**UNCERTFIED ROUGH DRAFT**

138

- - -

CHRISTOPHER SMITH-HUGHES

Called as a witness on behalf of the Plaintiff, being first
duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SCHLEIN:

Q     Good afternoon, Sergeant Smith Hughes.

A     Good afternoon.

Q     Can you do me a favor and state your name and spell your
last name for the record, please.

A     Christopher Smith-Hughes.  My last name is S-m-i-t-h,
hyphen, H-u-g-h-e-s.

Q     Are you currently employed by the Division of Police?

A     Yes.

Q     What is your current title?

A     I'm the recruiting sergeant for the Columbus Division of
Police.

Q     How long have you held the recruiting sergeant title?

A     Since January of 2018.

Q     And I want to start back in the beginning of your
career.  When did you become an officer with the Division of
Police?

A     I started in December of 2005 as a recruit.

Q     And when did you become a sergeant?

A     June of 2013.

**UNCERTFIED ROUGH DRAFT**

139

1    Q    And what was your first assignment as a sergeant?

2    A    It was actually -- in patrol administration.

3    Q    And what's patrol administration?

4    A    It's like the headquarters operation on third shift.

5    Q    Is that the known as the patrol administrative unit?

6    A    I think it's headquarters operation now, but maybe back

7    then that's what it was.

8    Q    And how long were you in that role?

9    A    About a year.

10   Q    And where did you move after that?

11   A    I went to Zone 2, relief sergeant.

12   Q    What's a relief sergeant mean?

13   A    You don't have a precinct.  You kind of work the

14   different precincts, but you don't have your own specific

15   precinct.

16   Q    So let me break down a little bit more.  So my

17   understanding is there are two patrol divisions, patrol north

18   and south, correct?

19   A    Yes.

20   Q    In that there are various zones.  How many zones are

21   there?

22   A    Five.

23   Q    And three in patrol south and two in patrol north?

24   A    Yes.

25   Q    And how many precincts were on Zone 2?

**UNCERTFIED ROUGH DRAFT**

140

1    A    Four.

2    Q    And what precincts are those?

3    A    Those are 9, 13, 14, and 20.

4    Q    And what's the rough geographic boundaries for Zone 2?

5    A    Oh, wow.  So to the north, I believe it's 5th Avenue.

6  For 9 -- for 14 it goes north of Broad and Waggoner area.  And

7  then south you're going almost outside of 270 and South High

8  Street.  West is probably like 70 and Livingston, around the

9  Alum Creek area and like -- yeah, that's about it.

10   Q    And how long did you serve as a relief sergeant?

11   A    A few weeks.

12   Q    And what did you do after those few weeks?

13   A    Then I got a permanent sergeant position as S14.

14   Q    What's S14 mean?

15   A    That is the sergeant for 14 Precinct.

16   Q    And do you work a particular shift as a sergeant, or is

17 it multishift responsibilities?

18   A    I was second shift, so 3 to 11, B Company.

19   Q    And who was your lieutenant when you became sergeant for

20 14th Precinct?

21   A    It was Lieutenant McFadden.

22   Q    And how long was Lieutenant McFadden your lieutenant?

23   A    Was my lieutenant?

24   Q    Yes, sir.

25   A    From I think -- approximately about four years.

**UNCERTFIED ROUGH DRAFT**

1    Q    And when did that end?

2    A    When I got the recruiting position, 2018.

3    Q    I want to talk about Zone 2 a little bit more.

4    How did Zone 2 compare against other zones in terms of

5    busy-ness?

6    A    It was probably the busiest as far as run totals.

7    Q    And can you tell me about the staffing of Zone 2, second

8    shift, where you were a sergeant?

9    A    It was pretty thin.  We -- when I got to 14, I had a

10   pretty good veteran crew, but as time went on, those veterans

11   started going to first shift and getting different jobs, so it

12   got thinner.

13   Q    You mentioned first shift and second shift.  Can you

14   tell me the hours of first, second, and third shift, please.

15   A    Yeah.  So first shift hours are either 6 to 2 or 7 to 3.

16   We also have day mid watch, which is 7A to -- I'm sorry, from 9A

17   to 7P.  And then B Company hours are typically 2P to 10P or 3P

18   to 11P.  And then you have evening mid watch shift, which is 7P

19   to 5A.  And then you also have C Company, which is 10P to 6A or

20   11P to 7A.

21   Q    And as a police sergeant, your job is a supervisor of

22   patrol level officers when you're in a patrol zone like Zone 2,

23   correct?

24   A    Correct.

25   Q    And you have an opportunity to work with these officers

**UNCERTFIED ROUGH DRAFT**

142

1    on a day-to-day basis?

2    A    Correct.

3    Q    Have the officers told you if there's a preference of

4    which shift is most desirable?

5    A    I mean, a lot of people want to get the first shift.

6    Q    Why is that?

7    A    Seems that the run totals seem to go down, less active.

8    Criminals essentially are not up.

9    Q    And how many officers left your zone, or at least the

10   14th Precinct, while you were the sergeant there?

11   A    I didn't keep a number, a track of that.  I just know

12   that there was a rotation of, you know, newer officers coming in

13   when my veteran officers would leave.

14   Q    Sure.  When an officer left, did you talk with them

15   about why they were leaving?

16   A    No.  Usually it was because they were taking the

17   position on a first shift or a detective position.

18   Q    How does a detective position work?  Is that a

19   competitively bid position?

20   A    It's bid the same way that the other positions are.

21   It's a seniority based position.

22   Q    As an officer becomes more senior, it's more likely they

23   can move to first shift or become a detective?

24   A    Yes, sir.

25   Q    When an officer left, did any officer that talked to you

**UNCERTFIED ROUGH DRAFT**

143

1   upon leaving mention Lieutenant McFadden as a reason for

2   leaving?

3       A    Negative.

4       Q    And I want to bring your attention to November of 2016.

5   Where were you serving on your daily shifts in November of 2016?

6       A    So I was on Zone 2.  It was probably S20, B Company.

7       Q    Were you on an injury assignment at all in 2016?

8       A    Was I on an injury assignment?

9       Q    Or any restricted duty status.

10      A    Oh, okay.  Yeah, I probably could have been in

11  restricted.  I've been injured before.

12      Q    And would that have been in November and December 2016?

13      A    I'm assuming so.

14      Q    And where were you working when you were on restricted

15  status?

16      A    Headquarters, 120 Marconi.

17      Q    And that was in the area that's colloquially known as

18  the fish bowl, correct?

19      A    I was actually outside of the fish bowl, but I could see

20  the fish bowl from where I worked.

21      Q    Can you tell the jury what the fish bowl is?

22      A    It's essentially where our injured or restricted duty

23  officers worked during their shift.  They answer phones, they do

24  subpoenas, and other paperwork.

25      Q    So officers are sent there if they're injured, you know,

**UNCERTIFIED ROUGH DRAFT**

1  on some restricted or a focus of some sort of IAB investigation?

2  A    Yes.

3  Q    And it's also known as 580 sometimes, correct?

4  A    Yes.

5  Q    And do you know an Officer Felicia Dragon?

6  A    Yes.

7  Q    And how do you know Officer Dragon?

8  A    She was one of my classmates when I went through the

9  police academy.

10  Q    And where was Officer Dragon in November and December of

11  2016?

12  A    She was there as well.

13  Q    Do you know why she was in the fish bowl?

14  A    I don't.

15  Q    Do you know Sergeant Kyle Fishburn?

16  A    Yes.

17  Q    And what race is Sergeant Kyle Fishburn?

18  A    He is a Caucasian male.

19  Q    And what was his role in November and December of 2016?

20  A    He was the patrol administration sergeant for second

21  shift.

22  Q    So for someone like Officer Dragon, he would have

23  been --

24  A    Her supervisor.

25  Q    Thank you.

**UNCERTFIED ROUGH DRAFT**

1    Did anything happen that you became aware of between

2  Sergeant Fishburn and Officer Dragon while you were in the

3  patrol administrative unit?

4    A    It didn't happen while I was there, but there was a

5  discrepancy about her getting more work to do subpoenas than

6  another officer in there, and they had a discrepancy about it.

7              MS. WILLIAMS:  Objection.  Foundation.

8              THE COURT:  I'm sorry.  There's an objection?

9              MS. WILLIAMS:  Foundation.

10             THE COURT:  Do you wish to back up and ask another

11  question?  I'll permit that before I rule on the objection.

12             MR. SCHLEIN:  Sure.

13 BY MR. SCHLEIN:

14   Q    Let me go back.  You said Sergeant Fishburn was the

15  direct supervisor of Officer Dragon?

16   A    Yes.

17   Q    And he was able to assign her tasks?

18   A    Yes.

19   Q    And at some point you became aware that a complaint was

20  filed by Officer Dragon against Sergeant Fishburn?

21   A    Yes, while I was there.

22             MS. WILLIAMS:  Objection.

23             THE COURT:  You have personal knowledge of that?

24             THE WITNESS:  Yes.

25             THE COURT:  Overruled.

**UNCERTFIED ROUGH DRAFT**

146

BY MR. SCHLEIN:

1

2    Q    Did you ever hear anybody speak about that complaint?

3    A    I heard Sergeant Fishburn speak about it.

4    Q    And who did you hear him speak about it to?

5    A    To Sergeant Edwards and Sergeant Earl Jack [phonetic]

6  and then at the time Commander Knight.

7    Q    And what did they say about the complaint?

8    A    So essentially Sergeant Fishburn asked what was going to

9  happen with his incident.

10   Q    And what was the response to that?

11   A    That it wasn't going to go anywhere.

12   Q    Who said that?

13   A    That was Commander Knight.

14   Q    And Commander Knight at the time was the commander of

15  the internal affairs bureau?

16   A    Correct.

17   Q    And did she say anything else?

18   A    I mean, they had a whole conversation.  I was sitting in

19  the next room over and I could just hear some things, not -- you

20  know, not everything verbatim.

21   Q    Was it loud enough -- the conversation they were having

22  was loud enough that you could hear in an adjacent office?

23   A    I could hear it in my office, and people could hear it

24  in the fish bowl as well.

25   Q    Did they have their door open?

**UNCERTFIED ROUGH DRAFT**

147

1    A    Yes.

2    Q    Was Lieutenant McFadden's name mentioned in that

3  conversation?

4    A    I don't remember her name being mentioned.

5    Q    And we talked a couple of years ago in a deposition,

6  correct?

7    A    Yes.

8    Q    And we talked about this situation and --

9         MR. SCHLEIN:  Your Honor, I would like to show the

10  witness his deposition transcript to refresh his recollection.

11         THE COURT:  Well, has he indicated a lapse of memory

12  at this point?

13  BY MR. SCHLEIN:

14    Q    So Sergeant Smith-Hughes, you don't recall whether

15  Lieutenant McFadden was discussed by Commander Knight and the

16  other sergeants, correct?

17    A    Yes, sir.

18    Q    Would it refresh your recollection to see your testimony

19  from 2020?

20    A    Yes.

21         MR. SCHLEIN:  Your Honor, now I may?

22         THE COURT:  You may.  Display it to him only, but he

23  may review it.

24         You can do it electronically too if you like.

25

**UNCERTFIED ROUGH DRAFT**

148

1    BY MR. SCHLEIN:

2      Q     Just let me know, Sergeant, after you've had a moment to

3    read that.

4      A     Yeah.  So what I testified to back then is that --

5             THE COURT:  Let me -- this is kind of a tricky

6     evidence issue here.  This is being used to refresh your

7     memory.

8             So go ahead you can ask him your next question.

9    BY MR. SCHLEIN:

10     Q     Yes.  And, Sergeant, has reading that refreshed your

11   recollection?

12     A     Yes.

13     Q     Do you recall now whether or not Lieutenant McFadden was

14   discussed in that meeting?

15     A     Yes.

16     Q     And what was said about Lieutenant McFadden?

17     A     And this was the part what I was saying earlier, that it

18   said you're not going anywhere -- that it's not going to go

19   anywhere and that he believed that Lieutenant McFadden had

20   something to do with the EEO.

21     Q     So just so I'm understanding correctly, Commander Knight

22   told Sergeant Kyle Fishburn, who was being accused of an EEO

23   allegation, that it wasn't going anywhere?

24            MS. WILLIAMS:  Objection to leading.

25            THE COURT:  Well, yeah, but this is a little bit of a

**UNCERTIFIED ROUGH DRAFT**

1    tricky issue with hearsay.  You're refreshing his memory.  If

2    his current memory is as you want it to be, he can testify to

3    that, but he can't just recite what is in -- what you used to

4    refresh him.  He's got to be willing to say that's his

5    testimony now.

6             MR. SCHLEIN:  Yes, Your Honor.

7    BY MR. SCHLEIN:

8       Q    And what do you remember?  Can you tell the jury again

9    what you remember today about Commander Knight saying

10   regarding --

11      A    So with this or without this?  So I'm --

12            THE COURT:  I'll just give you a quick instruction.

13   It's a neutral one.  You know, our memories are funny things,

14   right?  You can read something that you said a couple of years

15   ago, now I remember.  If it's that kind of moment, now I

16   remember, you can testify to what you now remember.  But if you

17   don't remember it now, you can't use that.

18            THE WITNESS:  Okay.

19   BY MR. SCHLEIN:

20      Q    From what your recollect today, Sergeant, can you please

21   tell us what you recall Commander Knight mentioning about

22   Lieutenant McFadden.

23      If you need to read that to refresh your recollection again,

24   feel free.

25      A    I just don't to go against what the rules are

**UNCERTIFIED ROUGH DRAFT**

150

1  essentially.  You know what I mean?

2          THE COURT:  I mean, you're clear on what the rule is,

3  right?

4          THE WITNESS:  So if I remember it as it happened back

5  then, then I'm free to speak on it?  But if I don't remember it

6  exactly --

7          THE COURT:  It's used to refresh your current memory,

8  current.

9          THE WITNESS:  Right.

10          THE COURT:  If this is something that maybe you didn't

11  about and now you've read it, now it refreshes your memory, now

12  you remember it today, you can testify to it.

13          THE WITNESS:  Yes.  So, I mean, that makes sense.

14  It's just confusing to me.

15  BY MR. SCHLEIN:

16    Q    Has reading that refreshed your recollection?

17    A    Yeah, it does.  I remember when I made that statement.

18    Q    Thank you, Sergeant.

19          Can you tell us what you remember today now that

20  Commander Knight mentioned about Lieutenant McFadden?

21    A    Yeah.  So essentially, like I said earlier, that was --

22  they were discussing the incident, and then that they knew that

23  Commander Knight had -- that Lieutenant McFadden had something

24  to do with the EEO that was filed.

25          So just to bring it back, because what I'm

**UNCERTIFIED ROUGH DRAFT**

1    remembering, there was an EEO filed on Sergeant Fishburn by

2    Officer Dragon.

3       Q    Do you know what Lieutenant McFadden's role was in that

4    EEO complaint was?

5       A    I don't fully know her full role.

6       Q    And what was your reaction when you heard those

7    comments?

8       A    I was very disappointed that they were speaking of this

9    incident in open air, and also Dragon and Fishburn were both my

10   classmates, so it was very disappointing to see that two of my

11   classmates were having this type of serious issue to where an

12   EEO was being filed.

13      Q    And what did you do after you heard that?

14      A    I waited until Commander Knight left.  I got up --

15   because I was on crutches at the time.  I got up, walked over to

16   the office where Sergeant Fishburn, Earl Jack, and Edwards were,

17   and essentially told them that if I was the person they were

18   talking about, I would feel really bad.

19           At that point, Officer -- I'm sorry, Earl Jack and

20   Edwards both left the room and Sergeant Fishburn turned back to

21   his computer, and I ended up having a conversation with

22   Officer Dragon, who was crying.

23      Q    Can you tell me a little bit about that conversation

24   with Officer Dragon?

25      A    Yeah.  I just pretty much told her she got to hang in

**UNCERTIFIED ROUGH DRAFT**

1   there, and she was very upset, so I was just trying to help her,

2   you know, stay calm and pretty much told her not to give up.

3      Q    And where was Dragon when this conversation was

4   happening?

5      A    She was in the fish bowl.  And when I had the

6   conversation with her, I talked to her in the copy room, which

7   is like a couple of doors over.

8      Q    Do you recall from, in the fish bowl, where she was

9   sitting related to this office where Commander Knight and the

10  sergeant were all located?

11     A    She was actually -- because -- when I looked out of my

12  office, I could look her right in the face, so she was -- the

13  door was open where she was and where her desk was where she was

14  working on whatever she was working on, she could hear

15  everything.

16     Q    So you were about equal distance yourself from that

17  conversation and --

18     A    I was actually a little closer to the conversation

19  next-door, because it was right next-door.

20     Q    So after you talked to Officer Dragon, did you tell

21  anybody else about the conversation?

22     A    I believe so.

23     Q    Who did you tell?

24     A    I think I told Lieutenant McFadden.

25     Q    And why did you tell Lieutenant McFadden about that?

**UNCERTFIED ROUGH DRAFT**

153

1    A    Because I think it had direct affect on her.

2    Q    And what affect on her did you think it had?

3    A    If they were going to, you know, do anything foul,

4  then -- and she needed to be notified.

5    Q    Did you ever talk to anyone else about the conversation?

6    A    Not that I can recall.

7    Q    Did you ever talk to the Chief of Police about it?

8    A    Yes, she called me in.

9    Q    Can you tell me about how that came to be and what you

10 told the Chief?

11   A    I can.  So I was working and I got a phone call, I

12 believe, from her secretary first that she would like to meet

13 with me, and she wanted to know what I knew, and she asked me to

14 come to her office.

15   Q    And at the time, that was Chief Kimberley Jacobs,

16 correct?

17   A    Correct.

18   Q    And what did you talk about in Chief Jacobs' Office?

19   A    I pretty much told her what I knew at the time.  I told

20 her about, you know, me sitting in that office hearing the parts

21 of the conversation I heard like I just said to you all just

22 now, and told her about my conversation with Dragon as well,

23 Officer Dragon.

24   Q    And after that conversation, did you hear anything else

25 that came about from that complaint?

**UNCERTFIED ROUGH DRAFT**

1    A    Later on I did hear that, at the time, Commander Knight

2  was moved from internal affairs commander to, I think, Zone 4

3  commander.

4    Q    And I want to switch gears and talk about Lieutenant

5  McFadden.  How long have you known Lieutenant McFadden?

6    A    Pretty much most of my career, from the beginning of my

7  career.

8    Q    And how often do you interact with her?

9    A    Often.

10    Q    Do you consider yourself her friend?

11    A    Yes.

12    Q    Social friends?

13    A    Yes.

14    Q    And you worked on Zone 2 with Lieutenant McFadden?

15    A    Yes.

16    Q    And I believe you said that was over a period of roughly

17  four years?

18    A    Yes.

19    Q    Have you worked on the same zone or assignments as

20  Lieutenant McFadden in other situations in those four years?

21    A    Not -- I don't think so, no.

22    Q    And as a patrol sergeant, how much interaction would you

23  have with your lieutenant?

24    A    Daily.

25    Q    And you had daily intersection with Lieutenant McFadden

**UNCERTFIED ROUGH DRAFT**

1   when you were both working Zone 2?

2       A    Yes, sir.

3       Q    And based on your observations and interactions with

4   Lieutenant McFadden, how would you describe her as a police

5   lieutenant?

6       A    By the book, fair, and demanding and -- I mean, I think

7   she's a good teaching supervisor as well.

8       Q    And why do you say she's a good teaching supervisor?

9       A    I mean, younger supervisors often get things wrong,

10  whether it's paperwork, whether it's, you know, situational.

11  She was open to helping us learn those things.

12      Q    And what do you think about Lieutenant McFadden

13  personally, not just as a police lieutenant?

14      A    I think she's a great person.

15           MS. WILLIAMS:  Objection to characterization.

16           THE COURT:  Well, so this is how we're going to leave

17   this.  You'll get some description of everybody who is a party

18   in this case.  You're not going to decide the case on whether

19   they're a nice person or not.  We've already talked about what

20   the legal standards are going to be.  But this is baked into

21   the case, so we'll permit a little bit of this.

22           So you can continue.

23  BY MR. SCHLEIN:

24      Q    Sir, can you pull microphone a little bit closer.  It's

25  been a little difficult to hear you.

**UNCERTIFIED ROUGH DRAFT**

156

1  A  Can I give y'all this back?

2  Q  Yeah, sure.  Probably a little bit heavy to be sitting

3 on your lap the whole time.

4  And have you ever heard Lieutenant McFadden use profanity

5 around other officers?

6  A  Yeah, I've heard that.

7  Q  How often does she use profanity?

8  A  I haven't been privy to her using profanity at work.

9  Q  I'm sorry, I thought you said you had.  Did you say you

10 hadn't?

11  A  Had not, had not.

12  Q  Had you her use the word -- I'm not going to use it, but

13 if I use the term MF or MFer, do you know what I'm referring to?

14  A  I do.

15  Q  Have you ever heard Lieutenant McFadden use that term or

16 any iteration of that term to yourself or another officer?

17  A  Not at work, no.

18  Q  I'm not going to use this word or any of its iterations,

19 but when I say the N word, do you know what I'm referring to?

20  A  I do.

21  Q  Have you ever heard Lieutenant McFadden use the N word

22 around yourself or other officers?

23  A  I have not.

24  Q  What about other racial epithets?

25  A  I have not.

**UNCERTFIED ROUGH DRAFT**

157

1    Q    Have you ever heard or observed Lieutenant McFadden make

2    a race based management decision?

3    A    I have not.

4    Q    Do you believe that she cares about fellow officers?

5    A    I do.

6    Q    And Lieutenant McFadden gave you performance reviews?

7    A    Yes.

8    Q    How many?

9    A    I believe four, since I was there for four years.

10   They're done annually.

11   Q    Are those done on your anniversary date of when you

12   became an officer roughly?

13   A    I believe it's on your birthday, around your birthday.

14   Q    Okay.  So any officer is not just first quarter is when

15   they're done.  It could be any time of year, just depending on

16   birthday?

17   A    Yeah, usually around your birthday.  Yes.

18   Q    And tell me about those reviews that you had with

19   Lieutenant McFadden.

20   A    Mine are straightforward.  When I excel places, I got

21   that.  And if I needed, you know, work somewhere, it was

22   documented.  Typically most of my evaluations were very

23   positive.

24   Q    Do you think they were accurate?

25   A    Yes.

**UNCERTFIED ROUGH DRAFT**

1    Q    Do you think they were artificially inflated because of

2    your race?

3    A    No.

4    Q    Was race discussed in any of your performance reviews?

5    A    Never.

6    Q    And as a sergeant do you perform performance reviews of

7    patrol officers?

8    A    Yes, I do.

9    Q    Can you tell me how the performance reviews that you

10    performed for your officers compared to the performance reviews

11    that Lieutenant McFadden performed on you over those four years?

12    A    So they follow the structure that is given in the book.

13    It is performance based, and you give your descriptions and your

14    comments where they are deemed to go, and then also you show

15    that evaluation to the person being evaluated, and then you have

16    a discussion over those evaluations.

17    Q    And you're a sergeant now.  Can you tell me about the

18    process that it takes to become a sergeant on the Columbus

19    Division of Police?

20    A    So lots of study.  There is a four part test.  You must

21    pass all four parts of that test to be placed on the eligibility

22    list.  If you have any seniority points after passing those four

23    parts, then you get those added.  And then you are added to a

24    promotional eligibility list, and then they go down the list.

25    Q    What did you do to study for those thefts?

**UNCERTFIED ROUGH DRAFT**

159

1     A     I studied.

2     Q     Were you part of any study groups?

3     A     Yes.

4     Q     Tell me about that study group?

5     A     There were several people involved, and we met at

6 different locations and we created questions and then we studied

7 those questions.

8     Q     And who ran that study group?

9     A     Lieutenant McFadden.

10    Q     And you said there were several people involved.  Was it

11 any particular race or across the racial spectrum?

12    A     There were several different people in there.

13    Q     Can you recall any of your study group mates?

14    A     Some, but some people would join, other people would

15 drop out, rotated.  I didn't really keep attendance while I was

16 there, to be honest.

17    Q     Sure.  And how often did you meet in these study groups?

18    A     It varied, depending on what our availability was.

19    Q     How did you learn about it?

20    A     There was several people that got together and I got

21 notification from them.

22    Q     Was this an official Division sanctioned study group

23 where everyone would show up in uniform?

24    A     No.

25    Q     Was it done on Division property?

**UNCERTFIED ROUGH DRAFT**

160

1      A      No.

2      Q      Where was it done?  You said various places.  Can you

3  give an example of some of the places?

4      A      Do I have to?

5      Q      To the best of your memory.

6      A      Coffee shops.

7      Q      Sure.  And do you know if Lieutenant McFadden received

8  any compensation for running these study groups?

9      A      No.

10      Q      Do you know how many --

11          THE COURT:  Just one second.  No, you don't know if

12   she did or, no, she didn't.

13          THE WITNESS:  No, she did not receive any

14   compensation.

15          THE COURT:  Thank you.

16          MR. SCHLEIN:  Thank you, Your Honor.

17  BY MR. SCHLEIN:

18      Q      And do you know how many study groups Lieutenant

19  McFadden ran?

20      A      I do not.

21      Q      And do you know if there was a bar to entry to anyone

22  for the study groups?

23      A      I do not.

24      Q      You don't know that there was a bar or you don't know if

25  there was or was not?

**UNCERTFIED ROUGH DRAFT**

1    A    I don't know if there was a bar and -- yeah, I don't

2   know.

3    Q    And at some point you learned that Lieutenant McFadden

4   was assigned to the property room, correct?

5    A    Yes.

6    Q    And how did you learn that?

7    A    I don't remember who told me, but I just -- I remember

8   that she was assigned there, and, yeah, that's messed up.

9    Q    And you just said it's messed up.  Can you explain why

10  that's messed up?

11          MS. WILLIAMS:  Objection.  Move to strike.

12          THE COURT:  Let me see you at sidebar.

13          You may stand if you wish, ladies and gentlemen.

14      (The following proceeding was held at sidebar.)

15          THE COURT:  You have an objection.  Go ahead.

16          MS. WILLIAMS:  The added characterization of, oh,

17   that's messed up.

18          THE COURT:  I'm sorry?

19          MS. WILLIAMS:  The added characterization that that

20   was messed up.  It wasn't added to anything.

21          THE COURT:  Yeah, it's -- let's just move forward.

22   I'm not going to strike it.  It will put too much emphasis on

23   it.  That's one of those phrases we don't want in the question.

24      (The following proceedings were had in open court.)

25

**UNCERTFIED ROUGH DRAFT**

1  BY MR. SCHLEIN:

2      Q     In the course of your career, have you learned the

3  desirability of a property room assignment?

4      A     No.

5      Q     And did you ever learn what Lieutenant McFadden was

6  doing in the property room when she was assigned?

7      A     Yes.

8      Q     And what did you learn that she was doing?

9      A     I was told that she was lifting boxes.

10           THE COURT:  Yeah, that's -- I'm going to strike that

11  answer.  If he has personal knowledge, he can testify to that,

12  but not what he's heard.

13  BY MR. SCHLEIN:

14      Q     So you never observed what Lieutenant McFadden did?

15      A     No.

16      Q     I want to go back to the study groups really quickly.

17  Were there -- and you said you didn't remember exactly who were

18  in there, but were there any white individuals in your study

19  group?

20      A     Not in my section, no.

21      Q     Were you aware -- do you have personal knowledge of

22  white individuals being in any other study groups that

23  Lieutenant McFadden --

24      A     I don't have any personal knowledge, no.

25      Q     I'm going to talk about just your general day-to-day

**UNCERTIFIED ROUGH DRAFT**

1   police work for a second.  We talked about how many patrol zones

2   there are and it's broken up north and south.  So I want to take

3   you back to the time when you were an officer.  You know, before

4   you were a sergeant, were you a patrol officer?

5       A    Yes.

6       Q    Were you always in a patrol setting as a patrol officer?

7       A    I did patrol and I did the gang unit as well.

8       Q    Is gang unit considered a patrol unit --

9       A    No, that's a speciality unit separate.

10      Q    How long in total were you a patrol officer?

11      A    So from when I graduated the academy in '06 to 2013 when

12  I got promoted.

13      Q    And when you were an officer, how much interaction did

14  you have with your lieutenant on a day-to-day basis?

15      A    Not very much.

16      Q    What about -- in what zone were you a patrol officer on?

17      A    Zone 2, and then redistricting I did some Zone 1.

18      Q    I'll focus this question for when you were on Zone 2.

19  When you were patrol officer on Zone 2, how often did you

20  interact with a lieutenant from any of the four other zones?

21      A    Rarely.

22      Q    Less than once a month?

23      A    I don't -- yes, I'd say, yes, less than once a month.

24      Q    What about when you were a sergeant?  You said when you

25  were talking with your own -- excuse me, your own zone

**UNCERTIFIED ROUGH DRAFT**

1   lieutenant, you would interact daily.  But when you were in Zone

2   2, Sergeant, how often did you interact with a lieutenant from

3   either of the other four zones?

4       A    It would depend.  So if you're -- say, my zone

5   lieutenant was not working that day, then I would have to work

6   with the covering zone lieutenant.

7       Q    Are you aware of the minimum lieutenant staffing for

8   patrol zones?

9       A    I am not.

10      Q    I want to go into a little bit more with Zone 2.  When

11  did Commander Grizzell become commander of Zone 2?

12      A    I don't remember exactly what year.

13      Q    Does early January 2017 sound correct?

14      A    I know she came over.  I just don't know exactly what

15  the time frame was.

16      Q    Sure.  What do you recall happening after she came over?

17      A    What do you mean?

18      Q    Did she attend roll calls?

19      A    Yeah, she attended some.

20      Q    Did she attend the roll call that you were at?

21      A    Yes.

22      Q    Can you explain to the jury what a roll call is and how

23  that works?

24      A    So roll call is where you share all the information

25  about, you know, what's going on on your Precinct, you share any

**UNCERTFIED ROUGH DRAFT**

1   training information that may be available, and then you also

2   distribute, you know, where they're going to be working at for

3   the day, what cruiser they will be in, and then what equipment

4   they will be having for the day.

5        Q    And is it typical for a new commander to attend these

6   roll calls?

7        A    Yes.

8        Q    When Commander Grizzell attended this roll call that you

9   were at, was Lieutenant McFadden present?

10       A    She was not.

11       Q    After that roll call, did you have a conversation with

12  Commander Grizzell?

13       A    Yes.

14       Q    Can you tell me about that?

15       A    Yes.  So it was like a general welcome to, you know --

16  welcome to Zone 2, essentially, and then she, you know, started

17  asking if there was, you know, anything I wanted to talk about.

18       Q    Did she ask you about Lieutenant McFadden?

19       A    Yes.

20       Q    And what did she ask you?

21       A    She pretty much was asking, like, you know, is she doing

22  anything she shouldn't be doing.

23       Q    What did you respond?

24       A    I said no.

25       Q    What happened after you said no?

**UNCERTFIED ROUGH DRAFT**

166

1      A      I was told to contact her if there was anything that I

2   needed to, you know, talk to her about directly.

3           MR. SCHLEIN:  Your Honor, may I speak with my

4    colleague for a moment?

5           THE COURT:  Sure.

6           (Plaintiff's counsel conferring off the record.)

7           MR. SCHLEIN:  I have no further questions.  Thank you,

8    Sergeant.

9           THE COURT:  Thank you.

10          And the defendant may examine.  Ms. Williams.

11          MS. WILLIAMS:  Yes, Your Honor.  Just one moment.

12                              - - -

13                       CROSS-EXAMINATION

14   BY MS. WILLIAMS:

15     Q      Good afternoon.

16     A      Afternoon.

17     Q      You testified just on direct that you had not heard that

18   anyone had left the zone because of Lieutenant McFadden.  Did I

19   hear you correctly?

20     A      Yes, because he asked about me.

21     Q      There's no question pending at the moment.

22     A      Okay.

23     Q      But you had, in fact, heard that there were others who

24   had left the zone because of Lieutenant McFadden; isn't that

25   correct?

167

1  A  Can you repeat the question?

2  Q  But you had, in fact, heard that there were others who

3 had left the Zone because of Lieutenant McFadden; isn't that

4 correct?

5  A  That wasn't the question that was given to me.

6  Q  Okay.  Isn't it true that you had heard that there were

7 people leaving the zone, Zone 2, because of Lieutenant McFadden?

8     THE COURT:  Is that question clear in your mind?

9     THE WITNESS:  I'm thinking about it.

10    THE COURT:  Well, when you say heard, that can be

11 different things.  Could you be a little more specific?

12 BY MS. WILLIAMS:

13  Q  Isn't it true that you've heard people say that they're

14 leaving the zone because of Lieutenant McFadden?

15  A  So the question is, isn't it true that I have heard that

16 people have left the zone?

17     THE COURT:  Just to be clear.  As I understand your

18 question, this would be someone who is leaving who is saying

19 why they're leaving?

20     MS. WILLIAMS:  Correct, Your Honor.

21     THE COURT:  Does that help?

22     THE WITNESS:  Yes.

23     THE COURT:  In other words, it can't be second or

24 third hand.

25     Can you answer that?

**UNCERTIFIED ROUGH DRAFT**

1     MR. SCHLEIN:  I'm going to object to hearsay on that.

2     THE COURT:  Let me see you sidebar.

3     You may stand if you wish, ladies and gentlemen.

4     (The following proceeding was held at sidebar.)

5     THE COURT:  Well, here's what I see as the problem,

6  and you can both educate me.  So, you know, this is part of the

7  case, why people left, if she were that bad of a lieutenant

8  that people were leaving the precinct, but here's -- when you

9  asked -- you asked about did people leave because of her.

10     Now, that could be based on what he knew through

11  hearsay or it can be based on maybe letters they -- well,

12  there's a lot of hearsay premise to that, right?

13     MR. SCHLEIN:  Sure.

14     THE COURT:  Now, there's cross-examination, so we'll

15  start with you.

16     MR. SCHLEIN:  So my argument here is I asked if

17  anybody had told him directly about that, and he had said no.

18  And I think what Ms. Williams is asking, she can correct me if

19  I'm wrong, if he had heard through other people that they

20  reported that, and that -- I think that's the hearsay on

21  hearsay.

22     THE COURT:  You're not objecting to if someone told

23  him, I'm leaving because of Lieutenant McFadden.

24     MR. SCHLEIN:  No.  If someone told him, I'm out of

25  here because Lieutenant McFadden.  But, like, if he heard from

**UNCERTIFIED ROUGH DRAFT**

1  Jones who told Smith, you know, who told Smith-Hughes, that's

2  where it's a bit problematic.

3      THE COURT:  Are you okay with just asking that, what

4  someone told him why they were leaving?

5      MS. WILLIAMS:  If someone told him?

6      MR. MARSHALL:  Him directly.

7      THE COURT:  Yeah.  In other words, an officer.

8      MS. WILLIAMS:  He had testified under oath that he had

9  heard that people were leaving.

10      MR. MARSHALL:  His testimony, I just read it, was he

11  heard grapevine rumors.  That was his testimony.  Not that

12  anyone told him directly.  It's on Page 17.  And I don't think

13  that's proper.

14      THE COURT:  Here's how I'm looking at this:  To be

15  honest with you, even if someone told him this, it's probably

16  still hearsay, but it gets us to -- the employer can rely on

17  hearsay if it's a job action.  So it's not so much for the

18  truth, as for the conduct that it would let him use it at this

19  point.

20      So we'll leave it like this, you can ask him about

21  anything he heard directly from another person, but not what

22  that other person heard from somebody beyond.

23      MS. WILLIAMS:  But he did hear it directly from

24  people.

25      MR. MARSHALL:  He called it grapevine rumors.

**UNCERTIFIED ROUGH DRAFT**

170

 1          THE COURT:  I'm not going to treat it as hearsay.

 2          MS. WILLIAMS:  So what you're saying is he heard

 3   directly, then?

 4          THE COURT:  Yes.

 5      (The following proceedings were had in open court.)

 6   BY MS. WILLIAMS:

 7   Q     Have you heard, directly heard, people saying that they

 8   were leaving the zone because of Lieutenant McFadden?

 9   A     No one came to me directly to say that they were leaving

10   because of Lieutenant McFadden.

11   Q     My question is, have you heard people directly say that

12   they were leaving the zone because of Lieutenant McFadden?

13   A     No.

14   Q     The conversations that you had with Commander Grizzell

15   took place when she first came on the zone as the new commander,

16   correct?

17   A     Yes, ma'am.

18   Q     And she asked you about Lieutenant McFadden's work

19   style, correct?

20   A     Yes, ma'am.

21   Q     She asked you about other officers not being able to do

22   proactive stuff on the zone unless the board was clear, correct?

23   A     Yes, ma'am.

24   Q     She asked you about your working relationship with

25   Lieutenant McFadden, correct?

**UNCERTIFIED ROUGH DRAFT**

171

1     A     Yes, ma'am.

2     Q     And you never told Chief Jacobs that Commander Knight

3   mentioned Lieutenant McFadden during the conversation?

4     A     I don't -- I don't -- I don't recall that.

5     Q     You don't recall?

6     A     I don't recall any of that with Chief Jacobs.

7     Q     Speaking about -- mentioning Lieutenant McFadden?

8     A     Yeah, I don't remember saying anything about her with

9   Chief.

10          MS. WILLIAMS:  May we show Joint Exhibit 6, please, to

11    the jury?

12          THE COURT:  You may.

13  BY MS. WILLIAMS:

14    Q     Are you able to see that?  I think it may be on your

15  screen.

16    A     Yes, yes.

17    Q     So this is a copy of Division Directive 8.08.

18          MS. WILLIAMS:  Can we go to scroll to Page 3 of 4.

19  BY MS. WILLIAMS:

20    Q     I want to direct your attention to Roman numeral 3.  Are

21  you with me?

22          MS. WILLIAMS:  Could you scroll down to H, as in

23    Harry, please.

24  BY MS. WILLIAMS:

25    Q     I'm going to read that.  Let me read this section.  Any

**UNCERTIFIED ROUGH DRAFT**

1    division supervisor receiving notification of the alleged

2    incident of a discrimination, including sexual harassment, shall

3    immediately forward a letter detailing the alleged

4    discrimination through the chain of command to the appropriate

5    Deputy Chief.

6        Did I read that correctly?

7        Did I read that correctly?

8    A    Are you asking me?

9    Q    Yes.

10   A    Yes.

11   Q    And you would agree that when a subordinate comes to you

12   with an EEO concern, you are required to forward a letter up the

13   chain of command, correct?

14   A    Yes.

15   Q    You would agree that even if the officer did not report

16   that promptly to you, you would still report it, correct?

17   A    Yes.

18   Q    And you would still have it investigated, correct?

19   A    Yes.

20   Q    Isn't it a fact that you did not know what Lieutenant

21   McFadden was put in the property room -- I'm sorry.

22       Isn't it a fact that you don't know why Lieutenant McFadden

23   was put in the property room?

24   A    Yes.

25   Q    Yes, you --

**UNCERTFIED ROUGH DRAFT**

1    A    Yes, it's a fact that I don't know why she was put in

2    the property room.

3            MS. WILLIAMS:  May I have a moment, Your Honor?

4            THE COURT:  You may.

5            (Defense counsel conferring off the record.)

6            MS. WILLIAMS:  Thank you.  Nothing further.

7            THE COURT:  Thank you.  And redirect?

8            MR. SCHLEIN:  Just briefly, Your Honor.

9                            - - -

10                   REDIRECT EXAMINATION

11   BY MR. SCHLEIN:

12   Q    Sergeant, I just want to clarify a couple of things that

13   you talked with Ms. Williams about.  You had mentioned that when

14   Commander Grizzell and you spoke after that roll call, that she

15   asked you about your working relationship with Lieutenant

16   McFadden.  What did you tell Commander Grizzell about your

17   working relationship?

18   A    I don't remember verbatim, but I am sure that I said

19   something that we have a positive working relationship.

20   Q    And what happened after you said that?

21   A    I don't know.

22   Q    Did the conversation continue or end?

23   A    I don't remember, to be honest.

24   Q    Thank you.

25   And you had mentioned talking about, in that conversation,

**UNCERTFIED ROUGH DRAFT**

1   clearing the board of runs.  Can you just tell us what that

2   means?

3   A      So, yeah, so pretty much, like I said earlier, Zone 2

4   was, like, one of the busiest zones, so when runs -- runs are

5   when people call 911 and the dispatcher puts that and it's

6   waiting, so it's waiting.

7   On Zone 2, we always had a lot of runs, just because the

8   people called the police a lot, and one of our primary jobs is

9   just to answer those calls for service.  If somebody calls 911,

10  you want them to show up.

11  So we were tasked with making sure that officers weren't

12  staying on runs that they needed to stay on too long and making

13  sure that they were cleared from those runs to take the other

14  runs that were stacking up on the board.

15  Q      That was a management decision made by Lieutenant

16  McFadden?

17  A      That's how it's supposed to be, but she put emphasis on

18  making sure that happened.

19  Q      If I'm understanding you correctly, Lieutenant McFadden

20  made an emphasis on Zone 2 second shift that 911 calls and calls

21  for service were answered?

22          MS. WILLIAMS:  Objection.  Leading.

23          THE COURT:  Rephrase if you would, please.

24  BY MR. SCHLEIN:

25  Q      And what was Lieutenant McFadden's emphasis in having

**UNCERTFIED ROUGH DRAFT**

1  that directive?

2    A    Again, just making sure that those calls for service

3  were cleared off the board before any proactive activity.

4              MR. SCHLEIN:  Thank you so much.

5              THE COURT:  Thank you.

6              Any recross?

7              MS. WILLIAMS:  No.

8              THE COURT:  Thank you.

9              Sergeant, thank you very much.  You may step down.

10             THE WITNESS:  Thank you.

11             THE COURT:  Plaintiff may call her next witness.

12             MR. MARSHALL:  Thank you, Your Honor.  We're going to

13  call Maranda Vollmer, HR representative -- former HR

14  representative of the City, who is unable to attend because of

15  her situation, but we're going to read short portions from her

16  deposition transcript, and Attorney Helen Robinson from our

17  office will play the part of Ms. Vollmer.

18             THE COURT:  All right.  So this will be similar to the

19  video.  Almost all the witnesses in this case have been deposed

20  by the other side.  They have had their testimony taken under

21  oath before a court reporter.  If the witness is legally unable

22  to be here, the testimony can be presented this way.

23             So nice to have you here.  This is not the witness.

24  This is someone playing the part of the witness as the

25  deposition is read.

**UNCERTFIED ROUGH DRAFT**

176

1          Whenever you're ready, Mr. Schlein you may proceed.

2          MR. SCHLEIN:  This is Ms. Robinson from our office who

3   will be reading this.

4                         - - -

5                    DIRECT EXAMINATION

6   BY MR. SCHLEIN:

7     Q    Ms. Robinson, do you have the deposition portions with

8   you?

9     A    I do have the paper copy.

10    Q    We'll ask you just to read the lines designated with an

11  A, and I will read the lines designated with a Q.

12    Good morning, Ms. Vollmer.  We just met.  Can you do me a

13  favor and say your name and spell your last name for the record.

14    A    Maranda Vollmer, V-o-l-l-m-e-r.

15    Q    And, Ms. Vollmer, are you currently employed by the --

16  you are currently not employed by the City of Columbus, correct?

17    A    Correct.

18    Q    Who is your current employer?

19    A    City of Gahanna.

20    Q    And how long have you been with Gahanna?

21    A    Almost two years.

22    Q    And what's your role with Gahanna?

23    A    I'm the director of human resources.

24    Q    What was your last role with the City of Columbus?

25    A    I was the human resources manager for the Division of

**UNCERTFIED ROUGH DRAFT**

177

1   Police.

2       Q     When did you start in that role?

3       A     '15 -- yeah, October of '15.

4       Q     And, excuse me, Lieutenant McFadden's based on

5   administrative reassignment was roughly March 12th, 2017,

6   correct?

7       A     I don't know.

8       Q     I'll represent to you that that's when it was, but we'll

9   go from March 2017 until you left in November of 2018, with that

10  time frame.  Okay?

11      A     Okay.

12      Q     Did anybody complain to you during that time period,

13  March 2017 to November 2018, that Lieutenant McFadden did

14  something improper during those time periods?

15      A     Not that I recall, no.

16      Q     Did anybody complain to you that anybody associated with

17  Lieutenant McFadden did anything improper during those time

18  periods?

19      A     No.

20      Q     So in the -- you were -- in the roughly three years you

21  were with the CPD as the HR manager, did you perform any

22  trainings for personnel about the City's or Division's, excuse

23  me, EEO policies?

24      A     Yes.

25      Q     Tell me about those.

**UNCERTFIED ROUGH DRAFT**

1    A    I did in-service training for all -- that's the training

2    that's conducted that all sworn officers are required to go to,

3    and I did the EEO training for all three shifts for two months

4    while in-service training was going on.

5    Q    And, Ms. Romans, could you please just pull the

6    microphone a little bit closer to you?

7    So is that an annual in-service training or was it just one

8    time?

9    A    They do annual in-service training.  It was in January,

10   February, I would think March.

11   Q    And how was that done?  Is it classroom?  Virtual?  How

12   do you do that?

13   A    It's classroom.

14   Q    And is it a full day?  How long is your presentation?

15   A    It was one hour.

16   Q    And what do you present in that?  Is it slides?  Do you

17   lecture?  Do you have a printed material that you give to the

18   officers?

19   A    There is a PowerPoint.

20   Q    In that PowerPoint, do you go over the Division

21   directives on EEO policies?

22   A    Yes.

23   Q    And do you explain the Division takes those policies

24   seriously?

25   A    Yes.

**UNCERTFIED ROUGH DRAFT**

1  Q   And do you explain the antiretaliation provisions?

2  A   Yes.

3  Q   And do you avail yourself to questions and answers after

4  your presentation?

5  A   Yes.

6  Q   And when you do those trainings, do you explain to the

7  personnel what would happen if they made a complaint?

8  A   Yes, I believe so.  I think there was a slide on that.

9  No, there was.

10  Q   What do you explain to them?

11  A   What the Division directive says, how you make a

12  complaint, what happens once you make a complaint, where it

13  goes.

14  Q   Can you run through the process for me, please?

15  A   So you make a complaint to your supervisor, HR,

16  different supervisor.  That supervisor forwards a letter through

17  the chain or calls me directly.  Then I send a letter through

18  the chain requesting an investigation to IA.  IA is going to

19  interview you and then any witnesses.  There will be an outcome,

20  and you will be notified.

21  Q   So if somebody makes a compliant or brings an issue to

22  you that gets to your desk, is that automatic that the focus of

23  the complaint is reassigned?

24  A   No.

25  Q   What factors go into the decision-making about whether a

**UNCERTIFIED ROUGH DRAFT**

1   focus in one of the kind of complaints gets -- in one of these

2   kinds of complaints get reassigned?

3       A    It depends on the nature of the allegation and the

4   information that was given to the Division by the person who

5   complained.

6       Q    I'm going to show you what's been marked as Joint

7   Exhibit 6.

8            MR. SCHLEIN:  John, can you zoom that out, please.

9   BY MR. SCHLEIN:

10      Q    Do you have Joint Exhibit 6 in front of you?

11      A    I have it.  The Division Directive 8.08?

12      Q    Yeah.  Do you know what this is?

13      A    Yes.

14      Q    What is this?

15      A    It's the Division Directive 8.08.

16      Q    And if I'm reading that correctly, that's the Division's

17  directive on Equal Employment Opportunity, nondiscriminations,

18  and Americans with Disabilities Act.

19      A    Correct.

20      Q    And this says it was revised September 30th, 2014.  Do

21  you know if it was in effect in March of 2017?

22      I'll represent to you that this was in effect in March of

23  2017.  Do you have any reason to disagree with that?

24      A    No.

25      Q    And is this something that when you did those annual

1  in-service trainings with all the sworn personnel, would you

2  train them on this information?

3      A    Correct.

4      Q    In your experience with the Division of Police, was it

5  common knowledge about how to get in contact with you or anyone

6  else in HR?

7      A    Yes.

8      Q    In this -- and when you trained the folks annually on

9  this, you provided contact information for yourself and other

10  contact says at HR?

11      A    Yes.

12      Q    Did you maintain an open-door policy for people to make

13  an EEO or HWE complaints to you as an HR professional?

14      A    Yes.

15      Q    Did you tell folks during these yearly in-service

16  trainings that you maintained an open-door policy to make an EEO

17  or HWE complaint?

18      A    I didn't use those specific words, but yes.

19      Q    What words did you use?

20      A    That I'm available 24/7.  You can call me at any time

21  and I'll come meet you wherever or outside of headquarters.

22  I've met people at Starbucks, Panera.

23      Q    So you made it a point to make clear to everyone during

24  these trainings that you would avail yourself to them for these

25  kinds of complaints whenever and however they needed to?

**UNCERTFIED ROUGH DRAFT**

182

1    A    Correct.

2    Q    Do you believe that they understood that to be true?

3    A    Yes.

4    Q    So I'd like you to flip over a couple of pages to Page 3

5    for me, in Section 3, Policy Statements, and can you read

6    Section 3G for me?

7    A    Any Division employee who believes that he or she has

8    been discriminated against in violation of the City EEO

9    policies, including sexual harassment, should promptly report

10   the incident to, one, the Division's HR manager, two, his or her

11   immediate supervisor or any supervisor, or, three, the City's

12   EEO office.

13   Q    And starting October of 2015 and running to November of

14   2018, that number one, the Division's HR manager, was yourself,

15   correct?

16   A    Correct.

17   Q    And you said reading that it said you should promptly

18   report the incident to.  Do you train in those in-services that

19   the sworn personnel should promptly report EEO or HWE

20   allegations?

21   A    Yes.

22   Q    What does that mean to you?  What does promptly report

23   mean to you?

24   A    Whatever the individual finds to be reasonably -- I

25   mean, I don't want to use the word prompt, but whatever they

**UNCERTIFIED ROUGH DRAFT**

1  find to be when it comes to their attention that there is an

2  issue and they're ready to report it, that's what prompt means

3  to me.

4      Q    And why is it important they promptly make a report of

5  an EEO allegation?

6      A    So if the behavior is occurring it can be stopped.

7      Q    It's still your portion, Helen.

8      A    Oh, I'm sorry.

9      Want to ask me the question again?

10     Q    You've got an obligation whether a complaint is one day

11 old, one year old, or three years old to investigate that if

12 somebody makes an EEO complaint to you, correct?

13     A    Correct.

14     Q    And you wouldn't change that -- and that wouldn't change

15 regardless of personal feelings about it.  You've got an

16 obligation to investigate that and go through the process that

17 we talked about earlier, correct?

18     A    Correct.

19     Q    Did you see in any time that you were involved in an EEO

20 or HWE complaint the focus officer admonished not to retaliate

21 against anyone involved?

22     A    You want to give me the definition of admonish?

23     Q    Instructed or told.

24     A    Yes, I personally sent -- had an e-mail that I would

25 send individuals who were the focus.

184

1    Q    And you send -- and you would send that to every person

2   you sent an e-mail with, with the antiretaliation language to

3   every focus of an EEO or HWE complaint you were involved with?

4    A    I believe so, but I -- there was -- we started doing it

5   at a point certain, but I don't know what that point certain is.

6   We verbally told people, but there was a follow-up e-mail that

7   started at some point.

8    Q    Sure.  And in your experience, of any of the folks that

9   you instructed not to retaliate, either verbally or via e-mail,

10  were there allegations of retaliation against those officers?

11   A    I don't think so.

12   Q    And were you ever made aware of when a sworn personnel

13  was reassigned or relieved from duty when they're a focus of an

14  EEO or HWE complaint?

15   A    Yes.

16   Q    And how were you made aware of that?

17   A    Either verbally or via e-mail.

18   Q    Are you ever part of the decision-making process for the

19  reassignment?

20   A    Sometimes.

21   Q    How often are you part of the decision-making process in

22  that reassignment?

23   A    I would say less than half.

24   Q    Where were folks reassigned when you were consulted

25  about the reassignment?

**UNCERTFIED ROUGH DRAFT**

185

1    A    Just depends on where they were working, who the

2  complainants were.  I mean, there's many assignments at the

3  Division where you can separate people.  So...

4    Q    Can you give me a list of some of those assignments

5  where you can separate people?

6    A    Anywhere literally.  There are, what, 2,300 people here,

7  so there are 2,300 assignments.

8    Q    So if you had a zone lieutenant on second shift -- there

9  are five zones, correct?

10    A    Correct.

11    Q    So you could have reassigned a Zone 2 lieutenant to

12  Zones 1, 3, 4, or 5?

13    A    Are we talking about this particular case with

14  Lieutenant McFadden?

15    Q    I'm just talking in general.

16    A    Just depends on the nature of the allegation.

17    Q    But you could have reassigned them to any of the other

18  four patrol zones?

19    A    Again, it depends on the situation.

20    Q    Another possible reassignment would be to the patrol

21  administrative unit, or 580, correct?

22    A    Yes.  Literally they could go anywhere in the Division.

23    Q    Another possibility would have been the training

24  academy, correct?

25    A    Correct.

**UNCERTFIED ROUGH DRAFT**

1   Q      And another possibility would have been the impound lot?

2   A      Yes.  Anywhere in the Division.

3   Q      I'm sorry, I forgot to mention this.  And what factors

4   would go into your recommendation of a reassignment happening?

5   A      Like the proximity to their -- like, where they worked.

6   Like, do they work in the same building?  If it's a supervisor,

7   would that supervisor have direct control or indirect control as

8   a supervisor over that employee?  The -- because there are many

9   factors, because you take an issue at -- like, let's say the

10  training academy where they're in one building, compared to

11  somebody out on patrol.  It's, like, very different because of,

12  you know, a building location and, like, you know, you're kind

13  of out on your own.

14          So it just really depends on where the person worked,

15   but it would be proximity that they could connect with each

16   other.  If it was a supervisor situation, how much, like,

17   authority or control or indirect control.  How often, what is

18   the likelihood that they would come across this person?  What

19   shifts do the people work on?

20  Q      Is it possible in a reassignment to change someone's

21  shift?  For example, if there are two first shifts -- if it's a

22  first shift officer making a complaint against a first shift

23  sergeant, EEO or HWE complaint, are you with me?

24  A      Yes.

25  Q      And you deem to base that on your first shift focus

187

1   officer and the sergeant needs to be reassigned, is it possible

2   or an option for that first shift sergeant to be reassigned to a

3   second or third shift to accomplish these goals?

4       A   It's possible but not likely.  We attempted to keep

5   people on the same shift on the same days off and shift that

6   they were on, unless they agreed to a different one, because of

7   the FOP contract.

8       Q   Okay.  So I'm sure -- just so I'm understanding

9   correctly, you could go to that sergeant and say, Sergeant, you

10  know, we need to reassign you.  Would you accept going to second

11  or third shift or mid watch shift?

12      A   Yes.  They often said no, but yes.

13      Q   I'd like to bring up Joint Exhibit 8.  What is this?

14      A   The e-mail from Ken Kuebler to Gary Dunlap and Rhonda

15  Grizzell.

16      Q   Yes, ma'am.  Are you there?

17      A   I'm here.

18      Q   That's dated, Friday, March 10th, 2017, at just a hair

19  before 4:30 p.m., correct?

20      A   Correct.

21      Q   And I'm reading here, it's the second line, it says,

22  Pursuant to our conversation and as a result of an EEO and

23  Hostile Work Environment allegation -- going to the next

24  paragraph, quote -- Lieutenant McFadden will be relieved of her

25  assignment (not relieved of duties) effective Sunday,

**UNCERTFIED ROUGH DRAFT**

188

1 March 12th. She will be assigned to work at the property room

2 beginning Monday, March 13th.

3     Did I read that correctly?

4     A    Yes.

5     Q    And it says, Pursuant to our conversation. Were you

6 part of the conversation that Deputy Chief Kuebler is referring

7 to?

8     A    I don't believe so.

9     Q    And Deputy Chief Kuebler has testified earlier in this

10 case that there was a conversation with yourself, him, and

11 Commander Grizzell on or about March 10th. Does that ring any

12 bells?

13     A    No.

14     Q    Did you talk to anybody about the reassignment -- or,

15 excuse me, relief of assignment of Lieutenant McFadden?

16     A    I don't recall speaking to -- I don't recall speaking to

17 anyone.

18     Q    Why were you included in this e-mail then?

19     A    Because I'm in charge of the time and attendance system,

20 so I would need to tell my staff to move Lieutenant McFadden's

21 assignment to the support operations bureau so that Commander

22 Gardner could see her time, so if she submitted a leave request

23 it would go to Commander Gardner.

24     Q    Understood. And your testimony is nobody discussed the

25 relief of assignment from prior to you receiving this e-mail?

**UNCERTFIED ROUGH DRAFT**

189

1    A    I don't recall it happening.

2         MR. SCHLEIN:  Thank you.

3         THE COURT:  Thank you very much.  You may step down.

4         We're going to take a 15-minute recess at this time,

5    ladies and gentlemen.

6      (Jury out at 2:41 p.m.)

7      (Recess taken from 2:41 p.m. to 3:01 p.m.)

8         THE COURT:  And the plaintiff may call her next

9    witness.

10         MR. SCHLEIN:  Plaintiff calls Sergeant Christopher

11   Odom.

12         THE COURT:  Witness will come forward.

13         THE DEPUTY CLERK:  Please come forward.  I'm going to

14   swear you in.  Can you please raise your right hand.

15      (Witness is sworn.)

16         THE DEPUTY CLERK:  Thank you.  Please be seated.

17         THE COURT:  Mr. Schlein, whenever you're ready, you

18   may proceed.

19         MR. SCHLEIN:  Thank you, Your Honor.

20                              - - -

21              SERGEANT CHRISTOPHER ODOM

22   Called as a witness on behalf of the Plaintiff, being first

23   duly sworn, testified as follows:

24                     DIRECT EXAMINATION

25

**UNCERTFIED ROUGH DRAFT**

190

1   BY MR. SCHLEIN:

2      Q      Good afternoon, Sergeant.  Can you state your name and

3   spell your last name for the record, please.

4      A      Sergeant Christopher Odom, O-d-o-m.

5      Q      Thank you.

6   And are you currently employed with the Division of Police?

7      A      Yes.

8      Q      Your rank is Sergeant?

9      A      Yes.

10     Q      How long have you been employed by the Division of

11  Police?

12     A      28 years.

13     Q      And how long have you been a sergeant for?

14     A      Since 2012, so ten years.

15     Q      And what's your current assignment?

16     A      S94 day mid watch.

17     Q      And what's S94 mean?

18     A      I cover the Zone 4 day mid watch officers.

19     Q      How long have you been in that assignment?

20     A      Since December of 2018.

21     Q      You said December 2018?

22     A      Uh-huh.

23     Q      Thank you.  What assignment were you in prior to this

24  current assignment?

25     A      I was same zone, Zone 4, but I was a relief sergeant.

**UNCERTFIED ROUGH DRAFT**

1    Q    How long were you a Zone 4 relief sergeant?

2    A    Since November of 2018.

3    Q    And where were you assigned prior to November 2018?

4    A    I was on Zone 3, C Company.

5    Q    And what about prior to that?

6    A    Zone 2, B Company.

7    Q    When did you leave Zone 2?

8    A    That was May of 2018, I believe.

9    Q    And why did you leave Zone 2?

10    A    Just to go to third shift.

11    Q    What shift were you on in Zone 2?

12    A    B Company, second shift.

13    Q    Why did you choose to go from second shift to third

14 shift?

15    A    Just change of assignments.

16    Q    Is there any reason to change assignments?

17    A    Yes.

18    Q    Can you tell me those, please?

19    A    Just issues I was having with my chain of command.

20    Q    Who was your chain of command in May of 2018?

21    A    At that time it was Commander Grizzell, Lieutenant

22 Rector.

23    Q    And then just so I understand, the Division of Police is

24 organized by patrol officers is the lowest rank?

25    A    Then sergeant, lieutenant, commander, then deputy chief,

**UNCERTFIED ROUGH DRAFT**

192

1   and Chief -- at that time, Deputy Chief, Chief.

2       Q    Now there's a position of Assistant Chief?

3       A    Yes, sir.

4       Q    And how long were you on Zone 2 prior to leaving in May

5   of 2018?

6       A    I want to say since July of 2012.

7       Q    So you were on Zone 2 for just shy of six years?

8       A    Yes.

9       Q    Thank you.  And how long have you known Lieutenant

10  McFadden?

11      A    For like 20 plus years.

12      Q    You consider yourself friends?

13      A    Yes.

14      Q    Social friends?

15      A    As in?

16      Q    Do you socialize outside of work?

17      A    Not very often, but yes.

18      Q    And you've -- have you worked on the same zone as

19  Lieutenant McFadden?

20      A    Yes.

21      Q    And how long did you work together on the same zone?

22      A    Since July of -- well, I was promoted July of 2012, and

23  I don't -- I can't remember if she was there then or came there

24  after.  I can't remember.

25      Q    But for some period between July of 2012 and when did

**UNCERTFIED ROUGH DRAFT**

193

1   you stop working with Lieutenant McFadden?

2       A    That was November of 2018.

3       Q    And when you were working with Lieutenant McFadden in

4   2012, somewhere in the 2012 to '18 period how often did you

5   interact with her?

6       A    Very often.

7       Q    And based on your observations and interactions with

8   Lieutenant McFadden, how would you describe her as a lieutenant?

9       A    Tough, definitely fair, by the book.

10      Q    Have you ever heard her use profanity around other

11  officers?

12      A    No.

13      Q    Have you ever heard -- I'm not going to use the term,

14  but if I say MF or MFer, do you know what I'm referring to?

15      A    Yes.

16      Q    Have you ever heard her use that term?

17      A    No.

18      Q    If I use the N word, do you know what I'm referring to?

19      A    Yes.

20      Q    Any of its iterations.

21      A    Yes.

22      Q    Have you ever heard Lieutenant McFadden use the N word

23  or any of its iterations?

24      A    No.

25      Q    Have you ever heard Lieutenant McFadden use racial

**UNCERTIFIED ROUGH DRAFT**

194

1    epithets?

2       A    No.

3       Q    Have you heard or observed Lieutenant McFadden make a

4    race based management decision?

5       A    No.

6       Q    Has anyone reported directly to you that Lieutenant

7    McFadden has been racist to them?

8       A    No.

9       Q    Based on your observations and interactions with

10   Lieutenant McFadden, how did she treat officers?

11      A    Fair.

12      Q    And is that across all racial lines?

13      A    Yes.

14      Q    And based on your 20 plus years of work with Lieutenant

15   McFadden and the times you've worked directly with her, do you

16   know her reputation generally in the division?

17      A    Yes.

18      Q    And what's her reputation?

19      A    That she's strict, some people think that she causes

20   problems and so forth.

21      Q    What kind of problems have you heard that she causes?

22      A    Just like, I guess, not as far as being a good work

23   partner -- I mean good work person.

24      Q    Anything else?

25      A    No.

**UNCERTFIED ROUGH DRAFT**

1  Q   Are you aware of any rumors in the Division about

2  Lieutenant McFadden filing complaints or lawsuits?

3  A   Yes.

4  Q   Can you tell me about that?

5  A   Just heard that she had filed on several people, yes.

6  Q   And do you know anything about those complaints, what

7  they were related to?

8  A   No.

9  Q   And were those rumors that you've heard about these

10 complaints?

11      MS. WILLIAMS:  Objection.

12      THE COURT:  I'll see you at sidebar.

13      Ladies and gentlemen, you may stand if you wish.

14    (The following proceeding was held at sidebar.)

15      THE COURT:  So the objection is what he's heard about

16 her reputation.  Are we getting into reputation here?

17      MR. MARSHALL:  As to her litigiousness.

18      THE COURT:  I'm sorry?

19      MR. MARSHALL:  As to her litigiousness, but I think

20 he's already testified about it.

21      MR. SCHLEIN:  Yeah.  This question was going to be

22 when he heard -- if those rumors predated March 2017, and I was

23 going to move on.

24      THE COURT:  If we leave it there, is that where we see

25 it?

**UNCERTFIED ROUGH DRAFT**

196

1        MS. WILLIAMS:  My argument has to do with foundation

2   and -- also to foundation because he just threw it out there

3   and these rumors.

4        THE COURT:  We've already gotten just our foot in the

5   reputation.  He's already testified to that.  If all you're

6   asking for now is the timing?

7        MR. SCHLEIN:  At this point, yes.  That's the last

8   question I have on this is the timing of that.

9        THE COURT:  So if we move forward, are you okay with

10  that?

11       MS. WILLIAMS:  Yeah, I want to see how far he's going

12  to go with that.

13       THE COURT:  It's going to be about timing, that's all.

14     (The following proceedings were had in open court.)

15  BY MR. SCHLEIN:

16    Q     Sergeant, these rumors about Lieutenant McFadden filing

17  a lot of complaints, how long have you been hearing these rumors

18  for?

19    A     I mean, just something that you heard about.  It wasn't

20  like a regular thing.  When something came out, you heard

21  rumors.

22    Q     I guess my question is a little bit different, it's did

23  you just recently start hearing about these or has it been

24  through the course of my career?

25    A     Through the course of my career.

**UNCERTFIED ROUGH DRAFT**

197

1    Q    Thank you.

2    Can you tell me about the process of becoming a sergeant on

3    the Division of Police.

4    A    It's a test taking process, and then the highest score

5    you have, the better chance of being made a sergeant.

6    Q    And what did you do to prepare for these tests?

7    A    I studied in a sergeant group -- I mean, an officers

8    group.

9    Q    And tell me about those groups, please.

10    A    Like tell you what?  Tell you --

11    Q    Can you tell me who organized them?  Where they ran?

12    Just the general brass tacks about them, if you will?

13    A    Okay.  They were organized by the Lieutenant McFadden.

14    It consisted of -- it was several other groups consisted of

15    maybe six to eight people, male and female, different genders,

16    different races.

17    Q    And so you said that both men and women were in the

18    group?

19    A    Yes.

20    Q    And what races were represented in the group?

21    A    White, black, Hispanic.

22    Q    Where were the groups held?

23    A    It was at a coffee shop.

24    Q    And how long did the groups run?

25    A    Ours ran -- you mean the length of the study group or

**UNCERTFIED ROUGH DRAFT**

198

1   the time period?

2       Q    The time period.  Was it a month?  A year?  Six months?

3       A    Maybe like a year out.

4       Q    How many tests are there to become a sergeant?

5       A    It's four separate tests.

6       Q    And do you recall who was in your study group

7   specifically?

8       A    Yes, vaguely.  It was myself, Officer DeWayne West,

9   Officer Alicia Zacker, Officer Demetrius -- I can't think of his

10  last -- Demetrius.  I can't think of his last name.  He's

11  Hispanic.  It's Ortega.  Shannon -- it was Officer Shannon

12  Johnson.

13      Q    And was anyone allowed to join these groups?

14      A    If they were invited in, yes.

15      Q    How does somebody secure an invite into the group?

16      A    That I do not know.

17      Q    What happened in these sessions?

18      A    We just studied.

19      Q    And was Lieutenant McFadden the only leader?

20      A    Was she the only leader there?

21      Q    The only leader of the group.  Was she leading the

22  group?

23      A    Yes.

24      Q    Can you describe what type of group leader she was?

25      A    Definitely she was to the point, sharp.

**UNCERTFIED ROUGH DRAFT**

1    Q    And was Lieutenant McFadden volunteering her time to do

2  this?

3    A    Yes.

4    Q    And as a sergeant, you perform performance reviews of

5  your officers?

6    A    Yes.

7    Q    How often do you perform performance reviews of them?

8    A    Once a year.

9    Q    And what type of discretion do you have when rating an

10  officer?  Can you kind of explain to the jury how those

11  performance evaluations work?

12    A    Basically yearly performance, and I use the categories

13  as on the evaluation to actually evaluate them.

14    Q    And Lieutenant McFadden was your direct supervisor when

15  you were on Zone 2 for a period of time?

16    A    Yes.

17    Q    And as your direct supervisor, did she perform

18  performance evaluations of yourself?

19    A    Yes.

20    Q    And how many performance reviews did she perform for

21  you?

22    A    At least a couple.  Maybe three or four.

23    Q    And tell me about those reviews.  Where did you meet?

24  How long did they last?  What happened during those reviews?

25    A    We met at her office.

**UNCERTFIED ROUGH DRAFT**

200

1    Q    And tell me about the tone of those meetings.

2    A    It was thorough.  She just went over things that she

3 was -- you know, whatever my progress was and she voiced if I

4 wasn't doing well in a certain area and so forth.

5    Q    Did you believe your reviews were fair?

6    A    Yes.

7    Q    Was race mentioned during the reviews?

8    A    No.

9    Q    How was your rating over time?  Did it change or was it

10 consistent?

11    A    Yes, it changed.  Like one year from the next it went

12 down a little bit.

13    Q    Do you believe that was a fair rating?

14    A    Yes.

15    Q    Accurate?

16    A    Yes.

17    Q    What happens -- are you -- excuse me.

18    If you disagree with a performance evaluation that you're

19 given, can you do anything about that?

20    A    Yes, you have a period where you can appeal it to the

21 chain of command.

22    Q    How long of a period is that?

23    A    I think it's 10 days.

24    Q    And what does the FOP stand for?

25    A    What it stand for?

**UNCERTFIED ROUGH DRAFT**

1  Q  FOP, yes.

2  A  The Fraternal Order of Police.

3  Q  What's the Fraternal Order of Police?

4  A  It's our union.

5  Q  And are you able to file grievances through the union?

6  A  Yes.

7  Q  If you believe a performance review was unfairly done,

8 is that something that's grievable through the union?

9  A  Yes.

10  Q  And if you believed a performance review violated the

11 equal employment policies, what could you do in that situation?

12  A  Yes, there was things, steps you could take to get the

13 necessary, you know, I guess, benefit from it.

14  Q  Can you tell me what some of steps were if you believed

15 your review was inappropriate because of an EEO violation?

16  A  Yes, just -- you can notify your chain of command or

17 supervisor that you believe this was race related.

18  Q  Just so we're clear and the record's clear, you

19 understood when I said EEO, I meant Equal Employment Opportunity

20 and the Division's policies on that?

21  A  Yes.

22  Q  Did you ever learn that Lieutenant McFadden had EEO

23 charges brought against her?

24  A  Brought against her?

25  Q  Yes.

**UNCERTFIED ROUGH DRAFT**

202

```
 1     A     Yes.

 2     Q     And how did you learn that?

 3     A     I think through, like, either I was notified by

 4  supervisor or somebody.

 5     Q     And when did you learn that?

 6     A     You said when?

 7     Q     Yes, sir.

 8     A     It's been so long ago, I don't have an exact date.  I

 9  don't know.

10     Q     And just so I make sure I heard you correctly, you said

11  you were notified by a supervisor?

12     A     Yes.

13     Q     Do you recall which supervisor?

14     A     No, huh-uh.

15     Q     Do you recall, other than saying you know what -- excuse

16  me.  Do you recall what that supervisor told you about

17  Lieutenant McFadden?

18     A     No, you just hear that someone filed an EEO on someone.

19  And more than likely, they don't go into detail explaining what

20  all, you know --

21     Q     Sure.  Did you learn what Lieutenant McFadden was doing

22  after those EEO charges were filed against her?

23     A     Did I learn what she was accused of?

24     Q     Not what she was accused of, what she was assigned to do

25  by the Division.
```

**UNCERTFIED ROUGH DRAFT**

203

1     A     Yes.

2     Q     How did you learn that?

3     A     From her.

4     Q     And what did you learn?

5     A     She advised me that she was forced to do --

6           THE COURT:  Rephrase the question if you would,

7     please.

8     BY MR. SCHLEIN:

9     Q     What did you learn that Lieutenant McFadden was doing?

10    A     I was advised that she was --

11          THE COURT:  One moment.  If the foundation for the

12    answer is hearsay, I'm going to sustain the objection.  I'm not

13    sure it is, but I'll let Mr. Schlein try to clear that up if

14    you could.

15          MR. SCHLEIN:  Sure.  I'll withdraw the question, Your

16    Honor.

17          THE COURT:  Thank you.

18    BY MR. SCHLEIN:

19    Q     I want to talk about bullet proof vests for a moment.

20    As an officer, did you wear a bullet proof vest?

21    A     Yes.

22    Q     As a sergeant, do you currently wear a bullet proof

23    vest?

24    A     Yes.  I don't have it on now, but yes.

25    Q     How much do bullet proof vests weigh?

**UNCERTFIED ROUGH DRAFT**

204

1    A    They're definitely heavy, yes.

2    Q    Can you give me an estimate?  You know, several pounds,

3  a few pounds?

4    A    Yeah, several pounds.

5    Q    And do you wash your vest?

6    A    Yes.

7    Q    How often?

8    A    Weekly.

9    Q    And are you aware of other officers who have had equal

10  employment allegations made against them?

11   A    Yes.

12   Q    And are you aware of other officers who have had equal

13  employment allegations levied against them that have been

14  reassigned?

15   A    Yes.

16   Q    And do you know where they were reassigned?

17   A    Up in headquarters.

18        MS. WILLIAMS:  Objection.  Can we get a foundation,

19  please?

20        THE COURT:  You might want to back up a question or

21  two.  In other words, clear up whether he's testifying based on

22  hearsay or firsthand knowledge.

23        MR. SCHLEIN:  Sure.

24  BY MR. SCHLEIN:

25   Q    When I was asking that and saying "you were aware of,"

**UNCERTIFIED ROUGH DRAFT**

1   were you aware of that based on things that you personally

2   observed?

3      A    Yes.

4      Q    And you have personally observed and have firsthand

5   knowledge of officers who have been accused of EEO violations?

6      A    Yes.

7      Q    And where -- and of those officers that you have

8   personal knowledge of that are accused of EEO violations, have

9   the sum of them been reassigned?

10     A    Yes.

11     Q    And where have those people been reassigned?

12     A    Working in headquarters.

13     Q    Is what do you mean working in headquarters?

14     A    Doing -- just doing like answering phones and taking

15   reports over the telephone.

16     Q    Is that an area that's known as the fish bowl?

17     A    Yes.

18     Q    And have you observed officers in the fish bowl?

19     A    Yes.

20     Q    What ranges of people on reassignment have you

21   personally observed working in the fish bowl?

22     A    In the actual fish bowl was officers and sergeants, but

23   in a satellite office where the supervisors are, I observed

24   supervisors working in there.

25     Q    When you say supervisors, what rank do you mean?

**UNCERTFIED ROUGH DRAFT**

1    A    Sergeant on up.

2    Q    And that's --

3    A    Lieutenant and so forth, yes.

4    Q    You have personal knowledge that some of those

5    individuals were accused of EEO violations?

6    A    Yes.

7    Q    When you were a supervisor -- when you were a sergeant

8    on Zone 2, you were responsible as a direct supervisor of patrol

9    officers, right?

10   A    Yes.

11   Q    And have you supervised Officer Le'von Morefield?

12   A    Yes.

13   Q    When were you -- when and where were you his direct

14   supervisor?

15   A    Somewhere between July of 2012 until -- I think I was in

16   13th Precinct for a year, year and a half, so between 2012 and

17   2014.

18   Q    And how often did you interact with Officer Morefield?

19   A    Not too often.  I mean, occasionally he will call me to

20   check up on me.

21   Q    Are you saying that currently or -- I'm talking about

22   when you were his direct supervisor.

23   A    Both.

24   Q    How would you describe your relationship with

25   Officer Morefield?

**UNCERTFIED ROUGH DRAFT**

207

1    A    It was great.

2    Q    Do you have an open policy -- communication with him?

3    A    Yes.

4    Q    Do you think he's candid with you?

5    A    Yes.

6    Q    Did Officer Morefield ever come to you and make a

7    complaint of racism?

8    A    No.

9    Q    Just so I'm sure, you were Officer Morefield's direct

10   supervisor?

11   A    Yes.

12   Q    Did Officer Morefield come to you about complaints with

13   Lieutenant McFadden?

14   A    Somewhat, saying she's strict and so forth and all that.

15   Q    So just complaints about management styles and

16   strictness?

17   A    Yes.

18   Q    You said you keep in contact with Officer Morefield

19   since he's left your supervision?

20   A    Yes.

21   Q    Subsequent to him leaving, has he talked to you about

22   Lieutenant McFadden?

23   A    No.

24   Q    Has Officer Morefield made complaints about other

25   supervisors to you?

**UNCERTFIED ROUGH DRAFT**

208

```
 1      A     None that I can think of right off, no.

 2      Q     And do you recall we had a deposition --

 3            MR. MARSHALL:  Pardon me, Your Honor.

 4       (Plaintiff's counsel conferring off the record.)

 5  BY MR. SCHLEIN:

 6      Q     Did Officer Morefield ever mention anything to do with

 7  Commander Gardner?

 8      A     Yes.

 9      Q     And what did Officer Morefield tell you about

10  Commander Gardner?

11      A     That he didn't like him so much and that he was accused

12  of being a liar by him.

13      Q     I'm sorry, that Officer Morefield didn't like

14  Commander Gardner, or that Commander Gardner did not like

15  Officer Morefield?

16      A     Right, Commander Gardner did not like Officer Morefield

17  and he accused Officer Morefield of being a liar.

18      Q     Other than the accused of being a liar, did

19  Officer Morefield tell you why he didn't like -- he didn't feel

20  that Commander Gardner liked him?

21      A     Well, he -- I think he gave his reasons like because of

22  his background or something.

23      Q     When did Officer Morefield leave Zone 2?

24      A     I don't have the exact date.

25      Q     Do you recall approximately?
```

**UNCERTFIED ROUGH DRAFT**

```
1    A    Maybe sometime 2013, 2014, somewhere in that time frame.

2    Q    And did you supervise Officer Anthony Johnson?

3    A    Yes.

4    Q    And from when to when did you supervise Officer Johnson?

5    A    During the same time as Officer Morefield.

6    Q    How often did you interact with Officer Johnson?

7    A    Currently none, but back then a lot.

8    Q    When you were supervising him, was it a day-to-day

9  interaction?

10   A    Yes.

11   Q    While supervising, did he make complaints to you?

12   A    No.

13   Q    Did he ever say if McFadden was racist?

14   A    No.

15   Q    When did Officer Johnson leave Zone 2?

16   A    I believe him -- it was a cluster of them.  Him,

17 Officer Morefield, and a few others left at the same time.

18   Q    Would that have been December of 2016?

19        MS. WILLIAMS:  Objection to leading.

20        THE WITNESS:  I can't remember.

21        THE COURT:  Well, he asked the date.  The objection is

22  overruled.

23        Go ahead.

24 BY MR. SCHLEIN:

25   Q    Does December 2016 sound correct for when
```

**UNCERTFIED ROUGH DRAFT**

210

1   Officer Morefield and Johnson left?

2       A    Yes.

3       Q    And what did Officer Johnson tell you when he was

4   leaving Zone 2?

5       A    He was leaving to go to a zone that's more -- he can do

6   more proactive work.

7       Q    Did he tell you that it was -- a particular supervisor

8   was the reason he was leaving Zone 2?

9       A    No.

10           MR. SCHLEIN:  Your Honor, can I take a moment to

11   confer with my colleague?

12           THE COURT:  You may.

13           (Plaintiff's counsel conferring off the record.)

14   BY MR. SCHLEIN:

15      Q    I want to go back to the study groups for a moment.

16   When those were going on, you had mentioned a couple of

17   individuals, Shannon Johnson and Alicia Zacker, were members of

18   your study group?

19      A    Yes.

20      Q    And what race were those women?

21      A    Female white.

22      Q    What rank was Lieutenant McFadden when that study group

23   was being run?

24      A    I think she was a sergeant, getting ready to be promoted

25   to a lieutenant or close to it.

**UNCERTFIED ROUGH DRAFT**

211

```
 1          MR. SCHLEIN:  All right.  I believe that's all I have
 2   for you, Sergeant.  Thank you very much.
 3          THE COURT:  Thank you.  Ms. Williams, you may have
 4   examination.
 5                            - - -
 6                     CROSS-EXAMINATION
 7   BY MS. WILLIAMS:
 8      Q    Good afternoon.
 9      A    Good afternoon.
10      Q    It's pretty well known that 580, or the fish bowl, are a
11   place where officers are sent sometimes when they're in trouble,
12   correct?
13      A    Yes.
14      Q    It's also pretty well known that 580 is a place where
15   officers are sent when they are maybe about to be fired,
16   correct?
17      A    Yes.
18          MS. WILLIAMS:  May we bring up Joint Exhibit 6 for the
19   jury, please.
20   BY MS. WILLIAMS:
21      Q    Can you see that?  It may also be on the monitor in
22   front of you.  Is that it?
23      Is it on your monitor, sir?
24      A    Yes.  Yes, it is.
25      Q    What you should have in front of you is Division
```

**UNCERTFIED ROUGH DRAFT**

212

1  Directive 8.08.

2          MS. WILLIAMS:  Can we scroll down to Page 3, please,

3  of the document.

4  BY MS. WILLIAMS:

5    Q    I want to draw your attention to Roman Numeral 3H, and

6  I'll read that out loud.  Any division supervisor receiving

7  notification of the alleged incident of discrimination,

8  including sexual harassment shall immediately forward a letter

9  detailing the alleged discrimination through the chain of

10  command to the appropriate Deputy Chief.

11    Did I read that correctly?

12    A    Yes.

13    Q    And you would agree that when a subordinate comes to you

14  with EEO concerns, you are required to write it up and send it

15  up the chain of command, correct?

16    A    Yes, yes.

17    Q    And you took part in a study group held by Lieutenant

18  McFadden, correct?

19    A    Yes.

20    Q    And isn't it a fact that you don't personally know the

21  racial make-ups of the other study groups Lieutenant McFadden

22  also held?

23    A    That's correct.

24          MS. WILLIAMS:  Nothing further.  Thank you.

25          THE COURT:  Thank you.

**UNCERTFIED ROUGH DRAFT**

213

 1          Any additional questioning?

 2          MR. SCHLEIN:  No further questions, Your Honor.

 3          THE COURT:  Sergeant, thank you very much.  You may

 4   step down.

 5          And the plaintiff may call her next witness.

 6          MR. MARSHALL:  Commander Gardner.

 7          THE COURT:  Witness may come forward.

 8          THE DEPUTY CLERK:  Good afternoon.  I'm going to swear

 9   you in.  Can you please come forward.  Can you please raise

10   your right hand.

11      (Witness is sworn.)

12          THE DEPUTY CLERK:  Thank you.  Please be seated.

13          THE COURT:  Mr. Marshall, whenever you're ready you

14   may proceed.

15          MR. MARSHALL:  Thank you, Your Honor.

16                        - - -

17                   DIRECT EXAMINATION

18   BY MR. MARSHALL:

19     Q   Good afternoon, Commander.

20     A   Good afternoon.

21     Q   John Marshall.  We have not met before, right?

22     A   That's correct.

23     Q   Please give us your name.

24     A   Mark Gardner.

25     Q   When did you start with the Columbus Division of Police?

**UNCERTIFIED ROUGH DRAFT**

214

1    A    May of 1995.

2    Q    And your current rank is commander, and you've been a

3 commander since May of 2020?

4    A    No, that's not correct.

5    Q    How long have you been a commander?

6    A    Since September of 2015.

7    Q    Sorry about that.  What is your current assignment?

8    A    Zone 2 Commander.

9    Q    What was your assignment previous to this?

10    A    Internal affairs bureau commander.

11    Q    How long were you the commander of internal affairs?

12    A    Seventeen months.

13    Q    Who did you replace as commander of internal affairs?

14    A    Commander Kelly Winer [phonetic].

15    Q    Do you know who the commander was before Kelly Winer?

16    A    I believe it was Commander Greg Bodkur [phonetic].

17    Q    Now, at some point were you commander of support

18 services, which includes the property room?

19    A    Yes, I was.

20    Q    Can you tell us from when to when you served in that

21 capacity?

22    A    Yes.  I went to that assignment in January of 2017 and

23 served there until April or May of 2020.

24    Q    And I believe that before that job, you were commander

25 of Zone 2 where you had responsibility -- you directly

**UNCERTFIED ROUGH DRAFT**

1  supervised Lieutenant Melissa McFadden; is that correct?

2      A    That's correct.

3      Q    I think you supervised her for approximately two years.

4  Does that sound right?

5      A    Maybe closer to a year and a half.

6      Q    Okay.  But you, as her direct supervisor, you would work

7  with her on a regular basis?

8      A    Yes.

9      Q    So you're on a daily basis if you were both on the

10 shift?

11     A    I'm sorry, I don't understand your question.

12     Q    Would you see her daily?

13     A    No, I wouldn't see her every day.

14     Q    Would you see her frequently during the week?

15     A    Yes, maybe once or twice throughout the week.

16     Q    You were able to observe her as a lieutenant, as a

17 supervisor?

18     A    Yes.

19     Q    Were you able, based upon those observations and

20 interactions and what you observed, to form an opinion about her

21 as a supervisor?

22     A    Yes.

23     Q    Now, one thing that you believed about Lieutenant

24 McFadden at the time was that she was very litigious and files

25 lots of grievances; is that right?

**UNCERTFIED ROUGH DRAFT**

216

1   A   Yes, I --

2   Q   Did she ever file a grievance against you?

3   A   No.

4   Q   She ever file a lawsuit against you?

5   A   No.

6   Q   Ever file an EEO complaint against you?

7   A   No.

8   Q   But you've heard over the years about her filing

9   lawsuits against fellow officers?

10  A   Yes.

11  Q   And she had this reputation for filing lawsuits and

12  complaints before March of 2017, didn't she?

13  A   Yes.

14  Q   Now, on Zone 2, B Company, B Company is second shift,

15  right?

16  A   That's correct.

17  Q   Fair to say that for the most part, most criminal

18  activity occurs during that time?

19  A   No, that's not fair to say.

20  Q   That's not in your report that you did on Zone 2?

21  A   Not that I recall.  I mean, the crime is spaced out over

22  all three shifts.  It is a busier shift on B Company, but not --

23  most crime does not occur on B Company.

24  Q   Well, I didn't say most.  If you take two other shifts

25  combined, I didn't mean that way.  But it's evening hours, night

**UNCERTIFIED ROUGH DRAFT**

217

1    hours, right?  Afternoon, evening and into the night, correct?

2         A    Are you referring to B company, sir?

3         Q    Yes, B company.

4         A    Yes, it goes from the afternoon into the evening.

5         Q    One of the reasons that that -- well, when you took over

6    B Company, you noticed there were a fair number of vacancies?

7         A    Sorry, I didn't take over B Company.  I had all three

8    shifts, sir.

9         Q    My apologies.  As commander you had responsibility for

10   the zone?

11        A    Correct.

12        Q    A, B, and C Company?

13        A    That is correct.

14        Q    But you did notice that B Company had somewhat more

15   vacancies than the others?

16        A    That's accurate.

17        Q    And one of the reasons for that was because officers

18   would bid their shifts for the shifts that they want?

19        A    Yes, sir.

20        Q    And officers typically preferred first shift hours, so

21   they tried to move off second shift when they can, when they get

22   seniority, right?

23        A    Correct.

24        Q    Now, you also thought that some officers might have been

25   leaving because of Lieutenant McFadden, right?

**UNCERTIFIED ROUGH DRAFT**

218

1   A   That's correct.

2   Q   Some people told you they thought she was a micro

3   manager, too strict, right?

4   A   Micro manager was the word I had heard.

5   Q   And despite -- in fact, I think Sergeant Ramsey

6   [phonetic] said he thought she was a micro manager and managed

7   runs too closely?

8   A   Yeah, I believe that's pretty accurate.

9   Q   Right.  And an officer on the CRT team complained to you

10  that she was too involved in the day-to-day activities of

11  officers he thought?

12  A   Yeah, that seems accurate.

13  Q   CRT is what?

14  A   The community response team.

15  Q   But despite the complaints and issues you heard bubbling

16  up with Lieutenant McFadden, nothing that you observed or were

17  told warranted any discipline, correct?

18  A   That's correct.

19  Q   There is a very low level of discipline within the

20  division called DCC, or documented constructive counseling,

21  right?

22  A   That's correct.

23  Q   And so whatever it is, the complaints, concerns, that

24  bubbled up to you about Lieutenant McFadden, they didn't even

25  warrant a DCC, correct?

**UNCERTFIED ROUGH DRAFT**

219

1      A    That is correct.

2      Q    In fact, you don't think these were disciplinary issues

3  that you were hearing about, right?

4      A    That is correct.

5      Q    Now, no one ever came to you and suggested that

6  Lieutenant McFadden was racially biased?

7      A    That is correct.

8      Q    And no one in any point in your career has told you that

9  they thought Lieutenant McFadden was racially biased; is that

10  right?

11      A    That's correct.

12      Q    Nothing you observed made you think Lieutenant McFadden

13  was racially biased in her management.  Do you agree?

14      A    I agree with that.

15      Q    And you never observed Lieutenant McFadden do anything

16  that favored black officers over nonblack officers, white

17  officers or other nonblack officers?  You never observed her do

18  anything that favored black officers in that way, correct?

19      A    That is correct.

20      Q    Now, during your time as commander of Zone 2,

21  Sergeant Tate, Officer Morefield, and Officer Johnson all served

22  under your command?

23      A    Yeah, at some point under my command.  I know that

24  Officer Morefield -- I'm sorry, yeah, I think it was

25  Officer Morefield transferred out under my command.  I think he

**UNCERTFIED ROUGH DRAFT**

220

1    transferred to Zone 5.

2        Q     I'm not suggesting the three of them were there the

3    whole time, but they were there for some period of time when you

4    were there?

5        A     Yes, sir.

6        Q     Now, as a commander did you make yourself available to

7    talk with officers and sergeants regarding issues or concerns or

8    problems they were having?

9        A     Yes, sir.

10       Q     Did any of these three officers ever talk to you about

11   concerns or problems they had with Lieutenant McFadden?

12       A     With regard to anything?

13       Q     Anything.

14       A     I believe at one point Officer Johnson may have

15   approached me when I first got to the zone and may have had --

16   just was not happy with the lieutenant, but I don't remember

17   what the particulars of that were.  I think it was like a

18   very -- just kind of a casual conversation after our roll call

19   visit.

20       Q     Was he making any kind of complaint about discrimination

21   or an EEO violation?

22       A     No, it wasn't.  It was about management style.

23       Q     Was it about the fact that he wasn't able to go off on

24   special assignments after -- to go on these 60 day special

25   assignments?  Did he complain about that?

**UNCERTFIED ROUGH DRAFT**

221

```
 1      A     Not that I recall.

 2      Q     Now, did any of these three ever say or suggest that

 3   they thought Lieutenant McFadden was engaged in racist or biased

 4   behavior, any of the three of them?

 5      A     No, sir.

 6      Q     Now, you did -- you did believe, in fact, took -- or

 7   attempted to take disciplinary action against Le'von Morefield

 8   at some point in time, correct?

 9      A     I did.

10      Q     And did you attempt to secure discipline against him

11   because you believed he was dishonest?

12      A     I don't believe the charge was being dishonest.

13      Q     Well, the charge was that -- what was the charge?

14      A     I think it had something to do with, with not working

15   harmoniously with other entities.  I think it might have -- I'm

16   sorry, I don't recall offhand.  It's been about six years.

17            MR. MARSHALL:  Your Honor, may I have a moment to look

18    at the transcript?

19            THE COURT:  You may.

20   BY MR. MARSHALL:

21      Q     The reason I asked you the question, Commander, about

22   honesty was, wasn't this about Officer Johnson creating a fake

23   Facebook page?

24      A     It was.

25      Q     In other words, he created a Facebook page in which he
```

**UNCERTIFIED ROUGH DRAFT**

222

1    hid his identity; is that right?

2       A    That is correct.

3       Q    You had a problem with that, didn't you?

4       A    It wasn't so much I had a problem with that.  I had a

5    problem with him not sharing information with the investigative

6    detectives out of a case about that fake Facebook page.

7       Q    Wasn't it correct that he wasn't completely honest with

8    the detectives about that fake Facebook page?

9       A    He did not share that with them.

10      Q    Meaning he wasn't honest about it, right?

11      A    He didn't share that with them.  I mean, I don't know

12   that I would say he was dishonest.  He just didn't tell them

13   about it.  When they asked him about it, he told them, yes, he

14   had created that page, and he told them that he did meet

15   somebody through there.

16      Q    What was the Facebook page for?

17      A    It was -- again, this is six years ago.  So to the best

18   of my recollection, it was -- he found somebody in the precinct

19   who was selling a gun, and he purported himself just to be an

20   average citizen wanting to buy the gun and asked the person to

21   meet up with him so he could buy the gun, and then he approached

22   them in uniform at a said location and time and arrested the

23   person for having a gun in their possession.

24      Q    Sounds like police work, in a way.  What's wrong with

25   that?

**UNCERTFIED ROUGH DRAFT**

223

1    A    I'm sorry?

2    Q    What's wrong with that?  Because it sounds like he was

3 doing police work, so what's wrong with it?

4    A    So the problem that I had with it is that he did not

5 share that with the investigative people that were putting the

6 investigative packet together, and so that information of how

7 they came across one another was not being relayed to the

8 prosecutors who were going to prosecute the case.

9    Q    What can that mean?

10    A    Well, the prosecutor could lose a case in court, part

11 one.  Part two, it could look unfavorably on the Division that

12 the pertinent information was not forthcoming.

13    Q    Thank you.

14    The property room, property room is located off of Woodrow

15 Avenue here in Columbus, right?

16    A    Yes, sir.

17    Q    It's a big building that's at least the size of a

18 Wal-Mart.  Is that fair?

19    A    That's accurate.

20    Q    Probably a pretty big Wal-Mart.

21    A    Super size Wal-Mart.

22    Q    The property room has two lieutenants and one sergeant

23 who worked there as well, right.

24    A    I'm sorry, could you say that again?

25    Q    Yes.  Among the sworn personnel at the property room,

**UNCERTFIED ROUGH DRAFT**

224

1   you have a lieutenant and sergeants.

2      A    Yes.

3      Q    And that would have been back in March of 2017, there

4   would have been a lieutenant and two sergeants assigned to the

5   property room?

6      A    Yes, sir.  If I could just qualify on that lieutenant.

7   He had split responsibilities the, property room and the impound

8   lot.

9      Q    I see.  So the lieutenant had responsibility over the

10  impound lot and property room?

11     A    Yes, sir.

12     Q    So what we called back in even March of '17, the

13  lieutenant in charge of the property room was also in charge of

14  impound and whoever worked there?

15     A    Yes, sir.

16     Q    And I believe both impound lot and the property room

17  also had civilian employees?

18     A    Yes, sir.

19     Q    Lieutenant had responsibility for those?

20     A    Yes, sir.

21     Q    So let's talk about March of '17.  How many civilian

22  employees worked in the property room?

23     A    Probably less than 20, maybe 17 to 20.  I'm not sure of

24  the exact number.

25     Q    Okay.  How many civilian employees worked in the impound

**UNCERTFIED ROUGH DRAFT**

225

```
1    lot in March of '17?
2        A    Maybe 15 to 20 again.
3        Q    Any sergeants in the impound lot?
4        A    Yes, sir.
5        Q    How many?
6        A    There was one.
7        Q    All right.  So if you're the property room lieutenant,
8    if you bid for that assignment, you have managerial
9    responsibility for all of the employees -- civilian employees in
10   the impound lot, all the civilian employees in the property
11   room, and the three sergeants, right?
12       A    That's accurate.
13       Q    Okay.  Sounds like a big management job, right?
14       A    Yes.
15       Q    And, in fact, you would say that that particular
16   lieutenant's job is a coveted job in the Division, fair?
17       A    That's fair.
18       Q    Why is that?  Why is that particular job coveted?
19       A    For a couple of reasons.  One, it works Monday through
20   Friday 8 a.m. to 4 p.m. traditionally, but multi shift
21   responsibility, so the lieutenant can move their hours that
22   works best for the Division and for the lieutenant.  There's
23   parking provided at the property room and the impound lot.  It's
24   outside of police work, so it's a little bit of a different
25   area.  There's some opportunities for overtime.  In 2017 there
```

**UNCERTIFIED ROUGH DRAFT**

226

1  weren't very many opportunities for overtime and so doing

2  auctions and that type of stuff, the lieutenants were able to

3  work -- lieutenant was able to work overtime.

4      Q    Let's take a look at the job description for that job,

5  which is Exhibit 11.

6          (Plaintiff's counsel conferring with defense counsel off

7   the record.)

8              THE DEPUTY CLERK:  Is this a Joint Exhibit?

9              MR. MARSHALL:  No, I'm sorry.  It's a Plaintiff's

10  exhibit.  I just asked counsel the City if we're okay to put it

11   on the screen.

12             Is that okay with you, Mr. Bernhart?

13             MR. BERNHART:  Yes.

14             MR. MARSHALL:  Thank you.

15             Why don't you zoom to the task.

16  BY MR. MARSHALL:

17      Q    First of all, Commander, do you see that -- I believe

18  it's on your scene as well, if you want to look on the monitor.

19  Do you recognize this as the police lieutenant's job in support

20  services section, property management?  So this is the property

21  room impound lot job description?

22      A    It appears to be.

23      Q    This would have been the one in March of 2017, right?

24      A    I don't know.  I don't see a date on there, sir.

25      Q    All right.  Well, does it -- do the tasks --

**UNCERTFIED ROUGH DRAFT**

227

```
 1            MR. MARSHALL:  Sam, would you zoom into the tasks,
 2   please?
 3            Thank you.  That's good.
 4   BY MR. MARSHALL:
 5     Q    Do the tasks you see listed there, are those consistent
 6   with the tasks of this lieutenant's job in March of '17?
 7     A    Yes.
 8     Q    All right.  Thank you.
 9            MR. MARSHALL:  You can take the exhibit down.
10   BY MR. MARSHALL:
11     Q    Now, when you were commander of support services over
12   the property room, was when Lieutenant Melissa McFadden was
13   assigned to the property room by then Chief Jacobs, right?
14     A    Yes.
15     Q    You didn't play any role in that decision; am I right?
16     A    That is correct.
17     Q    In fact, you did not have the authority to independently
18   assign Lieutenant McFadden to do anything other than the project
19   that she was sent to do in the property room, right?
20     A    That's accurate.
21     Q    You had no involvement in that decision whatsoever,
22   correct?
23     A    With her being assigned to the uniform office?  No, I
24   did not.
25     Q    She came to work under you in the property room -- by
```

**UNCERTIFIED ROUGH DRAFT**

1  the way, at that time, the lieutenant's job, the job description

2  we just looked at, that was filled, right?

3      A    It was.

4      Q    Who was the lieutenant?

5      A    Lieutenant Bill Morrison.

6      Q    And the sergeant's jobs were also filled, were they not?

7      A    They were.

8      Q    So McFadden came to you to work under you in the

9  property room in mid March and remained there until she was

10 injured on June 5th of 2017.  Does that sound right?

11     A    That sounds accurate.

12     Q    Now, when she was working there, she let you know that

13 she was not happy with that assignment, right?

14     A    She did.

15     Q    In fact, she filed grievances with the Division over

16 this involuntary reassignment to the property room, didn't she?

17     A    I don't recall offhand, but I know that she was not

18 happy there.

19     Q    She believed and told you that she thought it was not

20 appropriate for anyone to be assigned to do this job, but

21 especially for a lieutenant to be assigned to do this job?  She

22 let you know that?

23     A    I think she did.

24     Q    Now, Chief Dunlap conveyed to you what it was that

25 Lieutenant McFadden would be doing?

**UNCERTIFIED ROUGH DRAFT**

229

1    A    I believe so.

2    Q    And that was to disassemble and repair bullet proof

3  vests for destruction, correct?

4    A    That's correct.

5    Q    By the time this project started, the Division had

6  accumulated a pretty good amount of old body armer that needed

7  to be disposed of; is that fair?

8    A    That's fair.

9    Q    In fact, did you know that Lieutenant McFadden found

10  expiration dates on some of that body armor going back to the

11  lathe 1990s?

12    A    I think I am actually aware of that.

13    Q    So there was -- that had been piling up since the --

14  this is March of '17.  That had been piling up since the late

15  1990s?

16    A    Yes.

17    Q    Do you remember seeing them in those big wooden crates

18  there?

19    A    Yes.

20    Q    Now, she also had to record the serial numbers of the

21  vests she worked on, which was a requirement from the company

22  that was going to recycle them, correct?

23    A    That's correct.

24    Q    What was going to happen -- these vests, they are cloth

25  covering over Kevlar lumbar panels, right?

**UNCERTFIED ROUGH DRAFT**

230

1    A    Yes.

2    Q    And included sometimes in many of them are plates,

3    additional plates, metal plates that protect vital organs,

4    correct?

5    A    That's correct.

6    Q    All right.  And so her job was to disassemble all of

7    that and take those Kevlar vests and tape them together, or at

8    least package them up for recycling to the company, right?

9    A    Yes.

10   Q    Was it the Kevlar company that was doing the recycling?

11   A    It was a company in Toledo.  I believe fiber brokers,

12   maybe.  They recycled them.  They reshredded them and recycled

13   them for other products.

14   Q    When did -- and there were somewhere between 1,000 and

15   3,000 vests.  You don't know how many, right?

16   A    That's correct.

17   Q    Do you know how many now that were -- do you know how

18   many were eventually done?  Do you know?

19   A    I do not know.

20   Q    Do you know how long it took to get them all done?

21   A    I think they were completed in mid to late June of 2017.

22   I'm sorry.

23   Q    And you had 580 temps working on them?

24   A    No, I don't believe we did.

25   Q    You don't remember Kim Atwood, a 580 temp who was

**UNCERTFIED ROUGH DRAFT**

231

1   assisting?

2       A     So she was a 480 temp.

3       Q     480 temp.  I'm sorry.

4       A     So she -- I believe she completed the task that Melissa

5   had started.  I believe Kim completed that task after Melissa

6   was injured.

7       Q     Commander, thanks for your time.

8       A     You're welcome, sir.

9             THE COURT:  Thank you.

10            MR. BERNHART:  We reserve to call him on direct.

11            THE COURT:  You may be called back, Commander.  For

12  now, you may step down.

13            MR. MARSHALL:  Your Honor, may we approach?

14            THE COURT:  I'll see you at sidebar.

15            Ladies and gentlemen, you may stand if you wish.

16      (The following proceeding was held at sidebar.)

17            THE COURT:  Let me make a wild guess.  You're out of

18  witnesses.

19            MR. MARSHALL:  We were going to call Lou Reiter as our

20  next witness, and he'll be tomorrow first thing.

21            THE COURT:  Nobody else is around?

22            MR. MARSHALL:  No, there's no short witness around.

23            MR. SCHLEIN:  It's 10 until roughly.

24            THE COURT:  There's nobody you want to fill in, I'm

25  going to guess?

**UNCERTFIED ROUGH DRAFT**

232

1        MR. PHILLIPS: I could show our version of the Kenneth

2  Kuebler deposition.

3        THE COURT: If it doesn't screw up anybody's case.

4  How long is it?

5        MR. PHILLIPS: Like a half hour or 20 minutes.

6        THE COURT: Why don't we finish with that. All right?

7        While I have you here, so we've been through -- I

8  think this is witness No. 6.

9        MR. MARSHALL: We may get finished Wednesday.

10       THE COURT: And you've got a couple of days still to

11  go, right?

12       MR. PHILLIPS: Yeah. I predicted it right so far on

13  the timing.

14       THE COURT: You estimated a shorter number of days.

15       MR. PHILLIPS: I thought -- and we'll see, but I

16  thought the entire trial will get done in four days, maybe

17  closing on Monday.

18       THE COURT: I will tell them that this is part of your

19  case, or doesn't matter?

20       MR. MARSHALL: Please.

21   (The following proceedings were had in open court.)

22       THE COURT: Part of my job is to worry about your time

23  and schedule. Good news and bad news, the plaintiff for today

24  has run out of witnesses, but we do have a little bit more of

25  some testimony being produced. You remember Deputy Chief

**UNCERTFIED ROUGH DRAFT**

233

1    Kuebler, and defense side said they were going to use his

2    testimony in their case.  We're going to take them a little out

3    of order.  We're going to play video of his part of his

4    testimony that you would have heard probably later in the week.

5    That way we'll fill your time and get this case still on top

6    of.  We're actually ahead of schedule.

7              MR. MARSHALL:  Your Honor, I didn't want the jury to

8    think we were out of witnesses.  We will start again.

9              THE COURT:  In other words, out of witnesses for

10   today.  We have lots of witnesses to go.

11             MR. MARSHALL:  It's Mr. Schlein's fault entirely.

12             THE COURT:  I'm not going to let you respond to that,

13   but you may have your own thoughts on that issue.  It's

14   nobody's fault.  We've been through six witnesses, which is

15   pretty fast for an afternoon.  So with that, the City of

16   Columbus may play that part of the deposition.

17             MR. PHILLIPS:  Thank you, Your Honor.  This will be my

18   direct examination of Deputy Chief Kuebler.

19      (The following witness, Deputy Chief Kenneth Kuebler,

20   appeared by videotaped deposition.)

21             THE COURT:  That takes us right up to 4:30.

22             Let's hold that for the morning, okay, if you don't

23   mind.  How long is that, by the way?

24             MR. MARSHALL:  It's quite short, Your Honor.

25             THE COURT:  As in two minutes?

**UNCERTFIED ROUGH DRAFT**

234

1    MR. MARSHALL:  I'll let you know in a second here.

2    THE COURT:  Anybody have any major scheduling issues?

3    MR. MARSHALL:  11:37 to 11:45, so eight minutes.

4    THE COURT:  Unless there's a real objection, I prefer

5 to do it in the morning.

6    MR. MARSHALL:  That's fine.  Of course.

7    THE COURT:  So remember the warnings I gave you.

8 Those will apply all throughout the case.  Have a wonderful

9 evening.  We'll be back here to start at 9:00 tomorrow morning.

10    Thank you.

11  (Jury out at 4:32 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNCERTIFIED ROUGH DRAFT**