## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MELISSA McFADDEN,                  :
                                   :     **Civil Action No. 2:18-cv-544**
        Plaintiff,                 :
                                   :
    v.                             :     JUDGE: SARGUS
                                   :     MAGISTRATE JUDGE: JOLSON
CITY OF COLUMBUS,                  :
                                   :
        Defendant.                 :

### PLAINTIFF MELISSA McFADDEN'S MOTION
### FOR A NEW TRIAL ON DAMAGES ONLY

Plaintiff Lt. Melissa McFadden ("Lt. McFadden") respectfully moves pursuant to Fed.R.Civ.P. 59 for a new trial on damages because the one-dollar award for discrimination and one-dollar award for retaliation are (1) against the clear weight of the evidence on her damages; (2) reflect that the jury failed to follow the following jury instructions (a) by giving improper weight to the allegations that led to her reassignment rather than the complained of illegal conduct reassigning Lt. McFadden to the property room to disassemble vests, and (b) describing the factors to be considered in awarding damages; (3) perpetuating the very discrimination and retaliation the jury found the City had committed by apparently being anchored in dislike for her because she too aggressively pursued claims against what she perceived – rightly in light of the jury verdict on her temporary assignment to menial duties in the Property Room – to be discrimination and retaliation; and/or (4) constitute an injustice that unacceptably undervalues the intangible harm inflicted on victims of discrimination or retaliation and unreasonably rejects corroborated testimony.

### MEMORANDUM IN SUPPORT OF PLAINTIFF MELISSA
### McFADDEN'S MOTION FOR A NEW TRIAL ON DAMAGES

I.    **Background**

On June 13, 2022, the jury found that the City of Columbus had discriminated and retaliated against Lt. McFadden when its Division of Police (CDP) temporarily assigned her during an investigation of equal employment opportunity charges to menial duties in the Property Room.  Lt. McFadden testified in detail about her damages, including the emotional distress, mental anguish, and humiliation that being a victim of discrimination and retaliation inflicted, and the pain, suffering, and economic losses from a physical injury caused by the menial duties she was assigned and the deadlines under which they were performed.

Her husband corroborated that testimony.  She did not elicit expert medical testimony, nor was she required to do so.  *Miller v. Alldata Corp.,* 14 Fed. Appx. 457, 466–67 (6th Cir. 2001) (emotional distress award of $300,000 for a plaintiff who provided no medical evidence but claimed to have sleepless nights and stomach problems was not excessive).  The City did not elicit expert medical testimony to refute her claims, though it cross-examined her and her husband on other causes for her emotional distress and mental anguish and emphasized that the assignment to menial duties did not include instructions to lift a heavier number of ballistic vests than she could safely lift, despite the fact that testimony showed that no training was offered about how to safely lift the vests.

The City elicited considerable testimony, however, about her leadership style, the equal employment opportunity charges against her, and her readiness to characterize as discrimination or retaliation acts, omission, decisions, or statements by her superiors and other officers.  All this "background evidence" did not prevent the jury from finding that Lt. McFadden had been a victim of discrimination, but it poisoned the jury's attitude toward her, making her so unlikable that a total of $2.00 was awarded.  No doubt the Court recalls sidebars when counsel for Lt. McFadden

futilely pursued the issue of character assassination.  The award constituted an injustice that a new trial on damages can rectify.

## II.    <u>Evidence Admitted at Trial</u>

At trial, Lt. McFadden produced significant evidence that she was physically and emotionally harmed by the discriminatory and retaliatory actions of the City.

Lt. McFadden testified on June 7, 2022, that she processed over 1,100 vests (Day two trial transcript at 142:5-9) Lt. McFadden explained to the jury the state of the vests. The vests "had mold on them. They were mildewed. They were stained, dirty. They had a really strong smell to them" (*Id*. at 131:7-11) Lt. McFadden estimated that of the 1,100 vests that she processed 20% were moldy, and that in order to deal with the mold and smell she was forced to wear gloves and take allergy medication. Despite her wearing gloves and taking medication to prevent adverse symptoms from her allergies, the mold from the vests still caused her "problems" while in the property room. (*Id*. at 131:1-14) To demonstrate just how moldy the vests were and the sheer number of vests, Lt. McFadden presented several photographs that she took of the vests and crates in which they were stored as Exhibit 14 to her trial evidence. The City had no objection to the admittance of the photographs, and presented no evidence that the photographs were not legitimate or were not in fact the vests that Lt. McFadden processed.

Lt. McFadden's husband Charles McFadden corroborated Lt. McFadden's testimony about the condition of the property room and its smell. Mr. McFadden testified that Lt. McFadden took him to the property room one time, and he described it as "a dark warehouse no windows, dirty, really dusty, . . . and just must odor just a typical type of old warehouse." (Day three trial transcript 85:22-86:1)

Lt. McFadden testified that she was forced to process the vests in the stockroom of CDP's property room in view of other CDP employees. She explained "the stockroom uniform office is located, it's located in the property room building, but the property room is further up, and I didn't have access to the property room."  (Day two trial transcript at 144:20-25) She continued, that because of the location of the stockroom in the property room, that other officers and employees would have to walk by her work area when they were entering the rear of the property room warehouse. Lt. McFadden told the jury that when these officers and employees would walk by her work area "they would smirk at me. They would smirk at me and would act like -- they would say, How is your day? They know good and well my day is not good because I'm in these crates. And it was so embarrassing that I didn't want to be there, because at any given moment they can come back and see me in these crates doing things that I shouldn't be doing as a lieutenant, or that I shouldn't be doing as an officer, anybody -- no officer should -- is required to do that, has ever been required to do that. (*Id*. at 145:1-25) Lt. McFadden continued that she felt humiliated because she "felt like they were punishing me, and I was set as an example to the rest of the Division to see and humiliate." (*Id*. at 143:10-13)

Lt. McFadden was asked about how the property room reassignment affected her emotionally. She told the jury "It was humiliating to me because I was the only one ever assigned to the property room to do any kind of task like that It caused me undue stress. Already dealing with an issue of my life in general, and then to have this thrown on me, it was very stressful. It caused problems in my marriage, intimacy from my husband. I was withdrawn from society, didn't want to go anywhere. Very depressed" (*Id* at 167:1-9)

Lt. McFadden explained to the jury that she took many days off work because she "didn't want to be there" she took off as many days as she could, which totaled 22.75 days off work

between March 14, 2017, and June 6, 2017. (Day two trial transcript 143:5-13) She took this time off because she told the jury she just could not handle being there because of the humiliation of the reassignment.

Mr. McFadden testified that when Lt. McFadden was reassigned to the property room in March 2017, that she changed. He explained "she was not happy to go to work at all . . . just very – just dejected and really focused on how she can get over this hump of being there, of being in the property room." (Day three trial transcript 86:7-10) Mr. McFadden talked about how he and Lt. McFadden's home life changed because of the reassignment, "well just all those things that we used to do, we stopped doing. We didn't go out as much. She wasn't interested in, you know, watching TV shows. Everything was about how she can prove that she hasn't done anything wrong." (*Id*. at 86:14-18) Mr. McFadden continued that the intimacy level in their marriage changed after the reassignment. "We just basically were as intimate as before; you know I guess the sex life was less. . . [she] seemed like she was in a different place. There wasn't much hugging or you know cuddling or anything like that. Not [none] at all, but just a lot less. It was just a lot less." (*Id*. at 86:22-87:1) Mr. McFadden testified that in the time after the reassignment he and Lt. McFadden who normally enjoy going out to eat did not go out to eat often or "at all." (*Id* at 87:6-8).

The reassignment to the property room did not only adversely impact Lt. McFadden's marriage but also impacted her relationship with her son Isaiah. Mr. McFadden testified "she was always concerned with whatever Isaiah was—you know, just being a mother, always concerned with what he was doing. So now the focus is on her livelihood and how she can she – it wasn't taken completely away from Isaiah, but just there was less communication between the two. And

just setting back and watching it, it wasn't like you know, how it normally used to be." (Day three trial transcript 87:9-19)

Based on the humiliation and embarrassment of being reassigned to the property room, Lt. McFadden sought mental health treatment. At first, she saw Dr. Warren Bertner a psychologist where she "talked to him and just shared my stresses and frustrations, and he gave me different coping mechanisms to use to help me deal with the stress that I was going through." (*Id*. at 167:17-20) Lt. McFadden saw Dr. Bertner weekly from "immediately" after her reassignment until his retirement in July 2018. After treating with Dr. Bertner, Lt. McFadden began treatment with psychologist Dr. John Tarpey in July 2018. She testified that treating with both Dr. Bertner and Dr. Tarpey was "very helpful" to her emotional distress. (*Id*. at 168:14-169:4)

Finally, as to emotional distress, Lt. McFadden told the jury that the reassignment to the property room still affects her five years later.  She described the affects as "I'm better now, but it still affects me. The fact that it happened, it still affects me. I'm not trusting of people like I was. I'm not (sic) [now] very cautious of people now. She went further to clarify about being cautious "but when you're cautious about your family and about people you know, it's not good." (Day two trial transcript 169:5-15)

In addition to testimony from herself and her husband regarding the emotional impacts of her reassignment. Lt. McFadden also presented evidence that she was injured physically and financially by the reassignment.

On June 5, 2017, Lt. McFadden was "stacking the vests on the desk" and "went to pull them over" and she "pulled with my right and I'm left-handed, but I pulled with my right hand to pull them over and I felt a little strain in my shoulder, but I didn't think much of on it, you know So I picked up the stack and I put it in the basket, and that's when I hurt heard my shoulder. It was

really -- it was a sharp pain in my shoulder, and I hurt my shoulder." (Day two trial transcript 144:19-145:9) Lt. McFadden described the feeling when she tried to lift the stack of vests "I just felt a sharp pain in my shoulder, and then I couldn't move my arm above here, above this. Every time I moved my arm up, it would hurt." (*Id*. at 146:14-20) Lt. McFadden explained that how she was moving the vests on June 5, 2017, was the same way that she had done in the months prior to her injury, and that she had never had an issue before. (*Id*. at 145: 10-14)

After feeling the sharp pain, Lt. McFadden sought medical treatment on June 6, 2017. Lt. McFadden saw Dr. Steven Altic at Grandview Family Practice who ordered an X-ray and MRI on her shoulder. Lt. McFadden was then diagnosed with a torn rotator cuff and herniated discs in her neck. (Day two trial transcript 147:3-15) Lt. McFadden described the pain of the injury in the first few days as "8 out of the 10 being the worst." (*Id.* at 148:1) Lt. McFadden started treating with therapy for the injury and was prescribed "tramadol for pain medicine. I did electric stimulation, acupuncture. I did physical therapy with exercise band, massage therapy. And then I eventually got a cortisone shot in my shoulder." (*Id*. at 148:7-10)

Lt. McFadden had to treat for the injury for nearly a year and a half before she was able to return to work. At the outset of the injury Lt. McFadden "was in therapy three days a week, and maintaining therapy helped with the pain ... just therapy was helping me a lot." (Day two trial transcript: 148:17-20) Lt. McFadden continued going to physical therapy in person from the time of her injury until the Covid pandemic in early 2020, at that point she continued to do therapy exercises at home and "massaging my neck and shoulder I do at-home exercises that they taught me that's how I maintain." (*Id* at 151:21-24) Lt. McFadden testified that she still experiences pain in her neck and shoulder because of the injury, but that as long as she maintains her exercise and massage routine, she is able to work and function normally. (*Id*. at 151:24-152:6)

While Lt. McFadden suffered significant physical pain from her injury, the injury also caused her a real financial burden. Lt. McFadden testified that she was on injury leave status with the City from June 2017, until December 2018. When on injury status "the Division allows injury leave to so many hours. Then once that runs out, I had to go on temporary total disability. And the problem with temporary toral disability they only pay like 70 percent of my income, so I had to use vacation and sick time to make up the other 30 percent." (Day two trial transcript 152:14-19) Lt. McFadden displayed her paystubs to the jury from 2016-2018 as Exhibit 19, and that evidence showed that Lt. McFadden was forced to exhaust 263.556 hours of sick leave because of her injury and lost an additional $18,507.59 in actual pay based on the reduction in hours because of her injury. (*Id* at 154:23-156:21)

Not only did Lt. McFadden present evidence that she lost significant pay because of her injury. She was also forced to take out a loan for tuition for law school that she was attending at the time of her injury.  Lt. McFadden started law school in September 2014 enrolling, in Capital University Law School's part time program. (Day two trial transcript 162:15-24) During the first three years of her legal studies, the City paid for her tuition through the employee tuition reimbursement program. (*Id*. at 164:13-14) However, when Lt. McFadden was on injury leave, she was not eligible for tuition reimbursement. Lt. McFadden presented Exhibit 18 to the jury which was an e-mail from Deputy Chief Michael Woods explaining that while she was injured, she would not be able to receive any tuition reimbursement benefits.

As the City would not continue to pay for her schooling while injured, Lt. McFadden was forced to take out a loan to pay for the remainder of the program. Lt. McFadden presented the jury with Exhibit 17, a loan disbursement document showing a $20,000 loan that was paid to Capital University Law School. (Day two trial transcript at 166:2-11) Based on the interest rate of the

student loan, Lt. McFadden will be required to pay a total of $25,000 that she would not have had to pay if she was not injured in the property room. (*Id*. at 166:12-19)

When the City cross examined Lt. McFadden about her damages they focused primarily on economic damages. The City asked Lt. McFadden if her rank remained the same, her seniority, her pay rate, and medical benefits. The City pointed out that she received free parking in the property room and was able to change her shift if she desired. The City made sure to point out to the jury that the reassignment to the property room itself did not cause Lt. McFadden to lose her tuition reimbursement, but rather it was the injury that caused her to lose the reimbursement eligibility. The City also attacked Lt. McFadden's claim of a physical injury eliciting testimony that no one required her to "pick up a certain number of vests" at a time, and explained to the jury that Lt. McFadden also received workers' compensation benefits as a result of the injury.

Despite going at length in cross examination on the nature of Lt. McFadden's injury, and attempting to describe the reassignment to the property room as a plush assignment with better hours, better parking, and not having to wear a patrol uniform the City did not cross Lt. McFadden about her emotional distress. Rather, it left that to their cross examination of Mr. McFadden.

During the cross of Mr. McFadden, he explained to the jury that he and Lt. McFadden continued to travel after she was reassigned to the property room, and watched shows together. The City also had Mr. McFadden identify other stressors in Lt. McFadden's life during the time after the reassignment, such as issues with their son, moving, and the investigation into the allegations against Lt. McFadden. However, Mr. McFadden maintained that the crux of Lt. McFadden's stress was in 2017 around the reassignment. Mr. McFadden testified on cross that the reassignment was Lt. McFadden's "main concern at the time right when that happened, when she was being moved. So you know, there may have been some other stressors, but that was the main

stressor." (Day three trial transcript 104:23-25) Mr. McFadden continued that the property room reassignment stress was different from other stresses that Lt. McFadden was facing "she handled stress well. I mean there's the being removed from where you're – where she was used to being[to the property room]. And I mean there's other stressors, but there's not – were able to separate that." (*Id*. at 109 8-11) Mr. McFadden answered "no" in response to the City's question "there were some [events] that were even more stressful than being assigned to the property room, correct?" (*Id*. at 109:15-17)

Throughout the trial the City did not present any contrary evidence about the cause of Lt. McFadden's injury, or that she was not entitled to tuition reimbursement during her time on injury leave. There is no dispute that Lt. McFadden suffered both physically and emotionally based on her reassignment to the property room.

The City in its defense did not make any arguments that Lt. McFadden was not injured in the property room. Their defense on Lt. McFadden's emotional toll was limited. Rather, the city focused on the e-mail allegations against Lt. McFadden and sought to sling mud at her throughout the trial. In their case in chief, the City called all three officers who made complaints against Lt. McFadden. They asked each of the officers to *read aloud every word* of the e-mails they wrote to Commander Grizzell, and then asked them to explain what they meant by those words. The jury sat for hours hearing the nature of the allegations against Lt. McFadden in graphic painstaking detail, despite the case not centering around the need for a reassignment or investigation, but rather where Lt. McFadden was reassigned.

Then, the City called Commander Grizzell to testify, and again asked her to read the e-mails against Lt. McFadden and talk about the allegations against her. It got to the point where the Court during Commander Grizzell's testimony the Court reminded the jury that the case was not

about what type of manager or co-worker Lt. McFadden was. "Let me explain again what you'll be deciding, because you're hearing some evidence now that goes to issues in the case, but also goes beyond that. That's what I want to explain to you. So I think you understand this is a case about a claim of racial discrimination and a claim of retaliation for protected activity. That's the core of the case. So in a general sense it's not about whether the plaintiff was a good manager, bad manager, good co-worker, bad co-worker. You can get that too. Where the case becomes more difficult is the defendant's side gets to explain motivation in a way that their claim is different than the plaintiff's. Their claim is that there was no racial bias here, that this was for other reasons. Well, the other reasons turn into management questions, turn into co-worker questions. So my admonition to us is consider this as you consider whether this negates or doesn't negate claims of racial discrimination, but we're not here to determine whether plaintiff was a good or bad manager. So if you can keep that separate, then you'll be right on the issues that you'll be deciding in the end. (Day three trial transcript 52:8-5)

Even in closing arguments the City focused on slinging mud at Lt. McFadden rather than why she was reassigned to the property room to disassemble vests. The City again read the allegations of the e-mails, and counsel for the City stated that the words in the e-mails were so strong that Lt. McFadden's counsel would not use the full words but abbreviated the "n" word or "mf" rather than read the quotes of the e-mails. The City obviously wanted to make Lt. McFadden look like such a bad person that the jury would not follow the Court's instructions and award only $2.00 despite significant evidence regarding Lt. McFadden's damages. The City got what it wanted—it so tarnished Lt. McFadden through those hours of testimony that the jury deemed her unworthy of compensation.

### III.    Jury Instructions on Issues and Damages

11

The jury instructions were explicit in directing the jury that they should not hold Lt. McFadden's management style or the nature of the allegations against her. Instruction Number 7 reads:

> As I mentioned during trial, and as I will discuss further in a moment, this case is about what motivated the City to reassign Lt. McFadden to the property room to disassemble vests. Some of the testimony and exhibits offered at trial bore upon this issue, but also addressed other matters—for example, Lt. McFadden's managerial style. Again, you are only to consider this evidence to the extent it sheds light on the City's actual motivation for reassigning Lt. McFadden to the property room to disassemble vests.

(Doc # 106 PAGEID 5753)

While Jury instruction 19 directed the jury "in calculating a damages award, you should only consider the following types of compensatory damages, and no others: 1 lost wages, and 2 any physical, mental and/or emotional pain and suffering- including humiliation, anguish, frustration, and sadness—experienced by Lt. McFadden because of her reassignment to the property room" (Doc # 106 PAGEID 5767) This instruction also did not allow the jury to consider Lt. McFadden's out of pocket expenses such as her $25,000 in law school loans that she would not have had to take but for the City's discriminatory and retaliatory conduct.

It is clear that the jury disregarded both of these charges, and rather than awarding Lt. McFadden fair compensation for the lost wages that she demonstrated, and the "physical, mental and/or emotional pain and suffering- including humiliation, anguish, frustration, and sadness" that she and her husband testified to, they were so poisoned by the testimony that they were unwilling to compensate her even modestly for damages she clearly and undisputedly suffered.

IV.     **Argument**

A.     **Lt. McFadden Has Carried the Burden of Justifying a New Trial on Damages.**

Fed.R.Civ.P. 59(a)(1)(A) empowers the Court to exercise its discretion to "grant a new trial on all or some of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in an action at law in federal court." *See, generally, Davis ex rel. Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 132-33 (6th Cir. 1990).

One reason that historically has sufficed was a jury's unreasonable damages verdict.  *See, e.g., TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 546 (6th Cir. 1981).  More generally, a new trial should be granted "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215. F. 3d 628, 637 (6th Cir. 2000).  At bar, rather than an excessive damages award, the award was patently inadequate given the weight of the evidence, was prejudice or bias, and unfair.

In the Sixth Circuit, "the governing principle in the district court's consideration of a Motion for a New Trial is whether in the judgment of the trial court such course is required to prevent an injustice." *Park West Galleries v. Hochman*, 692 F. 3d 539, 544 (6th Cir. 2012) (quoting *Davis,* 912 F. 2d at 133 (internal quotation marks omitted)).  The "injustice" of a two-dollar award to a victim of discrimination and retaliation is palpable.  Just on the injuries of emotional distress, mental anguish, and humiliation, the award is woefully insufficient.  Even if a jury could reasonably reject compensation for the shoulder injury, no reasonable jury could find on the evidence that she suffered trivial emotional distress, mental anguish, and humiliation.

Lt. McFadden understands that she bears the burden of demonstrating the necessity for a new trial and that the Court will exercise sound discretion in deciding whether she has carried that burden. *Clarksville–Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F. 2d 993, 1002 (6th Cir. 1991). She also realizes that, as the moving party, she has "a heavy burden," *Miller v. American President Lines, Ltd.*, 989 F. 2d 1450, 1456 (6th Cir. 1993), and "the scope of review of a damage award is extremely narrow." *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996). Only when the verdict on damages is one that a jury could not reasonably reach will a new trial be granted, and that assessment is based on the evidence, instructions, and argument, rather than whether different inferences and conclusions could have been drawn or higher damages would be more reasonable. *Walker v. Bain*, 257 F. 3d 660, 670 (6th Cir. 2001); *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000).

Still, courts "have interpreted this language to mean that a new trial is warranted when a jury has reached a 'seriously erroneous result.'" *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996). The availability of a new trial on damages to prevent an injustice and correct a seriously erroneous result means that in the right case a new trial should be ordered. Lt. McFadden's case is that exception to the rule. No matter how heavy her burden or narrow the court's review, the award of $2.00 for the discrimination and retaliation against her fits the exception.

### 1.  The Weight of the Evidence on Damages Precludes a Nominal Award.

Lt. McFadden concedes that, in an appropriate case, nominal damages may be consistent with a finding of discrimination and/or retaliation. *See, e.g., Randolph v. Metro. Transp. Auth.*, No. 17CV1433(DLC), 2019 WL 1567663, at *8 (S.D.N.Y. Apr. 11, 2019) ("There is no inconsistency . . . between a finding that a plaintiff's rights were violated and that the plaintiff

should only be awarded nominal damages."). Thus, "[a] finding that the plaintiff has been deprived of a constitutional right does not automatically entitle him to a substantial award of damages." *Kerman v. City of New York*, 374 F.3d 93, 123 (2nd Cir. 2004).

Beyond that, Lt. McFadden appreciates that, as a general matter, "courts are reluctant to overturn jury verdicts on the grounds of excessive or inadequate damages." *Bruner v. Dunaway*, 684 F.2d 422, 427 (6th Cir. 1982) (citing *Cross v. Thomson*, 298 F.2d 186 (6th Cir. 1962)). She does not quarrel with the observation that "[t]he assessment of damages in a case tried before a jury is peculiarly the function of the jury." *Pohrybienyk v. Kirchner*, 410 F.2d 1114, 1115 (6th Cir. 1969). She accepts that "the value of pain and suffering" is part of that assessment and, rather than a "measuring stick," left "to the sound judgment of the jury." *Id.* at 1115–16 (quotations and citations omitted). She relies, instead, on the equally well-established principle that "the 'gross abuse' of the jury's discretion permits a court to substitute its judgment for that of the jury. *Davidson v. CSX Transportation, Inc.*, No. 1:15-CV-00528, 2017 WL 3422072, at *2 (S.D. Ohio Aug. 9, 2017) (quoting *Pohrybienyk*, 410 F.2d at 1115).

Rather than automatic damages, to "recover compensatory damages under Section 1983, a plaintiff must prove that his injuries were proximately caused by the constitutional violation." *Gibeau v. Nellis*, 18 F.3d 107, 110 (2nd Cir. 1994). As a species of tort law,[1] proving proximate causation adheres to "[t]he cardinal principle of damages in Anglo-American law . . . of compensation for the injury causes to plaintiff by defendant's breach of duty." *Carey v. Piphus*, 435 U.S. 247, 254-55 (1978).

Illustrating these principles is *Carlton v. C.O. Pearson*, 384 F. Supp. 3d 382, 388 (W.D.N.Y. 2019), where an inmate alleged deliberate indifference to an assault that delayed

---

[1] *Carey v. Piphus,* 435 U.S. 247, 253 (1978), quoting *Imbler v. Pachtman,* 424 U.S. 409, 417 (1976).

opening his cell door to stop the assault. "A reasonable jury could have concluded that while Defendant violated Plaintiff's constitutional rights, Defendant's failure to act did not proximately cause Plaintiff's injuries." *Id.* First, the assailant would have injured the inmate regardless of what the prison guards did. Second, injuries may have been sustained while guards were using justified force to stop the fight, rather than being deliberately indifferent. Third, "Plaintiff points to no evidence that would have required the jury to find that the injuries he sustained during the assault arose from Defendant's violation of his rights." *Id.* Fourth, "the degree to which Defendant's wrongful conduct proximately caused Plaintiff's injuries hinged upon the jury's assessment of the witnesses' demeanor[.]" *Id*.

At bar, two discrete categories of evidence were offered about damages: Lt. McFadden suffered emotional distress, mental anguish, and humiliation from being a victim of discrimination and retaliation and she was injured as a result of being assigned to menial tasks in the Property Room. On both categories, she would not have suffered or been injured had she been assigned to non-menial tasks in the Property Room or elsewhere that were consistent with her rank, knowledge, and experience. There is no combination of lawful and unlawful acts by CDP. The City's only evidence of other causes for her emotional distress and mental anguish were difficulties she was experiencing away from work, while the City completely lacked any evidence of other causes for her shoulder injury and the resulting economic loss of being on disability pay, and the loan that Lt. McFadden took to complete her law degree. Finally, proximate causation did not depend on credibility and weight determinations because she conceded that she was also experiencing difficulties and there was no evidence of other causes for her shoulder injury.

The weight of the evidence is that, as a victim of discrimination and retaliation, she suffered some emotional distress, mental anguish, and humiliation, and a foreseeable cause of her shoulder

injury was the menial tasks she had to perform in hurried fashion to meet the deadline imposed by her supervisor.  Tort law is settled that a tortfeasor takes the victim as it finds him or her.  "The 'thin skull' or 'eggshell plaintiff' rule is a creature of tort law, which states, '[A] defendant who negligently inflicts injury on another takes the injured party as he finds her, which means it is not a defense that some other person of greater strength, constitution, or emotional makeup might have been less injured, or differently injured, or quicker to recover.' *McDevitt v. Wenger,* Tuscarawas App. No. 2002AP090071, 2003-Ohio-6096, 2003 WL 22700553, ¶ 34."  *Fleckner v. Fleckner*, 177 Ohio App. 3d 706, 715, 895 N.E.2d 896, 902, 2008-Ohio-4000, ¶ 22.  *Accord Feterle v. Huettner*, 28 Ohio St. 2d 54, 56 & n.2, 275 N.E.2d 340, 342 & n.2 (1971) (automobile accident victim had pre-existing heart condition).

A Seventh Circuit jury instruction captures this reality: "A tortfeasor takes his victim as he finds him, and if a special vulnerability (a thin skull, or here a ventricular hypertrophy) leads to an unusually large loss, the wrongdoer is fully liable."  *Cobige v. City of Chicago, Ill.,* 651 F.3d 780, 782 (7th Cir. 2011).  Difficulties away from work that caused Lt. McFadden emotional distress and mental anguish are not compensable, *Gibson v. County of Washoe,* 290 F.3d 1175, 1193 (9th Cir. 2002) (damages "only for the extent to which the defendant's conduct has resulted in an aggravation of the pre-existing condition, and not for the condition as it was") (quotation omitted), and the jury may have discounted her damages for those difficulties.  But the discount to $2.00 is patently inadequate.

Lt. McFadden is not asking this Court to reweigh the evidence or draw different inferences from the evidence.  Rather, $2.00 is a verdict that could not reasonably have been reached on the evidence before the jury: that "evidence indicates that the jury awarded damages in an amount

substantially less than *unquestionably* proved by the plaintiff's *uncontradicted and undisputed* evidence." *Anchor*, 94 F.3d at 1021 (emphasis in original).

It is uncontradicted and undisputed that Lt. McFadden suffered ***some*** emotional distress, mental anguish, and humiliation from being a victim of discrimination and retaliation. It is totally unreasonable to remedy that emotional distress and mental anguish with $2.00.

"[I]f the [damages] verdict is supported by some competent, credible evidence, a trial court will be deemed not to have abused its discretion in denying the motion." *Anchor*, 94 F.3d at 1021. But there is no "competent, credible evidence" that Lt. McFadden was unfazed by the City's discrimination and retaliation or that her shoulder injury was not a foreseeable result of being assigned menial tasks under the pressure of a deadline or was caused in any way other than her efforts to meet that deadline. *Contrast Anchor*, 94 F.3d at 1021 ("In this case, there was competent, credible evidence that plaintiffs may have suffered no loss at all. . . . Here, the jury chose to accept defendants' version of the relationship between the parties and apparently determined that, although the O'Tooles breached the contract, the Anchors received the benefit of their bargain.").

On a motion for a new trial, the Court must "compare the opposing proofs, weigh the evidence, and set aside the verdict only if it determines that the verdict is against the clear weight of the evidence." *McDonald v. Petree,* 409 F.3d 724 (6th Cir. 2005) (internal quotation marks omitted). The City barely addressed the extent of the emotional distress, mental anguish, and humiliation Lt. McFadden suffered, offered no "opposing proofs" that she "suffered no loss at all," and admitted that her shoulder was injured in the Property Room.

Lt. McFadden appreciates that "[n]o formula exists to determine with precision compensatory damages. The amount is left to the sound discretion of the fact finder." *King v. Zamiara*, 788 F.3d 207, 215 (6th Cir. 2015) (quoting *Smith v. Heath*, 691 F.2d 220, 227 (6th Cir.

1982)).  "A jury sifts through the evidence and chooses what weight to give each piece."  *Heard v. Finco*, 930 F.3d 772, 774–75 (6th Cir. 2019).

Lt. McFadden is not claiming that the City had to rebut the testimony, including party-admissions, about her damages.  *See, e.g., Walker v. Bain*, 257 F.3d 660, 674 (6th Cir. 2001) ("The fact that the defendants did not rebut Walker's testimony directly does not necessarily render the jury's determination on the issue of damages against the great weight of evidence. Walker had the burden of proving damages, and the only evidence of damages was Walker's self-serving testimony about his mental distress.").  She is claiming that she carried her burden of proof and the weight of the evidence was overwhelming: she suffered ***some*** emotional distress, mental anguish, and humiliation from the City's discrimination and retaliation, as well as both pain and economic losses from her shoulder injury.

In *Walker*, the jury discarded the plaintiff's description of his injuries, and the Court held that "[t]here is no error in upholding civil rights jury verdicts awarding no compensatory damages where the plaintiff's sole evidence of damages is his or her own testimony of subjective injuries."  *Id.*  Lt. McFadden's testimony was not, however, the "sole evidence of damages," and there is no reasonable way of listening to all the evidence and reaching the conclusion that $2.00 suffices.

Indeed, there was barely any "conflicting evidence as to Plaintiff's mental anguish and its cause," *Bresser v. Total Quality Logistics, Inc.*, No. 1:12CV720, 2015 WL 3608989, at *2 (S.D. Ohio Apr. 14, 2015), and, most importantly, there was no evidence that Lt. McFadden suffered nothing.  A weight assessment or credibility determination on the evidence before the jury that she and her husband exaggerated her emotional distress and mental anguish from being the victim of discrimination and retaliation or ignored her own negligence in lifting too many heavy vests might

have justified a low damages award, but the evidence does not come close to justifying the unfair $2.00 award.

The jury was properly instructed on the scope of damages, but it deviated from those instructions. "The injury in civil rights cases may be intangible. . . . It need not be financial or physical but may include damages for humiliation and emotional distress." *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985). Unlike the $552,000 emotional distress damages award remitted in *Akouri v. State of Fla. Dept. of Transp.*, 408 F.3d 1338, 1345, n. 5 (11th Cir. 2005) (emphasis in original), where the plaintiff "failed to show *any* evidence regarding emotional distress," Lt. McFadden offered sufficient evidence. Considering humiliation alone, how could a Lieutenant assigned to menial tasks in the Property Room not be profoundly humiliated? Retaliation arises from resentment and leads to revenge. The City humiliated Lt. McFadden on purpose.[2]

Even the lowest level of emotional distress, described as "garden variety," has been awarded actual, rather than nominal, damages. "'Garden variety' emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $5,000 to $35,000 awards." *Munson v. Diamond,* 15-CV-0425, 2017 WL 4863096 at *8 (S.D.N.Y. June 1, 2017) (internal quotation marks omitted), *report and recommendation adopted*, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017); *Antoine v. Brooklyn Maids 26, Inc.,* No. 19-CV-5676, 2020 WL 5752186, at *16 (E.D.N.Y. Sept. 26, 2020) ("For 'garden-variety' emotional distress claims, where plaintiff 'did not seek medical treatment but [ ] the evidence in the form of plaintiff's

---

[2] "Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his race or color." S. Rep. No. 872, 88th Cong., 2d Sess., 16 (1964). "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005).

testimony describes shock, nightmares, sleeplessness, humiliation, and other subjective distress,' courts have awarded damages ranging from $5,000 to $35,000.") (citations omitted); *Perez v. Jasper Trading, Inc.*, 05-CV-1725, 2007 WL 4441062 at *9 (E.D.N.Y. Dec. 17, 2007) (emotional distress claims in the employment context where the evidence of emotional distress "consists of plaintiff's own testimony describing the emotional distress, with little or no supporting medical evidence" usually warrant awards of $5,000 to $30,000).

Courts have repeatedly held that a plaintiff may prove emotional distress and mental anguish **without submitting medical evidence**.  *See, e.g., Barrow v. City of Cleveland*, 773 Fed. Appx. 254, 265 (6th Cir. 2019); *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 472 (6th Cir. 2009) ("[M]edical evidence is not necessary in order for a plaintiff to be compensated for emotional distress."); *Moorer v. Baptist Memorial Health Care System,* 398 F.3d 469, 485 (6th Cir. 2005) (plaintiff's own testimony and circumstances of case); *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 488 (5th Cir. 2001) (approving $150,000 award for emotional distress based solely on lay testimony); *Miller,* 14 Fed. Appx. at 466–67 (emotional distress award of $300,000 for a plaintiff who provided no medical evidence but claimed to have sleepless nights and stomach problems was not excessive); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996); *Moody v. Pepsi–Cola Metro. Bottling Co.,* 915 F.2d 201, 210 (6th Cir.1990).  *See also Carey v. Piphus*, 435 U.S. 247, 263–64 (1978) ("Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff.").

Congress provided in 42 U.S.C. § 1981a(3) for a range of damages for Title VII violations, and, as a large governmental employer, the City was susceptible to the highest level, $300,000, while constitutional violations prosecuted under 42 U.S.C. § 1983 lack any ceiling.  The statute incorporated by Title VII explicitly refers to "emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(3). Under 42 U.S.C. § 1983, damages include "personal humiliation . . . and mental anguish and suffering." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986).

>    **2.    The Damages Award Reeks of Dislike for Lt. McFadden that Was Nurtured by "Background Evidence" the Jury Could Not Fairly Consider in Making that Award.**

The City unloaded on Lt. McFadden to demonstrate that she deserved to be investigated, had to be isolated, and lacked the leadership style, personality, or temperament to be permitted to remain in the field during the investigation. The City ***utterly failed*** through any of its negative evidence to explain persuasively why it treated her differently from other officers who had allegedly engaged in contemptible conduct or assigned her to menial tasks inconsistent with her rank, knowledge, and experience. The jury's finding of discrimination and retaliation rejected the City's pretextual explanations.

*Heard v. Finco*, 930 F.3d 772, 775 (6th Cir. 2019), described testimony from inmates, their medical records, and the harm they suffered by being deprived of religious freedom. "The jury weighed all this evidence and concluded that each inmate suffered $150 worth of harm for each Ramadan the prison officials disrupted." Appeal from denial of new trial on damages was unsuccessful because "[t]he district court had no good reason to second-guess this determination, and neither do we." *Id.* The good reason missing there is present here: the City's tactic of character assassination worked, the jury disliked Lt. McFadden and insulted her with a $2.00 verdict. That was blatantly unfair.

Rather than limit the City's "background evidence" to a liability merits use about why instead of discrimination or retaliation, Lt. McFadden was assigned temporarily to the Property

Room, the jury spilled over that evidence to use in calculating damages. She was painted to be unworthy of its respect, and they valued her damages accordingly.

The new trial ordered on remand in *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 805 (6th Cir. 2018), began with the jury's province: "This is not to suggest that a jury is precluded from making credibility determinations when assessing damages in a discrimination case." The Court gave an example: cross-examination showing that the plaintiff had failed to use reasonable diligence in seeking employment and thereby mitigating a backpay amount. *Id.* (citation omitted). Then, the Court distinguished the trial there because "the defendant here did not controvert or undermine Pittington's testimony with regard to damages." *Id.*

Rather than a credibility determination, the jury was improperly instructed about the burden of proof on mitigation: the employer, not the plaintiff, had to prove unreasonable diligence. *Id.* The jury here did not follow instructions on what claims were before it and how damages should be calculated. The $2.00 award was based on evidence that the jury should not have used for that purpose.

Nor were there circumstances that the jury "quite reasonably perceived to be a happy ending" justifying pain and suffering damages of $2,000. *Davidson*, 2017 WL 3422072, at *3 (painful rehabilitation, but good result from surgery, got along without using right hand during rehabilitation; praised surgeon and on-the-job supervisor). Neither weight assessment nor credibility determination explain the $2.00.

### B.  A New Trial on Liability Is Unnecessary.

New trials confined to damages are appropriate when the liability verdict is "conceptually distinct" from the issue of damages. *See, e.g., Crockett v. Long Island R.R.*, 65 F.3d 274, 279 (2nd Cir. 1995). So long as "the error infecting the damages award [was] entirely separable from the

underlying finding of liability, . . . retrial of damages alone [will be] appropriate." *Banks v. Travelers Cos.*, 180 F.3d 358, 364 (2nd Cir. 1999).

How much Lt. McFadden should be awarded for being the victim of discrimination and retaliation focuses on her reaction to that experience and the injury proximately caused by the discrimination and retaliation. Had an excessive damages award been made, the Court would have ordered remittitur or, in the alternative, a new trial. The City's right to a jury under the Seventh Amendment to the United States Constitution blocks the remedy of additur for a patently inadequate damages award. *Dimick v. Schiedt*, 293 U.S. 474, 482 (1935) ("[T]he established practice and the rule of the common law, as it existed in England at the time of the adoption of the Constitution, forbade the court to increase the amount of damages awarded by a jury in actions such as that here under consideration."). Consequently, a new trial on damages is the only available remedy.[3]

None of the "background evidence" submitted by the City about the reasons for investigating Lt. McFadden, denouncing her leadership style, or deeming her litigious would be admitted at a new trial on damages only. The jury would be instructed that they must accept as established that the City discriminated and retaliated against Lt. McFadden and may only determine whether she sustained any injuries because of that discrimination or retaliation and the amount of damages, if any, for those injuries. A two-day trial would likely suffice.

## IV.  <u>Conclusion</u>

The damages award was a surprise to everyone outside the jury box. The findings of discrimination and retaliation were anticipated because the evidence demonstrated differential

---

[3] Additur may only be indirectly done, for example, "when the parties would prefer to consent to an increased damages figure rather than proceed to a new trial as to damages" or the damages amount is definite and incontrovertible. *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 806 (6th Cir. 2018) (citations omitted).

treatment of similarly situated officers when they were under investigation and assignment of menial tasks flatly inconsistent with Lt. McFadden's rank, experience, knowledge.  But the dollar award on each finding was a shock.

Reconstructing where the jury went astray can be done with certainty on at least the emotional distress and mental anguish Lt. McFadden suffered and with probability on the shoulder jury.  The jury disregarded jury instructions and instead acted out of antipathy towards Lt. McFadden, a feeling nurtured by the relentless attack through "background evidence" that did not join the only issues left for trial: whether she was treated differently because of her race and/or her constitutionally and statutorily protected sincere opposition to discrimination she sincerely perceived had occurred.

The jury instructions did not free the jury to consider whether Lt. McFadden deserved to be charged with EEO violations or had a likeable management style.  To the jury's credit, its findings of liability maintained the proper focus.  To its discredit, its award of damages was tainted by "background evidence" that made her appear unworthy of an award consistent with the unrefuted evidence.  A new trial on damages should, therefore, be granted.

Respectfully submitted,

By: */s/ Samuel M. Schlein*
Samuel M. Schlein (0092194)
*(sschlein@marshallforman.com)*
John S. Marshall (0015160)
*(jmarshall@marshallforman.com)*
Edward R. Forman (0076651)
*(eforman@marshallforman.com)*
Helen M. Robinson (0097070)
*(hrobinson@marshallforman.com)*
Madeline J. Rettig (0098816)
*(mrettig@marshallforman.com)*
MARSHALL FORMAN AND SCHLEIN LLC
250 Civic Center Dr., Suite 480

**OF COUNSEL:**
Louis A. Jacobs (002101)
*(LAJOhio@aol.com)*
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-9007

Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was filed with the Court on this 27 day of

June, 2022, using the CM/ECF system, which will send notification of such filing to all counsel

of record. Parties may access this filing through the court's filing system.

By: */s/ Samuel M. Schlein*
Samuel M. Schlein (0092194)