**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA McFADDEN, | : | |
| | : | **Civil Action No. 2:18-cv-544** |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE: SARGUS |
| | : | MAGISTRATE JUDGE: JOLSON |
| CITY OF COLUMBUS, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF MELISSA McFADDEN'S REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR NEW TRIAL ON DAMAGES ONLY**

**I  Summary**

The opposition from Defendant City of Columbus ("Defendant" or "City") highlights evidence from which a reasonable jury could conclude that Plaintiff Lieutenant Melissa McFadden ("Lt. McFadden") suffered no economic injury because of its discrimination and retaliation. The opposition omits, however, evidence about her physical injury and humiliation and instead directs the Court to other stressors in her life and activities that she enjoyed, including focusing on events years after her reassignment. Lt. McFadden took the bar for the first time in February 2019, her son moved to Arizona in November 2018, and Lt. McFadden moved and wrote her book in 2020, well after the trauma of the illegal reassignment. The question posed by her motion for a new trial is whether a reasonable jury could have ignored evidence about her physical injury and humiliation, nearly all corroborated and left unrebutted, and concluded that her damages were capped at a dollar per count.

Completely missing from the City's opposition is a response to the character assassination she alleged it committed. By emphasizing her personality, leadership style, and different

1

approaches, the City convinced the jury to make only a nominal damages award. The City's one rejoinder is that the leaders of the police department lacked any intent to injure Lt. McFadden. On the evidence, argument, and instructions, though, the finding of discrimination and retaliation rested firmly on the proposition that she was reassigned to menial, physical tasks in the Property Room and by that decision intentionally discriminated and retaliated against her. To paraphrase the Bard,[1] was there any evidence a reasonable jury could find that Lt. McFadden was immune to humiliation or invulnerable to suffering from being a victim of discrimination and retaliation? The testimony and documents demonstrated that she was neither immune nor invulnerable and, therefore, non-nominal damages should have been awarded.

## II. Evidence, Arguments, and Instructions at Trial

### A. Lt. McFadden's Physical Injury and Its Cause Were Overwhelmingly Proven.

The City argues that Lt. McFadden's shoulder injury was not caused by its illegally reassigning her to the Property Room. However, the City misrepresents what the jury actually found. The City says that Chief Jacobs and Deputy Chief Kuebler had no idea what she would be doing or how she would be doing it. That is simply not so.

The Jury Instructions inform the jury that the question about liability hangs on whether it was illegal for the City to "reassign Lt. McFadden to the property room *to disassemble vests*." (emphasis added) (See Doc # 106 generally). The Jury was well aware that the City assigned Lt. McFadden to engage in physical labor while in the property room.

---

[1] W. Shakespeare, THE MERCHANT OF VENICE, act 3, sc. 1 ("Hath not a Jew eyes? Hath not a Jew hands, organs, dimensions, senses, affections, passions? Fed with the same food, hurt with the same weapons, subject to the same diseases, healed by the same means, warmed and cooled by the same winter and summer, as a Christian is? If you prick us, do we not bleed? If you tickle us, do we not laugh?").

Furthermore, Lt. McFadden put on evidence through exhibits and testimony that she disassembled more than 1,000 vests and went into graphic detail about how she was injured. On June 5, 2017, Lt. McFadden testified that she was "stacking the vests on the desk" and "went to pull them over" and she "pulled with my right and I'm left-handed, but I pulled with my right hand to pull them over and I felt a little strain in my shoulder, but I didn't think much of on it, you know So I picked up the stack and I put it in the basket, and that's when I hurt heard my shoulder. It was really -- it was a sharp pain in my shoulder, and I hurt my shoulder." (Day two trial transcript 144:19-145:9) Lt. McFadden described the feeling when she tried to lift the stack of vests: "I just felt a sharp pain in my shoulder, and then I couldn't move my arm above here, above this. Every time I moved my arm up, it would hurt." (*Id*. at 146:14-20) Lt. McFadden explained that how she was moving the vests on June 5, 2017, was the same way that she had done in the months prior to her injury, and that she had never had an issue before. (*Id*. at 145: 10-14)

After feeling the sharp pain, Lt. McFadden sought medical treatment on June 6, 2017. Lt. McFadden saw Dr. Steven Altic at Grandview Family Practice who ordered an X-ray and MRI on her shoulder. Lt. McFadden was then diagnosed with a torn rotator cuff and herniated discs in her neck. (Day two trial transcript 147:3-15) Lt. McFadden described the pain of the injury in the first few days as "8 out of the 10 being the worst." (*Id.* at 148:1) Lt. McFadden started treating with therapy for the injury and was prescribed "tramadol for pain medicine. I did electric stimulation, acupuncture. I did physical therapy with exercise band, massage therapy. And then I eventually got a cortisone shot in my shoulder." (*Id*. at 148:7-10)

Lt. McFadden had to treat for the injury for nearly a year and a half before she was able to return to work. At the outset of the injury Lt. McFadden "was in therapy three days a week, and maintaining therapy helped with the pain ... just therapy was helping me a lot." (Day two trial

3

transcript: 148:17-20) Lt. McFadden continued going to physical therapy in person from the time of her injury until the Covid pandemic in early 2020, at that point she continued to do therapy exercises at home and "massaging my neck and shoulder I do at-home exercises that they taught me that's how I maintain." (*Id* at 151:21-24) Lt. McFadden testified that she still experiences pain in her neck and shoulder because of the injury, but that as long as she maintains her exercise and massage routine, she is able to work and function normally. (*Id*. at 151:24-152:6)

The City points to no evidence that Lt. McFadden was not injured in exactly the way she described. The City did not question Lt. McFadden about her medical records, did not ask her to submit to an independent medical evaluation, did not accuse her of confabulation or faking her injury or the seriousness of it, nor did the City contest that lifting vests was the reason she was hurt. Rather, she was asked a handful of questions about if she was told to lift a specific number of vests at a time. The idea that Lt. McFadden was not injured as a result of being reassigned to the property room *to dissemble vests* holds no water.

In addition to this argument, the City attempts to show that Lt. McFadden did not dissemble many vests based on the testimony of Commander Gardner who stated that Lt. McFadden only processed 16-20 vests. The City ignores the notebook pages showing hundreds of vests processed by Lt. McFadden, or the photographs of vests processed by Lt. McFadden, which by Commander Gardner's own admission showed hundreds of processed vests. But instead, they rely on Commander Gardner who saw Lt. McFadden on her phone twice in the same day several hours apart, without asking if she disassembled vests in between the times on the phone or asking how many vests she dissembled on days he did not visit her. This argument that Lt. McFadden only processed a handful of vests is unsupported by the manifest weight of the evidence.

4

Lt. McFadden informed the jury that she was not offered any real training on how to perform the task of disassembling the vests. Lt. McFadden testified that she was not trained on "any particular method of doing this in terms of moving the panel" nor was Lt. McFadden given "any direction about how much to lift or not lift." In fact, "other than the direction of you need to try to get 100 [vests] a day done" and a civilian clerk "showing [her[ how to take it apart" Lt. McFadden was provided no guidance on this task. (Day two trial testimony 145:20-146:7)

The work that Lt. McFadden was assigned without training to do in the property room consisted of repetitive physical labor in disassembling vests. That work was not typical of what a patrol Lieutenant would be doing for the City. Chief Jacobs testified that "engaging in repetitive physical labor of the sort done with vest processing" would "not be her responsibility" and that Lt. McFadden would not be dealing with "any sort of body armor" in her day-to-day activities. (Day three trial testimony 55:13-19) Chief Jacobs explained that the physical nature of a patrol lieutenant at the Division consisted of "just getting out of the car, in and out of the cruiser to perform their patrol duties." A far cry from repetitive physical labor. (*Id*. at 55:21-24)

Commander Gardner agreed that the process of taking apart a vest was physical. He testified that taking apart a vest: "it was physical. As an officer, we take apart our ballistic vest once a week to wash them and put them into a clean carrier. But it is physical. I mean you have to unzip or pull Velcro apart." (Day four trial testimony 20:4-8)

### B. Regardless of Other Stressors in her Life, the Evidence Demonstrates that Lt. McFadden Suffered Cognizable Emotional Distress Because of Being a Victim of Discrimination and Retaliation.

Lt. McFadden presented compelling evidence about the humiliation and anguish she suffered based on the reassignment to the Property Room to perform menial, physical tasks. Her husband Charles McFadden testified that, when she was reassigned to the property room in March

5

2017, that she changed. Mr. McFadden explained "she was not happy to go to work at all . . . just very – just dejected and really focused on how she can get over this hump of being there, of being in the property room." (Day three trial transcript 86:7-10) Mr. McFadden talked about how he and Lt. McFadden's home life changed because of the reassignment, "well just all those things that we used to do, we stopped doing. We didn't go out as much. She wasn't interested in, you know, watching TV shows. Everything was about how she can prove that she hasn't done anything wrong." (*Id*. at 86:14-18) Mr. McFadden continued that the intimacy level in their marriage changed after the reassignment. "We just basically were as intimate as before; you know I guess the sex life was less. . . [she] seemed like she was in a different place. There wasn't much hugging, or you know cuddling or anything like that. Not [none] at all, but just a lot less. It was just a lot less." (*Id*. at 86:22-87:1) Mr. McFadden testified that in the time after the reassignment he and Lt. McFadden who normally enjoy going out to eat did not go out to eat often or "at all." (*Id* at 87:6-8).

Lt. McFadden testified, that because of the location of the stockroom in the Property Room, that other officers and employees would have to walk by her work area when they were entering the rear of the Property Room warehouse. Lt. McFadden told the jury that when these officers and employees would walk by her work area "they would smirk at me. They would smirk at me and would act like -- they would say, How is your day? They know good and well my day is not good because I'm in these crates. And it was so embarrassing that I didn't want to be there, because at any given moment they can come back and see me in these crates doing things that I shouldn't be doing as a lieutenant, or that I shouldn't be doing as an officer, anybody -- no officer should -- is required to do that, has ever been required to do that. (*Id*. at 145:1-25) Lt. McFadden continued

6

that she felt humiliated because she "felt like they were punishing me, and I was set as an example to the rest of the Division to see and humiliate." (*Id*. at 143:10-13)

Lt. McFadden's testimony that she felt like the City was punishing her was shared by Police Practices Expert Lou Reiter. Mr. Reiter testified that based on his 60-plus years of law enforcement experience and expertise that he found Lt. McFadden's reassignment to the property room to disassemble vests to be "demeaning." He continued that it would "transmit and tarnish her reputation as a manager, and in my opinion a reasonable person - - police employee would believe she was being punished for some reason." (Day two trial transcript 24:2-18)

Lt. McFadden was asked about how the property room reassignment affected her emotionally. She told the jury "It was humiliating to me because I was the only one ever assigned to the property room to do any kind of task like that It caused me undue stress. Already dealing with an issue of my life in general, and then to have this thrown on me, it was very stressful. It caused problems in my marriage, intimacy from my husband. I was withdrawn from society, didn't want to go anywhere. Very depressed" (*Id* at 167:1-9).

Lt. McFadden also sought extensive treatment. At first, she treated with Dr. Warren Bertner a psychologist. She "talked to him and just shared my stresses and frustrations, and he gave me different coping mechanisms to use to help me deal with the stress that I was going through." (*Id*. at 167:17-20) Lt. McFadden saw Dr. Bertner weekly from "immediately" after her reassignment in March of 2017 until his retirement in July 2018. After treating with Dr. Bertner, Lt. McFadden began treatment with psychologist Dr. John Tarpey in July 2018. She testified that treating with both Dr. Bertner and Dr. Tarpey was "very helpful" to her emotional distress. (*Id*. at 168:14-169:4)

Despite this testimony, the City seems to think that Lt. McFadden's reassignment to the Property Room was somehow of great value to her. The City points out that Lt. McFadden and her

7

husband moved into a nice new big house [and] sex life is better than ever before. (Doc # 117 PAGEID 7069). Yes, Mr. McFadden did testify that he and Lt. McFadden's life has improved in during the past five years. But the testimony at trial was clear that it was because years of necessary hard work—physical therapy, mental health treatment --and strength of character-- that got Lt. McFadden to a good place, more than five years after her reassignment.

Mr. McFadden testified on cross that the reassignment was Lt. McFadden's "main concern at the time right when that happened, when she was being moved. So, you know, there may have been some other stressors, but that was the main stressor." (Day three trial transcript 104:23-25) Mr. McFadden continued that the Property Room reassignment stress was different from other stresses that Lt. McFadden was facing "she handled stress well. I mean there's the being removed from where you're – where she was used to being[to the property room]. And I mean there's other stressors, but there's not – were able to separate that." (*Id*. at 109 8-11) Mr. McFadden answered "no" in response to the City's question "there were some [events] that were even more stressful than being assigned to the property room, correct?" (*Id*. at 109:15-17)

While the City attempts to argue that Lt. McFadden had so many other stressors in her life that the reassignment to the Property Room was not a compensable one, that is defeated by the unrebutted evidence of Mr. McFadden who said it was a separate and more serious stressor. Her motion seeks a new trial because no reasonable jury could discount to two dollars the evidence before it. Absent character assassination, the City might have convinced the jury that not all her emotional distress was compensable, but the jury lost its way in essentially negating all of her testimony and that of her expert on a record where the City did not rebut testimony that she suffered *some* emotional distress and would have been humiliated.

8

Finally, the City makes the case that the Property Room assignment was not distressing to Lt. McFadden because she applied to work in the Property Room upon her return from injury leave. This argument must fail. Lt. McFadden, Commander Gardner, and Lou Reiter all testified that the role of the Property Room lieutenant for which Lt. McFadden applied was apples and oranges different than what she was illegally assigned to do. Lt. McFadden applied for an administrative position after her return, not repetitive physical labor.

Much like with her physical injury the City did not ask Lt. McFadden to submit to a medical or psychological evaluation. It did nothing to show that Lt. McFadden did not suffer from her reassignment. Rather, it is apparent that the City knew that if it could paint a negative picture of Lt. McFadden's character, using the e-mails and testimony of Tate, Moorefield, and Johnson that the Jury would ignore all that happened to Lt. McFadden and award her nominal damages. The statements effectively prejudiced the Jury who did just that.

### C. **Any Conclusion that Police Supervisors Lacked an Intent to Punish Unreasonably Conflicts with Jury Findings on Discrimination and Retaliation.**

The City argues that Lt. McFadden was awarded nominal damages because the jury somehow found that the City did not mean to punish her when reassigning her to the Property Room to dissemble vests. This argument was clearly rejected by the jury when it found in Lt. McFadden's favor.

In Jury Instruction Number 17, the Court instructed the jury that "Lt. McFadden claims that the City violated these laws when it reassigned her to the property room to disassemble vests. She contends, *specifically, that her reassignment was meant to punish* her for openly opposing employment practices which she sincerely and reasonably believed were racially discriminatory" (Doc # 106 PAGEID 5764) (emphasis added). By finding for Lt. McFadden on the retaliation claim, the jury specifically found that the City did in fact punish her for engaging in protected

9

activity. The City's attempts to rehabilitate its illegal actions by using Chief Jacobs' rejected testimony must fail.

### III. Conclusion

The City's plan in the trial of this case is clear. Knowing that the evidence of how comparable white officers were treated was irrefutable and that the assignment they made for Lt. McFadden indefensibly retaliatory, they went the character assassination route: Use the e-mails sent by Moorefield, Johnson, and Tate, to smear Lt. McFadden with those words, over and over again. While some of that background evidence was proper, Lt. McFadden more than once at trial objected to the manner and extent of its use. For the most part, those objections were overruled.

As to damages, the City did little before or during trial to attack her damages testimony—perhaps thinking that the jury would never reach that question because they had so tarnished her. The City was both right and wrong. The jury was able to see enough through the transparent attempts at character assassination against Lt. McFadden and found in her favor on liability. However, the City was successful in so damaging Lt. McFadden in the eyes of the jury that it decided not to award her significant damages. The only reasonable and just next step is to allow Lt. McFadden a new trial on damages where she can present evidence of her suffering both physically and emotionally without suffering an assault on her character.

Respectfully submitted,

By: */s/ Samuel M. Schlein*
Samuel M. Schlein (0092194)
*(sschlein@marshallforman.com)*
John S. Marshall (0015160)
*(jmarshall@marshallforman.com)*
Edward R. Forman (0076651)
*(eforman@marshallforman.com)*
Helen M. Robinson (0097070)
*(hrobinson@marshallforman.com)*
Madeline J. Rettig (0098816)

**OF COUNSEL:**
Louis A. Jacobs (002101)
*(LAJOhio@aol.com)*
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255

10

Fax (510) 250-9007

*(mrettig@marshallforman.com)*
MARSHALL FORMAN AND SCHLEIN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

### CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was filed with the Court on this 20 day of July, 2022, using the CM/ECF system, which will send notification of such filing to all counsel of record. Parties may access this filing through the court's filing system.

By: */s/ Samuel M. Schlein*
Samuel M. Schlein (0092194)